## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:22-cv-11009-RGS

LYNNEL COX, as administrator of the estate
of Shayne R. Stilphen,

          Plaintiff,

v.

BOSTON POLICE DEPARTMENT, ISMAEL
ALMEIDA, PAULMICHAEL BERTOCCHI,
CATIA FREIRE, and JOHN/JANE DOES
NOS. 1–2,

          Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS PAULMICHAEL BERTOCCHI AND CATIA FREIRE'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)

Officers Paulmichael Bertocchi and Catia Freire submit this memorandum of law in support of their motion to dismiss the Complaint of Plaintiff Lynnel Cox ("Plaintiff"). The Complaint alleges that Plaintiff's son Shayne Stilphen ("the decedent") died as the result of a drug overdose while in police custody on the morning of July 14, 2019. According to the Complaint, Officers Bertocchi and Freire were responsible for booking the decedent at the D4 police station following his arrest for breaking into a car. After the booking process, the officers' last interaction with the decedent was placing him in a single-person cell. But the decedent did not die immediately – or even within one or two hours—of being placed in his cell. Rather, according to the Complaint, the decedent stopped breathing approximately three hours and sixteen minutes after he entered the cell, having slumped down into a motionless state roughly fifty-one minutes earlier. Further, the decedent became motionless immediately following a two-hour period in which he consumed drugs from a baggie that he had concealed in his shorts. The

Complaint fails to establish that Officers Bertocchi and Freire were aware of the decedent's consumption of drugs in his cell, or that the decedent showed signs of a serious medical need during booking.  For these reasons, the Complaint should be dismissed with respect to Officers Bertocchi and Freire.

## FACTUAL BACKGROUND

For the limited purposes of the instant motion, Officers Bertocchi and Freire accept the nonconclusory facts alleged in the Amended Complaint as true.

Around 1:00 AM on July 14, 2019, BPD officers stopped the decedent in the Mass and Cass area at 666 Massachusetts Avenue because he matched the description of an individual who had allegedly broken into a car.  Complaint, at ¶ 45.  Officers at the scene included defendant Officers Freire and Bertocchi, as well as Officer Kevin Butcher, Officer Sean Doolan, Officer Kevin Zarnoch, Officer William Dick, Officer Mitchell Logan Gampon, Officer Timothy Lenane, and Sergeant Brian McManus.  Id.  The Complaint alleges, on information and belief, that Officer Doolan had previously interacted with the decedent during earlier periods of incarceration and was aware that he had a history of opioid use.  Id. at ¶ 46.  Officer Bertocchi also believed that the decedent "appeared" to have the "tendencies" of someone who used drugs.  Id. at ¶ 47.  On information and belief, the decedent told Officer Doolan during his arrest on July 14, 2019, that he had ingested opioids about thirty minutes earlier and that he had recently left a detoxification treatment center.  Id. at ¶ 48.  According to the Complaint, the dangerous effects of an opioid on the human body can become greater over a period of many hours.  Id. at ¶ 49.

On July 14, 2019, Officers Freire and Bertocchi, along with Officer Ismael Almeida, worked a shift at District 4 station.  Id. at ¶ 50.  During that shift, these officers were responsible for the safe custody of all incarcerated people under their care.  Id.  Officers Zarnoch and Freire

brought the decedent to the District 4 station at approximately 1:28 AM and put him in a group holding cell for approximately half an hour before booking.  Id. at ¶ 51.  In the group holding cell, the decedent swayed side-to-side while talking with Officer Bertocchi and another officer. Id. at ¶ 52.  The officers watched as the decedent took off his socks and turned them inside out; the decedent also showed the officers the inside of his mouth.  Id.  Another officer later searched the decedent's mouth with a flashlight.  Id.

At approximately 1:52AM, the decedent slumped forward over his legs, his head hanging low beyond his knees.  Id. at ¶ 53.  About a minute later, Officer Bertocchi entered the cell while the decedent was still in this contorted position.  Id. at ¶ 54.  The decedent straightened up and took a carton of milk from Officer Bertocchi, who soon left the group holding cell.  Id.  At approximately 1:55 AM, the decedent again slumped forward with his head dropping past his knees.  Id. at ¶ 55.

Officer Zarnoch escorted the decedent from the group holding cell to the station's booking area at approximately 1:58 AM.  Id. at ¶ 56.  Officer Almeida worked as the booking officer on July 14, 2019.  Id. at ¶ 57.  Officers Freire and Bertocchi assisted Officer Almeida with the decedent's booking process.  Id. at ¶ 58.  According to the Complaint, Officer Bertocchi thought it was common for people arrested in the area where the decedent was arrested to have tendencies of people who use drugs.  Id.

District 4's booking area is subject to video surveillance and recording.  Id. at ¶ 59. According to the Complaint, the decedent showed obvious signs of over-intoxication, as his body

contorted into unnatural positions and he struggled to stay awake and stand on his own throughout the twenty-three minute booking process.[1]  Id.

According to the Complaint, in a five-minute period during the decedent's booking process, Officers Bertocchi and Freire had to help him stand a total of seven times.  Id. at ¶ 60. Officer Bertocchi repeatedly had to put his hand on the decedent's back; when this was not enough to help him stand, Officer Bertocchi ultimately had to hold the decedent's arm to ensure that he remained upright and tap the decedent to try to keep him awake.  Id.  Even after these interventions, the decedent still could not remain steady on his feet, and Officers Bertocchi and Freire once again placed their arms on his back to help him stand.  Id. at ¶ 61.  While Officer Bertochi physical moved the decedent's hand during the fingerprinting process, Officer Freire had to place her hand on the decedent's back to help him remain standing.  Id.  The Complaint alleges that the decedent could not stand while having his booking photos taken; he leaned against the wall and began to slump down numerous times, while Officers Bertocchi and Freire stood and watched.  Id. at ¶ 62.  Shortly after the photos were taken, Officer Bertocchi completed a quick search of the decedent: he patted down the outside of the decedent's clothing, slid his finger under the band of his shorts, and shook the back pockets of his shorts.  Id. at ¶ 63.

The Complaint alleges that any reasonable person would have recognized the decedent's urgent need for medical attention in light of these symptoms, but the individual defendants did not request that a doctor, nurse, or emergency medical technician come to the station for a

---

[1] The Factual Background section reproduces Plaintiff's allegations about the booking process, which are drawn almost entirely from surveillance video at the police station, as they appear in the Complaint.  At the same time, Officers Bertocchi and Freire contend that these allegations contain several speculative or unfounded claims and leave out other features of the booking process that undermine the Complaint's conclusions regarding the decedent's need for medical attention.  See Part I.B of the Argument section, infra.

medical evaluation, transport the decedent to the hospital for medical treatment, or provide medical care themselves. Id. at ¶ 64.

Once booking was completed, Officers Bertocchi and Freire took the decedent to a single-person cell. Id. at ¶ 65. Almost immediately after he was locked in the cell, and while Officers Bertocchi, Freire, and another unidentified officer remained directly outside, the decedent slumped over his legs with his arms bent awkwardly behind him in an unnatural position. Id. at ¶ 66. According to the Complaint, any reasonable person who viewed the decedent in this position would understood that he urgently needed medical attention. Id. at ¶ 67. But the Defendant Officers ignored these signs of medical distress, and left the decedent alone in his cell. Id. The Complaint alleges that for the next several hours, the decedent should have been clearly visible to officers both through the surveillance video of his cell, which streamed into the booking area, and physical monitoring of his cell, where officers periodically walked by. Id. at ¶¶ 68, 70.

At approximately 2:33 AM, roughly ten minutes after being placed in the cell, the decedent retrieved a baggie—later revealed to contain drugs—from his shorts. Id. at ¶ 69. Soon thereafter, he began to ingest drugs from the baggie, and continued to do so periodically for the next two hours, appearing to temporarily lose consciousness at different points in between ingestion. Id. The person detained in the cell across the hall from the decedent reported that he saw him ingesting drugs and stated, "it looked like he had been doing it for a while." Id. at ¶ 70.

At approximately 4:42 AM, the decedent appeared to ingest drugs for the last time. Id. at ¶ 72. For the next six minutes, the decedent's body periodically jerked as he tried to remain upright. Id. at ¶ 73. The Complaint alleges that at approximately 4:48 AM, the decedent slumped forward, his limp torso awkwardly folding over his crossed legs. Id.

According to the Complaint, between 4:48 AM and 5:39 AM, the decedent remained in this exact same position of distress.  Id. at ¶ 74.  During those 51 minutes, officers walked by his cell seven times, and his cell was subject to continuous video surveillance.  Id. at ¶ 75.  But no officer entered the decedent's cell, attempted to rouse him, sought outside medical treatment, or provided medical care themselves.  Id.  Officer Almeida walked by the decedent's cell at approximately 4:55 AM, 5:05 AM, and 5:10 AM.  Id. at ¶ 76.  Two unidentified officers walked by the decedent's cell at approximately 5:20 AM.  Id. at ¶ 77.  Officer Almeida walked back and forth by the decedent's cell at 5:35 AM.  Id. at ¶ 78.  At approximately 5:39 AM, an unidentified officer dropped food through the slot in the decedent's door.  Id. at ¶ 79.  According to BPD's investigation, the decedent took his last breath at this exact moment—5:39 AM.  Id. at ¶ 80.

At approximately 5:51 AM, it was time to walk by the cells again.  Id. at ¶ 81.  Because the booking officers were occupied with another detainee, Officer Doolan filled in for Officer Almeida to conduct the walkthrough.  Id. at ¶ 81.  Officer Doolan reported that as he walked by the decedent's cell, he observed him "in a position that looked as if it would be of extreme discomfort for most individuals."  Id. at ¶ 82.  Officer Doolan kicked the cell door and yelled out the decedent's name.  Id. at ¶ 83.  When Officer Doolan did not receive a response, he called Officer Almeida to open the cell.  Id. Officer Doolan reported that when he and Officer Almeida entered the cell, they "immediately noticed [the decedent] to be unresponsive" and noted that his "body was limp and appeared rained of color."  Id. at ¶ 83.

Officer Almeida began CPR, and Officer Doolan attempted to administer Narcan but appeared on video to struggle to administer it.  Id. at ¶ 85.  Officer Doolan threw the dose to the floor and an officer ran to retrieve more.  Id.  During this time, Officer Bertocchi took over administering CPR to the decedent.  Id. The officers administered at least two additional doses of

Narcan while waiting for Boston EMS to arrive.  Id.  According to the Complaint, by the time

BPD intervened, it was too late to successfully reverse the decedent's overdose.  Id. at ¶ 86.  His

heart had stopped beating.  Id. at ¶ 86.  Boston EMS arrived approximately five minutes after the

officers entered the decedent's cell.  Id. at ¶ 87.  EMS took over the medical efforts, using an

automated external defibrillator ("AED") and starting an IV to administer epinephrine.  Id.

These efforts induced the decedent to briefly regain a pulse, but they did not save his life.  Id.

EMS took the decedent to Tufts Medical Center in an ambulance.  Id.  Either on the way to or

soon arriving at Tufts, the decedent went back into cardiac arrest.  Id.  At the time of his death,

the decedent was in BPD custody.  Id. at ¶ 88.  The medical examiner concluded that the

decedent's cause of death was an accidental overdose.  Id. at ¶ 89.

## STANDARD OF REVIEW

A complaint or count therein must be dismissed where it fails to state a claim upon which

relief can be granted.  See Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss, the Court

is obliged to accept the Plaintiff's well-pleaded facts as they appear, granting every reasonable

inference in their favor.  See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).

However, this tenet does not apply to legal conclusions.  See Ashcroft v. Iqbal, 556 U.S. 662,

664 (2009).  This court also need not credit "subjective characterizations, optimistic predictions,

or problematic suppositions."  United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992).

"Empirically unverifiable conclusions, not logically compelled, or at least supported, by the

stated facts, deserve no deference."  Id. (internal quotation omitted).

For medical treatment of a pretrial detainee to offend the Fourteenth Amendment of the

Constitution, "the care 'must involve acts or omissions sufficiently harmful to evidence

deliberate indifference to serious medical needs.'"  Brace v. Massachusetts, 673 F. Supp. 2d 36,

40 (D. Mass. 2009) (quoting <u>Feeney v. Corr. Med. Servs., Inc</u>., 464 F.3d 158, 161 (1st Cir. 2006)).  To prove a Fourteenth Amendment violation, a plaintiff must show: (1) that there was a serious medical need; (2) and that officers exhibited deliberate indifference to this medical need. <u>See</u> <u>Brace</u>, 673 F. Supp. 2d at 40 (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994)).  "A 'serious medical need' is one 'that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" <u>Mahan v. Plymouth County House of Corrections</u>, 64 F.3d 14, 18 (1st Cir. 1995) (quoting <u>Gaudreault v. Municipality of Salem</u>, 923 F.2d 203, 208 (1st Cir. 1990)).  With respect to the second element, a showing of deliberate indifference "requires more than mere inadvertence or negligence.  Rather, a plaintiff must establish that the officer was aware of a substantial risk of serious harm which he intentionally disregarded." <u>Turkowitz v. Town of Provincetown</u>, 914 F. Supp. 2d 62, 71 (D. Mass. 2012) (citing <u>Brace</u>, 673 F. Supp. 2d at 41). "To establish deliberate indifference, the plaintiff must prove that the officers 'had a culpable state of mind and intended wantonly to inflict pain.'" <u>LaFrenier v. Kinirey</u>, 478 F. Supp. 2d 126, 140 (D. Mass. 2007) (quoting <u>DesRosiers v. Moran</u>, 949 F.2d 15, 19 (1st Cir. 1991)).

## ARGUMENT

I.   **The Complaint fails to state Fourteenth Amendment claims against Officers Bertocchi and Freire because the well-pleaded allegations in the Complaint, in combination with the surveillance video of the booking process, do not establish that the officers exhibited deliberate indifference to the decedent's medical need.**

A.   **Where the decedent died more than three hours after his last interaction with Officers Bertocchi and Freire, and consumed drugs from a concealed baggie over a two-hour period in the interim, the Complaint fails to establish that the officers were aware of the risk of substantial harm that the decedent ultimately suffered.**

According to the timeline set forth in the Complaint, the decedent took his last breath three hours and sixteen minutes after Officers Bertocchi and Freire's last interaction with him. Moreover, the most pivotal events in the decedent's detainment at the D4 police station—his consumption of drugs from a baggie he had concealed in his shorts before he entered a motionless state—occurred in the interim.  Specifically, following the booking process, Officers Bertocchi and Freire placed the decedent in a single person cell around 2:23 AM.  See Complaint, at ¶¶ 65, 69.  At approximately 2:33 AM, roughly ten minutes after being placed in the cell, the decedent retrieved a baggie—later revealed to contain drugs—from his shorts.  Id. at ¶ 69.  Soon thereafter, he began to ingest drugs from the baggie, and continued to do so periodically for the next two hours, appearing to temporarily lose consciousness at different points in between ingestion.  Id.  The decedent appeared to consume drugs for the last time at 4:42 AM.  Id. at ¶ 72.  After his body jerked for six minutes, the decedent slumped forward at 4:48 AM, remaining in that position for the next 51 minutes.  Id. at ¶¶ 73–74, 80.  He took his last breath at 5:39 AM.  Id. at ¶ 80.

The Complaint offers no basis for inferring that Officers Bertocchi and Freire observed or were aware of the decedent's consumption of drugs in the single cell.  The Complaint alleges

9

that video surveillance of the decedent's cell was streaming into the booking area and asserts that

the decedent's consumption of drugs "should have been visible both on the surveillance footage

streaming into the booking area and from the hall outside Shayne's cell, where officers

periodically walked by throughout this time."  Id. at ¶¶ 68–70.  But any claim that Officers

Bertocchi and Freire were monitoring the surveillance footage—or even that they were

responsible for monitoring the footage—is unfounded speculation, as the Complaint

acknowledges that they were not the booking officer on the night of the decedent's arrest.  See

id. at ¶ 57.  Moreover, the Complaint is devoid of any allegations about the activities of Officers

Bertocchi and Freire following the decedent's placement in his cell.  The Complaint alleges that

officers walked by the decedent's cell seven times while he was in a motionless position, but

does not allege that Officers Bertocchi or Freire were among these officers.[2]  See id. at ¶¶ 75–80.

Given that the Complaint alleges that Officers Bertocchi and Freire were at the scene of the

decedent's arrest at 666 Massachusetts Avenue earlier that night, id. at ¶ 45, the more reasonable

inference to draw is that they were working in the field and would have returned there after

completing the decedent's booking.

While the Complaint adequately pleads that the decedent had a serious medical need at

some point on the morning of July 14, 2019, it fails to plead that Officers Bertocchi and Freire

were subjectively aware of the serious medical risk stemming from the decedent's ingestion of

drugs in the single person cell.  Such a deficiency may mean that the deliberate indifference

claims against Officers Bertocchi and Freire simply fail.  Cf. Jones v. Mathews, 2 F.4th 607, 614

(7th Cir. 2021) (correctional officer was not aware of risk of substantial harm of death to inmate

---

[2] The Complaint identifies Officer Bertocchi as one of the officers who administered CPR to the
decedent when he stopped breathing, Complaint, at ¶ 85, but does not otherwise provide
information about his activities following decedent's placement in the single-person cell.

from diphenhydramine toxicity due to inmate's ingestion of numerous pills that she smuggled into county jail, where there was no evidence that officer knew that inmate had smuggled pills into jail, as inmate had been strip searched and no contraband was found, and inmate's ingestion of the pills occurred hours after officer's shift ended).  At the very least, in order to show deliberate indifference on the part of Officers Bertocchi and Freire, the Complaint must state a claim that they were "aware of a substantial risk of serious harm which [they] intentionally disregarded" prior to his ingestion of drugs from the concealed baggie.

### B.  The Complaint fails to establish that Officers Bertocchi and Freire exhibited deliberate indifference to the decedent during the booking process.

The Complaint alleges that Officers Bertocchi and Freire displayed deliberate indifference to decedent's serious medical needs during the booking process, maintaining that "any reasonable person would have recognized [the decedent's] urgent need for medical attention in light of [the] symptoms" that he manifested prior to being placed in a single-person cell.  See Complaint, at ¶ 64.  But this speculative characterization of the decedent's condition and his "urgent need for medical attention" is belied by the fact that the decedent did not go into cardiac arrest until more than three hours after he was placed in the single-person cell, following a two-hour period in which he ingested drugs that he had secreted in a baggie.  Moreover, in describing the booking process, the Complaint relies on "subjective characterizations" and "unverifiable conclusions," AVX Corp., 962 F.2d at 115, to support its claim that the decedent "showed obvious signs of over-intoxication, as his body contorted into unnatural postures and he struggled to stay awake and stand on his own throughout the twenty-three-minute booking process."  See Complaint, at ¶ 59.  In particular, the Complaint's assertions such as the ones that Officers Bertocchi and Freire "placed their arms on [the decedent's] back to help him stand," that Officer Bertocchi "had to hold [the decedent's] arm to ensure that he remained upright and tap

[him] to try to keep him awake," or that the decedent "could not stand while having his booking photos taken," id. at ¶¶ 60–62, are tendentious, speculative, and need not be accepted by this Court.

Additionally, the Complaint's account of the decedent's booking process leaves out numerous details from the surveillance video[3] that undercut its claim that "any reasonable person would have recognized [the decedent's] urgent need for medical attention . . . ." See Complaint, at ¶ 64. Notably, the decedent walked unassisted and without stumbling from the sally port to the group holding cell, then to the booking area, and finally to his individual cell. See Ex. 1; Ex. 2, at 00:37–00:48, 27:47–27:48; Ex. 3, at 00:03–00:13, 22:49–22:55. In the group holding cell, the decedent took several steps backwards while handcuffed before taking a seat on the bench. See Ex. 2, at 00:37–00:48. He accepted a cup from Officer Bertocchi and drank its contents intermittently without spilling. See id. at 11:54–23:49. In the booking area, after an officer searched his shoes, the decedent put them back on his feet one at a time, first by standing on his left foot, then by standing on his right foot. See Ex. 3, at 04:30–04:42. While having his

---

[3] Officers Bertocchi and Freire have attached the surveillance video of the booking process as Exhibits 1–3 in support of the motion to dismiss. While courts do not normally consider documents that were not attached to the complaint or expressly incorporated therein when reviewing a motion to dismiss, narrow exceptions have been made for "documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). Such documents can include video or audio recordings whose authenticity is not in dispute. See Barrigas v. United States, No. 17-10232, 2018 WL 1244780, at *1 (D. Mass. Mar. 9, 2018) (because content of audio recording was central to dispute and referenced throughout complaint, court considered recording and transcripts in reviewing whether plaintiff plausibly stated claims). See also Speaker v. U.S. Dep't. of Health & Human Servs. Ctrs. For Disease Control & Prevention, 623 F.3d 1371, 1379–80 (11th Cir. 2010) (in ruling on motion to dismiss, court properly relied on videos that were not disputed and were central to plaintiff's claim); Eggleston v. Daniels, No. 15-11893, 2016 WL 4363013, at *4 n.4 (E.D. Mich. Aug. 16, 2016) (same regarding video recording of television show).

picture taken, the decedent removed his shirts and then a few minutes later put them back on, one at a time.  See id. at 17:36–17:41, 20:56–22:00.  At the conclusion of the booking process, the decedent appears to sign his name on a form.  See id. at 22:03–22:20.  Finally, throughout the booking process, he responded to officers' instructions and engaged officers in conversation. See Exs. 2, 3.

The Complaint also makes much of the posture that the decedent assumed when he was placed in the single-person cell.  The Complaint alleges that "almost immediately after he was locked in the cell, and while Officers Bertocchi, Freire, and [an unknown officer] remained directly outside, [the decedent] slumped over his legs with his arms bent awkwardly behind him in an unnatural position."  Complaint, at ¶ 66.  According to the Complaint, any reasonable person who viewed the decedent in this position would have understood that he urgently needed medical attention.  Id. at ¶ 67.  Yet the Complaint also states that the decedent entered a similar slumping position before the booking process.  Specifically, the Complaint alleges that while he was in a group holding cell, the decedent "slumped forward over his legs, his head hanging low beyond his knees."  Id. at ¶ 53.  About a minute later the decedent straightened up when Officer Bertocchi entered the cell to bring him a carton of milk.  See id. at ¶ 54.  A few minutes after that, the decedent again slumped forward with his head dropping past his knees.  Id. at ¶ 55.  The surveillance video then shows the decedent straightening up again before standing up and entering the booking area.  See Ex. 1, at 27:18–27:48.  Accordingly, a review of the surveillance video of the entire booking process shows that the decedent slumped down from time to time as if he was dozing off, but then quickly sat up when prompted or when he awoke.  Indeed, approximately ten minutes after being placed in the single-person cell, the decedent retrieved a baggie from his shorts, and began to consume drugs from the baggie.  Id. at ¶ 69.

In sum, the full surveillance video, from which the Complaint's description of the booking process is drawn, simply does not show that Officers Bertocchi and Freire could have been "aware of a substantial risk of serious harm which [they] intentionally disregarded." Turkowitz, 914 F. Supp. 2d at 71.  After arriving at the police station at around 1:30 AM, the decedent appeared to twice doze off in the holding cell, his head slumping down below his knees.  He swayed from side to side while speaking with officers and leaned against the wall while being photographed.  After being placed in the individual cell, the decedent's head slumped down below his knees again.  But these symptoms, even combined with the decedent's alleged admission that he had ingested opioids about thirty minutes before his arrest and that he had recently left a detoxification treatment center, Complaint, at ¶ 48, at most show that the decedent may have been under the influence of drugs at the time of booking.  The Complaint falls woefully short of pleading a claim that Officers Bertocchi and Freire exhibited deliberate indifference to a serious medical need of the decedent's such as an imminent risk of an overdose.

Blaine v. Louisville Metropolitan Government, 768 Fed. Appx. 515 (6th Cir. 2019), is instructive.  In that case, the estate of an arrestee who died of a drug overdose while in custody filed a deliberate indifference claim against the nurse who conducted a medical assessment of the arrestee upon his arrival at the jail.  Id. at 517.  Medical records indicated that the decedent was stumbling to the station, and that he stated he had drunk half a beer that day and takes two types of opioids for pain.  Id. at 518.  The decedent also had slurred speech, gave off a strong odor of alcohol, and appeared to fall asleep several times during his 18-minute assessment.  Id. However, the decedent's vital signs were normal and the nurse deemed him "alert and responsive."  Id. at 518–520.  The nurse referred the decedent to an observation cell and noted

that he should be monitored every eight hours; the decedent died of a drug overdose approximately four and a half hours later.  Id. at 520–521.

In affirming the district court's allowance of the nurse's motion for summary judgment, the Sixth Circuit observed that the nurse determined that the decedent's symptoms indicated that he was under the influence of alcohol.  Id. at 525.  Additionally, the court reasoned that even if the nurse suspected that there was a risk of drug *use* on the decedent's part, there was no evidence that she inferred that the suspected drug use created a substantial risk of drug *overdose*. Id.  The nurse's actions, the court observed, "demonstrate that the risk of harm [she] identified— alcohol intoxication (and perhaps potential drug use)—was not substantial or otherwise determinative of drug overdose."  Id.  Likewise, in this case, the decedent's symptoms prior to his consumption of the baggie of drugs, which are plain to see from the surveillance video, would not have given rise to an inference that he was at substantial risk of overdosing.  See also Tamez v. Mathey, 589 F.3d 764, 766, 770–771 (5th Cir. 2009) (affirming allowance of summary judgment motion on deliberate indifference claim filed by estate of pretrial detainee who died while in custody from acute cocaine intoxication when bag of cocaine that he swallowed before his arrest burst in his intestines because detectives and jailers were only told detainee needed medical clearance and that he had dilated pupils).  Where the Complaint and surveillance video fail to establish that Officers Bertocchi and Freire exhibited deliberate indifference to the decedent, the Fourteenth Amendment claims against them should be dismissed.

II.    **The wrongful death claims against Officers Bertocchi and Freire fail because the Complaint does not establish that any action on their part was the proximate cause of decedent's death.**

The Plaintiff brings wrongful death claims under G.L. c. 229, § 2, against the individual defendants, including Officers Bertocchi and Freire.  The statute provides for civil liability

against a "person who (1) by his negligence causes the death of a person, or (2) by willful, wanton or reckless act causes the death of a person under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted . . . ." G.L. c. 229, § 2.  "As in any negligence action, to state a claim for negligent causation of wrongful death, a plaintiff proceeding under this statute must show that the defendant owed a duty of care to the plaintiff, which duty the defendant breached, and that the breach was a proximate cause of the plaintiff's injury (i.e., the decedent's death)."  Estate of Halloran v. United States, 268 F. Supp. 2d 91, 94 (D. Mass. 2003) (rev'd on other grounds by Donahue v. United States, 634 F.3d 615 (1st Cir. 2011)).

Assuming arguendo that Officers Bertocchi and Freire breached a duty of care during the booking process, a point which they do not concede, the wrongful death claims still fail because the Complaint does not establish that such breach was the proximate cause of the decedent's death.  "If a series of events occur between the negligent conduct and the ultimate harm, the court must determine whether those intervening events have broken the chain of factual causation or, if not, have otherwise extinguished the element of proximate cause and become a superseding cause of the harm."  Kent v. Commonwealth, 437 Mass. 312, 321 (2002) (citing Jesionek v. Massachusetts Port Auth., 376 Mass. 101, 105 (1978)).  Here the Complaint alleges that after Officers Bertocchi and Freire placed the decedent in a single-person cell, he took out a baggie that he had concealed in his shorts and ingested drugs contained inside the baggie over a two-hour period.  Complaint, at ¶ 69.  At the end of this two-hour period, the decedent's body "periodically jerked as he tried to remain upright" and then he slumped forward in a motionless state.  See id. at ¶¶ 73–75.  The decedent's intervening consumption of drugs certainly broke any chain of factual causation stemming from the officers' conduct during the booking process and

amounted to a superseding cause of the decedent's death.  The wrongful death claims against Officers Bertocchi and Freire should be dismissed.

## CONCLUSION

For the foregoing reasons, Officers Bertocchi and Freire respectfully request that this Honorable Court dismiss all of Plaintiff's claims against them.

Respectfully submitted,

Defendants Paulmichael Bertocchi
and Catia Freire
By their attorneys,

Adam Cederbaum
Corporation Counsel

/s/ *Randall Maas*

Edward Whitesell BBO#644331
Senior Assistant Corporation Counsel
Randall Maas BBO#684832
Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
(617) 635-4042
Edward.Whitesell@boston.gov
Randall.Maas@boston.gov

17

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on October 28, 2022.

October 28, 2022                      /s/ *Randall Maas*
Date                                       Randall Maas