# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LYNNEL COX, as administrator of the estate of Shayne R. Stilphen, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:22-cv-11009-RGS |
| | * | |
| BOSTON POLICE DEPARTMENT, | * | **[ORAL ARGUMENT REQUESTED]** |
| ISMAEL ALMEIDA, PAUL MICHAEL | * | |
| BERTOCCHI, CATIA FREIRE, and | * | |
| JOHN/JANE DOES NOS. 1–2, | * | |
| | * | |
| Defendants. | * | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS
## <u>BERTOCCHI AND FREIRE'S MOTION TO DISMISS</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 2

   I.   Shayne was a caring son, loving brother, and faithful friend who, like millions of other Americans, also struggled with opioid use disorder. ........................................................... 3

   II.   Officers Bertocchi and Freire were present during Shayne's arrest at the epicenter of the Massachusetts opioid epidemic. ............................................................................................ 4

   III.   Officers Bertocchi and Freire ignored Shayne's obvious symptoms of medical distress prior to, during, and immediately after the booking process. ............................................... 4

   IV.   Shayne died in the custody of the Boston Police Department. ........................................... 6

ARGUMENT ....................................................................................................................... 6

   I.   The Complaint states a claim that Officers Bertocchi and Freire violated Shayne's Fourteenth Amendment right to adequate medical care. .................................................... 7

      A.   The Fourteenth Amendment claim should be analyzed under an objective reasonableness standard. ..................................................................................... 8

      B.   Under either an objective reasonableness standard or a subjective deliberate indifference standard, the Complaint states a plausible Fourteenth Amendment claim. ............................................................................................................. 10

      C.   Defendants' arguments to dismiss the Fourteenth Amendment claim focus on the wrong time period and apply the wrong standard for motions to dismiss. ................. 13

   II.   The Complaint states a claim for wrongful death based on Officers Bertocchi and Freire's intentional conduct. ......................................................................................................... 17

CONCLUSION ................................................................................................................... 20

REQUEST FOR ORAL ARGUMENT ................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Ahanotu v. Massachusetts Tpk. Auth.*,
    466 F. Supp. 2d 378 (D. Mass. 2006) ....................................................................7

*Alderson v. Concordia Par. Corr. Facility*,
    848 F.3d 415 (5th Cir. 2017) ...............................................................................9

*Ambrose v. Bos. Globe Media Partners LLC*,
    No. 21-cv-10810-RGS, 2022 WL 4329373 (D. Mass. Sept. 19, 2022)............................11, 16

*Bannon v. Godin*,
    No. 20-cv-11501-RGS, 2020 WL 7230902 (D. Mass. Dec. 8, 2020) ......................................7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................7, 9

*Bell v. Wolfish*,
    441 U.S. 520 (1979).............................................................................................9

*Blaine v. Louisville Metropolitan Government*,
    768 Fed. Appx. 515 (6th Cir. 2019).................................................................16, 17

*Brawner v. Scott Cnty.*,
    14 F.4th 585 (6th Cir. 2021), *cert. denied sub nom. Scott Cnty., TN v.*
    *Brawner*, No. 21-1210, 2022 WL 4651298 (Oct. 3, 2022).......................................9

*Bruno v. City of Schenectady*,
    727 F. App'x 717 (2d Cir. 2018) ...........................................................................9

*Chong v. Ne. Univ.*,
    No. 20-cv-10844-RGS, 2020 WL 7338499 (D. Mass. Dec. 14, 2020) ............................13, 14

*Commonwealth v. Buckley*,
    90 Mass. App. Ct. 177 (2016)..............................................................................18

*Coughlin v. Dep't of Corr.*,
    43 Mass. App. Ct. 809 (1997)..............................................................................20

*da Silva Medeiros v. Martin*,
    458 F. Supp. 3d 122 (D.R.I. 2020)........................................................................10

*Dang ex rel. Dang v. Sheriff, Seminole Cty.*,
    871 F.3d 1272 (11th Cir. 2017) .............................................................................9

*Darnell v. Pineiro*,
  849 F.3d 17 (2d Cir. 2017)................................................................................9

*Farmer v. Brennan*,
  511 U.S. 825 (1994)........................................................................................8

*Gaudreault v. Salem*,
  923 F.2d 203 (1st Cir. 1990)...........................................................................8

*Gomes v. U.S. Dep't of Homeland Sec., Acting Sec'y*,
  460 F. Supp. 3d 132 (D. Mass 2020) .............................................................10

*Gordon v. Cnty. of Orange*,
  888 F.3d 1118 (9th Cir. 2018) ........................................................................9

*Grajales v. Puerto Rico Ports Auth.*,
  682 F.3d 40 (1st Cir. 2012).............................................................................11

*Griswold v. Driscoll*,
  625 F. Supp. 2d 49 (D. Mass. 2009), *aff'd on other grounds*, 616 F.3d 53 (1st
  Cir. 2010) .......................................................................................................2

*Helling v. McKinney*,
  509 U.S. 25 (1993)..........................................................................................8

*Henry v. Hodoson*,
  No. 16-cv-11606-RGS, 2018 WL 6045250 (D. Mass Nov. 19, 2018) ...................10

*United States ex rel Hutcheson v. Blackstone Med., Inc.*,
  647 F.3d 377 (1st Cir. 2011).....................................................................1, 7, 14

*Jones v. Mathews*,
  2 F.4th 607 (7th Cir. 2021) .........................................................................16, 17

*Kingsley v. Hendrickson*,
  576 U.S. 389 (2015)..............................................................................7, 8, 9, 10

*Leite v. Bergeron*,
  911 F.3d 47 (1st Cir. 2018).............................................................................8

*Love v. Franklin Cnty., Kentucky*,
  376 F. Supp. 3d 740 (E.D. Ky. 2019) ..............................................................9

*Mays v. Sprinkle*,
  992 F.3d 295 (4th Cir. 2021) ......................................................................12, 16

*Miranda v. Cnty. of Lake*,
  900 F.3d 335 (7th Cir. 2018) .........................................................................9

*Miranda-Rivera v. Toledo-Dávila,*
  813 F.3d 64 (1st Cir. 2016)............................................................................10, 12

*N. Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting LLC,*
  No. 02-cv-11760-NG, 2004 WL 6001505 (D. Mass. June 22, 2004).....................18

*Oahn Nguyen Chung v. StudentCity.com, Inc.,*
  854 F.3d 97 (1st Cir. 2017)..................................................................................20

*Ruiz-Rosa v. Rullan,*
  485 F.3d 150 (1st Cir. 2007)....................................................................................8

*Strain v. Regalado,*
  977 F.3d 984 (10th Cir. 2020) .................................................................................9

*Tamez v. Mathey,*
  589 F.3d 764 (5th Cir. 2009) ...........................................................................16, 17

*Thompson v. Upshur Cty.,*
  245 F.3d 447 (5th Cir. 2001) .................................................................................14

*United States v. AVX Corp.,*
  962 F.2d 108 (1st Cir. 1992)..................................................................................11

*Whitney v. City of St. Louis,*
  887 F.3d 857 (8th Cir. 2018) ...................................................................................9

*Wilson v. Seiter,*
  501 U.S. 294 (1991)..................................................................................................8

*Yanes v. Martin,*
  464 F. Supp. 3d 467 (D.R.I. 2020).........................................................................10

**Statutes**

Massachusetts Torts Claims Act, Mass. Gen. Laws ch. 258 ........................................17

MTCA ...........................................................................................................................17

## PRELIMINARY STATEMENT

Shayne Stilphen died of a preventable opioid overdose while in Boston Police Department (BPD) custody on July 14, 2019. He did so after spending nearly two hours with two of the defendants, Officers Paul Michael Bertocchi and Catia Freire, who were with Shayne during his arrest, before booking, and throughout the booking process. All through that time, Shayne demonstrated clear signs that he had ingested enough opioids to be at risk of a fatal overdose, including an inability to stay awake, difficulty standing, and unusual posturing. To any reasonable person—let alone two officers in BPD District D-4 (District 4) who regularly encounter people experiencing opioid intoxication and overdose—the obvious meaning of these symptoms was that Shayne required immediate medical attention to ensure that he remained conscious and continued to breathe. But Officers Bertocchi and Freire took no action to obtain or provide care and instead placed Shayne alone in the cell where he would ultimately die.

The forty-page Complaint contains specific and supported statements detailing each of these allegations, including nine pages regarding the period of time that Shayne was with Officers Bertocchi and Freire between his arrest and the time they placed him the single-person cell. There are therefore more than sufficient "factual allegations, either direct or inferential, respecting each material element necessary" to overcome a motion to dismiss on Plaintiff's Fourteenth Amendment and wrongful death claims against Officers Bertocchi and Freire. *See United States ex rel Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 384 (1st Cir. 2011) (internal quotation marks omitted).

Defendants reach the opposite conclusion only by applying three incorrect standards. First, although they recite the proper standard for motions to dismiss, their arguments turn that standard on its head: they ask this Court (1) to make inferences on their behalf, (2) to consider facts not alleged in the Complaint, and (3) to weigh their own inferences and supplemental facts

1

more heavily than those pleaded. At this stage of the proceedings, the Court must reject these requests. *See Griswold v. Driscoll*, 625 F. Supp. 2d 49, 55 (D. Mass. 2009), *aff'd on other grounds*, 616 F.3d 53 (1st Cir. 2010) ("The court must neither weigh the evidence nor rule on the merits because the issue is not whether the plaintiffs will ultimately prevail, but whether they are entitled to offer evidence to support their claims") (cleaned up). Second, in repeatedly referring to the three-hour period between the end of booking and Shayne's death, as well as his ingestion of additional drugs during that time, Defendants inappropriately ask the Court to make a factual determination about what Defendants call the "most pivotal" moment of Shayne's detainment. In essence, Defendants suggest that the Court should—as a matter of law and before any discovery—find that they had no duty to obtain or administer medical care for Shayne until he was almost dead, despite the fact that he was already displaying symptoms of serious medical need during their interactions with him. None of the authority cited by Defendants commands that dangerous result. The Fourteenth Amendment protects pretrial detainees not just from certain death but also against harm to their serious medical needs, and the Complaint plausibly alleges that Shayne clearly exhibited such needs from the time he entered the District 4 station. Finally, Defendants' argument against the wrongful death claim rests entirely on a concept—proximate cause—that has no bearing on the allegation that Officers Bertocchi and Freire caused Shayne's death by intentional acts. And, in any event, proximate cause is yet another factual issue that cannot be resolved at this stage. Under the proper standards, the motion to dismiss must be denied.

## **FACTUAL BACKGROUND**

As elaborated more fully in the arguments below, the Complaint alleges the following facts.

I.      **Shayne was a caring son, loving brother, and faithful friend who, like millions of other Americans, also struggled with opioid use disorder.**

Shayne was a beloved, son, brother, and friend. Compl., ECF No. 1, ¶ 1. He had a huge heart, made friends easily, and shared an unwavering and loving bond with his mother, Lynnel. *Id.* ¶ 25. He also took his role as older brother to his two sisters very seriously, never ending a phone call with his mother without saying, "Give the girls a hug for me and tell them I love them, I love you, Mah." *Id.* He loved creating art; he was a sports enthusiast and a great athlete himself; and he was learning to be a barber. *Id.* ¶ 26. Like millions of other people in this country, he also struggled with opioid use disorder (OUD). *Id.* ¶ 27.

OUD is a chronic brain disease with the potential for deadly complications. *Id.* ¶ 2.[1] Opioids depress the central nervous system, which means that they reduce consciousness and decrease the natural drive to breathe. *Id.* ¶¶ 5–6.[2] If a person takes a high enough dose of opioids, it can lead to an overdose, in which a toxic amount of the drug interferes with the part of the brain that regulates unconscious breathing. *Id.* ¶ 6. But a person who ingests an unsafe level of opioids does not necessarily stop breathing right away: the dangerous effects of opioids on the human body can increase over a period of many hours, and keeping the person awake can help avoid the respiratory depression that would occur if the person were left alone. *Id.* ¶¶ 5, 49.[3] What is more, if a person who ingested too many opioids becomes completely unresponsive, timely administration of the lifesaving drug naloxone—commonly known as Narcan—can

---

[1] On average, 207 people die from opioid-related overdoses in the United States every day, and the opioid-related death rate in Massachusetts far exceeds the national average. *Id.* ¶ 2.

[2] *See also* National Institute on Drug Abuse, *Heroin DrugFacts*, https://nida.nih.gov/download/944/heroin-drugfacts.pdf (Jun. 2021).

[3] *See also* Centers for Disease Control and Prevention, *Preventing an Opioid Overdose*, https://www.cdc.gov/drugoverdose/pdf/patients/ preventing-an-opioid-overdose-tip-card-a.pdf.

reverse an overdose and restore adequate breathing. *Id.* ¶ 6. In fact, throughout his struggles with OUD, Shayne overdosed several times, and Narcan repeatedly saved his life. *Id.* ¶ 29.

For all of these reasons, quickly responding to the signs that someone has ingested a life-threatening amount of opioids with proper monitoring and medical attention can save someone's life. *Id.* ¶¶ 1, 5–7. These signs include oversedation, an inability to stay awake, difficulty standing, and unusual posturing. *Id.* ¶ 5. In the face of these symptoms, a person's ability to interact with others when prompted does not mean that they are safe: to the contrary, that same person could remain at high risk of death due to respiratory depression if later left alone without prompting. *Id.*

## II. Officers Bertocchi and Freire were present during Shayne's arrest at the epicenter of the Massachusetts opioid epidemic.

Around 1:00 a.m. on July 14, 2019, BPD officers, including Officers Bertocchi and Freire, stopped Shayne near the intersection of Massachusetts Avenue and Melnea Cass Boulevard. *Id.* ¶ 45. This area, known as "Mass and Cass," has been the epicenter of the Commonwealth's opioid crisis since at least 2016 and falls within District 4. *Id.* ¶ 3. Officers assigned to that district therefore regularly encounter people with OUD and who are experiencing opioid over-intoxication and overdose. *Id.* ¶ 4. In fact, Officer Bertocchi knew that it was common for people arrested in this area to have "tendencies" of people who use drugs and believed that Shayne had such "tendencies." *Id.* ¶¶ 47, 58.

## III. Officers Bertocchi and Freire ignored Shayne's obvious symptoms of medical distress prior to, during, and immediately after the booking process.

Following Shayne's arrest, Officer Freire and another officer brought Shayne to the District 4 station and placed him in a group holding cell for twenty-three minutes before booking. *Id.* ¶ 51. During that period, Officer Bertocchi interacted with Shayne several times. *Id.* ¶¶ 52, 54. Initially, Shayne was unsteady on his feet and swayed from side to side while talking

to Officer Bertocchi. *Id.* ¶ 52. Officer Bertocchi later saw Shayne slumped forward over his legs, head hanging below his knees. *Id.* ¶ 54 & fig. 4.

Officers Bertocchi and Freire were the primary officers in charge of Shayne's booking. *Id.* ¶ 58−64. Throughout that process, Shayne showed obvious signs that the opioids in his body had reached a dangerous level: his body contorted into unnatural postures, he struggled to stay awake, and he could barely stand on his own. *Id.* ¶ 59. Officers Bertocchi and Freire understood that Shayne was having trouble standing up; during one five-minute stretch, they helped Shayne stand a total of seven times. *Id.* ¶ 60 & figs. 5–6. Officer Bertocchi repeatedly put his hand on Shayne's back to try to steady him, and when that was not enough, Officer Bertocchi held Shayne's arm to keep him upright and tapped Shayne to try to keep him awake. *Id.* Even after these interventions, Shayne still could not remain steady on his feet, and Officers Bertocchi and Freire once again placed their arms on his back to help him stand. *Id.* ¶ 61 & fig. 6.

Shayne continued to struggle to participate in the booking process without assistance. Shayne was unable even to complete the fingerprinting process on his own: to obtain Shayne's fingerprints, Officer Bertocchi physically moved Shayne's hand, while Officer Freire placed her hand on Shayne's back to help him remain standing. *Id.* Shayne also struggled to stand during his booking photos. *Id.* ¶ 62 & fig. 7. He leaned against the wall and began to slump down numerous times, while Officers Bertocchi and Freire stood and watched. *Id*. Although any reasonable person would have recognized Shayne's urgent need for medical attention in light of these symptoms, Officers Bertocchi and Freire did not request a medical evaluation, transport Shayne to the hospital for medical treatment, or provide medical care themselves. *Id*. ¶ 64.

Once booking was complete, Officers Bertocchi and Freire took Shayne to a single-person cell. *Id.* ¶ 65. Almost immediately after he was locked in the cell, and while Officers

Bertocchi and Freire remained directly outside the door, Shayne slumped over his legs with his arms bent awkwardly behind him in an unnatural position. *Id.* ¶ 66 & fig. 9. Any reasonable person who viewed Shayne in that position would have understood that he urgently needed medical attention, but Officers Bertocchi and Freire again ignored these signs of medical distress, and left Shayne alone in his cell. *Id.* ¶ 67. If Officers Bertocchi and Freire had instead subjected Shayne to close and careful monitoring after booking, sought outside medical treatment for Shayne, or provided Shayne with medical care themselves, he would not have died. *Id.* ¶¶ 105–06.

## IV.     Shayne died in the custody of the Boston Police Department.

Once inside his cell, Shayne periodically ingested drugs from a baggie over the course of the next two hours. *Id.* ¶ 69. At approximately 4:48 a.m., Shayne slumped forward, his limp torso awkwardly folding over his crossed legs. *Id.* ¶ 73. He remained in this contorted position as officers repeatedly walked by and did nothing. *Id.* ¶¶ 73−80 & figs. 10, 11.

At 5:51 a.m., Officer Sean Doolan walked by Shayne for the first time. *Id.* ¶ 81 & fig. 12. Unlike all the officers before him, after seeing Shayne's obvious need for help, Officer Doolan immediately entered Shayne's cell. *Id.* ¶¶ 81−83 & fig. 12. There, Officer Doolan found Shayne in a position that Officer Doolan later described as one "that looked as if it would be of extreme discomfort for most individuals." *Id.* ¶ 82. Officer Doolan administered Narcan, and Officers Bertocchi and Ismael Almeida administered cardiopulmonary resuscitation (CPR). *Id.* ¶ 85. Although an earlier intervention would have saved Shayne's life, by then it was too late to reverse Shayne's overdose. *Id.* ¶ 86. Shayne died in the cell. *Id.*

## ARGUMENT

To withstand a motion to dismiss, a complaint "need not be replete with factual allegations; rather a plaintiff's burden is to set out 'plausible grounds' for an entitlement to

relief." *Bannon v. Godin*, No. 20-cv-11501-RGS, 2020 WL 7230902, at *1 (D. Mass. Dec. 8, 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). This standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery" will provide evidence supporting the claims. *Twombly*, 550 U.S. at 556. The reviewing court must accept as true all well-pleaded facts in the complaint, "analyzing those facts in the light most hospitable to the plaintiff's theory, and drawing all reasonable inferences for the plaintiff." *Blackstone Med.*, 647 F.3d at 383. Dismissal is improper where a "clear factual dispute exists," which "must be resolved during discovery or at trial." *Ahanotu v. Massachusetts Tpk. Auth.*, 466 F. Supp. 2d 378, 391 n.3 (D. Mass. 2006).

I.     **The Complaint states a claim that Officers Bertocchi and Freire violated Shayne's Fourteenth Amendment right to adequate medical care.**

Count I alleges that Officers Bertocchi and Freire violated Shayne's constitutional rights by failing to provide him with adequate medical care while he was in their custody. Compl., ECF No. 1, ¶¶ 50–67, 146–53. Because Shayne was a pretrial detainee, he had a Fourteenth Amendment due process right to objectively reasonable medical care. Defendants ask this Court to dismiss Count I, claiming that their treatment of Shayne was constitutional because it did not violate the prohibition against subjective indifference to a prisoner's serious risk of harm. That argument is incorrect for two reasons. First, *Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015), demonstrates that unlike the Eighth Amendment, under the Fourteenth Amendment, "the relevant standard is objective not subjective." Second, the Complaint plausibly alleges that Officers Bertocchi and Freire engaged in conduct that both fell below an objective standard of reasonableness *and* reflected deliberate indifference to Shayne's risk of serious harm. Thus, Count I can proceed no matter which legal standard this Court applies.

A.     *The Fourteenth Amendment claim should be analyzed under an objective reasonableness standard.*

On the day of his death, Shayne was being held as a pretrial detainee. Plaintiff's constitutional claim for denial of medical care is therefore governed by the Fourteenth Amendment's due process clause rather than the Eighth Amendment. *See Gaudreault v. Salem*, 923 F.2d 203, 208 (1st Cir. 1990). "The Fourteenth Amendment provides at least as much protection for pretrial detainees as the Eighth Amendment provides for convicted inmates," *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 155 (1st Cir. 2007), and, as numerous courts have found (discussed below), there is good reason to hold that it provides even more.

Under the Eighth Amendment, convicted prisoners who challenge the adequacy of their medical care must establish that (1) they "face[d] a substantial" and objective "risk of serious harm" and (2) the defendant subjectively knew of and "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see also Helling v. McKinney*, 509 U.S. 25, 35–37 (1993) (discussing application of the "subjective and objective" elements of the Eighth Amendment standard); *Leite v. Bergeron*, 911 F.3d 47, 52 (1st Cir. 2018). The second, subjective element applies because the Eighth Amendment does not ban *all* cruel and unusual conditions but "only cruel and unusual *punishment*." *Wilson v. Seiter*, 501 U.S. 294, 300 (1991) (emphasis in original). As a result, "[i]f the pain inflicted is not formally meted out as punishment by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify" as punishment that triggers consideration under the Eighth Amendment. *Id.* (emphasis removed).

By contrast, under the Fourteenth Amendment, "pretrial detainees (unlike convicted prisoners) cannot be punished at all . . . ." *Kingsley*, 576 U.S. at 400. Consequently, "proof of intent (or motive) to punish" is not "required for a pretrial detainee to prevail on a claim that his

8

due process rights were violated." *See id.* at 398. *Kingsley* therefore squarely rejected a

subjective standard in evaluating a pretrial detainee's claim of excessive force. *See id.* at 395.

Relying on this same logic, at least four circuits have eliminated the subjective element where,

like here, a pretrial detainee raises an inadequate medical care claim. *See Bruno v. City of*

*Schenectady*, 727 F. App'x 717, 720–21 (2d Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17, 35 &

n.9 (2d Cir. 2017); *Brawner v. Scott Cnty.*, 14 F.4th 585, 593 (6th Cir. 2021), *cert. denied sub*

*nom. Scott Cnty., TN v. Brawner*, No. 21-1210, 2022 WL 4651298 (Oct. 3, 2022); *Miranda v.*

*Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. Cnty. of Orange*, 888 F.3d 1118,

1124 (9th Cir. 2018).[4] These courts have concluded that "medical-care claims brought by pretrial

detainees under the Fourteenth Amendment are subject only to the objective unreasonableness

inquiry identified in *Kingsley*." *Miranda*, 900 F.3d at 352. Several district courts in this circuit

---

[4] Several other circuits have cabined *Kingsley* to excessive force claims and continue to apply a subjective deliberate indifference standard to inadequate medical care claims or other claims concerning conditions of confinement brought by pretrial detainees. *See Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (failure to protect); *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020) (medical care); *see also Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 & n.4 (5th Cir. 2017) (holding that panel was constrained by pre-*Kingsley* law applying subjective standard in failure-to-protect and inadequate medical care contexts but noting that plaintiff's claims would fail under either subjective or objective standard); *Dang ex rel. Dang v. Sheriff, Seminole Cty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (same, as to inadequate medical care claims).

But *Kinglsey*'s careful analysis of the differences between the standards applicable to pretrial detainees and convicted prisoners extended beyond the context of excessive force to "the challenged governmental action" more generally. 576 U.S. at 398. And *Kingsley* relied extensively on *Bell v. Wolfish*, 441 U.S. 520 (1979)—a case concerning a range of jail conditions. As *Kingsley* explained, "*Bell* itself shows (and as our later precedent affirms) [that] a pretrial detainee can prevail [on a due process claim] by providing only objective evidence." *Id.* None of the decisions that continue to apply a deliberate indifference standard in the wake of *Kingsley* grapple with this analysis. As one court has noted, "[e]ach of these cases contains a dearth of reasoning, whether it is the Eighth Circuit's assertion without reason that *Kingsley* is limited to excessive force claims, or the Fifth and Eleventh Circuits' rote application of a circuit rule." *Love v. Franklin Cnty., Kentucky*, 376 F. Supp. 3d 740, 746 (E.D. Ky. 2019).

have similarly applied an objective standard. *See, e.g.*, *Yanes v. Martin*, 464 F. Supp. 3d 467, 469 n.3 (D.R.I. 2020) (holding "the *Kingsley* standard of 'objective reasonableness' is the appropriate one to be applied to an action" involving detainees rather than prisoners); *da Silva Medeiros v. Martin*, 458 F. Supp. 3d 122, 128 (D.R.I. 2020) (applying objective reasonableness where government agreed it was appropriate standard); *see also Gomes v. U.S. Dep't of Homeland Sec., Acting Sec'y*, 460 F. Supp. 3d 132, 148 (D. Mass. 2020) (noting that "[b]ased on the pertinent reasoning of *Kingsley* and the persuasive authority of other courts, it is likely that civil detainees no longer need to show subjective deliberate indifference in order to state a due process claim for inadequate conditions of confinement").[5]

As each of these courts recognized, *Kingsley* fundamentally changed the Supreme Court's approach to analyzing the rights guaranteed to pretrial detainees under the Fourteenth Amendment. This Court should similarly apply the objective reasonableness standard called for by *Kingsley* here.

> B.     *Under either an objective reasonableness standard or a subjective deliberate indifference standard, the Complaint states a plausible Fourteenth Amendment claim.*

The facts alleged in the Complaint are sufficient to state a Fourteenth Amendment claim not only under the objective reasonableness standard but also under the more stringent deliberate indifference standard on which the Defendants rely. That is because the Complaint plausibly alleges that Shayne had an objectively serious medical need and that Officers Bertocchi and Freire knowingly and deliberately failed to provide Shayne any treatment. These allegations are

---

[5] Other district courts in this circuit have continued to apply the deliberate indifference standard. *See e.g., Henry v. Hodoson*, No. 16-cv-11606-RGS, 2018 WL 6045250, *4 (D. Mass. Nov. 19, 2018) (applying deliberate indifference without analyzing whether *Kingsley* amended the standard). The First Circuit has not yet answered this question. *See Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 74 (1st Cir. 2016).

not, as Defendants contend, "speculative," "subjective," "tendentious," or "unfounded," Defs.'
Mem., ECF No. 28, at 10–12; they are based on the Complaint's detailed statements and
photographs, which provide more than "enough fact[s] to raise a reasonable expectation that
discovery will reveal evidence of the illegal conduct." *Grajales v. Puerto Rico Ports Auth.*, 682
F.3d 40, 49 (1st Cir. 2012) (internal citations and quotation marks omitted); *cf. United States v.
AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992) (affirming allowance of motion to dismiss where
allegations were "bereft of any vestige of a factual fleshing-out") (cited in Defs.' Mem., ECF No.
28, at 7, 11).[6]

First, the Complaint sufficiently alleges that Shayne's objectively serious medical needs
were clear. Before and throughout the booking process, Shayne exhibited obvious signs that he
had already consumed a life-threatening amount of opioids that could cause him to stop
breathing without intervention or treatment. Compl., ECF No. 1, ¶¶ 50–62. While in the group
holding cell, Shayne swayed side-to-side while talking with Officer Bertocchi and another
officer. *Id.* ¶ 52. He then slumped forward over his legs, his head hanging below his knees, and
remained in that contorted position when Officer Bertocchi entered the cell to give Shayne a
carton of milk. *Id.* ¶¶ 53–54. Although Shayne straightened up to take the milk carton, he
slumped over again very soon after. *Id.* ¶¶ 54–55. During the booking process itself, Shayne was
unable to remain awake and upright. *Id.* ¶¶ 59–62. Officers Bertocchi and Freire had to
repeatedly help Shayne stand up, Officer Bertocchi had to tap him to keep him awake, and

---

[6] Defendants' reliance on *AVX* is further misplaced because that case held that where, unlike
here, "standing is at issue, heightened specificity is obligatory at the pleading stage." 962 F.2d at
115; *compare with Ambrose v. Bos. Globe Media Partners LLC*, No. 21-cv-10810-RGS, 2022
WL 4329373, at *1 (D. Mass. Sept. 19, 2022) ("In most circumstances, the plaintiff need not
demonstrate a heightened fact pleading of specifics, but rather must present only enough facts to
state a claim to relief that is plausible on its face") (internal quotation marks and citation
omitted).

Officer Bertocchi physically moved Shayne's hand during the fingerprinting process. *Id.* ¶¶ 60–61. Shayne also struggled to stand while posing for his booking photographs, leaning against the wall and repeatedly slumping down. *Id.* ¶ 62. In other words, without repeated interventions, Shayne was unable to stay awake, placing him "at high risk for respiratory depression" if he was "left alone without prompting." *Id.* ¶ 5. As alleged, these were all physical symptoms of medical need "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Miranda-Rivera*, 813 F.3d at 74 (quoting *Gaudreault*, 923 F.2d at 208); *see also Mays v. Sprinkle*, 992 F.3d 295, 303 (4th Cir. 2021) (reversing grant of motion to dismiss and finding serious need for medical care where overdosing plaintiff was "lethargic, inactive, and compliant" and "it often took multiple officers to assist [the plaintiff] in the most elementary of movements").

Second, the Complaint sufficiently alleges that Officers Bertocchi and Freire were aware of Shayne's medical needs and chose not to address them in any way. Officers like Bertocchi and Freire, who are assigned to District 4, regularly encounter people who are experiencing opioid over-intoxication and overdose, as their station is located within the epicenter of the Commonwealth's opioid crisis. *Id.* ¶¶ 3–4. Nevertheless, they observed, and chose to ignore, the clear signs that the levels of opioids in Shayne's body at the time of his arrest and booking were potentially life-threatening. Both Defendants were present during Shayne's arrest, and Officer Bertocchi stated that Shayne "appeared" to have the "tendencies" of someone who used drugs. *Id.* ¶¶ 47, 58. Both Defendants observed Shayne's repeated inability to stay awake and upright before and during booking without their intervention. For example, Officer Bertocchi observed Shayne slumped over in a contorted posture while he was in the group holding cell, and both Defendants witnessed Shayne's difficulty standing and staying awake throughout the booking

process; indeed, Defendants themselves were the ones who had to help him remain alert and

upright. *Id.* ¶¶ 50–62. Finally, after booking, both Defendants saw Shayne slump over his legs

with his arms bent awkwardly behind him in an unnatural position when he was locked in the

single cell. *Id.* ¶ 66. These symptoms are all signs that someone has ingested a dangerous level of

opioids that puts them at risk of dying from an overdose if they are left without treatment or

intervention. *Id.* ¶ 5. Yet that is exactly what Defendants did. After observing Shayne's inability

to stay awake without their help, Defendants left him alone and failed to request a medical

evaluation, transport Shayne to the hospital for medical treatment, or provide medical care. *Id.*

¶ 64.

Based on these allegations, the Complaint sufficiently alleges that Officers Bertocchi and

Freire subjectively knew of Shayne's serious medical need and consciously failed to act. *Cf.*

*Chong v. Ne. Univ.*, No. 20-cv-10844-RGS, 2020 WL 7338499, at \*4, n.3 (D. Mass. Dec. 14,

2020) ("Plaintiffs' allegation is at least plausible, so it would be inappropriate to dismiss the

claim prior to discovery").

     C.    *Defendants' arguments to dismiss the Fourteenth Amendment claim focus on the*
            *wrong time period and apply the wrong standard for motions to dismiss.*

Despite the robust allegations described above, Officers Bertocchi and Freire still argue

that the Complaint fails to establish that they were aware of either "the decedent's consumption

of drugs in his cell, or that the decedent showed signs of a serious medical need during booking."

Defs.' Mem., ECF No. 28, at 2. The former is a red-herring; the latter is simply incorrect.

To begin, Defendants' lengthy discussion about the Complaint's purported silence

regarding their knowledge of Shayne's condition *post-booking* is irrelevant. Defs.' Mem., ECF

No. 28, at 9–11.[7] The claims against Officers Bertocchi and Freire currently focus on their failure to obtain or provide medical care for Shayne given their observations of him *prior to and during* booking.[8] Defendants justify their alternative temporal focus by suggesting that the "most pivotal events" in Shayne's detention occurred after booking, *id.* at 9, and repeatedly noting that Shayne did not go into cardiac arrest until three hours after booking, *id.*, at 1, 9, 11. But these contentions implicate factual questions that cannot be resolved on a motion to dismiss, including but not limited to whether the amount of opioids in Shayne's system at the time of booking already required intervention or treatment to save his life. *See, e.g.*, Compl., ECF No. 1, ¶¶ 5, 49. And at this stage of the litigation, Defendants' contentions cannot erase the legal significance of all that happened before Shayne entered the single cell. As a matter of law, the constitution does not impose a "verge of death standard" on the legally protected right to adequate medical care, *see Thompson v. Upshur Cty.*, 245 F.3d 447, 464 (5th Cir. 2001), and it does not authorize officers to wait to seek out or provide medical care themselves until it becomes necessary to use a defibrillator or perform CPR.

---

[7] Notably, it is also inaccurate. The Complaint *does* allege that post-booking, Officers Bertocchi and Freire observed Shayne slump into an awkward and unnatural position when he was placed in his cell. Compl., ECF No. 1, ¶¶ 66–67. The Complaint goes on to allege that officers should have been able to observe his serious medical condition and his ingestion of drugs via the surveillance footage streaming into the booking area. *Id.* ¶¶ 70–71. Given that Officer Bertocchi was at the station to administer CPR after Shayne stopped breathing, *id.* ¶ 85, it is reasonable to infer that he remained at the station and was able to observe Shayne for at least some portion of the three-hours after booking. Defendants' suggestion that "the more reasonable inference to draw is that they were working in the field and would have returned there after completing [Shayne's] booking," Defs.' Mem., ECF No. 28, at 10, is unsupported and, in any event, unwarranted at this stage in the proceedings. *See Blackstone Med.*, 647 F.3d at 383.

[8] If the claims against Officers Bertocchi and Freire proceed to discovery, as they should, this focus may expand based on facts developed during discovery, especially given that the Complaint already includes some allegations regarding Officers Bertocchi and Freire's observations of Shayne post-booking. *See supra* n.7.

Defendants' argument that the Complaint fails to plead a Fourteenth Amendment claim based on Officers Bertocchi and Freire's observations of Shayne prior to and during booking similarly upends the standard for motions to dismiss. Specifically, they ask this Court to make inferences in *Defendants'* favor, to consider facts *not* alleged in the Complaint, and to give those inferences and allegations *more* weight than those contained in the Complaint. For example, Defendants ask this Court:

- To adopt their preferred inference that Shayne's unnatural position did not convey a need for medical attention because he repeatedly "slumped down" and "then quickly sat up when prompted," Defs.' Mem., ECF No. 28, at 13, despite the Complaint's allegation that "a person's ability to interact with prompting does not mean that they are not experiencing a dangerous level of opioid over-intoxication." Compl., ECF No. 1, ¶ 5;

- To consider new allegations purportedly drawn from excerpts of the booking videos that they attached as exhibits to their motion, Defs.' Mem., ECF No. 28, at 12–13;[9] and

- To conclude that "in sum" their proposed inferences and additional facts fatally "undercut" Plaintiff's Fourteenth Amendment claim, *id.* at 12–14.

These arguments impermissibly substitute Defendants' views for the Complaint's well-pleaded allegations. What is more, they at most raise questions of fact regarding whether Shayne's need for medical attention was so obvious that a lay person would easily have recognized it. That is an issue for investigation during discovery and for a factfinder to decide at

---

[9] Based on these videos, Defendants allege that Shayne was able to walk unassisted, took several backwards steps, drank without spilling, put his shoes back on, removed and then put his shirts back on while having his booking picture taken, appeared to sign his name on a form, and responded to officers' instructions throughout the booking process. Defs.' Mem., ECF No. 28, at 12–13. The final two allegations are especially unfounded, as the video is neither close enough to reveal what Shayne wrote nor accompanied by audio to demonstrate whether Shayne was responsive. Plaintiff cites the video in her Complaint and therefore does not object to the Court considering the video at this stage—indeed, Plaintiff submits that the video footage, as a *whole*, substantiates Plaintiff's case. However, Plaintiff does object to Defendants' request that the Court adjudicate this case summarily on an incomplete and disputed record.

a later stage of this litigation. Even if "one could imagine a different conclusion at summary judgment once the evidence is examined," Defendants' "arguments in favor of dismissal rely on factual disputes that are not appropriate for disposition at this early stage." *Ambrose*, 2022 WL 4329373, at *2; *see also Mays*, 992 F.3d at 304–05 (reversing allowance of officers' motion to dismiss Fourteenth Amendment claims of pretrial detainee who died in custody where officers sought to "discount the inferences" from the complaint because "on a motion to dismiss, we cannot rely on facts not found in the complaint or draw inferences in the officers' favor").

The very cases that Defendants highlight as "instructive" demonstrate that dismissal is improper here. Defs.' Mem., ECF No. 28, at 10–11, 14–15 (citing *Tamez v. Mathey*, 589 F.3d 764 (5th Cir. 2009), *Blaine v. Louisville Metropolitan Government*, 768 Fed. App'x 515 (6th Cir. 2019), and *Jones v. Mathews*, 2 F.4th 607 (7th Cir. 2021)). All three were decided on summary judgment based on a complete evidentiary record.[10] And all three involved a medical examination of the decedent by a medical professional who concluded that there was no urgent medical need.[11] In stark contrast, there has been no discovery in this case, and a key aspect of Plaintiff's allegations is that Officers Bertocchi and Freire failed to provide Shayne with medical

---

[10] *Tamaz*, 589 F.3d at 770–71 (affirming summary judgment where plaintiffs failed to present evidence that defendants were aware of decedent's need for medical care); *Blaine*, 768 Fed. Appx. at 525 (affirming summary judgment where there was "insufficient evidence from which a reasonable jury could find" that defendants subjectively thought decedent was at substantial risk of harm from a drug overdose but ignored that risk); *Jones*, 2 F.4th at 614 (affirming summary judgment where record showed that defendant had "no forewarning" that decedent might die of diphenhydramine toxicity).

[11] *Tamaz*, 589 F.3d at 767 (nurse who examined decedent did not find that he needed urgent or emergency medical care and did not communicate any urgency to detectives charged with taking decedent to hospital for medical clearance); *Blaine*, 768 Fed. App'x at 517–25 ("unrebutted facts" showed that in medical assessment by licensed nurse, decedent's "vital signs were normal" and his score on test used to assess and manage alcohol withdrawal was "mild"); *Jones*, 2 F.4th at 611 (defendant sought medical evaluation of decedent within thirty minutes of her reports of stomach pain, and nurse placed decedent in "mild" withdrawal category).

treatment themselves or seek an assessment by a medical professional despite the fact that he

was in clear medical distress. In addition, all three cases relied on a subjective deliberate

indifference standard which—for the reasons previously articulated—is not appropriate in a case

brought under the Fourteenth Amendment. *Tamez*, 589 F.3d at 770; *Blaine*, 768 Fed. Appx. at

524; *Jones*, 2 F.4th at 612. Because the Complaint adequately alleges that Defendants' failure to

obtain or provide medical care for Shayne was deliberately indifferent and objectively

unreasonable given Officers Bertocchi and Freire's observations of him prior to and during

booking, the motion to dismiss must fail.

## II.    The Complaint states a claim for wrongful death based on Officers Bertocchi and Freire's intentional conduct.

Officers Bertocchi and Freire argue that the wrongful death claim against them must be

dismissed because the Complaint does not establish that their conduct was "the proximate cause"

of Shayne's death. Defs.' Mem., ECF No. 28, at 16. This argument fails for two reasons. First, it

wholly fails to grapple with the Complaint's allegations, which are based on intentional, not

negligent, conduct. Second, proximate cause is irrelevant to the analysis of intentional torts and

is, in any event, not appropriate for resolution at this stage of the proceedings.

As a threshold issue, the motion to dismiss must be denied because the well-pleaded

allegations of the Complaint set forth a cause of action for wrongful death based on Officers

Bertocchi and Freire's intentional acts, and Defendants entirely fail to address this claim. The

Massachusetts Torts Claims Act (MTCA), Mass. Gen. Laws ch. 258, governs tort claims brought

against the Commonwealth, its subdivisions, and its employees. Although the MTCA immunizes

public employees from suits based on negligent conduct committed within the scope of their

employment, *id.* § 2, it provides no protection for those who commit intentional torts, *id.* § 10(c).

In this case, the Complaint alleges the latter: that Officers Bertocchi and Freire caused "Shayne

Stilphen's death by intentional acts." Compl., ECF No. 1, ¶ 167. As described at length above, Defendants knew their conduct would cause Shayne physical harm or remained willfully blind to that fact as they ignored Shayne's signs of obvious medical distress and deprived him of necessary medical care. Nothing in Defendants' motion disputes the intentional tort theory that Plaintiff alleged in the Complaint. For that reason alone, the motion must fail.

The entirety of Officers Bertocchi and Freire's argument hinges instead on whether the Complaint establishes proximate cause between their conduct and Shayne's death. But proximate cause is irrelevant in the context of intentional torts because "[a]n actor who intentionally causes harm is subject to liability for that harm *even if it was unlikely to occur*." Restatement (Third) of Torts: Phys. & Emot. Harm § 33(a) (2010) (emphasis added); *see also id.* § 33(b) ("An actor who intentionally or recklessly causes harm is subject to liability for a broader range of harms than the harms for which that actor would be liable if only acting negligently"); *Commonwealth v. Buckley*, 90 Mass. App. Ct. 177, 183 (2016) ("the scope of liability of actors who engage in intentional wrongdoing is broader than is the scope of liability of actors who are merely negligent").

Indeed, even in cases where decedents died by suicide, sessions of this Court have found that plaintiffs' claims based on intentional—but not negligent—conduct may lie so long as "in the judgment of the trier of the fact, the intentional conduct caused severe emotional distress that was a substantial factor in bringing about the suicide." *N. Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting LLC*, No. 02-cv-11760-NG, 2004 WL 6001505, at *4 (D. Mass. June 22, 2004), *report and recommendation adopted,* No. 02-cv-11760-NG, 2004 WL 6001506 (D. Mass. Aug. 16, 2004) (finding that "the trend of recent cases" supported recovery under such circumstances). Accordingly, Defendants' argument—that, as a matter of law, there can be no

cause of action where an intervening act may have also contributed to Shayne's death—misses the mark for the intentional tort at issue and cannot be a basis for dismissal.

Here, the Complaint plausibly alleges that Defendants' intentional actions were a factual cause of Shayne's death[12] and that his death was within the scope of liability for their tortious actions. Indeed, the Complaint specifically alleges that if Defendants had "provided Shayne with an adequate medical evaluation after his booking, he would have been subject to close and careful monitoring"—which "is part of the standard of care for highly intoxicated individuals out of both a concern that the dangerous effects of an opioid on the human body can become greater of many hours and a concern that such individuals are likely to engage in conduct that may harm themselves"—and "he would not have died." Compl., ECF No. 1, ¶ 105; *see also id.* ¶ 106 ("Had the officers sought outside medical treatment for Shayne or provided Shayne with adequate medical care themselves," he "would not have died"). As a result, Plaintiff has pled a viable wrongful death claim that should proceed to discovery. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 29 (2010) (noting an actor is liable for "those harms that result from the risks that made the actor's conduct tortious"); *Id.* at § 33 Comment b (noting "the unforeseeability or unlikelihood of harm that is intended does not affect the intentional tortfeasor's liability" and extending the scope of liability "to those harms whose risk of occurring was increased by the intentional [tort]").

---

[12] Notably, this does not eliminate the liability of the other Defendants in this case, whose tortious conduct was also a factual cause of Shayne's death. *See, e.g.,* Restatement (Third) of Torts: Phys. & Emot. Harm § 27 Comment a (2010) (recognizing that several different tortious actions can all be a factual cause of harm because "[i]n many cases, multiple sufficient causes will each . . . be capable of causing the harm"). "When two tortious multiple sufficient causes exist, to deny liability would make the plaintiff worse off due to multiple tortfeasors than would have been the case if only one of the tortfeasors had existed." *Id.* at Comment b.

Finally, even if proximate cause were relevant here, it is a fact-specific issue particularly within the "special province of the jury." *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 102 (1st Cir. 2017) (in wrongful death claim, element of "[c]ausation, by contrast [to duty, breach, and damage], generally presents a question of fact within the special province of the jury") (internal quotation and citation omitted); *see also Coughlin v. Dep't of Corr.*, 43 Mass. App. Ct. 809, 817 (1997) (noting that "[e]specially in a wrongful death case where many relevant facts may not be known to the plaintiff (as administrator of an estate), not allowing the opportunity for discovery seems especially inequitable" and therefore "plaintiff is entitled to engage in discovery to develop further his theories of negligence"). For this reason too, Defendants' motion must fail.

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that the pending motion to dismiss be denied. If, however, the Court is inclined to grant the motion, Plaintiff respectfully requests that she be given leave to amend the Complaint to address any concerns that might result in such dismissal.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Plaintiff requests oral argument on Defendants Bertocchi and Freire's Motion to Dismiss based on the belief that oral argument may assist this Court in deciding the issues raised therein.

[*Signature block on next page*]

November 22, 2022

Respectfully submitted,

*/s/ Robert Frederickson III*
Robert Frederickson III (BBO #670111)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.: (617) 570-1000
rfrederickson@goodwinlaw.com

Matthew R. Segal (BBO #654489)
Jessie J. Rossman (BBO # 670685)
Alexandra Arnold (BBO #706208)
American Civil Liberties Union
Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
Tel.: (617) 482-3170
msegal@aclum.org
jrossman@aclum.org
aarnold@aclum.org

Alexandra D. Valenti* (*Pro hac vice*)
Christine Armellino* (*Pro hac vice*)
Gabriella Montes* (*Pro hac vice*)
Wrenne Bartlett* (*Pro hac vice*)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel.: (212) 459-7351
avalenti@goodwinlaw.com
carmellino@goodwinlaw.com
gmontes@goodwinlaw.com
wbartlett@goodwinlaw.com

Matthew Ginther* (*Pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
Tel.: (202) 346-4000
mginther@goodwinlaw.com

*Attorneys for Plaintiff Lynnel Cox, as administrator*
*of the estate of Shayne R. Stilphen*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 22, 2022, a true copy of the above document was filed via the Court's CM/ECF system and that a copy will be sent via the CM/ECF system electronically to all counsel of record.

*/s/ Robert Frederickson III*