# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LYNNEL COX, as administrator of the estate
of Shayne R. Stilphen,

        Plaintiff,

v.

CITY OF BOSTON, ISMAEL ALMEIDA,
PAULMICHAEL BERTOCCHI, CATIA
FREIRE, DAVID MARSHALL, and
JOHN/JANE DOE NO. 1,

        Defendants.

Civil Action No. 1:22-CV-11009

## FIRST AMENDED COMPLAINT

## INTRODUCTION

1.      This Complaint is against the City of Boston ("the City"), of which the Boston Police Department ("BPD") is a component, as well as several individual BPD officers, for the wrongful death of Shayne Stilphen. Shayne was a beloved son, brother, and friend. Yet he died alone in a cell in the BPD District 4 station on July 14, 2019, from a preventable opioid overdose. He was in the custody of the BPD and depended on the BPD for healthcare. Shayne had displayed obvious signs of urgent medical distress for hours, and any reasonable person would have understood that he required immediate medical attention. But the officers who could have saved Shayne's life failed to obtain a medical evaluation, seek outside medical treatment, or provide him with medical care themselves, causing his death.

2.      Opioid use disorder ("OUD") is a chronic brain disease with the potential for deadly complications, including overdoses that can be fatal if untreated.[1] Signs of OUD include cravings of opioids, increased tolerance to opioids, an inability to stop using opioids, withdrawal symptoms, and a loss of control of opioid use. An average of 207 people die from an opioid-related overdose in America every day.[2] The opioid-related death rate in Massachusetts far exceeds the national average with more than six opioid-related overdose deaths in the Commonwealth per day from June 2020 to June 2021.[3]

---

[1]*See, e.g.*, American Society of Addiction Medicine, *Public Policy Statement: Definition of Addiction* (Aug. 15, 2011), https://www.asam.org/docs/default-source/public-policy-statements/1definition_of_addiction_long_4-11.pdf?sfvrsn=a8f64512 ("Addiction is a primary, chronic disease of brain reward, motivation, memory, and related circuitry.").
[2]CDC National Center for Health Statistics, *Drug Overdose Death in the U.S. Top 100,000 Annually* (Nov. 17, 2021),
https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.htm.
[3]Massachusetts Department of Public Health, *Data Brief: Opioid-Related Overdose Deaths among Massachusetts Residents* (Nov. 2021), https://www.mass.gov/doc/opioid-related-overdose-deaths-among-ma-residents-november-2021/download.

3.      The epicenter of the Commonwealth's opioid crisis since at least 2016—the intersection of Massachusetts Avenue and Melnea Cass Boulevard, known as "Mass and Cass"—falls within an area of Boston designated by the BPD as District D-4 ("District 4"). In 2019, then-Boston Mayor Martin J. Walsh described Mass and Cass as "the most public face of the [opioid] epidemic."[4]

4.      BPD officers assigned to District 4 therefore regularly encounter people who are living with OUD, experiencing opioid over-intoxication, and/or experiencing an opioid overdose. These encounters include arrests and detentions.

5.      Signs that someone is at risk of overdose due to their level of opioid over-intoxication include oversedation, an inability to stay awake, difficulty standing, and unusual posturing. A person's ability to interact with prompting does not mean they are not experiencing a dangerous level of opioid over-intoxication. That same person could still be at high risk for respiratory depression if they are later left alone without prompting.

6.      Opioid overdose causes respiratory depression that can be fatal if untreated. The overdose reversal medication naloxone, commonly known as Narcan, will save someone's life if it is administered in time.

7.      Unfortunately, at all times relevant to this complaint, rather than provide people living with OUD the medical attention they desperately and obviously needed, the BPD's policy, practice, and custom was to lock them alone in cells without having them evaluated by a medical provider and without properly monitoring them for, or responding to, signs of overdose.

8.      This policy, practice, and custom was reflected in the BPD's written rules & procedures, the BPD's failure to properly train its officers how to recognize or treat signs and

---

[4]City of Boston, *Melnea Cass/Mass Ave 2.0* (Oct. 2019),
https://www.boston.gov/sites/default/files/embed/m/melnea_cass_mass_ave_2.0.pdf.

symptoms of opioid intoxication and overdose, and the BPD's failure to supervise, investigate, and discipline officers who violated the right of people living with OUD to receive reasonable and adequate medical care after arrest.

9.    At least in part because of the BPD's policy, practice, custom, including its policy, practice, and custom of failing to train or supervise, investigate, and discipline its staff, BPD officers were acclimated to disregarding the medical distress of people they regarded as using drugs; in consequence, BPD officers behaved objectively unreasonably and deliberately indifferently toward, and intentionally discriminated against, such people because of their disease.

10.    Indeed, at all times relevant to this complaint, BPD officers intentionally discriminated against those living with OUD because of their disease. As a result, BPD officers failed to provide those living with OUD with adequate medical care even in the face of clear signs that these people were in a state of medical distress that any reasonable person would have understood required medical attention.

11.    The consequences of these practices have been deadly. In May 2019, a man living with OUD (referred to in this complaint by the pseudonym "John Smith") died of a suspected opioid overdose while in BPD custody at the District 4 station. In the wake of Mr. Smith's death, the BPD made no changes to its policies, practices, customs, training, or supervision with respect to the people it encountered, arrested, and booked at the District 4 station.

12.    Less than two months later, the BPD arrested Shayne Stilphen and booked him into the District 4 station. Shayne had lived with OUD for years. He had survived previous opioid overdoses by regularly carrying Narcan. But he did not survive the District 4 station.

13.     Shayne's death was caused by the BPD and its employees. During booking, despite Shayne's repeated inability to stand on his own, BPD officers failed to seek a medical evaluation, obtain outside medical treatment, or provide medical care themselves. After locking Shayne in a cell, when video surveillance demonstrated that he continued to periodically ingest drugs for approximately two hours, BPD officers failed to seek a medical evaluation, obtain outside medical treatment, provide medical care themselves, or otherwise intervene. And when Shayne subsequently displayed clear symptoms of overdose in his cell, BPD officers failed to seek a medical evaluation, obtain outside medical treatment, or provide medical care themselves. These signs of overdose included remaining for approximately one hour in a position that Officer Sean Doolan described as "look[ing] as if it would be of extreme discomfort for most individuals."

14.     Any reasonable person would have understood that Shayne's symptoms made clear that he required immediate medical attention. Indeed, Officer Doolan instantly recognized that Shayne's contorted posture was a sign of urgent medical distress the very first time he walked by his cell, and he rushed into Shayne's cell to administer Narcan when Shayne did not respond to Officer Doolan calling his name. But it was too late, because despite the clear signs and their obligation to protect him, other BPD officers had walked by Shayne's cell seven times over the course of an hour—when Shayne had been in that exact same position—without providing any help.

15.     Shayne was just 28 years old. He left behind a grieving community of family and friends.

16.     Defendants' failure to obtain a medical evaluation, seek outside medical treatment, or provide medical care themselves despite Shayne's obvious signs of urgent medical

distress was objectively unreasonable towards, and deliberately indifferent to, a serious medical need in violation of his due process rights under the Fourteenth Amendment. Defendants' failures also demonstrated unlawful discrimination on the basis of Shayne's opioid use disorder in violation of the Americans with Disabilities Act ("ADA"). Shayne's estate seeks damages under 42 U.S.C. § 1983, Mass. Gen. Laws ch. 229, § 2, and the ADA.

## PARTIES

17.     Plaintiff Lynnel M. Cox is Shayne's mother and the administrator of the estate of Shayne R. Stilphen (the "Estate"). The Estate was formed under the laws of Massachusetts, by order of the Massachusetts Probate Court, to represent the interests of Shayne, who is deceased. Shayne's grieving parents, Lynnel M. Cox and Richard W. Stilphen, Jr., are the sole beneficiaries of the Estate.

18.     Defendant City is a Massachusetts municipality. The BPD is a component of the City. The BPD's headquarters are at One Schroeder Plaza, Roxbury Crossing, MA 02120. The BPD operates the lockup at the District 4 station, which is located at 650 Harrison Ave, Boston, MA 02118.

19.     Defendant Ismael Almeida was at all relevant times an officer in the BPD. His actions alleged in this complaint were taken under the color of laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

20.     Defendant Paulmichael Bertocchi was at all relevant times an officer in the BPD. His actions alleged in this complaint were taken under the color of laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

21.    Defendant Catia Freire was at all relevant times an officer in the BPD. Her actions alleged in this complaint were taken under the color of laws of the Commonwealth of Massachusetts and the City of Boston. She is sued in her individual capacity.

22.    Defendant David Marshall was at all relevant times an officer in the BPD. His actions alleged in this complaint were taken under the color of laws of the Commonwealth of Massachusetts and the City of Boston. He is sued in his individual capacity.

23.    John/Jane Doe No. 1 is an employee of the BPD who is not yet identified, who was at all relevant times an officer in the BPD. His/her actions alleged in this complaint were taken under the color of laws of the Commonwealth of Massachusetts and the City of Boston. He/she is sued in their individual capacity.[5]

## JURISDICTION AND VENUE

24.    Jurisdiction is proper under 28 U.S.C. §§ 1331, 1343, and 1367. Venue is proper under 28 U.S.C. § 1391.

## ALLEGATIONS

**Shayne Stilphen was a caring son, loving brother, and faithful friend**

---

[5]Defendants Almeida, Bertocchi, Freire, Marshall, and John/Jane Doe No. 1 are referred to collectively herein as "Defendant Officers."



*Fig. 1: Shayne with his sisters.*

25.     Shayne was born in Quincy, Massachusetts.

26.     Shayne had a huge heart and was sensitive and giving. Shayne easily made friends and gained respect wherever he went with his innate ability to make people laugh and his quick wit. As both a small boy and a grown man, Shayne helped others and put their needs before his own. Shayne was the apple of his grandparents' eyes as the first-born grandchild on both sides of the family. Shayne and his mother Lynnel shared an unwavering, loving bond. This paralleled Shayne's love for his two younger sisters, and he took his role as their older brother very seriously. Shayne never ended a telephone call with his mother without saying, "Give the girls a hug for me and tell them I love them, I love you, Mah."

27.     From a young age, Shayne loved creating art, including drawing, painting, and sketching with lead. He was a sports enthusiast, a loyal fan of all New England sports teams and a great athlete himself. As he grew older, Shayne channeled his athletic ability into weight training and his artistic talents into learning to become a barber and a cook, creating nutritious dishes for his family and friends.

28.     Shayne was also one of millions of people in this country who became addicted to opioids. Shayne began using opioids in high school, and experienced years of cycling between periods of active addiction and recovery. This experience is typical for those with OUD, which, like other chronic diseases, has stages of remission and activation.

29.     At the time of his death, Shayne had been talking to his mother about turning thirty and his future plans to enter recovery, asking her to secure a long-term recovery program for him so he could turn his desire to become the "Boston Barbah" into a reality and start his own family. Lynnel saw this as a sign that Shayne was not only contemplating recovery but preparing for a healthy future.



*Fig. 2: Shayne practicing to become the "Boston Barbah."*

30.     Even in periods of active addiction, Shayne utilized harm reduction practices because he wanted to live: he carried the overdose reversal medication Narcan and tried to use substances in the presence of other people so that they could administer this life-saving medication if he began exhibiting the clear signs of an overdose. Although Shayne overdosed

many times as a result of his disease, Narcan is extremely effective, and it repeatedly saved his life.

31.     Shayne spoke openly with his mother about the many social and systemic problems facing people living with substance use disorder. This inspired Lynnel to create "Hand Delivered Hope," an organization of people impacted by the opioid epidemic working to solve the systemic roadblocks facing those seeking treatment and living in recovery.



*Fig. 3: On the left, Shayne and Lynnel at a Hand Delivered Hope event; on the right, the Facebook page of Hand Delivered Hope.*

32.     The organization regularly delivered "hope bags," which, among other things, included a stamped note card with a pen so that people could write to someone who missed them. Lynnel included these note cards specifically because Shayne made sure to reach out through the mail to let his family know that he loved them. When Lynnel asked Shayne why he was writing home and not calling, Shayne told her, "It is too painful to hear you cry, but I want

you to know I'm thinking of you guys and I'm okay." Shayne's thoughtful actions inspired

Lynnel to find a way for other people to contact someone who loved and missed them.

33.     Hand Delivered Hope also applied Shayne's understanding of how to connect the

broader community to an otherwise forgotten population by developing an outreach program

that educated legislators, clergy, medical providers, law enforcement, and others to understand,

accept, include, and care for those living with substance use disorder.

34.     Inspired by Shayne's desire to help others, Hand Delivered Hope's numerous

statewide volunteers raised awareness, countered stigma and shame, and assisted countless

people.

**BPD's rules and procedures required officers to provide medical care to people experiencing non-OUD related health issues, but did not require officers to do the same for people who displayed signs and symptoms of opioid intoxication or overdose after arrest**

35.     At all relevant times, BPD required its officers to regularly walk by the cells of

people held in custody after arrest, dictating that the Duty Supervisor must "visit, or cause to be

visited, all persons in their custody at least once every fifteen minutes," and "ensure that each

visit is recorded in the Prisoner Inspection Record."[6]

36.     However, BPD rules and procedures did not require the officers to *look* in the

cells during these visits, *record what they observed* during a visit, or *do* anything as a result of

these visits to protect the life and health of people living with OUD who were held in custody

after arrest.

37.     Specifically, BPD's rules and procedures did not require officers to look into a

cell during these visits. It did not require officers to obtain a medical evaluation or transport

people held in their custody after arrest to a hospital if they were demonstrating signs of opioid

---

[6]BPD Rules and Procedures, Rule 318, § 14.

intoxication during booking. It did not require officers to seek outside medical treatment or provide medical care themselves to people held in their custody after arrest when they were exhibiting signs of opioid intoxication or overdose during their detention. And it did not require officers to implement protocols to prevent people held in their custody after arrest from overdosing.

38.    This stood in stark contrast to BPD's rules and procedures regarding the treatment of non-OUD medical matters in people held in their custody after arrest.

39.    Specifically, BPD mandate for "visible injuries" required that when a detained person was "found to be suffering from wounds or injuries requiring medical attention," officers *must* summon medical attention and *must* transport the detained person to the hospital if so advised.[7] The mandate for "sickness or injuries" extended to requiring a hospital transport prior to booking for "seriously injured prisoners"; noted that "[a]ny unusual appearance or behavior displayed by a prisoner shall receive immediate attention"; and stated "when a prisoner is unconscious, the Duty Supervisor shall be notified, every effort shall be made to restore consciousness and medical assistance shall be summoned."[8]

40.    Under these rules, BPD officers were required to procure medical attention for a detained person with a medical condition like a broken leg, an open wound, or a concussion. Yet no such rule directed BPD officers to take action when people were experiencing opioid intoxication or overdose—even though those conditions, like wounds or injuries or sickness, require medical attention.

41.    BPD also mandated specific protocols that were triggered "whenever, in the opinion of the Duty Supervisor or the person in charge of any police facility, a prisoner shows

---

[7]*Id.* § 2.
[8]*Id.* § 3.

indications that he may attempt to commit suicide (e.g., extreme depression, anxiety)."[9] The policies dictated that officers shall take "all reasonable precautions to prevent such an attempt," including ensuring "that the prisoner is closely monitored," dispatching "appropriate medical personnel" to the station to conduct a medical evaluation, and if such personnel are unavailable, transporting the prisoner to the hospital for such an evaluation.[10]

42.     No such protocols existed regarding the prevention of opioid overdose for people showing signs of drug intoxication, even though such people similarly require close monitoring to avoid deadly consequences.

43.     BPD was aware of the importance of providing medical care to individuals who were intoxicated with opioids. Indeed, its policy mandated that those brought into protective custody under the Massachusetts Alcoholism Treatment and Rehabilitation Law "shall be transported to a hospital or medical facility" "[i]n instances where the incapacitation is due to drugs."[11]

44.     Critically, however, no such rule existed for people held in BPD custody after arrest.

**BPD took custody of Shayne in an area known as the epicenter of the opioid epidemic**

45.     Shayne lost his life, and his family lost their loving son and caring brother, as a result of the Defendant Officers' unconstitutional and unlawful behavior and the BPD's policy, practice, and custom, including its policy, practice, and custom of failing to train, supervise, investigate, or discipline their officers.

---

[9]*Id.* § 15.
[10]*Id.*
[11]BPD Rules and Procedures, Rule 318A.

46.      Around 1:00 AM on July 14, 2019, BPD officers stopped Shayne in the Mass and Cass area at 666 Massachusetts Avenue because he matched the description of an individual who had allegedly broken into a car. BPD Officers at the scene included Officer Kevin Butcher, Officer Paulmichael Bertocchi, Officer Catia Freire, Officer Sean Doolan, Officer Kevin Zarnoch, Officer William Dick, Officer Mitchell Logan Gambon, Officer Timothy Lenane, and Sgt. Brian McManus.

47.      On information and belief, at least one of the officers who participated in Shayne's arrest was aware that he had a history of opioid use, as Officer Doolan had previously interacted with Shayne during earlier periods of incarceration.

48.      Officer Bertocchi also believed that Shayne "appeared" to have the "tendencies" of someone who used drugs.

49.      On information and belief, Shayne told Officer Doolan during his arrest on July 14, 2019, that he had ingested opioids about thirty minutes earlier and that he had recently left a detoxification treatment center.

50.      The dangerous effects of an opioid on the human body can become greater over a period of many hours.

**Throughout booking, Shayne showed obvious signs of opioid over-intoxication, but Defendant Officers failed to seek a medical evaluation, obtain medical treatment, or provide medical care**

51.      On July 14, 2019, Officers Ismael Almeida, Freire, Bertocchi, and Marshall worked a shift at District 4 station. During that shift, these officers were responsible for the safe custody of all incarcerated people under their care.[12]

---

[12]BPD Rule & Procedures, Rule 318, General Considerations.

52.    Officers Zarnoch and Freire brought Shayne to the District 4 station at approximately 1:28 AM and put him in a group holding cell for approximately half an hour before booking.

53.    In the group holding cell, Shayne swayed side-to-side while talking with Officer Bertocchi and another officer. The officers watched as Shayne took off his socks and turned them inside out; Shayne also showed the officers the inside of his mouth. Another officer later searched Shayne's mouth with a flashlight.

54.    At approximately 1:52 AM, Shayne slumped forward over his legs, his head hanging low beyond his knees.

55.    About a minute later, Officer Bertocchi entered the cell while Shayne was still in this contorted position. Shayne straightened up and took a carton of milk from Officer Bertocchi, who soon left the group holding cell.

56.    At approximately 1:55 AM, Shayne again slumped forward with his head dropping past his knees.



*Fig. 4: Shayne slumped forward in the group holding cell as Officer Bertocchi entered.*

57.     Officer Zarnoch escorted Shayne from the group holding cell to the station's booking area at approximately 1:58 AM.

58.     Officer Almeida worked as the booking officer on July 14, 2019. As the booking officer, Officer Almeida was responsible for collecting Shayne's personal information, fingerprinting Shayne, searching Shayne, and taking Shayne's photographs. Officer Almeida described District 4 as being "in the middle of the methadone mile."

59.     Officer Freire and Officer Bertocchi assisted Officer Almeida with Shayne's booking process. Officer Bertocchi thought that it was common for people arrested in the area where Shayne was arrested to have tendencies of people who use drugs.

60.     District 4's booking area is subject to video surveillance and recording. As demonstrated by the videos of Shayne's booking, Shayne showed obvious signs of over-intoxication, as his body contorted into unnatural postures and he struggled to stay awake and stand on his own throughout the twenty-three-minute booking process. Even without specific training, any reasonable person would have understood that Shayne needed medical assistance given these symptoms, yet the Defendant Officers failed to seek a medical evaluation, obtain outside medical treatment, or provide medical care themselves.

61.     For example, in a five-minute period during Shayne's booking process, Officers Bertocchi and Freire had to help Shayne stand a total of seven times. Officer Bertocchi repeatedly had to put his hand on Shayne's back; when this was not enough to help Shayne stand, Officer Bertocchi ultimately had to hold Shayne's arm to ensure that he remained upright and tap Shayne to try to keep him awake.



*Fig. 5: (Top Left) Officer Bertocchi propping Shayne up during the fingerprinting process; (Top Right) Less than 30 seconds later, Officer Bertocchi again propping Shayne up; (Bottom Left) For a third time within two minutes, Officer Bertocchi propping Shayne up; (Bottom Right) Officer Bertocchi tapping Shayne in an attempt to keep him awake.*

62.    Even after these interventions, Shayne still could not remain steady on his feet, and Officers Bertocchi and Freire once again placed their arms on his back to help him stand. While Officer Bertocchi physically moved Shayne's hand during the fingerprint process, Officer Freire had to place her hand on Shayne's back to help him remain standing.

17



*Fig. 6: (Top Left) Officer Bertocchi standing closely behind Shayne while he struggles to stand; (Top Right) Officer Freire propping Shayne up during the fingerprinting process; (Bottom Left) Officer Freire propping Shayne up while Officer Bertocchi is holding Shayne's hand to fingerprint him; (Bottom Right) Shayne struggling to stand when left without the support of Officers Bertocchi or Freire.*

63.    Shayne could not stand while having his booking photos taken. He leaned against the wall and began to slump down numerous times, while Officers Bertocchi and Freire stood and watched. On information and belief, Officer Almeida saw this unfold through the booking window.



*Fig. 7: Officers Bertocchi and Freire watching Shayne struggle to stand while posing for booking photos.*



*Fig. 8: Shayne's booking photos.*

64.    Shortly after the photos were taken, Officer Bertocchi completed a quick search of Shayne. Officer Bertocchi patted down the outside of Shayne's clothing, slid his finger under the band of his shorts, and shook the back pockets of his shorts.

65.    Although any reasonable person would have recognized Shayne's urgent need for medical attention in light of these symptoms, Officers Almeida, Bertocchi, and Freire neither requested that a doctor, nurse, or emergency medical technician come to the station for a medical evaluation, nor transported Shayne to the hospital for medical treatment, nor provided medical care themselves.

**Defendant Officers did not intervene after observing obvious signs of Shayne's urgent medical distress while he was detained alone in a cell**

66.    Once booking was completed, Officers Bertocchi and Freire took Shayne to a single-person cell.

67.    Almost immediately after he was locked in the cell, and while Officers Bertocchi, Freire, and John/Jane Doe No. 1 remained directly outside, Shayne slumped over his legs with his arms bent awkwardly behind him in an unnatural position.

68.    Any reasonable person who viewed Shayne in this position would have understood that he urgently needed medical attention. But Defendant Officers ignored these signs of medical distress, and left Shayne alone in his cell.



*Fig. 9: Shayne bent over his legs almost immediately after being locked in his cell, with Officers Bertocchi, Freire, and John/Jane Doe No. 1 standing outside ignoring him.*

69.    For the next several hours, Shayne should have been clearly visible to officers both through the surveillance video of his cell, which streamed into the booking area, and physical monitoring of his cell. Throughout the time that Shayne was detained in his cell in the District 4 Station on the morning of July 14, 2019, Officer Almeida walked by Shayne's cell approximately every fifteen minutes.

70.     At approximately 2:33 AM, roughly ten minutes after being placed in the cell, Shayne retrieved a baggie—later revealed to contain drugs—from his shorts. Soon thereafter, he began to ingest drugs from the baggie, and continued to do so periodically for the next two hours, appearing to temporarily lose consciousness at different points in between ingestion.

71.     These actions should have been visible both on the surveillance footage streaming into the booking area and from the hall outside Shayne's cell, where officers periodically walked by throughout this time. Indeed, the person detained in the cell across the hall from Shayne reported that he saw Shayne ingesting drugs and stated, "it looked like he had been doing it for a while."

72.     Based on the video surveillance of Shayne's cell that was streaming into the booking area, Defendant Officers knew or should have known that Shayne was continuing to ingest drugs while he was in his cell and that Shayne was in dire need of medical attention, yet they did nothing to stop Shayne from ingesting drugs, to seek a medical evaluation, to obtain outside medical treatment, or to provide medical care themselves.

73. According to the BPD's investigation, at 4:43 AM, Officer Marshall walked by Shayne's cell while Shayne simultaneously putting his right hand behind his waist and likely in his pants. According to the BPD's investigation, Officer Marshall did not look into the cell at that time.

74. Soon after Officer Marshall left, Shayne appeared to ingest drugs for the last time.

75. For the next six minutes, Shayne's body periodically jerked as he tried to remain upright. At approximately 4:48 AM, Shayne slumped forward, his limp torso awkwardly folding over his crossed legs.

76.    Between 4:48 AM and 5:39 AM, Shayne remained in this exact same position of distress. Any reasonable person would have understood this to mean that Shayne needed immediate medical attention.

77.    During those 51 minutes, officers walked by his cell seven times, and his cell was subject to continuous video surveillance. During this time, the officers had access to Narcan. Yet not a single officer entered Shayne's cell, attempted to rouse him, sought outside medical treatment, or provided medical care themselves.



*Fig. 10: (Top Left) Officer Almeida walking by Shayne's cell at 4:55 AM, seeing him in a manifestly abnormal position, and failing to help him; (Top Right) Officer Almeida walking by Shayne's cell at 5:05 AM, seeing him in the same position, and failing to help him; (Bottom Left) Officer Almeida walking by Shayne's cell at 5:10 AM without looking inside; (Bottom Right) Unidentified officer walking by Shayne's cell at 5:20 AM, seeing him in the same position, and failing to help him.*

78.     Officer Almeida walked by Shayne's cell at approximately 4:55 AM, 5:05 AM, and 5:10 AM. Officer Almeida appeared to have looked inside Shayne's cell on at least two of these instances and saw Shayne sitting in the same manifestly abnormal position, but he did nothing to help Shayne.

79.     Two unidentified officers walked by Shayne's cell at approximately 5:20 AM. At least one of these officers appeared to have looked inside Shayne's cell. Despite seeing Shayne in the same contorted position, this officer did nothing to help him.

80.     Officer Almeida walked back and forth by Shayne's cell at 5:35 AM. He did not appear to look inside the cell, and he did nothing to help Shayne.

81.     At approximately 5:39 AM, Officer Marshall dropped food through the slot in Shayne's door and stared into the cell. Although Shayne was in the same manifestly abnormal position, Officer Marshall did nothing to help him.

82.     According to the BPD's own investigation, Shayne took his last breath at the exact moment—5:39 AM—that Officer Marshall observed Shayne's contorted body and, like his colleagues, chose to do nothing.

83.     According to Sergeant Detective Lucas E. Taxter of BPD's Internal Investigations Unit, "although Almeida and Marshall conducted rounds of the cellblock, disabled the prisoner inspection alarm, and recorded their inspections in the Prisoner Inspection Log, they did not take any measures to check on Stilphen's wellbeing and ensure that he was not in any distress, even though he was seated in a very unusual position for one hour and four minutes."



*Fig. 11: (Top Left) Officer Almeida walking by Shayne's cell at 5:35 AM, without looking inside; (Top Right) Officer Almeida walking by Shayne's cell at 5:35 AM, without looking inside; (Bottom Left) Officer Marshall looking in Shayne's cell at 5:39 AM, seeing him in a manifestly abnormal position, and failing to help him; (Bottom Right) Officer Marshall placing food through the slot in Shayne's door at the moment Shayne took his last breath.*

**BPD Officers only responded after it was too late to save Shayne's life**

84.     At approximately 5:51 AM, it was time to walk by the cells again. Because the booking officers were occupied with another detainee, Officer Doolan filled in for Officer Almeida to conduct the walk through.

85.     Officer Doolan reported that as he walked by Shayne's cell the very first time, he observed him "in a position that looked as if it would be of extreme discomfort for most individuals." In fact, Shayne had been in that same position for over an hour while his cell was

25

subject to continuous video surveillance. Officers had walked by Shayne *seven times* while he

was in this position, but no one other than Officer Doolan reacted to Shayne's obvious need for

immediate medical attention.



*Fig. 12: At 5:51 AM, Officer Doolan walked by for the first time, noticed that Shayne was in a position of "extreme discomfort," and intervened.*

86.    Officer Doolan kicked the cell door and yelled out Shayne's name. When he did

not receive a response, he called Officer Almeida to open the cell. Officer Doolan reported that

when he and Officer Almeida entered the cell, they "immediately noticed Shayne to be

unresponsive" and noted that his "body was limp and appeared drained of color."

87.    Although the officers had access to Narcan the entire time that Shayne was at

District 4, no officer attempted to administer Narcan until Officer Doolan finally intervened and

called for help.

88.    Officer Almeida began cardiopulmonary resuscitation ("CPR"), and Officer

Doolan attempted to administer Narcan but appeared on video to struggle to administer it.

Officer Doolan threw the dose to the floor and an officer ran to retrieve more. During this time, Officer Bertocchi took over administering CPR to Shayne. The officers administered at least two additional doses of Narcan while waiting for Boston Emergency Medical Services ("EMS") to arrive.

89.     There was a point at which Narcan could have saved Shayne's life. But by the time the BPD intervened, it was too late to successfully reverse Shayne's overdose. His heart had stopped beating.

90.     Boston EMS arrived approximately five minutes after the officers entered Shayne's cell. EMS took over the medical efforts, utilizing an automated external defibrillator ("AED") and starting an IV to administer epinephrine. These efforts induced Shayne to briefly regain a pulse, but they did not save his life. EMS took Shayne to Tufts Medical Center in an ambulance. Either on the way to or soon after arriving at Tufts, Shayne went back into cardiac arrest.

91.     At the time of his death, Shayne was in BPD custody.

92.     The medical examiner concluded that Shayne's cause of death was an accidental overdose.

**Shayne's loss was deeply and widely felt**

93.     Shayne's family was devasted by his death and has experienced severe emotional distress as a result of his loss.

94.     Shayne's mother, Lynnel, was further shattered by the fact that the BPD did not inform her of her first-born child's death until his body was released to the medical examiner, even though she was listed as his next of kin. This robbed Lynnel and the rest of Shayne's family of the chance to hold Shayne and say goodbye.

95.    Lynnel thinks about Shayne every day. Not a day goes by that she does not cry over losing him. His death has taken everything from her.

96.    Within weeks of Shayne's passing, Lynnel's grief was compounded when she discovered that BPD had lost Shayne's possessions. When Lynnel requested Shayne's belongings, BPD provided her with a bag marked with his name that contained clothing that did not belong to her son. To date, BPD has been unable to explain what happened to, or provide a record of, the clothes Shayne wore the night he died.

97.    Instead, officers provided conflicting accounts during interviews conducted for the Internal Affairs investigation into Shayne's death. The one thing on which all of the officers could agree is that no one knew what happened to Shayne's clothing.

98.    Lynnel continues to be haunted by these actions, as they stole from her the opportunity to save the last items her son wore while he was still alive.

99.    Shayne's two younger sisters have been similarly rocked by Shayne's death. Not a day goes by that they do not think of Shayne as they manage their own pain at losing their only brother, and watch their mother struggle with the agony of losing her only son.

100.    For years following Shayne's death and every so often even to this day, Lynnel receives messages from people sharing with her the positive impact that Shayne had on their lives. One staff person at a rehabilitation facility where Shayne was a patient shortly before he died wrote: "There are people that you meet along the way that will forever remain in your heart and Shayne was one of those people."

101.    The impact of Shayne's death was even felt by the incarcerated people, corrections officers, lawyers, and judges with whom he came in contact during his life.

102.     Shayne had interacted with many incarcerated people and several Suffolk County House of Corrections officers from prior periods of incarceration due to his addiction. Several of those officers attended Shayne's funeral, and people who were still incarcerated held a service within the jail to honor him.

103.     In addition, after learning of Shayne's death, a judge at the Charlestown Drug Court (where Shayne had appeared several times due to his addiction) held a moment of silence at the court in honor of Shayne's life. According to one drug court employee, in her experience that was the only time that the court ever held a moment of silence in this manner.

**Defendants caused Shayne's death by failing to seek a medical evaluation, obtain medical treatment, or provide medical care**

104.     Shayne remained in BPD custody until he died. BPD held Shayne as a pretrial detainee. He was not being held under a criminal conviction and was not serving a criminal sentence.

105.     While Shayne was in BPD custody, any reasonable person would have understood that he had serious medical needs given his symptoms. Shayne's unusual posturing and his inability to stay awake or stand on his own throughout the booking process would have alerted any reasonable person that Shayne urgently needed medical help. Similarly, as Officer Doolan's response the very first time he observed Shayne at 5:51 AM demonstrated, the contorted position of Shayne's body in the cell made clear that he required immediate medical attention. Nevertheless, BPD officers walked by Shayne's cell seven times while he remained in this position during the last hour of his life and did nothing: they either failed to perceive the clear and obvious signs that Shayne was in a state of urgent medical distress, or ignored those signs, causing his death.

106.     Shayne's need for medical attention was especially obvious given that he was arrested in the Mass and Cass area; at least one of the officers on duty at District 4 during his detention knew that Shayne had a history of opioid use and had ingested opioids about half an hour before his arrest; and Shayne visibly continued to ingest opioids while he was detained.

107.     Defendant Officers Almeida, Bertocchi, Freire, Marshall, and John/Jane Doe No. 1 knew or should have known of, and acted in a manner that was objectively unreasonable towards, and deliberately indifferent to, the serious risk to Shayne's health and safety by taking him to a cell without first providing a medical evaluation, and then leaving him alone in that cell without seeking outside medical treatment or providing medical care themselves. Although these officers observed obvious signs that Shayne was under the influence of opioids and at high risk of an overdose, they did not request a medical evaluation for Shayne, provide medical care to Shayne, adequately monitor Shayne to ensure his health and safety, administer Narcan to Shayne when it was evident that Shayne was exhibiting signs of opioid overdose, call an ambulance for Shayne, or otherwise seek outside medical treatment for Shayne until he had already stopped breathing. Instead, Defendant Officers consciously and unreasonably failed to provide Shayne with medical care of any kind while he was in their custody.

108.     Had the officers provided Shayne with an adequate medical evaluation after his booking, he would have been subject to close and careful monitoring. Such monitoring is part of the standard of care for highly intoxicated individuals out of both a concern that the dangerous effects of an opioid on the human body can become greater over many hours and a concern that such individuals are more likely to engage in conduct that may harm themselves or others. Had Shayne been provided an adequate medical evaluation, he would not have died.

109.    Had the officers sought outside medical treatment for Shayne or provided Shayne with adequate medical care themselves, including but not limited to repositioning Shayne's body, attempting to rouse him, calling 911, and/or administering the medication Narcan earlier, Shayne would not have died.

110.    If diagnosed and treated at an appropriate time, opioid overdose is reversible. When administered in time, Narcan saves lives. According to the Massachusetts Bureau of Substance Abuse Services: "Giving [Narcan] to someone who has overdosed restores normal breathing, by reversing the effects of opioids. It is safe, easy to administer, and has no potential for abuse."[13]

111.    Indeed, Narcan had saved Shayne's life before.

112.    Had Shayne received appropriate medical care while in BPD custody, he also would have survived on July 14, 2019. If the Defendant Officers had sought outside medical treatment or provided medical care themselves earlier, the Narcan would have been effective, and Shayne would not have died that day.

113.    Defendants' deliberate, intentional, and unreasonable failure to seek a medical evaluation for Shayne, obtain outside medical treatment for Shayne, or provide Shayne medical care themselves caused Shayne's death.

**BPD's policies, practices, customs, including its policy, practice, and custom of failing to train, supervise, investigate or discipline their officers, caused the Defendant Officers to deny Shayne's constitutional right to medical care**

114.    The BPD's policies, practices, customs, were the moving force behind the violations of Shayne's constitutional rights by the Defendant Officers.

---

[13]Massachusetts Bureau of Substance Addiction Services, *How to Reverse an Overdose*, https://www.mass.gov/service-details/how-to-reverse-an-overdose.

115.     As described above, *supra* paras. 35-44, BPD's rules and procedures required officers to seek a medical evaluation, obtain outside medical treatment, or provide medical care themselves when incarcerated people displayed signs of non-OUD-related medical needs, but failed to include such requirement for people displaying signs and symptoms of opioid intoxication or overdose after an arrest.

116.     In addition, a public records request to the BPD yielded no directives, Special Orders, Commissioner's Memoranda, or Training Bulletins in place at the time of Shayne's death regarding the booking or detaining of people showing signs of intoxication after arrest.

117.     As a result, on information and belief, at all relevant times, BPD did not require its officers to seek a medical evaluation, obtain outside medical treatment, or provide medical care themselves for people held in custody after arrest who showed signs and symptoms of opioid intoxication or overdose.

118.     Given the location of the District 4 station, the frequency with which officers at the District 4 station arrest and detain intoxicated people, and the prior incidents of overdoses at the District 4 station, this policy, practice, and custom was objectively unreasonable, and deliberately indifferent, to a serious medical need.

119.     The BPD's policy, practice, and custom of failing to train its officers to recognize and respond to opioid intoxication or overdose in detainees after arrest was also the moving force behind the violations of Shayne's constitutional rights by the Defendant Officers.

120.     In response to a public records request seeking "all records containing, discussing or reflecting any trainings administered to BPD employees regarding: overdose prevention; recognizing signs & symptoms of intoxication; deciding when to seek medical care for someone

showing signs or symptoms of intoxication; [or] administering the overdose reversal medication

NARCAN," the BPD did not produce any documents dated prior to Shayne's death.

121.     Notwithstanding this lack of document production, several District 4 Officers

stated during Internal Affairs interviews taken in the wake of Shayne's death that they did

receive Naloxone training.

122.     Any training that existed, however, was constitutionally insufficient because it

did not educate its officers to recognize and respond to opioid intoxication or overdose in

detainees after arrest.

123.     Three officers working in District 4 on July 14, 2019 could not remember if the

Naloxone training included the recognition of signs and symptoms of an overdose. While

Officers Bertocchi and Freire stated that the training did review these signs, their explanation

that Shayne did not display any of the symptoms they had learned during the training

demonstrates that the training was constitutionally inadequate.

124.     Shayne could not stay awake or stand on his own during booking; he repeatedly

collapsed into painful-looking positions in the group holding cell and his individual cell; and he

did not move from one such contorted position for more than hour before he died. These are

classic signs that someone is at a high risk of overdose even if that person is able to respond to

stimulus. A training that suggested that someone displaying these symptoms did not require

medical attention was constitutionally deficient.

125.     BPD had notice that the training of its officers on opioid intoxication and

overdose was inadequate to stop the otherwise preventable deaths of people held in their custody

after arrest.

126.    Specifically, Mr. Smith's death forty-seven days before Shayne's death, while in BPD custody at District 4 under similar circumstances, demonstrated that the BPD knew or should have known that their training was inadequate. But nonetheless the BPD exhibited objective unreasonableness towards, and deliberate indifference to, the fatal and unconstitutional effects of these inadequacies.

127.    On May 26, 2019, Mr. Smith was taken into BPD custody at the District 4 station and placed in a single-person cell after booking.

128.    The first day and a half of Mr. Smith's detention was relatively uneventful. But between the hours of 6:00 PM and 6:30 PM on May 27, 2019, Mr. Smith repeatedly ingested drugs in his cell. Mr. Smith's actions should have been clearly visible on BPD's surveillance video and from the hallway outside his cell.

129.    Minutes later, Mr. Smith experienced what appeared to be a seizure, as his body shook and his limbs flailed uncontrollably. This was clearly visible on BPD's surveillance video. Mr. Smith then became motionless on the bench in his cell, and for the next thirteen minutes, visibly struggled to breathe.

130.    According to the BPD's investigation, Mr. Smith took his last breath at approximately 6:40 PM.

131.    Over the next four and a half hours, an officer walked by Mr. Smith's cell a total of nineteen times, looking into his cell on five of those occasions. Each of those five times Mr. Smith remained in the exact same position: face down on the cell bench.

132.    Between 11:30 PM on May 27, 2019, and 12:15 AM on May 28, 2019, officers walked by Mr. Smith's cell four times.

133.     Between the hours of 12:29 AM and 4:00 AM, Officer Ismael Almeida—the same officer who booked Shayne and walked by his cell throughout the night of his arrest—was assigned to the booking desk at the District 4 station. Officer Almeida walked by Mr. Smith's cell a total of fourteen times during these hours as Mr. Smith remained in the exact same position, but he never looked in.

134.     At approximately 4:00 AM, an alarm rang and the Boston Fire Department arrived. Officer Almeida and another officer walked by Mr. Smith's cell during this time. If either officer had glanced in, they would have noticed that, despite the commotion, Mr. Smith had not changed his position.

135.     At approximately 5:00 AM, an officer placed Mr. Smith's breakfast in his cell. At 6:22 AM, that same officer walked by Mr. Smith's cell and looked inside. It had been nearly eleven hours since Mr. Smith had eaten dinner, and the officer noted that Mr. Smith had not touched his breakfast. Despite this observation, the officer did not enter Mr. Smith's cell, attempt to rouse him, or seek medical assistance.

136.     Instead, the BPD only discovered that Mr. Smith had died when, fourteen hours after he took his last breath, Officer Kevin Butcher attempted to wake him for a scheduled court hearing. At that time, Officer Butcher discovered that Mr. Smith was stiff and not moving. When EMS arrived, resuscitation was not attempted due to "obvious signs of death."

137.     On information and belief, the BPD did not implement any new or additional training as a result of Mr. Smith's death, nor did it change any of its policies or protocols.

138.     Instead, the BPD deliberately, unreasonably, and unconstitutionally continued to implement an inadequate training program for their employees that was the moving force in Shayne's death.

139.    Finally, the BPD's policy, practice, and custom of failing to supervise, investigate, and discipline BPD officers who violated the rights of people living with OUD to receive reasonable and adequate medical care while in custody was also the moving force behind the violations of Shayne's constitutional rights by the Defendant Officers.

140.    A few months after Mr. Smith's death, the BPD's Internal Affairs Unit ratified the actions of its officers by concluding that Mr. Smith's death did not involve any violation of BPD rules and procedures.

141.    On information and belief, this investigation was insufficient, as there are no audio records of any interviews and no record of a Form 26 report from Officer Almeida.

142.    On information and belief, the involved officers were never subject to any discipline as a result of Mr. Smith's death.

143.    Through its failure to supervise, investigate, and discipline its officers, the BPD tolerated, and was objectively unreasonable towards, and deliberately indifferent to, the fatal and unconstitutional effects of BPD officers' behavior.

144.    This sent a message to BPD officers and employees, including Defendant Officers, that they could violate the rights of others with impunity. In turn, this resulted in the Defendant Officers' objective unreasonableness towards, and deliberate indifference to, Shayne's need for medical care.

145.    The BPD's practice and custom of condoning civil rights violations by BPD employees is also shown by its efforts to shield the violations in this case.

146.    The Internal Affairs investigation into Shayne's death remained open for nearly three years. The recorded Internal Affairs interviews occurred five to seven months after Shayne

had died. The investigation remained open for more than two years after these interviews without a conclusion.

147.    The longest recorded interview—Officer Almeida's interview—lasted approximately 19 minutes. All of the other interviews lasted approximately 13 minutes or less. Officer Doolan was not interviewed.

148.    At the time of filing, nearly three years after Shayne's death, Lynnel still did not know if any of the involved officers were subject to any discipline.

## CLAIMS FOR RELIEF

### Count I - Unconstitutional Failure to Provide Medical Care, Treatment, and Monitoring in Violation of the Fourteenth Amendment's Right to Due Process (42 U.S.C. § 1983)
(against all Defendants)

149.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth here in their entirety.

150.    Defendant Officers Almeida, Bertocchi, Freire, Marshall, and John/Jane Doe No. 1, and the City of Boston are persons within the meaning of 42 U.S.C. § 1983.

151.    On July 14, 2019, Shayne Stilphen was held in custody by BPD, a component of Defendant City of Boston, and specifically subject to the custody and control of Defendant Officers Almeida, Bertocchi, Freire, Marshall, and John/Jane Doe No. 1.

152.    On July 14, 2019, Defendant Officers Almeida, Bertocchi, Freire, Marshall, and John/Jane Doe No. 1 were aware of Shayne's serious medical needs, and deliberately and unreasonably failed to seek a medical evaluation, obtain outside medical treatment, or provide him with medical care themselves. This failure was pursuant to the policies, practices, and customs of the BPD as described above, including but not limited to its written rules and procedures, and its failure to train, supervise, investigate and discipline its officers.

153.    Defendants' refusal to seek a medical evaluation, obtain outside medical treatment, or provide Shayne with medical care themselves caused Shayne to die.

154.    Defendants' actions deprived Shayne of his rights, privileges, or immunities secured by the U.S. Constitution and laws, including his clearly established due process rights under the Fourteenth Amendment to the U.S. Constitution, in violation of 42 U.S.C. § 1983.

155.    Defendants' actions were taken with reckless disregard for Shayne's constitutional rights.

156.    As a result of Defendants' actions, Shayne and his next of kin lost his reasonably expected income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice. Shayne died because of Defendants' actions. As a result, his grieving parents and sisters lost their only son and brother.

### Count II - Violation of Title II of the Americans with Disabilities Act (ADA)
(against Defendant City of Boston)

157.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth here in their entirety.

158.    Defendant City of Boston and its component BPD are public entities subject to the ADA.

159.    Drug and alcohol addiction is a "disability" under the ADA. *See* 42 U.S.C. §§ 12102 and 12131(2); 28 C.F.R. § 35.108 (The phrase "physical or mental impairment includes, but is not limited to . . . drug addiction.").

160.    Shayne Stilphen was subject to the custody and control of BPD from approximately 1:37 AM on July 14, 2019, until he was declared dead at 6:48 AM that same day.

161.    Throughout his time in BPD's custody, Shayne was a qualified person with a disability, including because he had a physical or mental impairment that substantially limited

one or more major life activities, and because the BPD regarded him as having a mental or physical impairment within the meaning of the ADA.

162.    BPD intentionally and unreasonably discriminated against Shayne on account of his OUD by failing to implement policies and train its officers in methods that would have provided Shayne with an adequate medical evaluation, monitoring, care, and treatment.

163.    BPD intentionally and unreasonably discriminated against Shayne on account of his OUD because its policies and training treated OUD-related medical needs differently from other kinds of medical needs.

164.    Defendant Officers intentionally and unreasonably discriminated against Shayne on account of his OUD by failing to obtain an adequate medical evaluation, seek outside medical treatment or provide medical care themselves despite his clear signs of urgent medical distress.

165.    Because of Shayne's disability, BPD and Defendant Officers intentionally discriminated against Shayne, failed to provide him with adequate treatment for his medical conditions, deprived him of the benefits of its medical program, and were objectively unreasonable towards, and deliberately indifferent to, his serious medical needs.

166.    BPD's unlawful discrimination against Shayne caused his death.

167.    Separately, BPD is vicariously liable for the Defendant Officers unlawful discrimination against Shayne.

168.    As a result of Defendant's actions, Shayne and his next of kin lost his reasonably expected income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice. Shayne died because of Defendant's actions. As a result, his grieving parents and sisters lost their only son and brother.

**COUNT III - Wrongful Death (Mass. Gen. Laws ch. 229, § 2)**
(against Defendant Officers Ismael Almeida, Paulmichael Bertocchi, Catia Freire, David
Marshall, and John/Jane Doe No. 1)

169.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth here in
their entirety.

170.    Defendant Officers caused Shayne Stilphen's death by intentional acts.

171.    Shayne's next of kin, by and through the Estate, is entitled to compensation for
the loss of Shayne's reasonably expected income, services, protection, care, assistance, society,
companionship, comfort, guidance, counsel, and advice.

## JURY DEMAND

Plaintiff requests a trial by jury for all claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

1.    Award Plaintiff compensatory damages and statutory interest;

2.    Award Plaintiff punitive damages against Defendants Ismael Almeida,
Paulmichael Bertocchi, Catia Freire, David Marshall, and John/Jane Doe No. 1;

3.    Award Plaintiff attorneys' fees and costs; and

4.    Grant such other and further relief as the Court deems just and proper.

[signature block on next page]

February 22, 2023                          Respectfully submitted,

                                           */s/Robert Frederickson III*
                                           Robert Frederickson III (BBO #670111)
                                           GOODWIN PROCTER LLP
                                           100 Northern Avenue
                                           Boston, Massachusetts 02210
                                           Tel.: (617) 570-1000
                                           rfrederickson@goodwinlaw.com

                                           Matthew R. Segal (BBO #654489)
                                           Jessie J. Rossman (BBO # 670685)
                                           Alexandra Arnold (BBO # 706208)
                                           American Civil Liberties Union
                                           Foundation of Massachusetts, Inc.
                                           One Center Plaza, Suite 850
                                           Boston, MA 02108
                                           Tel.: (617) 482-3170
                                           msegal@aclum.org
                                           jrossman@aclum.org
                                           aarnold@aclum.org

                                           Alexandra D. Valenti (*Pro hac vice*)
                                           Christine Armellino (*Pro hac vice*)
                                           Gabriella Montes (*Pro hac vice*)
                                           Wrenne Bartlett (*Pro hac vice*)
                                           GOODWIN PROCTER LLP
                                           The New York Times Building
                                           620 Eighth Avenue
                                           New York, NY 10018
                                           Tel.: (212) 459-7351
                                           avalenti@goodwinlaw.com
                                           carmellino@goodwinlaw.com
                                           gmontes@goodwinlaw.com
                                           wbartlett@goodwinlaw.com

                                           Matthew Ginther (*Pro hac vice*)
                                           GOODWIN PROCTER LLP
                                           1900 N Street, NW
                                           Washington, DC 20036
                                           Tel.: (202) 346-4000
                                           mginther@goodwinlaw.com

                                           *Attorneys for Plaintiff Lynnel Cox, as administrator*
                                           *of the estate of Shayne R. Stilphen*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served electronically on February 22, 2023 via the CM/ECF system to registered participants as identified on the Notice of Electronic Filing.

Dated: February 22, 2023                    /s/ Robert Frederickson III
                                            Robert Frederickson III