# Exhibit B



**D E P A R T M E N T**                        *1 Schroeder Plaza, Boston, MA 02120-2014*

| | |
|---|---|
| **To:** | **Deputy Superintendent Eddy Chrispin**<br>**Assistant Chief, Bureau of Professional Standards** |
| **From:** | **Sergeant Detective Lucas E. Taxter**<br>**Internal Investigations Unit** |
| **Date:** | **February 16, 2020** |
| **Subject:** | **IAD2019-0519** |
| **Employee:** | **Lieutenant James M. Foley**<br>**ID# 12260** |
| **Violation:** | **Rule 318 § 03 – Prisoners; Sickness or Injury**<br>**Rule 318 § 13 – Prisoner Inspection**<br>**Rule 106 § 12 – Duty Supervisor** |
| **Employee:** | **Police Officer Ismael L. Almeida**<br>**ID# 99715** |
| **Violation:** | **Rule 318 § 03 – Prisoners; Sickness or Injury**<br>**Rule 318 § 13 – Prisoner Inspection** |

**Incident Summary**

On Sunday, July 14, 2019, Shayne Stilphen ingested a controlled substance while in custody at District 4 and was later found unresponsive in cell 19. Officers and Emergency Medical Technicians performed life-saving measures and resuscitated Stilphen, however, he was pronounced deceased after his arrival at Tufts Medical Center. Stilphen's mother, Lynnel Cox, alleged that Stilphen's clothing was lost sometime after he was brought to the hospital. A preliminary investigation into Stilphen's death revealed potential violations of Rule 318 – Prisoners and Rule 102 § 4 – Neglect of Duty. (Attachment 1)

**Interview Summary of Police Officer Michael P. Pankievich**

On December 18, 2019, at 7:09 am, Sergeant Detectives Lucas Taxter and John Fitzgerald conducted an audio-recorded interview of Police Officer Michael Pankievich within the offices of the Internal Affairs Division at Boston Police Headquarters. Officer Pankievich was represented by Attorney Bryan Decker, BPPA.

Prior to the interview starting, Pankievich was provided with a copy of Police Commissioner's Memorandum 10-007, *Disciplinary Policy Statement*. He acknowledged receipt and understanding of the document. The following synopsis is not intended to be

*Mayor Martin J. Walsh*

**COB 02289**

a verbatim account of that interview.  Information was provided in narrative form and as a result of direct questioning.

Pankievich acknowledged that he worked a morning watch tour of duty on Saturday, July 13th to the 14th, 2019.  At the time, he was a Field Training Officer and was partnered with Officer Alex Rosa.  Pankievich described this night as particularly busy, primarily due to an officer-in-trouble call that resulted in an arrest of a man who severely injured himself in the wagon bay.  That incident resulted in the notification of several specialized units including the Homicide Unit, the Crime Scene Response Unit, and Internal Affairs.

Later that morning, while in the station, Pankievich heard an officer say that a prisoner was in distress in the cellblock.  Pankievich immediately radioed Operations and requested EMS.  He then joined other officers in cell 19 who were already attending to Stilphen.  Stilphen was eventually transported to Tufts Medical Center and Pankievich followed.

Stilphen was pronounced deceased at 6:48 am.  Pankievich called the Duty Supervisor's office, informed Lieutenant Foley, and asked if he should collect Stilphen's belongings.  Foley replied that he would get back to him.  A short time later, Foley called Pankievich and instructed him to collect Stilphen's clothing and bring it back to D-4.  Pankievich obtained two paper evidence bags from hospital security.  He put Stilphen's sneakers in one bag, and his shorts in the other.

At approximately 7:00 am, Pankievich returned to D-4, brought the bags into the Duty Supervisor's office, and asked Foley where he should put them.  Initially, Foley told Pankievich to hold onto them, but then instructed him to place them on the floor in the back corner of the office.  Foley advised Pankievich he would tell Sergeant Detective Mitchell from Homicide that the bags were there.  Pankievich testified that he did not know what happened to the bags of clothing after he left them in the Duty Supervisor's office.

Under direct questioning, Pankievich testified that he had no interaction with, nor did he make any observation of, Stilphen prior to responding to the medical emergency in cell 19.

**Interview Summary of Police Officer Alex Rosa**

On February 6, 2020, at 10:50 am, Sergeant Detectives Lucas Taxter and John Fitzgerald conducted an audio-recorded interview of Police Officer Alex Rosa within the offices of the Internal Affairs Division at Boston Police Headquarters.  Officer Rosa was represented by Police Officer William Moran, BPPA.

Prior to the interview starting, Rosa was provided with a copy of Police Commissioner's Memorandum 10-007, *Disciplinary Policy Statement*.  He acknowledged receipt and understanding of the document.  The following synopsis is not intended to be

COB 02290

a verbatim account of that interview. Information was provided in narrative form and as a result of direct questioning.

Rosa acknowledged that he worked a last half on July 13th into the 14th, 2019, in District 4. At the time, Rosa was a new Recruit Officer and was partnered with his Field Training Officer, Michael Pankievich. Rosa testified that he and Pankievich were directed by Lieutenant Foley to respond to Tufts Medical Center (TMC) to guard a prisoner, Shayne Stilphen. At 6:48 am, Stilphen was pronounced deceased by Dr. Justin Popso. At that time, Rosa observed Pankievich on the phone. They were instructed to collect Stilphen's clothing and bring it back to District 4. Rosa did not know who Pankievich was on the phone with.

Under direct questioning, Rosa testified that he did not observe Pankievich package Stilphen's belongings in the two evidence bags, nor did he know what the contents were. Rosa brought the bags into District 4 and left them in the booking area at the request of Sergeant Detective Mitchell. Rosa was not aware that Stilphen's clothing was missing until he received the notice to appear at IAD. Rosa did not observe or interact with Stilphen until he was told to respond to TMC.

**Interview Summary of Police Officer Catia Freire**

On February 13, 2020, at 7:10 am, Sergeant Detectives Lucas Taxter and John Fitzgerald conducted an audio-recorded interview of Police Officer Catia Freire within the offices of the Internal Affairs Division at Boston Police Headquarters. Officer Freire was represented by Attorney Peter Pasciucco, BPPA.

Prior to the interview starting, Freire was provided with a copy of Police Commissioner's Memorandum 10-007, *Disciplinary Policy Statement*. She acknowledged receipt and understanding of the document. The following synopsis is not intended to be a verbatim account of that interview. Information was provided in narrative form and as a result of direct questioning.

Freire acknowledged that she worked a last half on July 13th into the 14th, 2019 on District 4. At the time, Freire was assigned to the D101A with her Field Training Officer, Kevin Zarnoch. At approximately 1:34 am on the 14th, Freire and Zarnoch transported Stilphen into the station from the location of his arrest at Massachusetts Avenue and Harrison Avenue. During transport, Stilphen did not lose consciousness or appear to be ill. Once they arrived at District 4, Stilphen walked into the station without difficulty. Freire then assisted with the booking process by taking Stilphen's fingerprints. Freire explained that although it was not her arrest, she volunteered to assist because she had only recently graduated from the Academy approximately 3 – 4 weeks prior.

Under direct questioning, Freire testified that Stilphen spoke coherently, was able to follow instructions, and answered all questions asked of him during the booking process. At no time did Stilphen ask for EMS or make any statements about being under the influence of drugs or alcohol. Freire did not observe any indication that Stilphen was under

COB 02291

the influence of drugs or in need of medical attention. Freire added however that while she was taking his prints, Stilphen was *"wobbling back and forth"* which made the process somewhat difficult. Freire had to tell Stilphen to stand still in order to take his fingerprints. At that point, Freire observed Bertocchi assist Stilphen in order to prevent him from moving back and forth. Freire stated this was not unusual behavior for many prisoners who are booked at District 4. Freire completed naloxone training while in the Academy which included recognizing the indicators of someone who is overdosing. Freire testified that Stilphen exhibited no such indicators during their interaction.

After successfully booking Stilphen, Freire went back on patrol and completed her tour. Freire did not conduct any cellblock inspections or make any further observations of Stilphen, nor did she respond to the hospital. Freire had never encountered Stilphen prior to that date and had no information regarding his missing clothing.

## Interview Summary of Police Officer David Marshall

On February 13, 2020, at 7:20 am, Sergeant Detectives Lucas Taxter and John Fitzgerald conducted an audio-recorded interview of Police Officer David Marshall within the offices of the Internal Affairs Division at Boston Police Headquarters. Officer Marshall was represented by Attorney Peter Pasciucco, BPPA.

Prior to the interview starting, Marshall was provided with a copy of Police Commissioner's Memorandum 10-007, *Disciplinary Policy Statement*. He acknowledged receipt and understanding of the document. The following synopsis is not intended to be a verbatim account of that interview. Information was provided in narrative form and as a result of direct questioning.

Marshall acknowledged that he worked a last half tour of duty on July 13th into the 14th, 2019. At the time, Marshall had been assigned to District 4 for approximately 11 months. Marshall testified that he made no observations of Stilphen during his arrest or during booking. After Stilphen was booked, Marshall performed approximately 2 to 3 cellblock inspections. Under direct questioning, Marshall testified that he believed he looked into each occupied cell during each inspection. Also, under direct questioning, Marshall testified that he received naloxone training at the Academy including indicators of someone who had overdosed. Although Marshall could not recall the exact positioning of Stilphen during his cellblock inspections, Stilphen did not exhibit any such indicators. Marshall added that his observations of Stilphen were not unusual, based on other prisoners he had observed in District 4.

After Stilphen was found unresponsive, Marshall remained in the cellblock hallway while other officers and EMT's rendered aid. He did not respond to the hospital and had no information about Stilphen's missing clothing. Marshall had never encountered Stilphen prior to this date.

COB 02292

**Interview Summary of Police Officer Paulmichael Bertocchi**

On February 13, 2020, at 7:27 am, Sergeant Detectives Lucas Taxter and John Fitzgerald conducted an audio-recorded interview of Police Officer Paulmichael Bertocchi within the offices of the Internal Affairs Division at Boston Police Headquarters. Officer Almeida was represented by Attorney Peter Pasciucco, BPPA.

Prior to the interview starting, Bertocchi was provided with a copy of Police Commissioner's Memorandum 10-007, *Disciplinary Policy Statement*. He acknowledged receipt and understanding of the document. The following synopsis is not intended to be a verbatim account of that interview. Information was provided in narrative form and as a result of direct questioning.

At the time of this interview, Bertocchi had been a sworn member of the Department for approximately 2 ½ years. Bertocchi acknowledged that he worked a last half on July 13th into the 14th, 2019 in the DK01A with Officer Kevin Butcher. At about 1:00 am on the 14th, Bertocchi and Butcher arrested Stilphen in the area of 666 Massachusetts Avenue after he was positively identified as being responsible for breaking into a motor vehicle. During his interaction with Stilphen, Bertocchi did not observe any signs that caused him to believe that Stilphen was under the influence of drugs or in need of medical attention.

Stilphen was placed in a holding cell when he arrived at District 4. Bertocchi interacted with Stilphen during that time and made no observations that Stilphen was under the influence of drugs or in need of medical attention. Bertocchi did observe Stilphen leaning forward at one point when he brought him a carton of milk, however, Stilphen sat up immediately when he entered the cell.

Bertocchi also assisted during the booking procedure. At one point, Stilphen leaned forward toward Freire while she was trying to take his fingerprints. Using his hands, Bertocchi guided Stilphen into an upright position. Bertocchi testified that Stilphen was coherent, able to answer all questions asked of him, followed all instructions, and did not fall over. Bertocchi did not recall hearing Almeida ask Stilphen if he had any medical conditions but acknowledged that it was part of the booking process. At no time did Stilphen say that he was under the influence of drugs or that he needed medical attention. Bertocchi acknowledged that Stilphen displayed some lethargic characteristics of a drug user. He added that it is common to see this in District 4, especially during the last half shift where a large number of prisoners are also drug abusers.

After Stilphen was placed in cell #19, Bertocchi brought him a sandwich and some milk. Similar to when he was in the holding cell, Stilphen was again sitting down and leaning forward. Under direct questioning, Bertocchi testified that this did not cause any concern because Stilphen stood up immediately and took the food. Bertocchi also testified that he received naloxone training in the Academy that included the signs and symptoms

of someone who had overdosed. Bertocchi did not observe Stilphen display any such signs. Bertocchi had no information about Stilphen's missing clothing.

## Interview Summary of Lieutenant James M. Foley

On December 16, 2019, at 9:25 am, Sergeant Detective Lucas Taxter and Sergeant Michael Hanson conducted an audio-recorded interview of Lieutenant James M. Foley within the offices of the Internal Affairs Division at Boston Police Headquarters. Lieutenant Foley was represented by Attorney Patrick Bryant, Lieutenant Timothy Kervin, and Sergeant Jeannie Carroll, BPSOF.

Prior to the interview starting, Foley was provided with a copy of Police Commissioner's Memorandum 10-007, *Disciplinary Policy Statement*. He acknowledged receipt and understanding of the document. The following synopsis is not intended to be a verbatim account of that interview. Information was provided in narrative form and as a result of direct questioning.

Foley acknowledged that he worked a morning watch overtime shift at D-4 on Saturday, July 13th into the 14th, 2019 as the Duty Supervisor. Although Saturdays are typically busy nights on D-4, this night was particularly busy. Foley explained that earlier during the shift, a prisoner had been transported to D-4 from an arrest on C-6, the result of a citywide officer-in-trouble (OT) call on Massachusetts Avenue. Upon arrival in the sally port, the prisoner refused to exit the rear of the transport wagon. The prisoner then severely injured himself, an act that resulted in *"full notifications"* being made. Homicide Unit and Crime Scene investigators responded, processed the scene, and departed at approximately 5:30 am.

At approximately 5:50 am, Officer Doolan notified Foley that Stilphen was unresponsive and in distress. Foley retrieved several doses of naloxone and responded to cell 19 where other officers had already begun CPR. Officers administered three doses of naloxone and continued CPR until the arrival of EMS. Stilphen was subsequently transported to Tufts Medical Center.

Sometime later, Foley was informed that Stilphen had passed away at the hospital. Foley recalled that Pankievich called from the hospital and spoke with Sergeant Deleo, who then notified Foley. Under direct questioning, Foley testified that he did not recall instructing Pankievich to retrieve Stilphen's clothing from the hospital, nor did he recall if Deleo did. Foley also testified that he did not recall seeing Pankievich bring Stilphen's clothing into the Duty Supervisor's office. *"I don't recall. I wasn't in the DS office at that time"*, he said. Foley did not recall if he discussed Stilphen's clothing with anyone that morning or what happened to it. *"I don't recall. Homicide would have been responsible for that"*, he said.

Foley testified that he made no observations of Stilphen prior to, during, or after he was booked. Under direct questioning, Foley testified that the cellblock monitor in the Duty Supervisor's office was operable that morning, however, he did not make any

COB 02294

observations of Stilphen. Foley explained that the prisoner monitor was located on the desk behind him. Foley further explained that the prisoner monitor is *"rather small"* with multiple 1 ½ inch camera views from a height of 8 feet. Foley also noted that he was busy that morning attending to his many other duties. Foley further testified that prior to 5:50 am, no one advised him that Stilphen was under the influence of drugs or alcohol or in need of medical attention.

Foley testified that he received training in the administration of naloxone, but he did not recall if it included training on recognizing the indicators of someone who had overdosed on drugs. Foley testified that had he observed Stilphen *"nod off"*, have trouble keeping his balance, retrieve drugs from his shorts, or ingest drugs, he would have checked on his wellbeing and would have searched him.

## Interview Summary of Police Officer Ismael L. Almeida

On December 18, 2019, at 7:38 am, Sergeant Detectives Lucas Taxter and John Fitzgerald conducted an audio-recorded interview of Police Officer Ismael Almeida within the offices of the Internal Affairs Division at Boston Police Headquarters. Officer Almeida was represented by Attorney Bryan Decker, BPPA.

Prior to the interview starting, Almeida was provided with a copy of Police Commissioner's Memorandum 10-007, *Disciplinary Policy Statement*. He acknowledged receipt and understanding of the document. The following synopsis is not intended to be a verbatim account of that interview. Information was provided in narrative form and as a result of direct questioning.

Almeida acknowledged that he worked a morning watch tour of duty on D-4 on Saturday, July 13th into the 14th, 2019 and was assigned as the Booking Officer. Almeida testified that Friday and Saturday nights are generally the busiest nights at D-4 and many of those arrested are somehow drug-related. Almeida testified that this night was likely the busiest night of his career. Almeida explained that a prisoner severely injured himself earlier in the night which resulted in the response of the Homicide and Crime Scene Response Units.

Later in the shift, Stilphen was brought into D-4 by officers assigned to the Anti-Crime Unit. Almeida stated that he heard broadcasts related to Stilphen's arrest on the radio and knew he was arrested for attempting to break into a motor vehicle. Almeida assisted with the pre-booking search of Stilphen in the holding cell which included collecting his personal property, laces, and belt. Almeida stated that Stilphen's socks were also searched. However, Almeida added that there was no probable cause to conduct a strip search of Stilphen. Under direct questioning, Almeida testified that in his experience, strip searches are rarely conducted.

During the booking process, Almeida did not make any observations of Stilphen that caused any concern. Almeida stated that although Stilphen leaned a few times, he never lost his balance. Almeida added that Stilphen answered all questions coherently and

was cooperative throughout the booking process. Stilphen told Almeida that he was not injured and had no medical conditions; Almeida noted this on the booking form. Almeida remained in his work area for the entire booking process and observed nothing of concern. Almeida queried Stilphen's criminal history and ensured that he was not on the suicide watch list (Q5). He described Stilphen's booking process as nothing out of the ordinary for a weekend night on D-4.

Almeida believed there were six or seven prisoners in custody that night. Although he did not perform every 15-minute cellblock inspection, Almeida was sure that every check was performed. Almeida was sure of this thanks to the alarm system that sounds and flashes lights every fifteen minutes as a reminder. It is not uncommon for other officers to perform cellblock inspections, especially on busy nights when Almeida is also tending to his many duties as the booking offer. Almeida believed that he looked into each occupied cell during his inspections. He stated that although he may not have stopped and looked directly into each cell, he sometimes uses his peripheral vision.

Almeida testified that the prisoner cell monitor was operating that night and is located at his work station. Under questioning, Almeida testified that he did not observe Stilphen appear to nod-off while in the holding cell, nor did he observe anything that caused any concern while Stilphen was in cell 19. Almeida stated that he did observe Stilphen leaning forward and believed he was sleeping. Almeida testified that he has seen prisoners in that position before. Almeida testified that he did not observe Stilphen reach into his shorts, nor did he observe Stilphen appear to ingest any drugs. Almeida noted again that it was a particularly busy night and he was unable to focus his attention solely on the prisoner monitor.

Almeida testified that at approximately 5:53 am, Doolan notified him that Stilphen may be in need of assistance. Almeida responded to cell 19 and found Stilphen unresponsive. He also observed a plastic bag of powder and a makeshift straw, apparently made from a piece of a milk carton. Almeida immediately started CPR while Doolan and Bertocchi administered Narcan. EMS arrived and continued CPR until Stilphen regained a pulse. He was then transported to the hospital.

Also, under direct questioning, Almeida testified that he received naloxone training at the Academy approximately 3 – 4 years ago, but he did not recall if the training included the recognition of symptoms of an overdose, including the position of the body. Almeida also testified that he did not know what happened to Stilphen's clothing, nor did he observe Pankievich bring the evidence bags into the Duty Supervisor's office.

Almeida stated that he believed he did everything he could have done to ensure Stilphen's wellbeing while in custody. At the conclusion of his interview, Almeida was very remorseful and clearly shaken by Stilphen's death. *"I took it pretty hard... I felt bad. I didn't want the kid to die."*

COB 02296

## Interview Summary of Sergeant Paul A. Deleo

On December 26, 2019, at 10:01 am, Sergeant Detectives Lucas Taxter and Andrew Johnson conducted an audio-recorded interview of Sergeant Paul Deleo within the offices of the Internal Affairs Division at Boston Police Headquarters. Deleo chose to be interviewed without representation.

Prior to the interview starting, Deleo was provided with a copy of Police Commissioner's Memorandum 10-007, *Disciplinary Policy Statement*. He acknowledged receipt and understanding of the document. The following synopsis is not intended to be a verbatim account of that interview. Information was provided in narrative form and as a result of direct questioning.

Deleo acknowledged that he worked a day tour at District 4 on July 14, 2019, as the Duty Supervisor. Deleo arrived for his shift at approximately 6:30 am, after Stilphen was already transported to the hospital by EMS and after Pankievich was instructed to respond to Tufts Medical Center. Deleo did not answer the phone when Pankievich called the Duty Supervisor's office to advise that Stilphen had been pronounced deceased, nor did he recall being present when the call came in. Deleo was not present for any conversation with Foley or anyone else with regard to Stilphen's clothing that had been removed from him at the hospital.

Deleo believes he would have been in the Duty Supervisor's office at approximately 7:00 am, however, he did not recall being present when Pankievich brought in the bags of clothing, or when Pankievich asked Foley what he should do with the bags. Deleo's only memory with regard to Stilphen's clothing was from later on that day. Deleo believes Officer Jeffrey Lynch, who was the day tour booking officer, informed him that there was an evidence bag in the booking area that contained Stilphen's sneakers. Deleo believes he called someone at the Homicide Unit sometime after 7:30 am and either had the sneakers brought to Homicide or that someone from Homicide came to D-4 and retrieved them. Deleo could not recall who he spoke with at Homicide, however. Deleo had no memory of a second bag that contained shorts or other items.

Days later, Deleo became aware that Stilphen's clothing was missing. He stated he was advised by Captain Sweeney and Detective Wagner, from Homicide, but he could not recall who informed him first. Deleo stated that Wagner called him at one point to inquire about the missing clothing. Wagner then responded to D-4 to look for the items, however, she could not locate them. Deleo stated he spoke with Officer David McNabb, D-4 Property Officer, who stated he never took custody of Stilphen's clothing. Deleo had no further information regarding the missing clothing.

## Interview Summary of Sergeant Detective Garrett G. Mitchell

On January 2, 2020, at 10:13 am, Sergeant Detective Lucas Taxter and Sergeant Michael Hanson conducted an audio-recorded interview of Sergeant Detective Garrett

COB 02297

Mitchell within the offices of the Internal Affairs Division at Boston Police Headquarters. Mitchell chose to be interviewed without representation.

Prior to the interview starting, Mitchell was provided with a copy of Police Commissioner's Memorandum 10-007, *Disciplinary Policy Statement*. He acknowledged receipt and understanding of the document. The following synopsis is not intended to be a verbatim account of that interview. Information was provided in narrative form and as a result of direct questioning.

At the time of this interview, Mitchell had been assigned to the Homicide Unit for approximately two years. He acknowledged that he was on-call on the morning of July 19, 2019. At 6:23 am, Mitchell responded to D-4 for a prisoner who had overdosed in a cell. When he arrived, Mitchell observed an ambulance leaving the parking lot with Stilphen on board.

Mitchell was not present when Pankievich was instructed to go to the hospital with Stilphen, nor was he present when Pankievich called the Duty Supervisor's office to advise that Stilphen had been pronounced. Mitchell did not have any conversation with Pankievich either in person or on the phone that morning. Mitchell did not recall speaking with Foley, Deleo, or anyone else about Stilphen's clothing. Mitchell did not observe Pankievich arrive at D-4 with Stilphen's clothing, nor was he present when Pankievich asked Foley what to do with the evidence bags. Mitchell did not take custody of Stilphen's clothing that morning.

Sometime later, Mitchell became aware that some of Stilphen's clothing was missing. He believed he learned of this from Stilphen's mother who he spoke with in front of Headquarters. Mitchell then spoke with Detective Wagner and asked her to go to D-4 and try to locate the clothing Stilphen was wearing when he went to the hospital. Mitchel believes that Wagner took custody of some clothing that was left behind on D-4, but not the clothing that Stilphen was wearing when he was transported to the hospital. Mitchell had no further information regarding Stilphen's missing clothing.

## Interview Summary of Detective Jessica Wagner

On December 26, 2019, at 10:01 am, Sergeant Detective Lucas Taxter and Sergeant Michael Hanson conducted an audio-recorded interview of Detective Jessica Wagner within the offices of the Internal Affairs Division at Boston Police Headquarters. Wagner chose to be interviewed without representation.

Prior to the interview starting, Wagner was provided with a copy of Police Commissioner's Memorandum 10-007, *Disciplinary Policy Statement*. She acknowledged receipt and understanding of the document. The following synopsis is not intended to be a verbatim account of that interview. Information was provided in narrative form and as a result of direct questioning.

COB 02298

Wagner acknowledged that on July 14, 2019, at approximately 6:30 am, she responded to District 4 for a report of a prisoner who had overdosed. When Wagner arrived, the prisoner, Shayne Stilphen, had already been transported to Tufts Medical Center. Later that morning, Wagner learned that Stilphen was pronounced deceased at the hospital; She could not recall what time that was.

Wagner testified that on a later date, an officer brought some of Stilphen's clothing to the Homicide Unit: A pair of black Nike sneakers, a ball cap, and a belt. She could not recall when or who the officer was. Wagner provided a photograph of the items. (Attachment 2) The sneakers were on top of a green plastic bag, possibly a hospital bag. The hat appeared to be in a clear plastic Boston Police evidence bag. The belt was not visible.

Wagner testified that on a later date, Mitchell advised her that some of Stilphen's clothing was missing and he asked her to go to District 4 and try to locate the items. Wagner called Pankievich who told her that after Stilphen was declared deceased, he brought Stilphen's clothing from Tufts Medical Center to District 4 and left the bags in the Duty Supervisor's office. Wagner then went to District 4 but was unable to locate any of Stilphen's clothing.

Under direct questioning, Wagner testified that she did not observe Pankievich on the morning of July 14, nor did she have any conversation with him on the phone. Wagner had no conversation with Foley or anyone else about Stilphen's clothing, nor did she take custody of any that day.

## Summary of Postmortem Toxicology Report and Cause and Manner of Death
(Attachment 3)

On August 7, 2019, Doctor Richard Atkinson, MD, submitted a postmortem toxicology report, Medical Examiner Case Number 19-8884, with the following results:

- Heart Blood – Positive for Benzodiazepines, Cocaine, Fentanyl, and Opiates
- Vitreous Humor – Positive for Morphine, Acetylmorphine, and Fentanyl
- Femoral Blood – Clonazepam, 7-Aminoclonazepam, Nordiazepam, Oxazepam, Benzoylecgonine, Morphine, and Fentanyl

On August 9, 2019, Sergeant Detective Garrett Mitchell received a copy of the toxicology report and subsequently provided a copy of the police reports to the Medical Examiner's Office. After reviewing the police reports, and all medical data, Dr. Atkinson determined the cause of death to be Acute Fentanyl, Despropoinyl Fentanyl, Heroin, Cocaine, and Benzodiazepine Intoxication. Dr. Atkinson determined the manner of death to be Accidental Substance Abuse.

COB 02299

## Summary of BPD Academy Naloxone Training

On January 28, 2020, Police Officer Patrick Higgins provided a copy of the Nasal Narcan Training PowerPoint presentation used at the Academy. (Attachment 4) The following slides cover recognizing an opioid overdose and include a very limp body and the *"heavy nod"*.

 

## Investigation

At approximately 1:00 am on Sunday, July 14, 2019, Police Officers Kevin Butcher and Paul Bertocchi responded to a 911 call for a breaking and entering into a motor vehicle at 666 Massachusetts Avenue in the South End of Boston. Their investigation resulted in the arrest of 28-year-old Shayne Stilphen who was subsequently charged with breaking and entering a motor vehicle at night (MGL 266 § 16). Stilphen was transported back to District 4 where he was searched, booked, and remanded to cell 19. (Attachment 5)

A review of the D-4 sally port video evidence revealed that at 1:30 am, Officer Kevin Zarnoch escorted Stilphen from his cruiser into the booking area. Stilphen was able to walk on his own and did not need any assistance from Zarnoch.

A review of the holding cell video evidence revealed that Stilphen was first placed into a holding cell at 1:31 am where he was searched by the booking officer, Officer Ismael Almeida, while Zarnoch stood by. Stilphen's belt and sneakers were removed. At 1:35 am, Officer Paulmichael Bertocchi uncuffed Stilphen and searched his socks. At 1:42 am, Bertocchi gave Stilphen a cup of water. At 1:51 am, Stilphen, now alone in the holding cell, hinged forward at the waist and appeared to fall asleep, or *"nod-off."* At 1:53 am, Bertocchi entered the cell and gave Stilphen a container of milk. Stilphen sat up immediately. Bertocchi testified that because Stilphen sat up immediately when he entered the holding cell, he was not concerned that he had been leaning forward. At 1:55 am, Stilphen hinged forward and appeared to nod-off a second time. At 1:58 am, the cell door opened, Stilphen stood up, and exited the holding cell.

A review of the booking area video evidence revealed that Zarnoch escorted Stilphen from the holding cell to the booking desk at 1:58 am. Two officers assisted

COB 02300

Almeida with the booking process: Bertocchi and Freire.  Officers Bertocchi, Freire, and Almeida testified that Stilphen spoke coherently, followed instructions, and answered all questions asked of him.  A review of the video evidence showed that Stilphen was swaying and appeared to have some difficulty standing still.  At one point, Bertocchi placed his hand on Stilphen's back while Freire took his fingerprints.  Bertocchi testified that Stilphen was leaning toward Freire and making it difficult to take his prints, so he guided Stilphen into an upright position with his hands.  Freire testified that Stilphen wobbled back and forth and she told him to stand still.  After Stilphen was printed and photographed, he signed the booking forms and was escorted to cell 19 by Freire and Bertocchi.

A review of cell 19 video evidence revealed that Stilphen was placed into the cell at 2:21 am.  A short time later, Stilphen leaned forward at the waist and appeared to fall asleep.  Bertocchi appeared at the door and knocked on it.  Stilphen lifted his head, stood up, walked to the cell door, and accepted the milk.  After drinking it, Stilphen looked at the video camera, reached into the back of his shorts, and removed an item. (Attachment 6 and 7)  Stilphen then manipulated the item, leaned forward at the waist, and although not viewable in the shot, appeared to ingest drugs. (Attachment 8 and 9)  Stilphen repeated this several times until he apparently fell asleep while seated on the bench, legs crossed in front of him, hinged forward at the waist.  Stilphen remained in this position for approximately an hour before waking up. (Attachment 10)

Again, at 4:40 am, while seated on the bench with his legs crossed in front of him, Stilphen tore off a piece of paper from a sandwich wrapper and proceeded to manipulate it with his hands into a straw.  At 4:43 am, Officer David Marshall walked by the cell and Stilphen simultaneously reached his right hand behind himself.  Marshall did not look into cell 19 at that time.  A few seconds later, Marshall looked into cell 19 as he walked by again.  Stilphen still had his right hand behind his waist and likely inside his pants, although the angle of the camera inhibited a clear view of Stilphen's right hand.  Stilphen appeared to fall asleep again for about 3 minutes until 4:46 am at which point he removed a plastic bag from his buttocks. (Attachment 11)  Stilphen manipulated the bag and leaned forward at 4:48 am.  His legs were still crossed in front of him.  Although out of sight, this is likely when Stilphen ingested more drugs.  He remained in this seated position, hinged forward at the waist with his legs crossed before him, for approximately one hour until 5:52 am. (Attachment 12)  During that time, Almeida walked past the cell 5 times:  4:56 am, 5:06 am, 5:21 am, 5:35 am, and 5:37 am.  A review of the video evidence from cell 19 showed that Stilphen showed signs of possible agonal breathing at 5:06:30 am.  Stilphen showed no further signs of breathing or movement.

At 5:39 am, Marshall placed a sandwich and a carton of milk in the meal slot of cell 19 and appeared to look into the cell.  Marshall testified that Stilphen did not exhibit any indicators that he had overdosed.  Marshall added that his observations of Stilphen were not unusual, based on other prisoners he had observed in District 4.

At 5:51 am, Officer Sean Doolan looked into the cell and observed Stilphen.  Doolan wrote in his Form 26 that Stilphen was *"... resting in a position that looked as if it would be of extreme discomfort for most individuals."* (Attachment 13)  Doolan kicked the

COB 02301

cell door five times in an attempt to get a reaction from Stilphen. When Stilphen did not react, Doolan kicked the door five more times and summoned Almeida. Almeida and Doolan entered the cell at 5:52 am. Almeida attempted to evoke a response from Stilphen by lifting his right shoulder, however, Stilphen's body slumped to the left. Almeida motioned for Doolan to go get help. Almeida then picked up the makeshift straw from the bench directly in front of Stilphen and examined it. Realizing Stilphen had likely overdosed, Almeida moved Stilphen into a rescue position and began chest compressions.

At 5:53 am, Doolan and Bertocchi entered the cell and assisted Almeida. Doolan administered a dose of Naloxone while Almeida continued chest compressions. Sergeant Michael Aziz and Lieutenant James Foley entered the cell at this time. Bertocchi relieved Almeida and continued chest compressions at that time. At 5:54 am, Officer Michael Pankievich entered the cell with a bag valve mask and handed it to Doolan who in turn used it to administer rescue breaths to Stilphen while Bertocchi continued chest compressions. At 5:55 am, Bertocchi administered a second dose of Naloxone and CPR continued. At 5:57 am, Bertocchi administered a third dose of Naloxone and CPR continued. At 5:57:30, Doolan appeared to administer the fourth dose of Naloxone and CPR continued. At 5:57:45, three Boston EMS EMT's arrived at cell 19, relieved Doolan and Bertocchi, and continued to administer first aid to Stilphen. At 5:59 am, EMT's applied an automatic defibrillator to Stilphen. At 6:01 am, two Boston EMS paramedics arrived at cell 19. Stilphen was transferred to a gurney and into the booking area. Aziz and Doolan secured cell 19 with crime scene tape. EMT's and paramedics resuscitated Stilphen and transported him to the hospital where he was later pronounced deceased at 6:48 am.

Dr. Atkinson from the Medical Examiner's Office determined the manner of death to be Accidental Substance Abuse.

In addition to the video evidence, a review of the prisoner inspection journal revealed that a cellblock inspection was completed at least once every fifteen minutes. (Attachment 14)

Missing Clothing

Lynell Cox, Stilphen's mother, alleged in an email that the clothing Stilphen was wearing when he was transported to the hospital was lost. (Attachment 15) A review of Booking Form 19-01039-04 revealed that Stilphen was wearing a red shirt, grey shorts, and black sneakers when he was booked at District 4. (Attachment 16) There is no mention of a belt or a ballcap. Video evidence shows that Stilphen was wearing black shorts and black sneakers when he was transported to Tufts Medical Center. (Attachments 17 and 18)

Stilphen was pronounced deceased at 6:48 am at the hospital. Pankievich testified that he called the Duty Supervisor's office, spoke with Foley, and informed him about Stilphen's passing. Pankievich also testified that he asked Foley if he should collect Stilphen's clothing and Foley said he could call him back. Foley testified that when Pankievich called, Deleo answered the phone and in turn, informed Foley that Stilphen had passed. Foley also testified that he did not recall instructing Pankievich to retrieve

COB 02302

Stilphen's clothing from the hospital, nor did he recall if Deleo did. Deleo testified that he did not recall being present when Pankievich called. The Duty Supervisor's line is not a recorded line.

Pankievich testified that he obtained two evidence bags and placed Stilphen's sneakers in one bag and his shorts in the other. At approximately 7:00 am, Pankievich and Rosa returned to D-4. Pankievich testified that he brought the evidence bags into the Duty Supervisor's office and asked Foley where he should put them. Initially, Foley told Pankievich to hold onto them, but then instructed him to leave the bags in the back corner of the office. Foley advised Pankievich that he would tell Sergeant Detective Mitchell that the bags were there. Rosa however indicated in his Form 26 and testimony that he left Stilphens' belongings in the booking area.

Foley testified that he did not recall seeing Pankievich bring Stilphen's clothing into the Duty Supervisor's office. *"I don't recall. I wasn't in the DS office at that time"*, he testified. Foley did not recall if he discussed Stilphen's clothing with anyone that morning, nor did he know what happened to it. *"I don't recall. Homicide would have been responsible for that"*, he testified. Neither Mitchell nor Wagner recalled discussing Stilphen's clothing with anyone at District 4 that morning.

Deleo's only memory regarding Stilphen's clothing was from later that day. Deleo believes Officer Jeffrey Lynch, who was the day tour booking officer, informed him that there was an evidence bag in the booking area that contained a pair of sneakers. Deleo believes he called someone at the Homicide Unit sometime after 7:30 am and either had the sneakers brought to Homicide or that someone from Homicide came to D-4 and retrieved them. Deleo could not recall who he spoke with at Homicide, however. Deleo had no memory of a second bag that contained shorts or other clothing.

Wagner testified that she did not observe Pankievich on the morning of July 14, nor did she have any conversation with him on the phone. Wagner had no conversation with Foley or anyone else about Stilphen's clothing, nor did she take custody of any while at District 4.

Wagner also testified that an unknown officer brought some of Stilphen's clothing to the Homicide Unit: a pair of black Nike sneakers, a ball cap, and a belt. Wagner provided a photograph of those items. The sneakers are on top of a green plastic bag, possibly a hospital bag. The hat appears to be in a clear plastic Boston Police evidence bag. The belt is not visible. Because the belt and hat would not be allowed in the cell, it is likely that they were part of Stilphen's property at D-4 booking. The sneakers resemble the sneakers Stilphen was wearing in the cell.

Wagner also provided a Homicide Unit Investigative Report that indicates on August 1, 2019, Wagner turned over the sneakers, belt, and hat to Suffolk County District Attorney Ryan Mingo. (Attachment 19)

COB 02303

Days later, Mitchell advised Wagner that some of Stilphen's clothing was missing. He asked her to go to District 4 to try to locate the items. Wagner called Pankievich who told her that he left them in the Duty Supervisor's office when he returned from the hospital. Wagner then went to District 4 but was unable to locate any of Stilphen's clothing.

On January 23, 2019, Pankievich viewed the photograph provided by Wagner. He stated the black Nike sneakers appeared to be the same pair that he brought back from the hospital. He also stated that the hat and belt would not have gone to the hospital because Stilphen was not wearing them in the cell.

Also, on January 23rd, Officer Jeffrey Lynch viewed the same photograph. He vaguely recalled telling Deleo that he found some of Stilphen's belongings in the booking area. Lynch had no further information regarding Stilphen's clothing.

On January 27, 2020, ADA Ryan Mingo advised me in an email that he recalled Wagner gave him a brown evidence bag that contained Stilphen's clothing. Mingo gave the bag to Cox on August 15, 2019. However, he did not look in the bag to see what it contained. Suffolk County DA's Office Charlene Luma confirmed this in an email. (Attachment 20)

On January 27, 2019, I sent an email to Cox in which I asked if she recalled receiving a brown evidence bag from ADA Mingo on August 15, 2019. (Attachment 21)

On February 1, 2020, Cox responded to the email. She did not answer my question however. Cox wrote that Wagner was untruthful in her testimony and the black sneakers were not in the evidence bag. Cox also questioned how the sneakers and shorts became separated. Cox also questioned if ADA Mingo recalled the contents of the bag that Wagner transferred to him. The black shorts were never located.

**Applicable Rules**
(Attachments 22 – 24)

Rule 318 § 3 – Prisoners; Sickness or Injury

Rule 318 § 3 states in part, *"Any unusual appearance or behavior displayed by a prisoner shall receive immediate attention."* Officer Almeida noted on Stilphen's disposition form that there were no visible injuries. Almeida, Freire, and Bertocchi reported that Stilphen did not request medical attention at any time. Almeida testified that Stilphen did not appear to be under the influence of drugs at the time of his booking. Freire reported in her Form 26 and testimony that Stilphen was cooperative and helpful during booking, aside from swaying back and forth while she was taking his finger prints. Bertocchi and Freire reported that Stilphen appeared to be a drug user, but did not appear to be under the influence of drugs at the time of booking.

COB 02304

Although uninjured and cooperative, video evidence showed that Stilphen was unable to stand still at times during the booking procedure. At one point, Bertocchi had to physically assist Stilphen by guiding him into an upright position. Additional video evidence from the holding cell and from cell 19 showed that Stilphen nodded-off or fell asleep at least five times, twice while in the holding cell and three times while in cell 19. When he did, Stilphen folded over at the waist with his head either between his legs or on his lap. Stilphen reacted to officers three of those times however and this appeared to be the way Stilphen chose to rest.

Although Almeida and Marshall conducted inspections of the cellblock and disabled the prisoner inspection alarm, they did not take any measures to check on Stilphen and ensure that he was not in any distress, even though he was seated in an unusual position for an extended period of time. By their own testimony, however, the officers did not consider Stilphen's position to be of concern, given their experience and previous observations of prisoners at District 4.

All video evidence would have been visible on monitors located in the Duty Supervisor's office and in the booking officer's work area. Almeida testified that he did not observe Stilphen appear to nod-off or fall asleep while in the holding cell or while in cell 19. Almeida also testified that because it was a busy night, he was not able to focus solely on the prisoner monitor. Foley testified that he did not look at the prisoner monitor located in the Duty Supervisor's office during his shift. All involved officers received training at the Academy for recognizing the signs of an opioid overdose, including a very limp body and a *"heavy nod."*

Rule 318 § 4 – Booking Procedures

Rule 318 § 4 states in part, *"The Duty Supervisor will also designate a Boston Police Officer to conduct a search of the person and be responsible for the removal of all personal property from the prisoner."* The officers involved in the search of Stilphen conducted their searches in accordance with this rule. They removed from Stilphen all of his property, including his belt and shoestrings which could have been used for suicidal purposes. The Booking Form indicated that a suicide query (Q5) was also completed. The only item which was not discovered was the bag of drugs, however, it would not be possible for the officers to discover the drugs under Rule 318D § 4 (see below).

Rule 318 § 13 – Prisoner Inspection

Rule 318 § 13 states in part, *"The Duty Supervisor… shall visit, or cause to be visited, all persons in their custody at least once every fifteen minutes, and shall ensure that each visit is recorded in the Prisoner Inspection Record (MGL c. 40 § 36B)."* A review of the Prisoner Inspection Record and the Prisoner Alarm Replay Report showed that this rule was adhered to.

COB 02305

Rule 318 § 14 – Suicides and Attempted Suicides

Although this was not a suicide, this rule applies inasmuch as it states in part that, *"...whenever a person in police custody commits suicide, <u>dies</u>, or inflicts self-injury at a lockup facility which subsequently results in his/her death..."* the incident shall be documented in an *"...Incident Report, BPD Form 1.1. and a Special Report (BPD Form 26)"*. This rule was adhered to with the submission of Incident Report I-192054058 and several Form 26's submitted by involved officers.

Rule 318D § 4 – Strip Search and/or Visual Body Cavity Search

Rule 318D § 4 states in part, *"Strip searches and/or visual body cavity searches <u>MAY NOT</u> be conducted as a routine part of the booking procedure. A strip search and/or a visual body cavity search may <u>ONLY</u> be conducted if the <u>DUTY SUPERVISOR</u> finds that the suspect is in custody, and the officer has <u>PROBABLE CAUSE</u> to believe that the suspect has a weapon, contraband, or the fruits or instrumentalities of the crime that he could not reasonably expect to discover without forcing the suspect to discard all of his/her clothing."* This rule was adhered to. Under the circumstances, the arresting officers did not have probable cause to believe that Stilphen had drugs secreted on or in his body.

Rule 102 § 4 – Neglect of Duty

Rule 102 § 4 states in part *"... any conduct or omission which is not in accordance with established and ordinary duties or procedures as to such employees..."*

Pankievich testified that after Stilphen was pronounced, he called the Duty Supervisor's office, informed Lieutenant Foley, and asked if he should collect Stilphen's belongings. Foley replied that he would get back to him. A short time later, Foley called Pankievich and instructed him to collect Stilphen's clothing and bring it back to D-4. Rosa observed Pankievich on the phone, but he did not know with whom. Rosa testified they were instructed to collect Stilphen's clothing and bring it back to District 4. Foley testified that Pankievich spoke with Deleo. Foley did not recall instructing Pankievich to take Stilphen's clothing. Deleo testified that he did not answer the phone when Pankievich called the Duty Supervisor's office, nor did he recall being present when the call came in. Deleo was not present for any conversation with Foley or anyone else regarding Stilphen's clothing.

Pankievich testified that he obtained two evidence bags from hospital security. He put Stilphen's sneakers in one bag, and his shorts in the other. At approximately 7:00 am, he and Rosa returned to District 4. Pankievich testified that he brought the bags into the Duty Supervisor's office, and asked Foley where he should put them. Initially, Foley told Pankievich to hold onto them, but then instructed him to place them on the floor in the back corner of the office. Foley advised Pankievich he would tell Sergeant Detective Mitchell from Homicide that the bags were there. Foley testified that he did not recall speaking with Pankievich on the phone or observe him bring the evidence bags into the Duty Supervisor's office. Rosa testified that he brought the bags into District 4 and left them in the booking

COB 02306

area at the request of Sergeant Detective Mitchell. Mitchell testified that he did not recall speaking with Foley, Deleo, or anyone else about Stilphen's clothing. Mitchell did not observe Pankievich arrive at D-4 with Stilphen's clothing, nor was he present when Pankievich asked Foley what to do with the evidence bags. Mitchell did not take custody of Stilphen's clothing that morning.

Deleo's only memory with regard to Stilphen's clothing was from later on that day. Deleo believes Officer Jeffrey Lynch, who was the day tour booking officer, informed him that there was an evidence bag in the booking area that contained Stilphen's sneakers. Deleo believes he called someone at the Homicide Unit sometime after 7:30 am and either had the sneakers brought to Homicide or that someone from Homicide came to D-4 and retrieved them. Deleo could not recall who he spoke with at Homicide, however. Deleo had no memory of a second bag that contained shorts or other items. Lynch vaguely recalled telling Deleo that he found some of Stilphen's belongings in the booking area.

Wagner also testified that an unknown officer brought some of Stilphen's clothing to the Homicide Unit: a pair of black Nike sneakers, a ball cap, and a belt. Wagner provided a photograph of those items. Wagner also provided a Homicide Unit Investigative Report that indicates on August 1, 2019, Wagner turned over the sneakers, belt, and hat to Suffolk County District Attorney Ryan Mingo. Mingo recalled that Wagner gave him a brown evidence bag that contained Stilphen's clothing. Mingo gave the bag to Cox on August 15, 2019. He did not look in the bag to see what it contained however. Victim witness advocate Charlene Luma confirmed Mingo's account.

Respectfully Submitted,

Sergeant Detective Lucas E. Taxter
Internal Investigations Unit

Approved,

Lieutenant Detective Michael J. Connolly
Internal Investigation Unit

COB 02307

Contents Noted

_____
Deputy Superintendent Eddy Chrispin
Assistant Chief, Bureau of Professional Standards


Noted & Approved

_____
Superintendent Sharon Dottin
Chief, Bureau of Professional Standards

_____
Legal Advisor

COB 02308

Attachments

1. SA2019-014
2. Digital Image of Stilphen's Property
3. Postmortem Toxicology Report
4. Nasal Narcan Training PowerPoint Slides
5. Incident Report I-192054023
6. Digital Image – Stilphen
7. Digital Image - Stilphen
8. Digital Image - Stilphen
9. Digital Image - Stilphen
10. Digital Image - Stilphen
11. Digital Image - Stilphen
12. Digital Image - Stilphen
13. Form 26 – Doolan
14. Cellblock Inspection Journal
15. Email – Cox
16. Arrest Booking Form 19-01039-04
17. Digital Image – Stilphen/EMT's
18. Digital Image – Stilphen/EMT's
19. Homicide Unit Investigation Report – Wagner
20. Email – Mingo/Luma
21. Email – Cox
22. Rule 318 – Prisoners
23. Rule 318D – Strip Search, etc.
24. Rule 102 § 4 – Neglect of Duty

COB 02309