# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LYNNEL COX, as administrator of the Estate
of Shayne R. Stilphen,

        Plaintiff,

v.

CITY OF BOSTON, ISMAEL ALMEIDA,
PAULMICHAEL BERTOCCHI, CATIA
FREIRE, and BRIAN PICARELLO,

        Defendants.

Civil Action No. 1:22-cv-11009-RGS

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Defendants, Ismael Almeida, Paulmichael Bertocchi, Catia Freire, Brian Picarello, and the City of Boston ("City"), respectfully submit this Statement of Undisputed Material Facts in support of their motions for summary judgment.

### D-4 Station

1. The four individual defendants, Ismael Almeida, Paulmichael Bertocchi, Catia Freire, and Brian Picarello, were Boston police officers who were working on the overnight shift (11:45 PM to 7:45 AM) at the D-4 station during the early morning of July 14, 2019. Exhibit 1, Deposition Transcript of Ismael Almeida, at 148: 4-6, 154: 9-11; Exhibit 4, Deposition Testimony of Brian Picarello, at 105: 23-24, 106: 1-4.

2. Officer Almeida worked as the booking officer at D-4. See Exhibit 1, at 26:5-12; 114:18-21 . On July 14, 2019, Officer Almeida knew the name Shayne Stilphen and had seen him around, but he did not know if he had previously booked Stilphen. See Exhibit 1, at 144:24-25; 145:1.

1

3.  Officer Bertocchi was a patrol officer who had worked at the D-4 station since December
    2018.  See Exhibit 2, Deposition Transcript of Paulmichael Bertocchi, at 47:8-17.  As a
    patrol officer, Officer Bertocchi's responsibilities were to respond to radio calls
    dispatched to him.  See Exhibit 2, at 47:18-24.

4.  Officers Freire and Picarello had graduated from the police academy in June 2019 – just a
    few weeks prior to July 14, 2019.  See Exhibit 3, Deposition Transcript of Catia Freire, at
    18:16-21; Exhibit 4, at 14:19-20.  They were assigned to the D-4 station as a six-month
    probationary assignment following their graduation from the academy.  See Exhibit 3, at
    20:17-22; Exhibit 4, at 15:1-9.

5.  On July 14, 2019, Officer Freire was working as a patrol officer under the supervision of
    a training officer, Officer Kevin Zarnoch.  See Exhibit 3, at 19:7-22, 91:4-20.

6.  Officer Picarello normally worked the day shift during his probationary assignment at D-
    4.  See Exhibit 4, at 68:11-15.  On July 14, 2019, he was working the overnight shift as
    an overtime assignment.  See Exhibit 4, at 20:17-22.

7.  During that shift, Officer Picarello was assisting Officer Almeida with booking, because
    the officer who usually worked alongside Officer Almeida was not there.  See Exhibit 16,
    Form 26 Report of Brian Picarello.  This was the first time Officer Picarello had ever
    been assigned booking.  See Exhibit 4, at 51:2-16.

8.  Another police officer who was working at D-4 on the overnight shift, though not named
    as a defendant in this lawsuit, was Sean Doolan.  See Exhibit 5, Deposition Transcript of
    Sean Doolan, at 155:7-18.  Prior to working as a Boston police officer, Officer Doolan
    had worked as a corrections officer at Nashua Street Jail, where he had met Stilphen
    while Stilphen was serving a sentence there.  See Exhibit 5, Deposition of Sean Doolan,

2

at 33:15-19, 150:17-24.  Officer Doolan knew that Stilphen likely struggled with opioids based on the medications Stilphen received in rounds while incarcerated at Nashua Street. See Exhibit 5, at 153:4-7, 154:1-7.

January 9, 2019, Arrest

9. Stilphen was arrested in Boston on the early morning of January 9, 2019.  See Exhibit 6, Incident Report 192002231, at 1.  He was brought to the A-1 station for booking.  See Exhibit 6, at 1.

10. During booking, Stilphen told officers that he had swallowed two and a half grams of crystal meth and a gram of fentanyl, and that he could feel a rapid heartbeat and needed to be evaluated by a doctor.  See Exhibit 6, at 2.  A police sergeant called for EMTs to transport Stilphen to the hospital.  See Exhibit 6, at 2.

11. Stilphen attempted to refuse emergency medical services, but the officers and EMTs told Stilphen that it was in his best interest to be evaluated by a doctor given what he had told officers about his condition.  See Exhibit 6, at 2.  Stilphen was eventually transported to the hospital.  See Exhibit 6, at 2.

Stilphen Is Arrested on July 14, 2019

12. At about 1:00 AM on July 14, 2019, officers from the D-4 station responded to a call for an individual breaking into a motor vehicle near 666 Massachusetts Avenue.  See Exhibit 7, Incident Report, at 6 (COB008); Exhibit 2, Bertocchi Dep., at 91:11-12.

13. Shortly after the radio call went out, Stilphen was stopped by a Boston police officer at the corner of Massachusetts Avenue and Harrison Avenue because he matched the description of the suspect broadcasted on the police radio.  See Exhibit 2, at 92:7-14.

14. Several police officers arrived at Stilphen's location including Officer Freire, Officer
    Zarnoch, Officer Bertocchi, Officer Kevin Butcher, and Sergeant Brian McManus.  See
    Exhibit 7, at 6; Exhibit 2, at 93:9-20.

15. Stilphen was talkative and argumentative with the officers on scene.  See Exhibit 2, at
    94:2-7.  He wanted to know why he was being stopped; officers told him it was because
    he matched the description of the suspect on the radio call.  See Exhibit 2, at 94:14-15.

16. At one point, Stilphen tried to walk away from the scene.  See Exhibit 2, at 99:17-18.
    Because Stilphen was argumentative and attempted to leave the scene, Officer Bertocchi
    placed him in handcuffs.  See Exhibit 2, at 94:14-22.

17. Officer Doolan did not respond to where Stilphen had been apprehended, but rather to
    where the 911 caller and vehicle were.  See Exhibit 5, at 156:4-7.  Upon arrival, Officer
    Doolan observed a car with a broken window and several items scattered around inside,
    as well as on the sidewalk.  See Exhibit 5, at 156:19-21.

18. While at the crime scene, Officer Doolan did not see Stilphen, nor was he aware that
    Stilphen was the suspect in the breaking and entering. See Exhibit 5, at 159:10-13.

19. Officer Doolan stayed near the vehicle while the 911 caller was taken to conduct a bring-
    back procedure.  See Exhibit 5, at 162:6-10, 19-23.

20. The 911 caller positively identified Stilphen as the person who broke into the car.  See
    Exhibit 2, Bertocchi Dep., at 97:5-6.  Stilphen was placed under arrest.  See Exhibit 2, at
    97:6.

<u>Sally Port and Holding Cell</u>

21. Officers Freire and Zarnoch transported Stilphen from the arrest scene to the D-4 police
    station.  See Exhibit 3, at 82:22-24.  Surveillance video of the sally port shows Officer

4

Zarnoch opening the rear door of the police cruiser at 1:30 AM.  See Exhibit 8, Sally Port Video, at :10.  The video then shows Stilphen stepping out of the police cruiser with his hands cuffed behind his back.  See Exhibit 8, at :21.  Stilphen waits for a few seconds while Officer Zarnoch examines the back seat of the cruiser; the two then walk into a door connecting the Sally Port to the rest of the police station.  See Exhibit 8, at :41.

22. Surveillance video shows Stilphen entering the holding cell at 1:30 AM.  See Exhibit 9, Holding Cell Video, at :37.  He takes a few steps backward and sits on the cell bench. See Exhibit 9, at :48

23. Officer Ismael Almeida, who was working as the booking officer at the D-4 station, enters the group holding cell with Officer Zarnoch.  See Exhibit 9, at :56.  Officer Almeida has a brief conversation with Stilphen in which he explains the booking and search procedures.  See Exhibit 9, at :59; Exhibit 1, Almeida Dep., at 240:9-11.

24. When Officer Almeida first encountered Stilphen on July 14, 2019, he thought that his face looked clearer and that he had put on some weight since the last time he had seen him.  See Exhibit 1, at 148:7-23.

25. Officers Almeida and Zarnoch then search Stilphen's pockets.  See Exhibit 9, Holding Cell Video, at 1:06.  The officers ask Stilphen to take off his shoes; Stilphen complies. See Exhibit 9, at 1:17.  Officer Almeida removes Stilphen's belt and places it in an evidence bag.  See Exhibit 9, at 1:26.  Officer Almeida then has Stilphen stand up and searches his pockets a second time.  See Exhibit 9, at 2:16.  Officer Almeida leaves the cell.  See Exhibit 9, at 2:32.

26. At 1:34 AM, Officer Bertocchi enters the group holding cell.  See Exhibit 9, at 3:41.  He has a conversation with Stilphen.  See Exhibit 9, at 3:50.  A minute later, Officer Bertocchi walks behind Stilphen and removes his handcuffs.  See Exhibit 9, at 4:56.

27. Officer Bertocchi was "talking normally" with Stilphen.  See Exhibit 2, at 102:13-15.  Officer Zarnoch and Bertocchi were laughing because they were wearing the same kind of sneakers.  See Exhibit 2, at 102:16-17.  Stilphen said that he had broken into the car to get money to buy drugs.  See Exhibit 2, at 104:4-6.  He said that he was living on the street because his family had disowned him.  See Exhibit 2, at 103:21-23, 104:8-11.  Stilphen also told Officer Bertocchi that he was tired of being on the street, and that he was willing to be a criminal informant.  See Exhibit 2, at 103:11-14.

28. Stilphen sits down on the cell bench.  See Exhibit 9, at 5:25.  At the officers' request, Stilphen takes off his socks one at a time, rolls them inside out, and then puts them back on.  See Exhibit 9, at 5:28.  After more conversation with Stilphen, Officers Bertocchi and Zarnoch leave the group holding cell. See Exhibit 9, at 7:01.

29. Another officer enters the cell, speaks with Stilphen, and then has Stilphen open his mouth so that he can examine the inside of it with a flashlight.  See Exhibit 9, at 8:09.  Stilphen continues speaking with that officer for approximately three and a half minutes.  See Exhibit 9, at 8:21.

30. After returning to the police station from the crime scene, Officer Doolan overheard that Stilphen was the person who had been arrested for breaking and entering into the vehicle.  See Exhibit 5, at 164:9-20.  Because he knew Stilphen, Officer Doolan went to the holding cell to speak with him.  See Exhibit 5, at 199:12-15; Exhibit 9, at 12:02.  Surveillance video shows Officer Doolan entering the holding cell and having a

conversation with Stilphen that lasts approximately two and a half minutes.  See Exhibit 9, at 12:15.

31. Officer Doolan described his conversation with Stilphen as "locker room banter."  See Exhibit 5, at 164:24.  The two discussed their shared experiences at Nashua Street jail. See Exhibit 5, at 165:22-24.  Stilphen repeatedly told Officer Doolan words to the effect of "You know me" and "You know I'm not a bad guy."  See Exhibit 5, at 165:3-11, 24; 166:1.

32. Based on his interactions with Stilphen in the holding cell, Officer Doolan thought that Stilphen was "perfectly fine," and that he "carried on a normal conversation."  See Exhibit 5, at 165:16-19.  He did not think that Stilphen was intoxicated, or that he needed to go to the hospital.  See Exhibit 5, at 237:20-14, 238:1-2.

33. Stilphen did not say anything to Officer Doolan about where he had been before he was arrested, nor did he say anything about having used drugs earlier that day.  See Exhibit 5, at 165:20-22; 236:22-24; 237:1-5.

34. After Officer Doolan left the holding cell, Stilphen remained there for approximately thirteen minutes.  See Exhibit 9, at 14:34 to 27:48.

35. While seated on the cell bench by himself, Stilphen bends forward at the waist.  See Exhibit 9, at 21:50.  After approximately two minutes, Officer Bertocchi enters the holding cell to bring Stilphen a carton of milk, at which point Stilphen immediately sits upright and has a conversation with him.  See Exhibit 2, at 126:20-25, 127:1; Exhibit 9, at 23:29.  Officer Bertocchi was not concerned to see Stilphen in the bent-over position, because Stilphen "popped right up" when he entered the cell, took the carton of milk, and was coherent.  See Exhibit 2, at 127:6-12; Exhibit 9, at 23:32.

<u>Booking</u>

36. Surveillance video shows Stilphen walking unassisted out of the group holding cell and into the booking area of the D-4 station.  See Exhibit 9, at 27:48; Exhibit 10, Booking Video, at 0:05.

37. The surveillance video shows Officer Picarello in the booking area with Stilphen for about forty-seven seconds before Officer Picarello leaves the booking area.  See Exhibit 10, at 0:05 to 0:52.

38. Under normal circumstances, Officer Bertocchi, as the arresting officer, would have been responsible for fingerprinting the arrestee.  See Exhibit 2, at 109:20-23.  On this occasion, however, Officer Freire asked to fingerprint Stilphen, because she was new on the job and wanted to gain experience fingerprinting an arrestee.  See Exhibit 3, Freire Dep., at 84:16-24.

39. Officer Zarnoch searched Stilphen's shoes.  See Exhibit 10, at 00:26.  Stilphen put them back on his feet one at a time, first by standing on his left foot, then by standing on his right foot. See Ex. 10, at 04:30–04:42.

40. Officer Freire stood with Stilphen at the fingerprinting machine and tried to take his fingerprints, while Officer Bertocchi supervised and ensured that the fingerprints were done properly.  See Exhibit 2, at 137:15-21.

41. The fingerprinting process took longer than normal because Officer Freire was inexperienced.   See Exhibit 1, Almeida Dep., at 154:16-18.

42. Officers Freire and Almeida thought that Stilphen was being cooperative during the booking process.  See Ex. 1, at 154:19-21; Ex. 2, at 87:7-16.

43. At one point during fingerprinting, Stilphen suggested to Officer Freire that his fingers should be dipped in water to facilitate the process.  See Exhibit 15, Form 26 Report of Catia Freire.

44. At another point, Officer Almeida and Stilphen made jokes about Officer Bertocchi's shoes.  See Exhibit 1, Almeida Dep., at 179:4-15.

45. At times during the fingerprinting, Stilphen bends at the knees.  See Exhibit 10, at 3:53; 12:54; 16:37.  At the time of booking, Officer Freire did not notice that Stilphen was bending at the knees because she had her back turned to him and was focused on the fingerprinting process.  See Exhibit 3, at 100:12-25; 101:1-14.

46. Viewing the surveillance video at her deposition, Officer Freire did not believe that Stilphen was having difficulty standing up straight, but rather that he was bending down to be at the same height as Officer Freire, who was several inches shorter than Stilphen. See Exhibit 3, at 98:14-25; 99:1-8; 100:3-8; Exhibit 10, at 04:21.

47. Officer Bertocchi thought that Stilphen was leaning in to assist Officer Freire to take his fingerprints.  See Exhibit 2, at 146:1-3.  He also thought that Stilphen was bending down to get a better view of the fingerprinting screen.  See Exhibit 2, Bertocchi Dep, at 138:2-10.

48. After Officer Freire spends about ten minutes with Stilphen at the fingerprinting station, Officer Bertocchi switches places with her to complete the last few fingerprints.  See Exhibit 10, at 14:49; Exhibit 3, at 110:14-25.

49. While Officer Bertocchi was conducting the fingerprinting with Stilphen, Officer Freire placed her hand on Stilphen's back.  See Exhibit 3, at 111:6-11; Exhibit 2, at 155:11-13.

Officer Freire said that she did this because Stilphen was dozing off and not helping with the fingerprinting.  See Exhibit 3, at 111:12-18; 114:13-19.

50. Once the fingerprinting was completed, Stilphen's booking photos were taken.  See Exhibit 10, at 17:45.  Officer Almeida took the photos from behind the booking window.  See Exhibit 10, at 17:57.

51. Stilphen was asked to remove his t-shirt; he complied.  See Exhibit 10, at 17:37.  He was then asked to turn to the right so that a profile picture could be taken; he again complied.  See Exhibit 10, at 18:06.  Stilphen looks through the booking window and gives a "thumbs up" to Officer Almeida.  See Exhibit 10, at 18:50.

52. In response to instructions from Officer Almeida, Stilphen positions his arms so that pictures of his tattoos can be taken.  See Exhibit 10, at 19:00; 19:28.

53. Officer Freire thought that Stilphen looked like he was tired and dozing off while his pictures were being taken.  See Exhibit 3, at 118:11-16; 119:4-11.  She observed that Stilphen would be standing up straight and communicating, then look like he was dozing off, and then when the officers talked to him, he would stand up straight and become alert again.  See Exhibit 3, at 119:23-25; 120:1-10.

54. Based on her training and experience, Officer Freire did not think Stilphen was under the influence of drugs during booking.  See Exhibit 3, at 121:6-13.

55. In response to questions posed by Officer Almeida, Stilphen stated that his sex was male; his race was White Non-Hispanic; his date of birth was August 8, 1990; his place of birth was Quincy, Massachusetts; his marital status was single; his mother's name was "OBRIEN, Lynn"; his father's name was Richard Stilphen; his height was five feet, eleven inches; his weight was 165 pounds; his build was slim; his eye color was brown;

his hair color was light brown; and his complexion was light.  See Exhibit 13, Arrest

Booking Form.  Stilphen also provided his social security number when asked by Officer

Almeida.  See Exhibit 13, Arrest Booking Form.

56. As part of his booking questions, Officer Almeida asked Stilphen if he had any

preexisting medical conditions or any medications.  See Exhibit 1, at 207:1-11.  Stilphen

answered "no" to both questions.  See Exhibit 1, at 207:12-16.

57. Stilphen did not request medical attention at any time during booking.   See Exhibit 1, at

154:25; 155:1-4; Exhibit 14, Form 26 Report of Ismael Almeida.

58. In the field of the booking sheet marked "Visible Injuries," Officer Almeida entered

"none."  See Exhibit 13.  In another field marked "Medical Notations," Officer Almeida

entered "none."  See Exhibit 13.

59. In another field marked "State of Consciousness," Officer Almeida entered "Alert."  See

Exhibit 17, at 4 (COB9785).  The other three choices available to Officer Almeida were

"Dazed," "Under the Influence of Liquor (UIL)"; or "Under the Influence of Drugs

(UID)".  See Exhibit 18, Deposition Transcript of James Lydon, at 88:17-24.

60. A booking sheet cannot be submitted without these questions being completed.  See

Exhibit 1, Almeida Dep., at 155:11-13; 161:7-17; Exhibit 2, Bertocchi Dep., at 111:15-

22.

61. Boston Police Department Rule 318, Section 4, provides in part that "When a prisoner is

unconscious, the Duty Supervisor shall be notified, every effort shall be made to restore

consciousness and medical assistance shall be summoned.  Any unusual appearance or

behavior displayed by a prisoner shall receive immediate attention."  See Exhibit 26, at 2

(COB2386).

62. Boston Police Department Rule 318A provides in part that "In instances where the incapacitation is due to drugs, the person in custody shall be transported to a hospital or medical facility."  Pl. Compl. ¶ 43.

63. During the booking process, Officer Bertocchi read Stilphen his Miranda rights.  See Exhibit 13, Prisoner Booking Form.  Stilphen signed a form acknowledging that he understood what Officer Bertocchi had told him.  See Exhibit 10, Booking Desk Video, at 22:05; Exhibit 2, Bertocchi Dep., at 160:23-25.  On the same form, Stilphen signed an acknowledgement that certain items of his personal property–specifically, his hat, shoelaces, and belt–were being held by the police.  See Exhibit 13.

64. As part of the routine booking process, Stilphen would have been offered the opportunity to make a phone call.  See Exhibit 1, at 155:7-17; Exhibit 2, at 120:12-15.  The booking sheet indicates that Stilphen declined to make a phone call.  See Exhibit 13.

65. The surveillance video shows Stilphen walking unassisted out of the booking area and into one of the cell blocks.  See Exhibit 11, Cell 19 Video, at 6:17.  At no point during his time in the sally port, group holding cell, or booking area did Stilphen fall down or stumble.  See Exhibit 8, Exhibit 9, Exhibit 10.

66. Officer Bertocchi did not think that Stilphen was intoxicated or needed medical assistance during booking.  See Exhibit 2, at 162:16-25; 163:1-3.  Officer Bertocchi noted that Stilphen was coherent, conversed normally, and was able to answer all of Officer Almeida's questions.  See Exhibit 2, at 138:25; 139:1; 147:8-15.  Officer Bertocchi also observed that Stilphen never fell over and was able to put his sneakers on by standing on one foot.  See Exhibit 2, at 147:16-24.

67. Officer Bertocchi said that if Stilphen had asked for or was in need of medical assistance, EMS would have been contacted.  See Exhibit 2, at 64:11-25; 65:2-7; 162:1-3, 6-8.

68. Officer Almeida thought that Stilphen's booking was an "average District 4 booking." See Exhibit 1, at 204:24-25; 205:1-4.  He did not think Stilphen was intoxicated.  See Exhibit 1, at 271:19-22.  He did not think Stilphen needed medical assistance based on the fact that Stilphen was able to answer all of his questions and did not request medical assistance.  See Exhibit 1, at 208:9-25; 209:1-18.

69. Lt. James Foley, the acting duty supervisor at D-4 on the early morning of July 14, 2019, testified that he does not "send everyone to the hospital who is drunk or high."  See Exhibit 19, at 145:22-24.  He added: "There wouldn't be an ambulance left in Boston–or the state probably."  See Exhibit 19, at 145:24-25; 146:1.

<u>Cell 19: 2:21 AM to 2:34 AM</u>

70. At 2:21 AM, Officers Bertocchi, Freire, and Almeida placed Stilphen in his individual cell, Cell 19.  See Exhibit 11, Cell 19 Video, at 6:17.  After he is led into the cell by the officers, Stilphen walks backward a few steps and sits on the cell bench.  See Exhibit 11, at 6:27.  He engages Officers Bertocchi and Freire in conversation before they close the cell door.  See Exhibit 11, at 6:42.

71. While Officers Bertocchi, Freire, and Almeida converse outside the cell door, Stilphen bends forward at the waist.  See Exhibit 11, at 7:07.  Officer Freire was not concerned about Stilphen's position because it was common to see people in the Mass and Cass area sleeping in similar positions.  See Exhibit 3, at 124:9-11; 125:9-15, 24-25; 126:1-11, 21-25; 127:1-18.

13

72. Stilphen stays in the bent-over position for about forty seconds, at which point Officer Bertocchi opens the cell door slightly and closes it again, prompting Stilphen to sit upright.  See Exhibit 11, at 7:41.

73. Stilphen bends forward at the waist a second time.  See Exhibit 11, at 8:01. Officers Bertocchi, Freire, and Almeida converse outside the cell door for a few seconds and then leave the cell block.  See Exhibit 11, at 8:15.  Officer Freire did not walk by Cell 19 again at any point that morning.  See Exhibit 3, at 129:14-18.

74. Stilphen remains seated on the bench in a bent-over position for approximately ten minutes.  See Exhibit 11, at 8:30-18:00.  At 2:32 AM, Officer Bertocchi knocks on the cell door, prompting Stilphen to sit upright.  See Exhibit 2, at 166:6-12; Exhibit 11, at 18:02.  Officer Bertocchi was not concerned by Stilphen's position because he responded immediately when Officer Bertocchi knocked on the cell door.  See Exhibit 2, at 166:13-22.

75. Officer Bertocchi puts a sandwich and two cartons of milk through the food slot at the bottom of the cell door.  See Exhibit 11, at 18:06.  Officer Bertocchi then leaves the cell block.   See Exhibit 11, at 18:11.  This was the last interaction between Officer Bertocchi and Stilphen before Stilphen was discovered unresponsive later that morning.   See Exhibit 2, at 167:4-12.

76. Stilphen walks to the cell door and takes the two cartons of milk.  See Exhibit 11, at 18:15. He returns to the cell bench and drinks from one of the cartons of milk.  See Exhibit 11, at 18:23.

77. After drinking the milk, Stilphen turns his body around and looks directly at the cell's security camera, which is situated high above and behind him.  See Exhibit 11, at 18:36; Exhibit 12a, Still of Cell 19 Video.

78. Stilphen then reaches his left hand underneath the back side of his shorts.  See Exhibit 11, at 18:39; Exhibit 12 b, Still of Cell 19 Video.

79. Stilphen walks to the cell door to retrieve the sandwich that Officer Bertocchi had brought.  See Exhibit 11, at 18:51.  Stilphen then walks backwards and sits down again on the cell bench with his legs crossed under him.  See Exhibit 11, at 19:00.

80. Stilphen unwraps the sandwich but does not appear to eat from it.  See Exhibit 11, at 19:16.  Instead, Stilphen can be seen manipulating a small object in his hands.  See Exhibit 11, at 19:25; Exhibit 12c, Still of Cell 19 Video

81. The position of Stilphen's body in the Cell 19 surveillance video prevents a clear view, but at various intervals over the next two hours, Stilphen ingests drugs.  See generally Exhibit 11.

82. The occupant of the cell immediately across from Stilphen told police that he saw Stilphen eating or sniffing from a little white bag.  See Exhibit 25, Interview of RL, at 3:01-3:18.

<u>Cell 19: 2:35 AM to 3:35 AM</u>

83.  As the booking officer, Officer Almeida was the designee of the duty supervisor who was responsible for conducting 15-minute checks of the prisoners in the D-4 cell block.  See Exhibit 1, at 122:5-16, 190:1-4.

84. Boston Police Department Rule 318, Section 13, provides that "The Duty Supervisor . . . shall visit, or cause to be visited, all persons in their custody at least once every fifteen

minutes, and shall ensure that each visit is recorded in the Prisoner Inspection Record (M.G.L. c. 40 § 36B)."  See Exhibit 26, at 8 (COB 2392).

85. Between 2:35 AM and 3:35 AM, Stilphen remains seated on the cell bench with his legs crossed underneath him.  See Exhibit 11, at 20:07.  During this time, Stilphen alternates between sitting upright and leaning forward with his body bent over his waist.  See Exhibit 11, at 23:00; 23:21; 24:35.

86. Various police officers walk up and down the cell block hallway between 2:35 AM and 3:35 AM.  See Exhibit 11, at 20:08.

87. At 2:35 AM, when an unidentified officer walks up and down the cell block, Stilphen is seated upright on the cell bench.  See Exhibit 11, at 20:09.

88. At 2:47 AM, an unidentified officer walks up and down the cellblock.  See Exhibit 11, at 32:21.  At 2:54 AM, Officer Almeida walks up and down the cellblock.  See Exhibit 11, at 39:54.  On both of these occasions, Stilphen is in the leaned-forward position.  See Exhibit 11, at 40:06.

89. At 2:58 AM, two police officers enter the cell block to bring a prisoner to a cell.  See Exhibit 11, at 43:21.  Stilphen is initially in the leaned-forward position but sits up as the two officers pass by his cell door.  See Exhibit 11, at 43:23.

90. At 3:00 AM, an unidentified officer walks up and down the cell block.  See Exhibit 11, at 45:23.  Between 3:05 and 3:06 AM, Officer Almeida walks up and down the cell block.  See Exhibit 11, at 51:00.  On both of these occasions, Stilphen is in the leaned-forward position.  See Exhibit 11, at 51:25.

91. At 3:15 AM, two unidentified officers enter the cell block to escort a prisoner to his cell.  See Exhibit 11, at 1:00:32.  Stilphen is in the leaned-forward position when the officers

pass his cell door the first time. See Exhibit 11, at 1:00:33. As the two officers pass

Stilphen's cell door on their way out of the cell block, Stilphen sits upright. See Exhibit

11, at 1:00:52.

92. Unidentified officers walk up and down the cell block at 3:17 AM and 3:20 AM. See

Exhibit 11, at 1:05:35. Between 3:32 and 3:33 AM, Officer Almeida also walks up and

down the cell block. See Exhibit 11, at 1:17:55. On all three of these occasions, Stilphen

is in the leaned-forward position. See Exhibit 11, at 1:05:35-1:18:10.

<u>Cell 19: 3:35 AM to 5:39 AM</u>

93. At 3:35 AM, Stilphen sits upright. See Exhibit 11, at 1:20:12. He appears to manipulate

a small item in his hands. See Exhibit 11, at 1:20:17.

94. At 3:36 AM, Stilphen changes positions by uncrossing his legs and extending them

straight out while he remains seated on the bench. See Exhibit 11, at 1:21:43.

95. Between 3:47 AM and 3:48 AM, Officer Picarello walks up and down the cellblock

hallway while Stilphen is seated on the cell bench with his legs sticking out straight in

front of him. See Exhibit 11, at 1:23:27. At one point, a small white object can be seen

in Stilphen's left hand. See Exhibit 11, at 1:23:38.

96. Stilphen begins to lean heavily to his right. See Exhibit 11, at 1:28:41. At 3:48 AM,

Officer Picarello walks down the cell block hallway while Stilphen is leaning to the right.

See Exhibit 11, at 1:32:26; Exhibit 12d, Still of Cell 19 Video. Stilphen then sits upright.

See Exhibit 11, at 1:32:32. As Officer Picarello walks past Stilphen's cell on his way out

of the cell block, Stilphen is seated upright. See Exhibit 11, at 1:32:36; 12e, Still of Cell

19 Video.

97. At 3:50 AM, Stilphen's legs relax and his shoes touch the floor.  See Exhibit 11, at 1:35:15.  Stilphen manipulates a small object in his hands.  See Exhibit 11, at 1:35:37.

98. At 3:51 AM, Stilphen leans forward at the waist.  See Exhibit 11, at 1:36:04.  He remains in the leaned-forward position for approximately eleven minutes.  See Exhibit 11, at 1:47:10.

99. At 4:02 AM, Officer Almeida walks down the cell block hallway.  See Exhibit 11, at 1:47:45.  Stilphen is in the leaned-forward position when Officer Almeida passes by the first time, but sits upright as Officer Almeida walks farther down the hallway.  See Exhibit 11, at 1:47:46; Exhibit 12f, Still of Cell 19 Video.  When Officer Almeida passes Stilphen's cell on his way out of the cell block, Stilphen is seated upright and touching his face with his hand.  See Exhibit 11, at 1:48:05; Exhibit 12g, Still of Cell 19 Video.

100. At 4:06 AM, Stilphen rests his back and head against the cell wall while still seated on the bench.  See Exhibit 11, at 1:51:38.  He remains in that position for approximately thirty-three minutes.  See Exhibit 11, at 2:24:41.

101. At 4:17 AM, Officer Picarello conducts a cellblock check while Stilphen is still resting against the cell wall.  See Exhibit 11, at 2:02:35.

102. At 4:19 AM, Officer Almeida and Officer David Marshall walk down the cell block hallway.  See Exhibit 11, at 2:04:16.  At 4:20 AM, Officers Almeida and Marshall walk back out of the cell block escorting a prisoner between them.  See Exhibit 11, at 2:05:12.  Stilphen is still resting against the cell wall.  See Exhibit 11, at 2:05:13.

103. At 4:29 AM, Officer Almeida conducts a cell check while Stilphen is still resting against the cell wall.  See Exhibit 11, at 2:14:02.  On his way out of the cell block,

Officer Almeida stops and peers closely in Stilphen's cell before continuing on his way. See Exhibit 11, at 2:14:05; Exhibit 12h, Still of Cell 19 Video.

104.　　　At 4:39 AM, Stilphen sits upright.  See Exhibit 11, at 2:24:41.  At 4:40 AM, he manipulates a small object in his hands.  See Exhibit 11, at 2:25:01.

105.　　　At 4:40 AM, while Stilphen is still seated upright, Officer Marshall and an unidentified officer walk down the cell block hallway with the prisoner who was removed from his cell twenty minutes earlier.  See Exhibit 11, at 2:25:26.  After the officers and prisoner passed his cell, Stilphen crossed his legs underneath him on the cell bench.  See Exhibit 11, at 2:25:43.  He tears off a piece of paper from the sandwich wrapper and holds it in his hands as Officer Marshall and the unidentified officer pass his cell on their way out of the cell block.  See Exhibit 11, at 2:26:00.

106.　　　At 4:41 AM, Stilphen takes a milk carton and tears off a piece of it.  See Exhibit 11, at 2:26:50.  He appears to roll up the piece of carton.  See Exhibit 11, at 2:26:52.  At 4:42 AM, he appears to sniff or ingest something in his hands.  See Exhibit 11, at 2:27:35.

107.　　　At 4:43 AM, Officer Picarello conducts a cell check.  See Exhibit 11, at 2:28:15. When Officer Picarello first passes Stilphen's cell, Stilphen, who is still seated upright on the cell bench, appears to conceal the item in his hand by placing it behind his back.  See Exhibit 11, at 2:28:16.  Stilphen continues to conceal the item as Officer Picarello passes the cell on his way out of the cell block.  See Exhibit 11, at 2:28:39.

108.　　　At 4:46 and 4:48 AM, Stilphen manipulates an item in his hands.  See Exhibit 11, at 2:31:23.

109.     At 4:48 AM, Stilphen leans forward at the waist.  See Exhibit 11, at 2:32:22.

From that point forward, he never sits upright again.  See Exhibit 11, at 2:32:42-3:37:22.

110.     Officer Almeida conducts a cell check at 4:55 AM.  See Exhibit 11, at 2:41:05.

111.     During these checks, Officer Almeida thought that Stilphen was sleeping and did

not need medical attention.  See Exhibit 1, at 233:7-10.  Because of his experience at the

booking desk at D-4, Officer Almeida had seen many individuals who sleep in "weird[,]

crazy" positions.  See Exhibit 1, at 232:21-25; 233:1-5, 20-25; 234:1-4.

112.     Steven Sweeney, the captain of the D-4 station, testified that he did not think

Officer Almeida violated BPD policy by not seeking medical attention for Stilphen,

because officers at the station see people sleep "in all different positions."  See Exhibit

29, at 25:18-23; 195:7-20.

113.     At 5:05 AM, Officer Almeida walks down the cell block hallway.  See Exhibit 11,

at 2:50:58.  At 5:06 AM, Officer Almeida walks out of the cell block, followed by a

prisoner.  See Exhibit 11, at 2:51:42.

114.     At 5:07 AM, Officer Almeida walks back down the hallway with the prisoner to

return him to his cell, which is immediately adjacent to Stilphen's cell.  See Exhibit 11, at

2:52:05.  Officer Almeida then leaves the cell block by himself.  See Exhibit 11, at

2:52:08.

115.     At 5:10 AM, Officer Almeida walks down the cell block hallway.  See Exhibit 11,

at 2:55:11.  He again takes the neighboring prisoner out of his cell and escorts him out of

the cell block.  See Exhibit 11, at 2:55:24.

116.     At 5:20 AM, Officers Almeida and Picarello walk down the cell block hallway with the neighboring prisoner to escort him back to his cell.  See Exhibit 11, at 3:05:33. Officers Almeida and Picarello then leave the cell block.  See Exhibit 11, at 3:05:55.

117.     At 5:35 AM, Officer Almeida conducts a check of the cell block.  See Exhibit 11, at 3:20:08.

118.     At 5:36 AM, Officer Almeida again walks down the cell block hallway.  See Exhibit 11, at 3:20:54.  On his way out of the cell block, Officer Almeida is followed by another prisoner.  See Exhibit 11, at 3:22:21.

119.     At 5:39 AM, Officer Picarello enters the cell block to bring food to the prisoners. See Exhibit 11, at 3:24:05.  Officer Picarello places some items in Stilphen's food slot and looks into Stilphen's cell.  See Exhibit 11, at 3:24:08.  Officer Picarello then continues going down the cell block.  See Exhibit 11, at 3:24:15.

120.     Officer Picarello thought that the position Stilphen was in was not an abnormal one for a person with a heroin, opiate, or fentanyl addiction.  See Exhibit 4, at 128:1-2; 129:7-9, 19-20.  He did not believe that Stilphen was in need of medical attention.  See Exhibit 4, at 134:23-24, 135:1-3.

121.     Stilphen appears to take his last breath at 5:39 AM or shortly thereafter.  See Exhibit 11, at 3:24:30.

<u>Joseph Perry Incident</u>

122.     At around 3:00 AM on January 14, 2019, a prisoner named Joseph Perry was transported to the D-4 station for booking for an attempted rape.  See Exhibit 5, Doolan Dep., at 16:5-6, 17:5-6; Exhibit 19, Deposition Transcript of James Foley, at 36:11-14. Perry had been involved in an incident that required a citywide "officer in trouble" call

and was resistant and violent when he was placed under arrest.  See Exhibit 5, at 17:4-5;
Exhibit 19, at 36:14-17.

123.       After the police wagon transporting Perry arrived at the D-4 sally port, Perry
continued being uncooperative.  See Exhibit 5, at 17:5-6.  He refused to get out of the
wagon.  See Exhibit 19, at 36:18-21.  Officers spent thirty minutes trying to coax him out.
See Exhibit 19, at 36:19-22.

124.       Perry then slammed his head three times on a steel handlebar in the wagon,
causing a significant amount of bleeding.  See Exhibit 5, at 17:12-13; Exhibit 19, at
36:22-25.  Perry thrust himself into the back of the wagon to prevent officers from
helping him.  See Exhibit 5, at 17:15-16.

125.       Officers were able to remove Perry from the wagon, but he continued to bash his
head against the cement floor, causing further bleeding.  See Exhibit 5, at 17:16-20;
Exhibit 19, at 36:25; 37:1-2.

126.       Boston EMS arrived at the D-4 station to transport Perry to a hospital.  See
Exhibit 19, at 37:2-4.

127.       Officer Doolan was one of the officers in the Sally Port who interacted with
Perry.  See Exhibit 5, at 167:10-11.  Following that incident, Officer Doolan was covered
with blood.  See Exhibit 5, at 167:13.  Officer Doolan had to take a shower and put on a
new uniform before returning to his duties on the shift.  See Exhibit 5, at 167:13-20.

128.       Officer Almeida was also in the sally port during the Perry incident, though he did
not personally see Perry ram his head into the handlebar.  See Exhibit 1, at 137:6-25;
138:1-25; 139:1-25; 140:1-14.

129.     After Perry was taken to the hospital, the duty supervisor set up a crime scene around the wagon.  See Exhibit 19, at 37:10-11.  The Homicide, Internal Affairs, and Crime Scene Response units of the Boston Police were all called to the D-4 station to conduct an investigation.  See Exhibit 5, at 168:12-14; Exhibit 19, at 37:11-12, 21-24.

130.     Officer Doolan described the atmosphere in the D-4 station following Perry's death as a "disaster."  See Exhibit 5, at 168:5-6.  Officer Almeida described the early morning of July 14, 2019, as "one of the busiest nights [he] had at the booking desk."  See Exhibit 1, at 200:14-25; 201:1-8.  He said there was "not a second where somebody isn't saying something to you, from you -- community, the person beside you."  See Exhibit 1, at 142:11-14.

131.     Because of the level of activity at the D-4 station following the Perry incident, a number of prisoners who arrived that morning were unable to be booked in a timely manner.  See Exhibit 5, Doolan Dep., at 168:12-14.

<u>Stilphen is Discovered Unresponsive</u>

132.     Shortly before 5:51 AM, Officer Doolan was assisting the Trauma 24 (crime scene cleanup) in the sally port area.  See Exhibit 5, at 185:2-4.

133.     Because the booking officers were involved in booking a prisoner who could not be booked earlier, Officer Doolan was asked to conduct a 15-minute check of the cell block.  See Exhibit 5, at 185:13-18.

134.     Surveillance video shows Officer Doolan conducting a cell block check beginning at 5:51 AM.  See Exhibit 11, at 3:36:24.  When he passed by Stilphen's cell, Officer Doolan saw Stilphen "sitting in a position that appeared uncomfortable."  See Exhibit 5,

at 169:15-21.  Doolan testified that he got a "sixth sense bulb that something might not be right."  See Exhibit 5, at 169:21-24.

135.      Officer Doolan called out to Stilphen, but got no response.  See Exhibit 5, at 170:1-2.

136.      Officer Doolan continued walking down the cell block to check on the other prisoners in their cells.  See Exhibit 5, at 170:3-6.

137.      After hitting the buzzer at the end of the hallway, Officer Doolan walked back down the cell block.  See Exhibit 5, at 170:10-12; Exhibit 11, at 3:36:36.  When he passed Stilphen's cell on his way out of the cell block, Officer Doolan kicked the cell door and yelled his name.  See Exhibit 5, at 170:10-12; Exhibit 11, at 3:36:39.  Stilphen did not respond.  See Exhibit 5, at 171:2-5; Exhibit 11, at 3:36:42.

138.      Officer Doolan did not think that Stilphen was dead at the time that he kicked the cell door.  See Exhibit 5, at 203:8-10.  In Officer Doolan's experience, certain individuals with opioid addiction have a different baseline than people who are not addicted to opioids.  See Exhibit 5, at 203:14-17.  According to Officer Doolan, these individuals are able to lie in uncomfortable positions and then "just pop right up."  See Exhibit 5, at 203:18-22.

139.      Based on his experience at the D-4 station, Officer Doolan had seen individuals in contorted positions before.  See Exhibit 5, at 203:24, 204:1-2.  In Officer Doolan's view, "the only thing wrong is the addiction that has caused them to just be in these positions."  See Exhibit 5, at 204:4-6.

140.      Because Stilphen did not respond, Officer Doolan yelled for Officer Almeida to bring the key to Stilphen's cell.   See Exhibit 5, at 171:6-8.

141.     Officer Almeida came to the cell block with the key.  See Exhibit 11, at 3:37:16.
Officer Almeida unlocked the cell door, and Officers Almeida and Doolan entered the
cell.  See Exhibit 11, at 3:37:19.

142.     Officer Almeida touched Stilphen's shoulder but Stilphen still did not respond.
See Exhibit 11, at 3:37:23.  Officer Doolan saw that Stilphen's body was "limp and
appeared drained of color."  See Exhibit 11, at 3:37:27.  Officer Doolan ran out of the cell
to call for help and retrieve Narcan.  See Exhibit 11, at 3:37:28.

143.     Officer Almeida saw the small baggie of drugs on the cell bench.   See Exhibit 1,
at 170:6-10; Exhibit 23, Photos of Small Baggie of Drugs.  Officer Almeida thought that
it might contain fentanyl, which would be a danger to everyone in the cell.   See Exhibit
1, at 170:6-15.

144.     Officer Almeida pushed the baggie to the side and began to perform
cardiopulmonary resuscitation ("CPR") on Stilphen.  See Exhibit 1, at 170:11-13.

145.     About a minute later, Officer Doolan reentered the cell with a Narcan kit.  See
Exhibit 11, at 3:38:33.  Officer Doolan was quickly followed by Officer Bertocchi, who
relieved Officer Almeida in performing CPR.  See Exhibit 11, at 3:38:48.  Other officers
arrived at Stilphen's cell.   See Exhibit 11, at 3:39:00.

146.      Officer Almeida took Officer Marshall's radio and left the cell block to request
EMS from a different location.   See Exhibit 11, Cell 19 Video, at 3:39:34; Exhibit 1, at
172:20-25, 173:1-12.  Based on his experience at the D-4 station, Officer Almeida knew
that the radio sometimes did not work from inside the cell block.   See Exhibit 1, at
173:9-11, 25; 174:1-8.  Officer Almeida wanted to ensure that the radio call went through
because he was worried about Stilphen.  See Exhibit 1, at 174:9-16.

147.        Officer Doolan struggled to administer the Narcan dose.  See Exhibit 11, at

3:39:24.  He threw it on the floor and another officer ran to get more Narcan.  See Exhibit

11, at  3:39:31.  Officers were able to administer three doses of Narcan before EMS

arrived.  See Exhibit 5, at 192:24, 193:1-7.

148.        Approximately five minutes after Officers Almeida and Doolan first entered

Stilphen's cell, Boston EMS arrived at the scene.  See Exhibit 11, at 3:42:48.  EMS took

over the medical efforts. See Exhibit 11, at 3:43:09.

149.        Stilphen was transported to Tufts Medical Center.  See Exhibit 21, Supplemental

Incident Report.  He died either en route to the hospital or shortly after arriving at the

hospital.  See Exhibit 21.

150.        The autopsy report lists Stilphen's cause of death as "acute fentanyl, despropionyl

fentanyl (4-ANPP), heroin, cocaine, and benzodiazepine intoxication."   See Exhibit 20,

Report of Autopsy, at 1.  The report lists the manner of death as "accident (substance

abuse)."   See Exhibit 20, at 1.

151.        The postmortem toxicology report indicates that Stilphen's heart blood was

positive on benzodiazepines screen, cocaine metabolite screen, fentanyl screen, and

opiates screen.  See Exhibit 22, Postmortem Toxicology Report, at 1.  An entry for

"Organic Bases and Neutrals" notes the following: "Gabapentin breakdown, methadone,

4-ANPP, fentanyl, nordiazepam, cocaine and metabolites, bupropion and metabolites, 7-

aminoclonazepam, chlordiazepoxide and metabolite detected."  See Exhibit 22, at 1.

Stilphen's vitreous humor was found to contain 6.3 ng/mL of morphine, 2.6 ng/mL of 6-

acetylmorphine, and 23 ng/mL of fentanyl.  See Exhibit 22, at 1.  Stilphen's femoral

blood was found to contain 1.4 ng/mL of clonazepam, 30 ng/mL of 7-aminoclonazepam,

86 ng/mL of nordiazepam, 4.7 ng/mL of oxazepam, 545 ng/mL of Benzoylecgonine, 10 ng/mL of "Morphine-Free", and 24 ng/ML of fentanyl.  See Exhibit 22, at 1-2.

152.     A Certificate of Drug Analysis indicates that the powdery substance discovered in Cell 19 "was found to contain Heroin, Fentanyl, and Valeryl Fentanyl, a synthetic opioid, all Class A controlled substances.  Analysis also indicated the presence of Tramadol, a Class E controlled substance, and Caffeine."  See Exhibit 24, Certificate of Drug Analysis.  The weight of the tested powder was .15 grams.  See Exhibit 24.

153.     A day or two after Stilphen's death, Officer Doolan was walking through the employee parking lot at the D-4 station when he came across Plaintiff and another family member.  See Exhibit 5, at 227:19-24; 228:1-15.

154.     After he learned who she was, Officer Doolan had a brief conversation with Plaintiff.  See Exhibit 5, at 228:20-24; 229:1-12.  Officer Doolan told Plaintiff that he was the one who found Stilphen, and that the officers tried everything they could to keep him alive.  See Exhibit 5, at 229:3-6, 17-19.  He said that he knew Stilphen from Nashua Street, and that he was not a bad kid.  See Exhibit 5, at 229:12-14.

155.     Officer Doolan also told Plaintiff that there were things he could not say about Stilphen's death because there was an ongoing investigation.  See Exhibit 5, at 229:6-8, 15-17.  He concluded by saying that someone would reach out to Plaintiff to let her know what was going on.  See Exhibit 5, at 229:20-24.

<u>Dr. MacDonald's Testimony</u>

156.     During expert discovery, the Plaintiff produced an expert report written by Dr. Ross MacDonald.  See Exhibit 27, Expert Report of Ross MacDonald, M.D.  Dr.

MacDonald was also deposed by defense counsel.  See Exhibit 28, Deposition of Ross MacDonald.

157.    Dr. MacDonald describes himself as an "expert in the treatment of substance use disorder, including the treatment of substance use disorder in correctional settings."  See Exhibit 27, at ¶ 8.   From 2017 to 2022, Dr. MacDonald worked as the Chief Medical Officer and Senior Assistant Vice President for the Division of Correctional Health Services at New York City Health + Hospitals, the division of the public hospital system responsible for healthcare, including substance use treatment, for those incarcerated in the New York City jail system.   See Exhibit 27, at ¶ 10.

158.    Dr. MacDonald does not perform any volunteer work with people who have opioid use disorder on the street.  See Exhibit 28, at 68:11-15.  In his current position as Chief Medical Officer at a public hospital in New York, Dr. MacDonald has gone out with a street outreach team to provide care to homeless individuals in the community one time.  See Exhibit 28, at 70:14-22.

159.    Dr. MacDonald acknowledged that the decision whether to send an arrestee who is suspected to be intoxicated on drugs concerns "thresholds."  See Exhibit 28, at 55:2-24; 56:1.  According to Dr. McDonald, "[i]t's not all intoxicated people, but certain concerning levels of intoxication would prompt [hospitalization]."  See Exhibit 28, at 56:1-3.

160.    Based on his review of the surveillance video and other materials, Dr. MacDonald asserted that it was very likely that Stilphen consumed drugs before he was arrested on July 14, 2019, though he acknowledged that he had no direct evidence of what Stilphen was doing prior to his arrest.  See Exhibit 28, at 71:14-15; 72:3-4.

161.     Dr. MacDonald opined that up to the point when Stilphen was placed in Cell 19, he did not believe that Stilphen was experiencing an overdose, or that he required Narcan to reverse an overdose.  See Exhibit 28, at 74:10-24, 75:1-22.

162.     Dr. MacDonald opined that Stilphen "had a serious medical need" during booking.   See Exhibit 28, at 73:20-24.  According to Dr. MacDonald, there were multiple ways the medical need could have been handled: the first way would be giving Stilphen medical attention, while the second way would be a "different or more robust monitoring of his status" following booking.  See Exhibit 28, at 73:24; 74:1-9, 83:4-13.

163.     Dr. MacDonald claimed that Stilphen's bent-forward position in the group holding cell was an "unnatural position."  See Exhibit 28, at 88:23-24; 89:1-14.  This characterization was based on Dr. MacDonald's belief that the position was "not a usual sleeping position" and "not something that would typically be comfortable."  See Exhibit 28, at 96:1-8.

164.     Dr. MacDonald further opined that the position is "not a good position from a respiratory standpoint."  See Exhibit 28, at 96:9-10.  He explained that "[e]specially in someone who is intoxicated, it would tend towards compressing the thoracic cavity, and could further impair breathing or respiratory perforations."  See Exhibit 28, at 96:7-14.

165.     Dr. MacDonald acknowledged that "it's not unusual to find people who are intoxicated in unusual positions."  See Exhibit 28, at 97:5-15.

166.     Dr. MacDonald testified that the half life of heroin is on the order of a few hours, and the halflife of fentanyl is a matter of minutes.  See Exhibit 28, at 57:16-24; 58:1-8; 59:4-17.

167.    Dr. MacDonald thought that the emergency response once officers discovered

Stilphen unresponsive was appropriate.  See Exhibit 28, at 95:6-8.

Defendants,

CITY OF BOSTON, ISMAEL ALMEIDA,
PAULMICHAEL BERTOCCHI, CATIA FREIRE,
and BRIAN PICARELLO,

By their attorneys,

Adam Cederbaum
Corporation Counsel

/s/ Randall Maas
_____
Edward Whitesell BBO#644331
Senior Assistant Corporation Counsel
Randall Maas BBO# 684832
Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA 02201
617-635-4045 (Whitesell)
617-635-4042 (Maas)
Edward.whitesell@boston.gov
Randall.maas@boston.gov