# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

LYNNEL COX, as administrator of the Estate
of Shayne R. Stilphen,

       Plaintiff,

v.

CITY OF BOSTON, ISMAEL ALMEIDA,
PAULMICHAEL BERTOCCHI, CATIA
FREIRE, and BRIAN PICARELLO,

       Defendants.

Civil Action No. 1:22-cv-11009-RGS

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## STATEMENT OF UNDISPUTED MATERIAL FACTS AND
## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

## PLAINTIFF'S PRELIMINARY STATEMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Civil Rules of the U.S. District Court for the District of Massachusetts, Plaintiff Lynnel Cox, as administrator of the Estate of Shayne R. Stilphen, hereby responds to Defendants Ismael Almeida, Paulmichael Bertocchi, Catia Freire, Brian Picarello, and the City of Boston's Statement of Undisputed Material Facts filed in support of Defendants' Motions for Summary Judgment (*see* ECF Nos. 84–87) and also makes statements of certain additional facts.

The positions, facts, statements, and objections herein are offered for summary judgment purposes only, and Plaintiff expressly reserves, and does not waive, any and all objections to evidence and factual assertions that may be made at trial. Furthermore, Plaintiff has prepared these Responses based on her good faith interpretation and understanding of each individual statement, and expressly reserves her right to amend, supplement, and/or change her Responses to correct any errors or omissions.

### D-4 Station[1]

**1.** The four individual defendants, Ismael Almeida, Paulmichael Bertocchi, Catia Freire, and Brian Picarello, were Boston police officers who were working on the overnight shift (11:45 PM to 7:45 AM) at the D-4 station during the early morning of July 14, 2019.  Exhibit 1, Deposition Transcript of Ismael Almeida, at 148: 4-6, 154: 9-11; Exhibit 4, Deposition Testimony of Brian Picarello, at 105: 23-24, 106: 1-4.

---

[1] Plaintiff repeats here the headings provided in Defendants' Statement of Undisputed Material Facts for reference and not because Plaintiff necessarily agrees with their substance.

**PLAINTIFF'S RESPONSE:** Not disputed.

2. Officer Almeida worked as the booking officer at D-4. See Exhibit 1, at 26:5-12; 114:18-21 . On July 14, 2019, Officer Almeida knew the name Shayne Stilphen and had seen him around, but he did not know if he had previously booked Stilphen. See Exhibit 1, at 144:24-25; 145:1.

**PLAINTIFF'S RESPONSE:** Not disputed, with the clarification that Officer Almeida further testified that he was "aware of . . . who [Shayne] is.  In other words . . . if [he] was able to see [Shayne] in the street, [he] [could] go, that's Shayne Stilphen." Def. Ex. 1 (Almeida Dep. Tr.) at 145:7-12.

3. Officer Bertocchi was a patrol officer who had worked at the D-4 station since December 2018.  See Exhibit 2, Deposition Transcript of Paulmichael Bertocchi, at 47:8-17.  As a patrol officer, Officer Bertocchi's responsibilities were to respond to radio calls dispatched to him.  See Exhibit 2, at 47:18-24.

**PLAINTIFF'S RESPONSE:** Not disputed.

4. Officers Freire and Picarello had graduated from the police academy in June 2019 – just a few weeks prior to July 14, 2019.  See Exhibit 3, Deposition Transcript of Catia Freire, at 18:16-21; Exhibit 4, at 14:19-20.  They were assigned to the D-4 station as a six-month probationary assignment following their graduation from the academy.  See Exhibit 3, at 20:17-22; Exhibit 4, at 15:1-9.

**PLAINTIFF'S RESPONSE:** Not disputed, except that Officer Picarello testified that after graduating from the academy, he was assigned to District D-14 for his first probationary

assignment, Def. Ex. 4 (Picarello Dep. Tr.) at 14:21–24, and that he used to take overtime at D-4 while assigned to District D-14. Pl. Ex. 19 (Picarello Dep. Tr.) at 18:1–2.

**5.** On July 14, 2019, Officer Freire was working as a patrol officer under the supervision of a training officer, Officer Kevin Zarnoch.  See Exhibit 3, at 19:7-22, 91:4-20.

> **PLAINTIFF'S RESPONSE:**  Not disputed.

**6.** Officer Picarello normally worked the day shift during his probationary assignment at D-4.  See Exhibit 4, at 68:11-15.  On July 14, 2019, he was working the overnight shift as an overtime assignment.  See Exhibit 4, at 20:17-22.

> **PLAINTIFF'S RESPONSE:**  Not disputed, except that Officer Picarello testified that his probationary assignment was in District D-14.  Def. Ex. 4 (Picarello Dep. Tr.) at 14:21–24.

**7.** During that shift, Officer Picarello was assisting Officer Almeida with booking, because the officer who usually worked alongside Officer Almeida was not there. See Exhibit 16, Form 26 Report of Brian Picarello.  This was the first time Officer Picarello had ever been assigned booking. See Exhibit 4, at 51:2-16.

> **PLAINTIFF'S RESPONSE:**  Not disputed.

**8.** Another police officer who was working at D-4 on the overnight shift, though not named as a defendant in this lawsuit, was Sean Doolan.  See Exhibit 5, Deposition Transcript of Sean Doolan, at 155:7-18.  Prior to working as a Boston police officer, Officer Doolan had worked as a corrections officer at Nashua Street Jail, where he had met Stilphen while Stilphen was serving a sentence there.  See Exhibit 5, Deposition of Sean Doolan, at 33:15-19, 150:17-24.  Officer Doolan knew that Stilphen likely struggled with opioids based on the medications Stilphen received in rounds while incarcerated at Nashua Street. See Exhibit 5, at 153:4-7, 154:1-7.

**PLAINTIFF'S RESPONSE:** Not disputed.

January 9, 2019, Arrest

**9.** Stilphen was arrested in Boston on the early morning of January 9, 2019.  See Exhibit 6, Incident Report 192002231, at 1.  He was brought to the A-1 station for booking.  See Exhibit 6, at 1.

**PLAINTIFF'S RESPONSE:** Not disputed.

**10.**     During booking, Stilphen told officers that he had swallowed two and a half grams of crystal meth and a gram of fentanyl, and that he could feel a rapid heartbeat and needed to be evaluated by a doctor.  See Exhibit 6, at 2.  A police sergeant called for EMTs to transport Stilphen to the hospital.  See Exhibit 6, at 2.

**PLAINTIFF'S RESPONSE:**  Not disputed that this is stated in the Offense/Incident Report (192002231) created on January 9, 2019 by Stephen McKunes. Def. Ex. 6 (Incident Report 192002231) at 2.

**11.**     Stilphen attempted to refuse emergency medical services, but the officers and EMTs told Stilphen that it was in his best interest to be evaluated by a doctor given what he had told officers about his condition.  See Exhibit 6, at 2.  Stilphen was eventually transported to the hospital.  See Exhibit 6, at 2.

**PLAINTIFF'S RESPONSE:**  Not disputed that an Offense/Incident Report (192002231) created on January 9, 2019 by Stephen McKunes states that "[w]hile still at the station the suspect attempted to refuse EMS.  Officers and EMTs stated that due to the nature of his condition that he stated to the Officers it was in his best interest to be evaluated by a doctor.  Boston EMS was able

to transport the suspect (Stilphen, Shayne DOB 08-09-1990) to Tufts Medical Center.  The A102A

(Byrne, J/Drew) escorted the prisoner to Tufts."  Def. Ex. 6 (Incident Report 192002231) at 2.

<u>Stilphen Is Arrested on July 14, 2019</u>

**12.**     At about 1:00 AM on July 14, 2019, officers from the D-4 station responded to a

call for an individual breaking into a motor vehicle near 666 Massachusetts Avenue.  See Exhibit

7, Incident Report, at 6 (COB008); Exhibit 2, Bertocchi Dep., at 91:11-12.

**PLAINTIFF'S RESPONSE:**  Not disputed.

**13.**     Shortly after the radio call went out, Stilphen was stopped by a Boston police officer

at the corner of Massachusetts Avenue and Harrison Avenue because he matched the description

of the suspect broadcasted on the police radio.  See Exhibit 2, at 92:7-14.

**PLAINTIFF'S RESPONSE:**  Not disputed.

**14.**     Several police officers arrived at Stilphen's location including Officer Freire,

Officer Zarnoch, Officer Bertocchi, Officer Kevin Butcher, and Sergeant Brian McManus.  See

Exhibit 7, at 6; Exhibit 2, at 93:9-20.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that other officers were

on the scene as well.  *See* Def. Ex. 7 (Incident Report) at COB000008.

**15.**     Stilphen was talkative and argumentative with the officers on scene.  See Exhibit

2, at 94:2-7.  He wanted to know why he was being stopped; officers told him it was because he

matched the description of the suspect on the radio call.  See Exhibit 2, at 94:14-15.

**PLAINTIFF'S RESPONSE**: Not disputed that Officer Bertocchi described the events in this manner. Def. Ex. 2 (Bertocchi Dep. Tr.) at 94:2–15.

16.     At one point, Stilphen tried to walk away from the scene. See Exhibit 2, at 99:17-18. Because Stilphen was argumentative and attempted to leave the scene, Officer Bertocchi placed him in handcuffs. See Exhibit 2, at 94:14-22.

**PLAINTIFF'S RESPONSE**: Not disputed that Officer Bertocchi described the events in this manner. Def. Ex. 2 (Bertocchi Dep. Tr.) at 99:14–18.

17.     Officer Doolan did not respond to where Stilphen had been apprehended, but rather to where the 911 caller and vehicle were. See Exhibit 5, at 156:4-7. Upon arrival, Officer Doolan observed a car with a broken window and several items scattered around inside, as well as on the sidewalk. See Exhibit 5, at 156:19-21.

**PLAINTIFF'S RESPONSE**: Not disputed.

18.     While at the crime scene, Officer Doolan did not see Stilphen, nor was he aware that Stilphen was the suspect in the breaking and entering. See Exhibit 5, at 159:10-13.

**PLAINTIFF'S RESPONSE**: Not disputed.

19.     Officer Doolan stayed near the vehicle while the 911 caller was taken to conduct a bring- back procedure. See Exhibit 5, at 162:6-10, 19-23.

**PLAINTIFF'S RESPONSE**: Not disputed.

20.     The 911 caller positively identified Stilphen as the person who broke into the car. See Exhibit 2, Bertocchi Dep., at 97:5-6. Stilphen was placed under arrest. See Exhibit 2, at 97:6.

**PLAINTIFF'S RESPONSE**: Not disputed.

<u>Sally Port and Holding Cell</u>

**21.**      Officers Freire and Zarnoch transported Stilphen from the arrest scene to the D-4 police station.  See Exhibit 3, at 82:22-24.  Surveillance video of the sally port shows Officer Zarnoch opening the rear door of the police cruiser at 1:30 AM.  See Exhibit 8, Sally Port Video, at :10. The video then shows Stilphen stepping out of the police cruiser with his hands cuffed behind his back. See Exhibit 8, at :21. Stilphen waits for a few seconds while Officer Zarnoch examines the back seat of the cruiser; the two then walk into a door connecting the Sally Port to the rest of the police station. See Exhibit 8, at :41.

**PLAINTIFF'S RESPONSE:**  Not disputed.

**22.**      Surveillance video shows Stilphen entering the holding cell at 1:30 AM.  See Exhibit 9, Holding Cell Video, at :37. He takes a few steps backward and sits on the cell bench. See Exhibit 9, at :48

**PLAINTIFF'S RESPONSE:**  Not disputed.

**23.**      Officer Ismael Almeida, who was working as the booking officer at the D-4 station, enters the group holding cell with Officer Zarnoch.  See Exhibit 9, at :56. Officer Almeida has a brief conversation with Stilphen in which he explains the booking and search procedures. See Exhibit 9, at :59; Exhibit 1, Almeida Dep., at 240:9-11.

**PLAINTIFF'S RESPONSE:** Not disputed, with the clarification that the video footage does not contain audio, and Plaintiff cannot confirm what Officer Almeida said to Shayne while in the holding cell.[2]

24.     When Officer Almeida first encountered Stilphen on July 14, 2019, he thought that his face looked clearer and that he had put on some weight since the last time he had seen him. See Exhibit 1, at 148:7-23.

**PLAINTIFF'S RESPONSE:** Not disputed that Officer Almeida testified that he had those thoughts. *See* Def. Ex. 1 (Almeida Dep. Tr.) at 148:7–23

25.     Officers Almeida and Zarnoch then search Stilphen's pockets.  See Exhibit 9, Holding Cell Video, at 1:06.  The officers ask Stilphen to take off his shoes; Stilphen complies. See Exhibit 9, at 1:17. Officer Almeida removes Stilphen's belt and places it in an evidence bag. See Exhibit 9, at 1:26. Officer Almeida then has Stilphen stand up and searches his pockets a second time.  See Exhibit 9, at 2:16. Officer Almeida leaves the cell.  See Exhibit 9, at 2:32.

**PLAINTIFF'S RESPONSE:** Not disputed.

26.     At 1:34 AM, Officer Bertocchi enters the group holding cell.  See Exhibit 9, at 3:41. He has a conversation with Stilphen.  See Exhibit 9, at 3:50. A minute later, Officer Bertocchi walks behind Stilphen and removes his handcuffs.  See Exhibit 9, at 4:56.

---

[2] The version of the video footage of the holding cell submitted as Exhibit 9 by Defendants does not contain timestamps indicating the time of day.  Defendants cite this video footage in support of a time of day in Defendants' Statement of Undisputed Material Fact Nos. 22 and 26. The time of day reference is not supported by the evidence cited by Defendants.  Plaintiff is submitting herein a version of the holding cell video footage that contains the time of day stamps.  *See* Pl. Ex. 1 (Holding Cell Video With Timestamps).

**PLAINTIFF'S RESPONSE:**  Not disputed.

27.        Officer Bertocchi was "talking normally" with Stilphen. See Exhibit 2, at 102:13-15. Officer Zarnoch and Bertocchi were laughing because they were wearing the same kind of sneakers. See Exhibit 2, at 102:16-17.  Stilphen said that he had broken into the car to get money to buy drugs.  See Exhibit 2, at 104:4-6.  He said that he was living on the street because his family had disowned him. See Exhibit 2, at 103:21-23, 104:8-11.  Stilphen also told Officer Bertocchi that he was tired of being on the street, and that he was willing to be a criminal informant.  See Exhibit 2, at 103:11-14.

**PLAINTIFF'S RESPONSE:**  Disputed that Shayne's family had disowned him or that Shayne told Officer Bertocchi that his family had disowned him. See Pl. Ex. 10 (Cox Depo. Tr.) at 109:11–19, 116:14–117:11. As to the remainder, not disputed with a clarification. Although Officer Bertocchi testified he was "talking normally" with Shayne, Def. Ex. 2 (Bertocchi Dep. Tr.) at 102:15, this appears to be a description of Officer Bertocchi's efforts to have "normal" conversation with *everyone* being booked in D-4, rather a comment on Shayne's physical or mental state. Officer Bertocchi testified regarding his preference to "make normal conversation" with everyone he is involved in booking, adding "just conversing with someone normally, just normal conversation is how I personally do it."  Pl. Ex. 5 (Bertocchi Dep. Tr.) at 105:3–14.

28.        Stilphen sits down on the cell bench. See Exhibit 9, at 5:25. At the officers' request, Stilphen takes off his socks one at a time, rolls them inside out, and then puts them back on.  See Exhibit 9, at 5:28. After more conversation with Stilphen, Officers Bertocchi and Zarnoch leave the group holding cell.  See Exhibit 9, at 7:01.

**PLAINTIFF'S RESPONSE**:  Not disputed, with the clarification that the video footage does not contain audio, and Plaintiff cannot confirm what any of the officers or Shayne said.

29.     Another officer enters the cell, speaks with Stilphen, and then has Stilphen open his mouth so that he can examine the inside of it with a flashlight.  See Exhibit 9, at 8:09.  Stilphen continues speaking with that officer for approximately three and a half minutes.  See Exhibit 9, at 8:21.

**PLAINTIFF'S RESPONSE**:  Not disputed with the clarification that the video footage does not contain audio, and Plaintiff cannot confirm what any of the officers or Shayne said.

30.     After returning to the police station from the crime scene, Officer Doolan overheard that Stilphen was the person who had been arrested for breaking and entering into the vehicle. See Exhibit 5, at 164:9-20.  Because he knew Stilphen, Officer Doolan went to the holding cell to speak with him.  See Exhibit 5, at 199:12-15; Exhibit 9, at 12:02.  Surveillance video shows Officer Doolan entering the holding cell and having a conversation with Stilphen that lasts approximately two and a half minutes.  See Exhibit 9, at 12:15.

**PLAINTIFF'S RESPONSE**:  Not disputed.

31.     Officer Doolan described his conversation with Stilphen as "locker room banter." See Exhibit 5, at 164:24. The two discussed their shared experiences at Nashua Street jail.  See Exhibit 5, at 165:22-24.  Stilphen repeatedly told Officer Doolan words to the effect of "You know me" and "You know I'm not a bad guy." See Exhibit 5, at 165:3-11, 24; 166:1.

**PLAINTIFF'S RESPONSE**:  Not disputed that Officer Doolan described his interaction with Shayne in this manner.  Def. Ex. 5 (Doolan Dep. Tr.) at 164:24–165:7, 165:22–166:1.

32.     Based on his interactions with Stilphen in the holding cell, Officer Doolan thought that Stilphen was "perfectly fine," and that he "carried on a normal conversation." See Exhibit 5,

at 165:16-19.  He did not think that Stilphen was intoxicated, or that he needed to go to the hospital. See Exhibit 5, at 237:20-14, 238:1-2.

 **PLAINTIFF'S RESPONSE:**  Disputed both that Shayne was "perfectly fine," and that Officer Doolan actually thought that Shayne was "perfectly fine," and not intoxicated because the evidence establishes that Shayne was obviously intoxicated and at serious risk of overdose at this time. *See, e.g.*, Pl. Ex. 1 (Holding Cell Video With Timestamps) at 1:45 AM–1:58 AM; Pl. Ex. 30 (SA2019-014 Report) at COB000065; Pl. Ex. 17 (MacDonald Dep. Tr.) at 75:16–76:6.

 **33.** Stilphen did not say anything to Officer Doolan about where he had been before he was arrested, nor did he say anything about having used drugs earlier that day.  See Exhibit 5, at 165:20-22; 236:22-24; 237:1-5.

 **PLAINTIFF'S RESPONSE:**  Disputed. Officer Doolan told Lynnel Cox that Shayne had communicated to Officer Doolan that Shayne had ingested opioids about 30 minutes before he was arrested and that he had recently left a detoxification treatment center and need to go back to the detoxification treatment center. Pl. Ex. 10 (Cox Dep. Tr.) 133:3–19, 143:8–144:13.

 **34.** After Officer Doolan left the holding cell, Stilphen remained there for approximately thirteen minutes.  See Exhibit 9, at 14:34 to 27:48.

 **PLAINTIFF'S RESPONSE:**  Not disputed.

 **35.** While seated on the cell bench by himself, Stilphen bends forward at the waist.  See Exhibit 9, at 21:50. After approximately two minutes, Officer Bertocchi enters the holding cell to bring Stilphen a carton of milk, at which point Stilphen immediately sits upright and has a conversation with him.  See Exhibit 2, at 126:20-25, 127:1; Exhibit 9, at 23:29. Officer Bertocchi was not concerned to see Stilphen in the bent-over position, because Stilphen "popped right up"

when he entered the cell, took the carton of milk, and was coherent.  See Exhibit 2, at 127:6-12;

Exhibit 9, at 23:32.

    **PLAINTIFF'S RESPONSE**:  Not disputed as to the first two sentences.  Disputed as to

the suggestion in the third sentence that Officer Bertocchi did not have reason to be concerned or

was not aware of reasons that he should be concerned for Shayne's safety in light of his obvious

signs of opioid intoxication and serious risk of overdose. *See, e.g.*, Pl. Ex. 1 (Holding Cell Video

With Timestamps) at 1:45 AM–1:58 AM; Pl. Ex. 30 (SA2019-014 Report) at COB000065; Pl. Ex.

17 (MacDonald Dep. Tr.) at 75:16–76:6.  Officer Bertocchi also recognized that Shayne had the

"tendencies" of a drug user and acknowledged Shayne could have used drugs on the day of his

arrest. Def. Ex. 2 (Bertocchi Depo. Tr.) at 183:16–186:18.

Booking

    **36.**    Surveillance video shows Stilphen walking unassisted out of the group holding cell

and into the booking area of the D-4 station.  See Exhibit 9, at 27:48; Exhibit 10, Booking Video,

at 0:05.

    **PLAINTIFF'S RESPONSE**:  Not disputed.

    **37.**    The surveillance video shows Officer Picarello in the booking area with Stilphen

for about forty-seven seconds before Officer Picarello leaves the booking area.  See Exhibit 10, at

0:05 to 0:52.

    **PLAINTIFF'S RESPONSE**:  Not disputed.

    **38.**    Under normal circumstances, Officer Bertocchi, as the arresting officer, would have

been responsible for fingerprinting the arrestee.  See Exhibit 2, at 109:20-23.  On this occasion,

however, Officer Freire asked to fingerprint Stilphen, because she was new on the job and wanted

to gain experience fingerprinting an arrestee.  See Exhibit 3, Freire Dep., at 84:16-24.

**PLAINTIFF'S RESPONSE:**  Not disputed, except that Shayne's BPD Arrest Booking Form lists Officer Kevin Butcher as the arresting officer.  Def. Ex. 13 (Arrest Booking Form) at COB000001.

39.       Officer Zarnoch searched Stilphen's shoes.  See Exhibit 10, at 00:26. Stilphen put them back on his feet one at a time, first by standing on his left foot, then by standing on his right foot.  See Ex. 10, at 04:30–04:42.

**PLAINTIFF'S RESPONSE:**   Not disputed that Officer Zarnoch appeared to have searched Shayne's shoes. Disputed that Shayne can be characterized to have been "standing on his left foot" or "standing on his right foot" during this process.  The video shows Shayne lifting each foot to put his shoe on, and quickly putting it back down for balance. Def. Ex. 10 (Booking Video) at 04:30–04:43; Pl. Ex. 2 (Booking Video With Timestamps) at 1:59 AM–2:00 AM. The video also shows that it took Shayne three attempts before he could lift his right foot for long enough to put his shoe on, causing Officer Freire to reach towards his back to steady him. *Id.*

40.       Officer Freire stood with Stilphen at the fingerprinting machine and tried to take his fingerprints, while Officer Bertocchi supervised and ensured that the fingerprints were done properly.  See Exhibit 2, at 137:15-21.

**PLAINTIFF'S RESPONSE:**  Not disputed.

41.       The fingerprinting process took longer than normal because Officer Freire was inexperienced.  See Exhibit 1, Almeida Dep., at 154:16-18.

**PLAINTIFF'S RESPONSE:**  Not disputed that the finger printing process took longer than normal. Disputed to the extent the statement suggests Officer Freire's inexperience was the sole or primary reason that it took longer. The video footage speaks for itself and shows that Shayne was struggling with symptoms of severe opioid intoxication during the fingerprinting

process, with Officer Bertocchi physically moving Shayne's hand, *see* Pl. Ex. 2 (Booking Video With Timestamps) at 2:11 AM, and Officers Bertocchi and Freire both placing their hands on Shayne's back to help support him in standing upright. *See id.*, at 2:09 AM–2:12 AM, 2:14 AM.

42.     Officers Freire and Almeida thought that Stilphen was being cooperative during the booking process.  See Ex. 1, at 154:19-21; Ex. 2, at 87:7-16.

**PLAINTIFF'S RESPONSE**:  Not disputed to the extent this statement indicates that Officers Freire and Almeida understood that Shayne was complying with instructions to the best of his ability and not attempting to obstruct the booking process.

43.     At one point during fingerprinting, Stilphen suggested to Officer Freire that his fingers should be dipped in water to facilitate the process.  See Exhibit 15, Form 26 Report of Catia Freire.

**PLAINTIFF'S RESPONSE**:  Not disputed, with the clarification that the video footage does not contain audio, and Plaintiff cannot confirm what Shayne said to Officer Freire during fingerprinting.

44.     At another point, Officer Almeida and Stilphen made jokes about Officer Bertocchi's shoes.  See Exhibit 1, Almeida Dep., at 179:4-15.

**PLAINTIFF'S RESPONSE**:  Not disputed that Officer Almeida testified that he and Shayne "were making fun of Officer Bertocchi" because "[h]e had the same sneakers on as Shayne had." Def. Ex. 1 (Almeida Dep. Tr.) at 179:7–11. The video footage does not contain audio, and Plaintiff cannot confirm what Officer Almeida and Shayne said.

45.     At times during the fingerprinting, Stilphen bends at the knees. See Exhibit 10, at 3:53; 12:54; 16:37. At the time of booking, Officer Freire did not notice that Stilphen was bending

at the knees because she had her back turned to him and was focused on the fingerprinting process. See Exhibit 3, at 100:12-25; 101:1-14.

**PLAINTIFF'S RESPONSE:**  Not disputed that Shayne bends at the knees. Not disputed that Officer Freire testified that while she was fingerprinting Shayne, she did not notice that Shayne was bending at the knee because she had her back turned to Shayne throughout most of the fingerprinting process. *See* Def. Ex. 3 (Freire Dep. Tr.) at 100:12–17. Disputed that Officer Freire did not notice that Shayne was bending at the knees. The video footage evidences that Officer Freire noticed at the time that Shayne was struggling to remain standing upright during the fingerprinting process and that she placed her hand on his back to support him in standing upright. *See* Pl. Ex. 2 (Booking Video With Timestamps) at 2:13 AM–2:14 AM.

46.       Viewing the surveillance video at her deposition, Officer Freire did not believe that Stilphen was having difficulty standing up straight, but rather that he was bending down to be at the same height as Officer Freire, who was several inches shorter than Stilphen.  See Exhibit 3, at 98:14-25; 99:1-8; 100:3-8; Exhibit 10, at 04:21.

**PLAINTIFF'S RESPONSE:**  Not disputed that Officer Freire described her interpretation of the events in this manner. Def. Ex. 3 (Freire Dep. Tr.) at 98:20, 99:24–100:2. Disputed both that this was what Shayne was doing and that this is what Officer Freire believed Shayne was doing. The video footage evidences that Officer Freire noticed at the time that Shayne was struggling to remain standing upright during the fingerprinting process and that she placed her hand on his back to support him in standing upright. *See* Def. Ex. 10 (Booking Video) at 04:21; Pl. Ex. 2 (Booking Video With Timestamps) at 2:13 AM–2:14 AM. The evidence also demonstrates that Shayne was displaying obvious signs of being dangerously intoxicated under the influence of opioids and supports the inference that Officer Freire knew that to be the case. *See, e.g.*, Pl. Ex. 30 (SA2019-

16

014 Report) at COB000065; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 106; Pl. Ex. 23 (Lyman Rpt.) at 16;

Pl. Ex. 24 (Fitzgerald Rpt.) at 4; Pl. Ex. 27 (2019 Boston Police Nasal Narcan Training); Pl. Ex.

36 (Freire Training History); Pl. Ex. 16 (Higgins Dep. Tr.) at 164:22–166:9; Pl. Ex. 21 (Taxter

Dep. Tr.) at 210:5–9, 214:9–215:6, 251:6–15; Pl. Ex. 20 (Sweeney Dep. Tr.) at 173:19–25; Pl. Ex.

9 (Connolly Dep. Tr.) at 169:23–170:8; Pl. Ex. 13 (Foley Dep. Tr.) at 141:22–142:5; Pl. Ex. 15

(Gaughan Dep. Tr.) at 140:19–142:4, 143:14–17, 145:20–21; Pl. Ex. 43 (Zarnoch Dep. Tr.) at

39:22–25, 40:2–6, 40:14–18.

**47.**     Officer Bertocchi thought that Stilphen was leaning in to assist Officer Freire to

take his fingerprints.  See Exhibit 2, at 146:1-3.  He also thought that Stilphen was bending down

to get a better view of the fingerprinting screen.  See Exhibit 2, Bertocchi Dep, at 138:2- 10.

**PLAINTIFF'S RESPONSE:** Not disputed that Officer Bertocchi described his

interpretation of the events in this manner. Disputed both that this was what Shayne was doing and

that this was what Officer Bertocchi believed Shayne was doing. The video footage evidences that

Officer Bertocchi noticed at the time that Shayne was struggling to be fingerprinted and to remain

standing upright during the fingerprinting process. *See* Pl. Ex. 2 (Booking Video With

Timestamps) at 2:09 AM-2:11 AM. The evidence also demonstrates that Shayne was displaying

obvious signs of being dangerously intoxicated under the influence of opioids and supports the

inference that Officer Bertocchi knew that to be the case. *See, e.g.*, Pl. Ex. 30 (SA2019-014 Report)

at COB000065; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 106; Pl. Ex. 23 (Lyman Rpt.) at 16; Pl. Ex. 24

(Fitzgerald Rpt.) at 4; Pl. Ex. 26 (2015 Boston Police Narcan Training); Pl. Ex. 35 (Bertocchi

Training History); Pl. Ex. 16 (Higgins Dep. Tr.) at 156:1–162:12; Pl. Ex. 21 (Taxter Dep. Tr.) at

210:5–9, 214:9–215:6, 251:6–15; Pl. Ex. 20 (Sweeney Dep. Tr.) at 173:19–25; Pl. Ex. 9 (Connolly

Dep. Tr.) at 169:23–170:8; Pl. Ex. 13 (Foley Dep. Tr.) at 141:22–142:5; Pl. Ex. 15 (Gaughan Dep.

Tr.) at 140:19–142:4, 143:14–17, 145:20–21; Pl. Ex. 43 (Zarnoch Dep. Tr.) at 39:22–25, 40:2–6, 40:14–18.

**48.**　　　After Officer Freire spends about ten minutes with Stilphen at the fingerprinting station, Officer Bertocchi switches places with her to complete the last few fingerprints.  See Exhibit 10, at 14:49; Exhibit 3, at 110:14-25.

**PLAINTIFF'S RESPONSE:**　　Not disputed, except that Officer Freire spent approximately thirteen minutes with Shayne at the fingerprinting station. Pl. Ex. 2 (Booking Video With Timestamps) at 1:59 AM–2:14 AM.

**49.**　　　While Officer Bertocchi was conducting the fingerprinting with Stilphen, Officer Freire placed her hand on Stilphen's back.  See Exhibit 3, at 111:6-11; Exhibit 2, at 155:11-13. Officer Freire said that she did this because Stilphen was dozing off and not helping with the fingerprinting.  See Exhibit 3, at 111:12-18; 114:13-19.

**PLAINTIFF'S RESPONSE:**  Not disputed that Officer Freire described her interpretation of the events in this manner. Def. Ex. 3 (Freire Dep. Tr.) at 111:6–18. Disputed both that this was what Shayne was doing and that this was what Officer Freire believed Shayne was doing. Officer Freire noticed at the time that Shayne was struggling to be fingerprinted and to remain standing upright during the fingerprinting process. *See* Pl. Ex. 2 (Booking Video With Timestamps) at 2:13 AM–2:14 AM. The evidence also demonstrates that Shayne was displaying obvious signs of being dangerously intoxicated under the influence of opioids and supports the inference that Officer

Freire knew that to be the case. *See, e.g.*, Pl. Ex. 30 (SA2019-014 Report) at COB000065; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 106; Pl. Ex. 23 (Lyman Rpt.) at 16; Ex. 24 (Fitzgerald Rpt.) at 4.

**50.**  Once the fingerprinting was completed, Stilphen's booking photos were taken.  See Exhibit 10, at 17:45. Officer Almeida took the photos from behind the booking window.  See Exhibit 10, at 17:57.

**PLAINTIFF'S RESPONSE:**  Not disputed.

**51.**  Stilphen was asked to remove his t-shirt; he complied.  See Exhibit 10, at 17:37. He was then asked to turn to the right so that a profile picture could be taken; he again complied. See Exhibit 10, at 18:06.  Stilphen looks through the booking window and gives a "thumbs up" to Officer Almeida.  See Exhibit 10, at 18:50.

**PLAINTIFF'S RESPONSE:**  Not disputed.

**52.**  In response to instructions from Officer Almeida, Stilphen positions his arms so that pictures of his tattoos can be taken.  See Exhibit 10, at 19:00; 19:28.

**PLAINTIFF'S RESPONSE:**  Not disputed.

**53.**  Officer Freire thought that Stilphen looked like he was tired and dozing off while his pictures were being taken.  See Exhibit 3, at 118:11-16; 119:4-11.  She observed that Stilphen would be standing up straight and communicating, then look like he was dozing off, and then when the officers talked to him, he would stand up straight and become alert again.  See Exhibit 3, at 119:23-25; 120:1-10.

**PLAINTIFF'S RESPONSE:**  Not disputed that Officer Freire testified that Shayne "appeared tired" and "dozing off because in one second he's standing up straight and the next he's like, he's falling asleep" while his booking photos were taken.  Def. Ex. 3 (Freire Dep. Tr.) at 118:5–16, 118:21–119:11.  Not disputed that Officer Freire testified that she believed that Shayne

was "tired, sleepy, he's dozing off.  In one second he's standing up straight communicating with us and in another he's dozing off, and then when we talked to him, he stands up straight and becomes alert again. To me, those are signs of someone that's tired. I don't know how long it was before we picked him up that he hadn't been sleeping, so I would assume that he's tired." *Id.* at 120:1–10.

Disputed both that Shayne was merely tired and not dangerously intoxicated and that Officer Freire believed Shayne was merely tired and not dangerously intoxicated Evidence establishes that Shayne was displaying obvious signs of being dangerously intoxicated under the influence of opioids and therefore supports the inference that Officer Freire knew that to be the case. *See, e.g.*, Pl. Ex. 30 (SA2019-014 Report) at COB000065; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 106; Pl. Ex. 23 (Lyman Rpt.) at 16; Pl. Ex. 24 (Fitzgerald Rpt.) at 4. Pl. Ex 27 (Boston Police Nasal Narcan Training-Freire (Depo. Ex. 190)); Pl. Ex. 16 (Higgins Dep. Tr.) at 164:22–166:9; Pl. Ex. 36 (Freire Training History); Pl. Ex. 21 (Taxter Dep. Tr.) at 210:5–9, 214:9–215:6, 251:6–15; Pl. Ex. 20 (Sweeney Dep. Tr.) at 173:19–25; Pl. Ex. 9 (Connolly Dep. Tr.) at 169:23–170:8; Pl. Ex. 13 (Foley Dep. Tr.) at 141:22–142:5; Pl. Ex. 15 (Gaughan Dep. Tr.) at 140:19–142:4, 143:14–17, 145:20–21; Pl. Ex. 43 (Zarnoch Dep. Tr.) at 39:22–25, 40:2–6, 40:14–18.

54.     Based on her training and experience, Officer Freire did not think Stilphen was under the influence of drugs during booking.  See Exhibit 3, at 121:6–13.

**PLAINTIFF'S RESPONSE:**  Disputed. Evidence establishes that Shayne was displaying obvious signs of being dangerously intoxicated under the influence of opioids and therefore supports the inference that Officer Freire knew that to be the case. *See, e.g.*, Pl. Ex. 30 (SA2019-014 Report) at COB000065; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 106; Pl. Ex. 23 (Lyman Rpt.) at 16; Pl. Ex. 24 (Fitzgerald Rpt.) at 4; Pl. Ex 27 (Boston Police Nasal Narcan Training-Freire); Pl. Ex.

16 (Higgins Dep. Tr.) at 164:22–166:9; Pl. Ex. 36 (Freire Training History); Pl. Ex. 21 (Taxter

Dep. Tr.) at 210:5–9, 214:9–215:6, 251:6–15; Pl. Ex. 20 (Sweeney Dep. Tr.) at 173:19–25; Pl. Ex.

9 (Connolly Dep. Tr.) at 169:23–170:8; Pl. Ex. 13 (Foley Dep. Tr.) at 141:22–142:5; Pl. Ex. 15

(Gaughan Dep. Tr.) at 140:19–142:4, 143:14–17, 145:20–21; Pl. Ex. 43 (Zarnoch Dep. Tr.) at

39:22–25, 40:2–6, 40:14–18.

**55.**        In response to questions posed by Officer Almeida, Stilphen stated that his sex was

male; his race was White Non-Hispanic; his date of birth was August 8, 1990; his place of birth

was Quincy, Massachusetts; his marital status was single; his mother's name was "OBRIEN,

Lynn"; his father's name was Richard Stilphen; his height was five feet, eleven inches; his weight

was 165 pounds; his build was slim; his eye color was brown; his hair color was light brown; and

his complexion was light. See Exhibit 13, Arrest Booking Form.  Stilphen also provided his social

security number when asked by Officer Almeida.  See Exhibit 13, Arrest Booking Form.

**PLAINTIFF'S RESPONSE:**   Disputed that Officer Almeida asked each of these

questions, as opposed to relying on information already within BPD's systems, as unsupported by

the cited evidence. Not disputed that Shayne's BPD Arrest Booking Form lists this information,

except that the Arrest Booking Form correctly lists his Date of Birth as August 9, 1990.  Def. Ex.

13 (Shayne's Arrest Booking Form); Def. Ex. 17 (Shayne's Intake Info) at COB009782.

**56.**        As part of his booking questions, Officer Almeida asked Stilphen if he had any

preexisting medical conditions or any medications.  See Exhibit 1, at 207:1-11.  Stilphen answered

"no" to both questions.  See Exhibit 1, at 207:12-16.

**PLAINTIFF'S RESPONSE:**  Not disputed that Officer Almeida described this portion of

the booking in this manner. *See* Def. Ex. 1 (Almeida Dep. Tr.) at 207:1–13.  The video footage of

the booking area does not contain audio, and Plaintiff cannot confirm what Officer Almeida said to Shayne during Shayne's booking.

57.     Stilphen did not request medical attention at any time during booking.  See Exhibit 1, at 154:25; 155:1-4; Exhibit 14, Form 26 Report of Ismael Almeida.

**PLAINTIFF'S RESPONSE:**  Not disputed that Officer Almeida reported and testified that Shayne did not request medical attention. Def. Ex. 1 (Almeida Dep. Tr.) at 154:25–155:4; Def. Ex. 14 (Almeida Form 26).  The video footage of the booking area does not contain audio, and Plaintiff cannot confirm what Officer Almeida said to Shayne during Shayne's booking.

58.     In the field of the booking sheet marked "Visible Injuries," Officer Almeida entered "none." See Exhibit 13.  In another field marked "Medical Notations," Officer Almeida entered "none." See Exhibit 13.

**PLAINTIFF'S RESPONSE:**  Not disputed. *See* Def. Ex. 17 (Shayne's Intake Info) at 4.

59.     In another field marked "State of Consciousness," Officer Almeida entered "Alert." See Exhibit 17, at 4 (COB9785).  The other three choices available to Officer Almeida were "Dazed," "Under the Influence of Liquor (UIL)"; or "Under the Influence of Drugs (UID)." See Exhibit 18, Deposition Transcript of James Lydon, at 88:17-24.

**PLAINTIFF'S RESPONSE:**  Not disputed.

60.     A booking sheet cannot be submitted without these questions being completed.  See Exhibit 1, Almeida Dep., at 155:11-13; 161:7-17; Exhibit 2, Bertocchi Dep., at 111:15- 22.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that the fact that questions were completed does not establish that Officer Almeida asked them.

61.     Boston Police Department Rule 318, Section 4, provides in part that "When a prisoner is unconscious, the Duty Supervisor shall be notified, every effort shall be made to restore

consciousness and medical assistance shall be summoned.  Any unusual appearance or behavior displayed by a prisoner shall receive immediate attention." See Exhibit 26, at 2 (COB2386).

**PLAINTIFF'S RESPONSE**:  Not disputed, except that the quoted language appears in Section 3, not Section 4.

62.        Boston Police Department Rule 318A provides in part that "In instances where the incapacitation is due to drugs, the person in custody shall be transported to a hospital or medical facility." Pl. Compl. ¶ 43.

**PLAINTIFF'S RESPONSE**:  Not disputed, with the clarification that this rule only applies to people who are taken into protective custody under the Massachusetts Alcoholism Treatment and Rehabilitation Law, M.G.L. Ch. 111-B, and does not apply to people held in BPD custody after arrest. ECF No. 59 (Plaintiff's Second Amended Complaint) ¶¶ 42–44; *see also* Pl. Ex. 33 (BPD Rules and Procedures, Rule 318A) at COB000115.

63.        During the booking process, Officer Bertocchi read Stilphen his <u>Miranda</u> rights. See Exhibit 13, Prisoner Booking Form.  Stilphen signed a form acknowledging that he understood what Officer Bertocchi had told him.  See Exhibit 10, Booking Desk Video, at 22:05; Exhibit 2, Bertocchi Dep., at 160:23-25.  On the same form, Stilphen signed an acknowledgement that certain items of his personal property–specifically, his hat, shoelaces, and belt–were being held by the police. See Exhibit 13.

**PLAINTIFF'S RESPONSE**:  Not disputed.

64.        As part of the routine booking process, Stilphen would have been offered the opportunity to make a phone call.  See Exhibit 1, at 155:7-17; Exhibit 2, at 120:12-15.  The booking sheet indicates that Stilphen declined to make a phone call.  See Exhibit 13.

**PLAINTIFF'S RESPONSE:**  Not disputed that the BPD Arrest Booking Form states "Telephone Used: No." Def. Ex 13 (Shayne's Arrest Booking Form) at 2.

**65.**        The surveillance video shows Stilphen walking unassisted out of the booking area and into one of the cell blocks.  See Exhibit 11, Cell 19 Video, at 6:17. At no point during his time in the sally port, group holding cell, or booking area did Stilphen fall down or stumble. See Exhibit 8, Exhibit 9, Exhibit 10.

**PLAINTIFF'S RESPONSE:**  Not disputed that Shayne did not fall down or trip. Disputed to the extent that the word "stumble" is used to suggest that Shayne was never off balance or that he moved with ease. Officer Almeida testified that Shayne "stumbled a little bit at the fingerprinting process."  Pl. Ex. 4 (Almeida Dep. Tr.) at 156:20–22, and the video demonstrates that Shayne was off balance when putting on his shoes.  Pl. Ex. 2 (Booking Video Footage with Timestamps) at 2:02 AM–2:03 AM.

**66.**        Officer Bertocchi did not think that Stilphen was intoxicated or needed medical assistance during booking.  See Exhibit 2, at 162:16-25; 163:1-3.  Officer Bertocchi noted that Stilphen was coherent, conversed normally, and was able to answer all of Officer Almeida's questions. See Exhibit 2, at 138:25; 139:1; 147:8-15.  Officer Bertocchi also observed that Stilphen never fell over and was able to put his sneakers on by standing on one foot.  See Exhibit 2, at 147:16-24.

**PLAINTIFF'S RESPONSE:**  Not disputed that Officer Bertocchi characterized his interaction with Shayne in this manner. *See* Def. Ex. 2 (Bertocchi Dep. Tr.) at 139:1, 147:9–24, 162:25–163:3.

Disputed that this accurately describes Shayne's behavior at booking, that Shayne did not need medical assistance during booking, and that Officer Bertocchi actually thought that Shayne

was not intoxicated and did not need medical assistance during booking.  The evidence establishes that Shayne was severely intoxicated and at serious risk of overdose at this time, and supports the inference that Officer Bertocchi knew that to be the case.  *See, e.g.*, Pl. Ex. 30 (SA2019-014 Report) at COB000065; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 106; Pl. Ex. 23 (Lyman Rpt.) at 16; Pl. Ex. 24 (Fitzgerald Rpt.) at 4; Pl. Ex. 26 (2015 Boston Police Narcan Training); Pl. Ex. 35 (Bertocchi Training History); Pl. Ex. 16 (Higgins Dep. Tr.) at 156:1–162:12; Pl. Ex. 21 (Taxter Dep. Tr.) at 165:1–15, 210:5–9, 214:9–215:6, 251:6–15; Pl. Ex. 20 (Sweeney Dep. Tr.) at 173:19–25; Pl. Ex. 9 (Connolly Dep. Tr.) at 169:23–170:8; Pl. Ex. 13 (Foley Dep. Tr.) at 141:22–142:5; Pl. Ex. 15 (Gaughan Dep. Tr.) at 140:19–142:4, 143:14–17, 145:20–21; Pl. Ex. 43 (Zarnoch Dep. Tr.) at 39:22–25, 40:2–6, 40:14–18; Pl. Ex. 31 (Connolly Dec. 2021 Rpt.) at COB02291-2295, COB02305; Pl. Ex. 19 (Picarello Depo. Tr.) at 130:12–14, 131:17–132:2.

67.     Officer Bertocchi said that if Stilphen had asked for or was in need of medical assistance, EMS would have been contacted. See Exhibit 2, at 64:11-25; 65:2-7; 162:1-3, 6-8.

**PLAINTIFF'S RESPONSE:**  Not disputed that Officer Bertocchi testified in this manner. Disputed that this was true, because the evidence establishes that Shayne was severely intoxicated and at serious risk of overdose at this time, and that the officers did not contact EMS or otherwise provide him with medical evaluation or assistance. *See, e.g.*, Pl. Ex. 30 (SA2019-014 Report) at COB000065; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 106; Pl. Ex. 23 (Lyman Rpt.) at 16; Pl. Ex. 12 (Fitzgerald Rpt.) at 4.

68.     Officer Almeida thought that Stilphen's booking was an "average District 4 booking." See Exhibit 1, at 204:24-25; 205:1-4.  He did not think Stilphen was intoxicated.  See Exhibit 1, at 271:19-22.  He did not think Stilphen needed medical assistance based on the fact

that Stilphen was able to answer all of his questions and did not request medical assistance. See Exhibit 1, at 208:9-25; 209:1-18.

**PLAINTIFF'S RESPONSE:** Not disputed that Almeida testified that it was an average District 4 booking, but disputed that this was true. Disputed as to the remainder. At his deposition Officer Almeida indicated that an "average District 4 booking" involves intoxication: "people come in, you're talking Saturday night, you can - - so maybe they've had a little bit too much to drink. Sometimes they're very agitated. It's never like a - - not never, but it's not a smooth process where the person is just listening and doing exactly what you say usually." Def. Ex. 1 (Almeida Dep. Tr.) at 205:5–12. In this case, evidence establishes that Shayne was displaying obvious signs of being dangerously intoxicated under the influence of opioids and was at serious risk of overdose and therefore supports the inference that Officers Almeida and Freire both knew Shayne was intoxicated on opioids and knew that he needed medical assistance. *See, e.g.*, Pl. Ex. 30 (SA2019-014 Report) at COB000065; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 106; Pl. Ex. 23 (Lyman Rpt.) at 16; Pl. Ex. 24 (Fitzgerald Rpt.) at 4; Pl. Ex. 4 (Almeida Dep. Tr.) at 209:24–210:3; Pl. Ex. 26 (2015 Boston Police Narcan Training); Pl. Ex. 34 (Almeida Training History); Pl. Ex. 16 (Higgins Dep. Tr.) at 167:4–172:14; Pl. Ex. 21 (Taxter Dep. Tr.) at 210:5–9, 214:9–215:6, 251:6–15; Pl. Ex. 20 (Sweeney Dep. Tr.) at 173:19–25; Pl. Ex. 9 (Connolly Dep. Tr.) at 169:23–170:8; Pl. Ex. 13 (Foley Dep. Tr.) at 141:22–142:5; Pl. Ex. 15 (Gaughan Dep. Tr.) at 140:19–142:4, 143:14–17, 145:20-21; Pl. Ex. 43 (Zarnoch Dep. Tr.) at 39:22–25, 40:2–6, 40:14–18.

**69.**     Lt. James Foley, the acting duty supervisor at D-4 on the early morning of July 14, 2019, testified that he does not "send everyone to the hospital who is drunk or high." See Exhibit 19, at 145:22-24. He added: "There wouldn't be an ambulance left in Boston–or the state probably." See Exhibit 19, at 145:24-25; 146:1.

**PLAINTIFF'S RESPONSE:**  Not disputed as to the first sentence.  As to the second sentence, not disputed that Lt. Foley testified in those words.

<u>Cell 19: 2:21 AM to 2:34 AM</u>

**70.**     At 2:21 AM, Officers Bertocchi, Freire, and Almeida placed Stilphen in his individual cell, Cell 19.  See Exhibit 11,[3] Cell 19 Video, at 6:17.  After he is led into the cell by the officers, Stilphen walks backward a few steps and sits on the cell bench.  See Exhibit 11, at 6:27. He engages Officers Bertocchi and Freire in conversation before they close the cell door.  See Exhibit 11, at 6:42.

**PLAINTIFF'S RESPONSE:**  Not disputed.

**71.**     While Officers Bertocchi, Freire, and Almeida converse outside the cell door, Stilphen bends forward at the waist.  See Exhibit 11, at 7:07.  Officer Freire was not concerned about Stilphen's position because it was common to see people in the Mass and Cass area sleeping in similar positions.  See Exhibit 3, at 124:9-11; 125:9-15, 24-25; 126:1-11, 21- 25; 127:1-18.

**PLAINTIFF'S RESPONSE:**  Not disputed as to the first sentence, with the clarification that Shayne was in a position more accurately described as being slumped over his legs with his arms bent awkwardly behind him in an unnatural position. *See, e.g.*, Def. Ex. 11 (Cell 19 Video) at 7:07; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:21 AM–2:23 AM; Ex. 22 (MacDonald Rpt.) at ¶ 111.

Not disputed that Officer Freire testified that she had seen other individuals falling asleep in that position "while driving by Mass and Cass on [her] Code 19 on Southampton Street on Mass

---

[3] The version of the video footage of cell 19 submitted as Exhibit 11 by Defendants does not contain timestamps indicating the time of day.  Any time of day reference is not supported by the evidence cited by Defendants.  Plaintiff is submitting herein a version of the cell 19 video footage that contains the time of day stamps. *See* Pl. Ex. 3 (Cell 19 Video Footage With Timestamps).

and Cass. [She'd] had prisoners that have been picked up, arrested on Melnea Cass in that position in the cell before."  Def. Ex. 3 (Freire Dep. Tr.) at 124:22–125:1.

Disputed as to the suggestion in the second sentence that Officer Freire did not have reason to be concerned or was not aware of reasons that she should be concerned for Shayne's safety in light of his obvious signs of severe opioid intoxication and substantial risk of overdose. *See, e.g.*, Def. Ex. 11 (Cell 19 Video) at 7:07; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:21 AM–2:23 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 111; Pl. Ex. 23 (Lyman Rpt.) at 12; Pl. Ex. 27 (2019 Boston Police Nasal Narcan Training); Pl. Ex. 36 (Freire Training History); Pl. Ex. 16 (Higgins Dep. Tr.) at 164:22–166:9.

**72.**     Stilphen stays in the bent-over position for about forty seconds, at which point Officer Bertocchi opens the cell door slightly and closes it again, prompting Stilphen to sit upright. See Exhibit 11, at 7:41.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne was in a position more accurately described as being slumped over his legs with his arms bent awkwardly behind him in an unnatural position. *See, e.g.*, Def. Ex. 11 (Cell 19 Video) at 7:07; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:21 AM–2:23 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 111.

**73.**     Stilphen bends forward at the waist a second time.  See Exhibit 11, at 8:01.  Officers Bertocchi, Freire, and Almeida converse outside the cell door for a few seconds and then leave the cell block.  See Exhibit 11, at 8:15. Officer Freire did not walk by Cell 19 again at any point that morning.  See Exhibit 3, at 129:14-18.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne was in a position more accurately described as being slumped over his legs with his arms bent awkwardly

behind him in an unnatural position. *See, e.g.*, Def. Ex. 11 (Cell 19 Video) at 7:07; Pl. Ex. 3 (Cell

19 Video With Timestamps) at 2:21 AM–2:23 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 111.

74.     Stilphen remains seated on the bench in a bent-over position for approximately ten

minutes.  See Exhibit 11, at 8:30-18:00.  At 2:32 AM, Officer Bertocchi knocks on the cell door,

prompting Stilphen to sit upright.  See Exhibit 2, at 166:6-12; Exhibit 11, at 18:02.  Officer

Bertocchi was not concerned by Stilphen's position because he responded immediately when

Officer Bertocchi knocked on the cell door.  See Exhibit 2, at 166:13- 22.

**PLAINTIFF'S RESPONSE:**   Not disputed as to the first two sentences, with the

clarification that Shayne was in a position more accurately described as being slumped over his

legs with his arms bent awkwardly behind him in an unnatural position. *See, e.g.*, Def. Ex. 11 (Cell

19 Video) at 7:07; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:21 AM–2:23 AM; Pl. Ex. 22

(MacDonald Rpt.) at ¶ 111. Disputed as to the suggestion in the third sentence that Officer

Bertocchi did not have reason to be concerned or was not aware of reasons that he should be

concerned for Shayne's safety in light of his obvious signs of severe opioid intoxication and

substantial risk of overdose.  *See, e.g.*, Pl. Ex. 22 (MacDonald Rpt.) at ¶ 108.  Evidence establishes

that Shayne was displaying obvious signs of being dangerously intoxicated under the influence of

opioids and was at serious risk of overdose and therefore supports the inference that Officer

Bertocchi both knew Shayne was intoxicated on opioids and knew that he needed medical

assistance. *See, e.g.*, Def. Ex. 11 (Cell 19 Video) at 8:30–18:00; Pl. Ex. 3 (Cell 19 Video With

Timestamps) at 2:22 AM–2:32 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 111; Pl. Ex. 23 (Lyman

Rpt.) at 12, 15; Pl. Ex. 30 (SA2019-014 Report) at COB000065; Pl. Ex. 26 (2015 Boston Police

Narcan Training); Pl. Ex. 35 (Bertocchi Training History); Pl. Ex. 16 (Higgins Dep. Tr.) at 156:1–162:12.

**75.**      Officer Bertocchi puts a sandwich and two cartons of milk through the food slot at the bottom of the cell door.  See Exhibit 11, at 18:06.  Officer Bertocchi then leaves the cell block. See Exhibit 11, at 18:11. This was the last interaction between Officer Bertocchi and Stilphen before Stilphen was discovered unresponsive later that morning.  See Exhibit 2, at 167:4-12.

        **PLAINTIFF'S RESPONSE**:  Not disputed.

**76.**      Stilphen walks to the cell door and takes the two cartons of milk.  See Exhibit 11, at 18:15. He returns to the cell bench and drinks from one of the cartons of milk.  See Exhibit 11, at 18:23.

        **PLAINTIFF'S RESPONSE**:  Not disputed.

**77.**      After drinking the milk, Stilphen turns his body around and looks directly at the cell's security camera, which is situated high above and behind him.  See Exhibit 11, at 18:36; Exhibit 12a, Still of Cell 19 Video.

        **PLAINTIFF'S RESPONSE**:  Not disputed.

**78.**      Stilphen then reaches his left hand underneath the back side of his shorts.  See Exhibit 11, at 18:39; Exhibit 12 b, Still of Cell 19 Video.

        **PLAINTIFF'S RESPONSE**:  Not disputed.

**79.**      Stilphen walks to the cell door to retrieve the sandwich that Officer Bertocchi had brought.  See Exhibit 11, at 18:51. Stilphen then walks backwards and sits down again on the cell bench with his legs crossed under him.  See Exhibit 11, at 19:00.

**PLAINTIFF'S RESPONSE**:  Not disputed.

**80.**        Stilphen unwraps the sandwich but does not appear to eat from it.  See Exhibit 11, at 19:16. Instead, Stilphen can be seen manipulating a small object in his hands.  See Exhibit 11, at 19:25; Exhibit 12c, Still of Cell 19 Video

**PLAINTIFF'S RESPONSE**:  Not disputed.

**81.**        The position of Stilphen's body in the Cell 19 surveillance video prevents a clear view, but at various intervals over the next two hours, Stilphen ingests drugs.  See generally Exhibit 11.

**PLAINTIFF'S RESPONSE**:  Not disputed that beginning at approximately 2:34 AM, Shayne appeared to have begun to ingest drugs and that he continued to do so periodically for the next two hours. *See* Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:32 AM. Disputed to the extent that this statement is intended to suggest that the Cell 19 surveillance video would not have provided any officer viewing it with the knowledge that Shayne was ingesting drugs. *See id*.

**82.**        The occupant of the cell immediately across from Stilphen told police that he saw Stilphen eating or sniffing from a little white bag.  See Exhibit 25, Interview of RL, at 3:01-3:18.

**PLAINTIFF'S RESPONSE**:  Not disputed.

<u>Cell 19: 2:35 AM to 3:35 AM</u>

**83.**        As the booking officer, Officer Almeida was the designee of the duty supervisor who was responsible for conducting 15-minute checks of the prisoners in the D-4 cell block.  See Exhibit 1, at 122:5-16, 190:1-4.

**PLAINTIFF'S RESPONSE**:  Not disputed.

**84.**        Boston Police Department Rule 318, Section 13, provides that "The Duty Supervisor . . . shall visit, or cause to be visited, all persons in their custody at least once every

fifteen minutes, and shall ensure that each visit is recorded in the Prisoner Inspection Record (M.G.L. c. 40 § 36B)." See Exhibit 26, at 8 (COB 2392).

**PLAINTIFF'S RESPONSE:**  Not disputed.

85.        Between 2:35 AM and 3:35 AM, Stilphen remains seated on the cell bench with his legs crossed underneath him.  See Exhibit 11, at 20:07.  During this time, Stilphen alternates between sitting upright and leaning forward with his body bent over his waist.  Exhibit 11, at 23:00; 23:21; 24:35.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne was in a position more accurately described as being slumped over his legs in an unnatural position. *See* Def. Ex. 11 (Cell 19 Video) at 23:00, 23:21, 24:35; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:35 AM–3:35 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 111, 112.

86.        Various police officers walk up and down the cell block hallway between 2:35 AM and 3:35 AM.  See Exhibit 11, at 20:08.

**PLAINTIFF'S RESPONSE:**  Not disputed.

87.        At 2:35 AM, when an unidentified officer walks up and down the cell block, Stilphen is seated upright on the cell bench.  See Exhibit 11, at 20:09.

**PLAINTIFF'S RESPONSE:**  Not disputed, except that Shayne's sitting position was bent forward, rather than upright.  Def. Ex. 11 (Cell 19 Video) at 20:09; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:35 AM.

88.        At 2:47 AM, an unidentified officer walks up and down the cellblock.  See Exhibit 11, at 32:21. At 2:54 AM, Officer Almeida walks up and down the cellblock.  See Exhibit 11, at 39:54. On both of these occasions, Stilphen is in the leaned-forward position. See Exhibit 11, at 40:06.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne was in a position more accurately described as being slumped over his legs with his arms bent awkwardly behind him in an unnatural position. *See, e.g.*, Def. Ex. 11 (Cell 19 Video) at 32:21, 39:54, 20:09; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:47 AM, 2:54 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 111, 112.

89.     At 2:58 AM, two police officers enter the cell block to bring a prisoner to a cell. See Exhibit 11, at 43:21. Stilphen is initially in the leaned-forward position but sits up as the two officers pass by his cell door.  See Exhibit 11, at 43:23.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne was in a position more accurately described as being slumped over his legs with his arms bent awkwardly behind him in an unnatural position. *See, e.g.*, Def. Ex. 11 (Cell 19 Video) at 32:21, 39:54, 20:09; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:47 AM, 2:54 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 111, 112.

90.     At 3:00 AM, an unidentified officer walks up and down the cell block.  See Exhibit 11, at 45:23. Between 3:05 and 3:06 AM, Officer Almeida walks up and down the cell block.  See Exhibit 11, at 51:00.  On both of these occasions, Stilphen is in the leaned-forward position. See Exhibit 11, at 51:25.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne was in a position more accurately described as being slumped over his legs with his arms bent awkwardly behind him in an unnatural position. *See, e.g.*, Def. Ex. 11 (Cell 19 Video) at 32:21, 39:54, 20:09;

Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:47 AM, 2:54 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 111, 112.

91.     At 3:15 AM, two unidentified officers enter the cell block to escort a prisoner to his cell.  See Exhibit 11, at 1:00:32. Stilphen is in the leaned-forward position when the officers pass his cell door the first time.  See Exhibit 11, at 1:00:33. As the two officers pass Stilphen's cell door on their way out of the cell block, Stilphen sits upright.  See Exhibit 11, at 1:00:52.

**PLAINTIFF'S RESPONSE:**  Not disputed with the clarification that Shayne was in a position more accurately described as being slumped over his legs with his arms bent awkwardly behind him in an unnatural position. *See, e.g.*, Def. Ex. 11 (Cell 19 Video) at 32:21, 39:54, 20:09; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:47 AM, 2:54 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 111, 112.

92.     Unidentified officers walk up and down the cell block at 3:17 AM and 3:20 AM. See Exhibit 11, at 1:05:35. Between 3:32 and 3:33 AM, Officer Almeida also walks up and down the cell block.  See Exhibit 11, at 1:17:55. On all three of these occasions, Stilphen is in the leaned-forward position.  See Exhibit 11, at 1:05:35-1:18:10.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne was in a position more accurately described as being slumped over his legs with his arms bent awkwardly behind him in an unnatural position. *See, e.g.*, Def. Ex. 11 (Cell 19 Video) at 32:21, 39:54, 20:09; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:47 AM, 2:54 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 111, 112.

Cell 19: 3:35 AM to 5:39 AM

93.     At 3:35 AM, Stilphen sits upright.  See Exhibit 11, at 1:20:12. He appears to manipulate a small item in his hands. See Exhibit 11, at 1:20:17.

**PLAINTIFF'S RESPONSE:**  Not disputed, except that Shayne's sitting position is generally leaned forward rather than upright. Def. Ex. 11 (Cell 19 Video) at 1:20:17; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 3:35 AM.

94.        At 3:36 AM, Stilphen changes positions by uncrossing his legs and extending them straight out while he remains seated on the bench.  See Exhibit 11, at 1:21:43.

**PLAINTIFF'S RESPONSE:**  Not disputed.

95.        Between 3:47 AM and 3:48 AM, Officer Picarello walks up and down the cellblock hallway while Stilphen is seated on the cell bench with his legs sticking out straight in front of him.  See Exhibit 11, at 1:23:27. At one point, a small white object can be seen in Stilphen's left hand.  See Exhibit 11, at 1:23:38.

**PLAINTIFF'S RESPONSE:**  Not disputed.

96.        Stilphen begins to lean heavily to his right.  See Exhibit 11, at 1:28:41. At 3:48 AM, Officer Picarello walks down the cell block hallway while Stilphen is leaning to the right.  See Exhibit 11, at 1:32:26; Exhibit 12d, Still of Cell 19 Video.  Stilphen then sits upright.  See Exhibit 11, at 1:32:32. As Officer Picarello walks past Stilphen's cell on his way out of the cell block, Stilphen is seated upright.  See Exhibit 11, at 1:32:36; 12e, Still of Cell 19 Video.

**PLAINTIFF'S RESPONSE:**  Not disputed that Officer Picarello walks up and down the cell block hallway at 3:48 AM, that Shayne sits upright at that point, or that Officer Picarello walks past Shayne's cell on his way out of the cell block. Disputed as to other characterizations of Shayne's body positions. During this time period, the video shows Shayne leaning heavily to the left, and then leaning to the right as Officer Picarello walks by on his way out of the cell block.

*See* Def. Ex. 11 (Cell 19 Video) at 1:28:41, 1:32:26, 1:32:32, 1:32:36; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 3:48 AM.

**97.**      At 3:50 AM, Stilphen's legs relax and his shoes touch the floor. See Exhibit 11, at 1:35:15. Stilphen manipulates a small object in his hands.  See Exhibit 11, at 1:35:37.

**PLAINTIFF'S RESPONSE:**  Not disputed.

**98.**      At 3:51 AM, Stilphen leans forward at the waist.  See Exhibit 11, at 1:36:04.  He remains in the leaned-forward position for approximately eleven minutes.  See Exhibit 11, at 1:47:10.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne was in a position more accurately described as being slumped over his legs in an unnatural position. *See* Def. Ex. 11 (Cell 19 Video) at 1:36:04–1:47:10; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 3:51 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 111, 112. Not disputed that Shayne remained in this position for approximately eleven minutes. *See* Def. Ex. 11 (Cell 19 Video) at 1:36:04–1:47:10; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 3:51 AM–4:02 AM.

**99.**      At 4:02 AM, Officer Almeida walks down the cell block hallway.  See Exhibit 11, at 1:47:45. Stilphen is in the leaned-forward position when Officer Almeida passes by the first time, but sits upright as Officer Almeida walks farther down the hallway. See Exhibit 11, at 1:47:46; Exhibit 12f, Still of Cell 19 Video.  When Officer Almeida passes Stilphen's cell on his way out of the cell block, Stilphen is seated upright and touching his face with his hand.  See Exhibit 11, at 1:48:05; Exhibit 12g, Still of Cell 19 Video.

**PLAINTIFF'S RESPONSE:**  Not disputed with the clarification that Shayne was in a position more accurately described as being slumped over his legs with his arms bent awkwardly behind him in an unnatural position. *See, e.g.*, Def. Ex. 11 (Cell 19 Video) at 32:21, 39:54, 20:09;

Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:47 AM, 2:54 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 111, 112.

100.     At 4:06 AM, Stilphen rests his back and head against the cell wall while still seated on the bench.  See Exhibit 11, at 1:51:38. He remains in that position for approximately thirty-three minutes.  See Exhibit 11, at 2:24:41.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne's position is more accurately described as leaning against the wall with his head tilted to one side. Pl. Ex. 3 (Cell 19 Video With Timestamps) at 4:06 AM.

101.     At 4:17 AM, Officer Picarello conducts a cellblock check while Stilphen is still resting against the cell wall.  See Exhibit 11, at 2:02:35.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne's position is more accurately described as leaning against the wall. Pl. Ex. 3 (Cell 19 Video With Time Stamps) at 4:17 AM.

102.     At 4:19 AM, Officer Almeida and Officer David Marshall walk down the cell block hallway.  See Exhibit 11, at 2:04:16. At 4:20 AM, Officers Almeida and Marshall walk back out of the cell block escorting a prisoner between them.  See Exhibit 11, at 2:05:12. Stilphen is still resting against the cell wall.  See Exhibit 11, at 2:05:13.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne's position is more accurately described as leaning against the wall. Pl. Ex. 3 (Cell 19 Video With Time Stamps) at 4:19 AM–4:20 AM.

103.     At 4:29 AM, Officer Almeida conducts a cell check while Stilphen is still resting against the cell wall.  See Exhibit 11, at 2:14:02.  On his way out of the cell block, Officer Almeida

stops and peers closely in Stilphen's cell before continuing on his way. See Exhibit 11, at 2:14:05; Exhibit 12h, Still of Cell 19 Video.

**PLAINTIFF'S RESPONSE**:  Not disputed, with the clarification that the video does not make clear what in the cell Officer Almeida is looking at, and the further clarification that Shayne's position is more accurately described as leaning against the wall. Pl. Ex. 3 (Cell 19 Video With Time Stamps) at 4:28 AM–4:29 AM.

104.     At 4:39 AM, Stilphen sits upright.  See Exhibit 11, at 2:24:41.  At 4:40 AM, he manipulates a small object in his hands.  See Exhibit 11, at 2:25:01.

**PLAINTIFF'S RESPONSE**:  Not disputed.

105.     At 4:40 AM, while Stilphen is still seated upright, Officer Marshall and an unidentified officer walk down the cell block hallway with the prisoner who was removed from his cell twenty minutes earlier.  See Exhibit 11, at 2:25:26. After the officers and prisoner passed his cell, Stilphen crossed his legs underneath him on the cell bench.  See Exhibit 11, at 2:25:43. He tears off a piece of paper from the sandwich wrapper and holds it in his hands as Officer Marshall and the unidentified officer pass his cell on their way out of the cell block.  See Exhibit 11, at 2:26:00.

**PLAINTIFF'S RESPONSE**:  Not disputed.

106.     At 4:41 AM, Stilphen takes a milk carton and tears off a piece of it.  See Exhibit 11, at 2:26:50. He appears to roll up the piece of carton.  See Exhibit 11, at 2:26:52. At 4:42 AM, he appears to sniff or ingest something in his hands.  See Exhibit 11, at 2:27:35.

**PLAINTIFF'S RESPONSE**:  Not disputed.

107.     At 4:43 AM, Officer Picarello conducts a cell check.  See Exhibit 11, at 2:28:15. When Officer Picarello first passes Stilphen's cell, Stilphen, who is still seated upright on the cell

bench, appears to conceal the item in his hand by placing it behind his back.  See Exhibit 11, at 2:28:16. Stilphen continues to conceal the item as Officer Picarello passes the cell on his way out of the cell block.  See Exhibit 11, at 2:28:39.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne's sitting position was bent forward rather than upright. *See* Def. Ex. 11 (Cell 19 Video) at 2:28:15; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 4:43 AM.

108.     At 4:46 and 4:48 AM, Stilphen manipulates an item in his hands.  See Exhibit 11, at 2:31:23.

**PLAINTIFF'S RESPONSE:**  Not disputed.

109.     At 4:48 AM, Stilphen leans forward at the waist.  See Exhibit 11, at 2:32:22. From that point forward, he never sits upright again.  See Exhibit 11, at 2:32:42-3:37:22.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Shayne was in a position at 4:48 AM and thereafter more accurately described as being slumped over his legs with his arms bent awkwardly behind him in an unnatural position. *See* Def. Ex. 11 (Cell 19 Video) at 2:32:22; Pl. Ex. 3 (Cell 19 Video With Timestamps) at 4:48 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 111. Not disputed that Shayne remains in this position of distress until 5:52 AM when Officer Almeida begins CPR. *See* Def. Ex. 11 (Cell 19 Video) at 4:48 AM–5:52 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 114.

110.     Officer Almeida conducts a cell check at 4:55 AM.  See Exhibit 11, at 2:41:05.

**PLAINTIFF'S RESPONSE:**  Not disputed.

111.     During these checks, Officer Almeida thought that Stilphen was sleeping and did not need medical attention.  See Exhibit 1, at 233:7-10.  Because of his experience at the booking

desk at D-4, Officer Almeida had seen many individuals who sleep in "weird[,] crazy" positions. See Exhibit 1, at 232:21-25; 233:1-5, 20-25; 234:1-4.

**PLAINTIFF'S RESPONSE:**  Not disputed that Officer Almeida testified that "[p]eople sleeping in all types of weird crazy positions there.  You try not to wake them up, you know, unless you feel that they need medical attention" and "[he] didn't feel, in [his] opinion, [Shayne] needed medical attention. [He] just thought . . . [Shayne] was sleeping at that time." Def. Ex. 1 (Almeida Dep. Tr.) at 233:3–10.

Disputed that Officer Almeida thought that Shayne was sleeping and did not need medical attention. The evidence establishes that Shayne had displayed obvious signs of being dangerously intoxicated and was overdosing at this time, and therefore supports the inference that Officer Almeida knew that Shayne was not sleeping and needed medical attention. *See generally, e.g.*, Def. Ex. 11 (Cell 19 Video); Pl. Ex. 22 (MacDonald Rpt.) at ¶ 114; Pl. Ex. 30 (SA2019-014 Report) at COB000065; Pl. Ex. 28 (Doolan Form 26) at 1; Pl. Ex. 23 (Lyman Rpt.) at 15; Pl. Ex. 19 (Picarello Depo. Tr) at 130:12–14, 131:17–132:2; Pl. Ex. 26 (2015 Boston Police Narcan Training); Pl. Ex. 34 (Almeida Training History); Pl. Ex. 16 (Higgins Dep. Tr.) at 167:4–172:14.

**112.**    Steven Sweeney, the captain of the D-4 station, testified that he did not think Officer Almeida violated BPD policy by not seeking medical attention for Stilphen, because officers at the station see people sleep "in all different positions." See Exhibit 29, at 25:18-23; 195:7-20.

**PLAINTIFF'S RESPONSE:**  Not disputed that Captain Sweeney is the captain of D-4 and testified in this manner. Def. Ex. 29 (Sweeney Dep. Tr.) at 25:18–23, 195:7–20. Disputed that an officer would have assumed Shayne was sleeping in this position. *See, e.g.*, Def. Ex. 11 (Cell 19 Video); Pl. Ex. 22 (MacDonald Rpt.) at ¶ 114; Pl. Ex. 30 (SA2019-014 Report) at COB000065;

Pl. Ex. 28 (Doolan Form 26) at 1; Pl. Ex. 23 (Lyman Rpt.) at 15; Pl. Ex. 19 (Picarello Depo. Tr) at 130:12–14, 131:17–132:2.

113.      At 5:05 AM, Officer Almeida walks down the cell block hallway.  See Exhibit 11, at 2:50:58. At 5:06 AM, Officer Almeida walks out of the cell block, followed by a prisoner.  See Exhibit 11, at 2:51:42.

**PLAINTIFF'S RESPONSE**:  Not disputed. Pl. Ex. 3 (Cell 19 Video With Timestamps) at 5:05 AM–5:06 AM.

114.      At 5:07 AM, Officer Almeida walks back down the hallway with the prisoner to return him to his cell, which is immediately adjacent to Stilphen's cell.  See Exhibit 11, at 2:52:05. Officer Almeida then leaves the cell block by himself.  See Exhibit 11, at 2:52:08.

**PLAINTIFF'S RESPONSE**:  Not disputed. Pl. Ex. 3 (Cell 19 Video With Timestamps) at 5:07 AM.

115.      At 5:10 AM, Officer Almeida walks down the cell block hallway.  See Exhibit 11, at 2:55:11. He again takes the neighboring prisoner out of his cell and escorts him out of the cell block.  See Exhibit 11, at 2:55:24.

**PLAINTIFF'S RESPONSE**:  Not disputed. Pl. Ex. 3 (Cell 19 Video With Timestamps) at 5:10 AM.

116.      At 5:20 AM, Officers Almeida and Picarello walk down the cell block hallway with the neighboring prisoner to escort him back to his cell.  See Exhibit 11, at 3:05:33. Officers Almeida and Picarello then leave the cell block.  See Exhibit 11, at 3:05:55.

**PLAINTIFF'S RESPONSE:**  Not disputed. Pl. Ex. 3 (Cell 19 Video With Timestamps) at 5:20 AM.

117.    At 5:35 AM, Officer Almeida conducts a check of the cell block.  See Exhibit 11, at 3:20:08.

**PLAINTIFF'S RESPONSE:**  Not disputed. Pl. Ex. 3 (Cell 19 Video With Timestamps) at 5:35 AM.

118.    At 5:36 AM, Officer Almeida again walks down the cell block hallway.  See Exhibit 11, at 3:20:54. On his way out of the cell block, Officer Almeida is followed by another prisoner.  See Exhibit 11, at 3:22:21.

**PLAINTIFF'S RESPONSE:**  Not disputed. Pl. Ex. 3 (Cell 19 Video With Timestamps) at 5:36 AM.

119.    At 5:39 AM, Officer Picarello enters the cell block to bring food to the prisoners. See Exhibit 11, at 3:24:05.  Officer Picarello places some items in Stilphen's food slot and looks into Stilphen's cell. See Exhibit 11, at 3:24:08.  Officer Picarello then continues going down the cell block.  See Exhibit 11, at 3:24:15.

**PLAINTIFF'S RESPONSE:**  Not disputed. Pl. Ex. 3 (Cell 19 Video With Timestamps) at 5:39 AM.

120.    Officer Picarello thought that the position Stilphen was in was not an abnormal one for a person with a heroin, opiate, or fentanyl addiction.  See Exhibit 4, at 128:1-2; 129:7-9, 19-20. He did not believe that Stilphen was in need of medical attention. See Exhibit 4, at 134:23-24, 135:1-3.

**PLAINTIFF'S RESPONSE:**  Not disputed that Officer Picarello testified as to the first sentence. Disputed that Officer Picarello did not believe that Shayne was in need of medical

attention as not supported by the cited evidence. When asked at his deposition "seeing [Shayne's] positioning, would you think that he would have needed medical attention," Officer Picarello answered "At 5:00 in the morning?  Maybe.  No, probably - - maybe.  I don't know.  It's - - like I said, it's tough to tell at 5:00 in the morning with someone with a drug history if they're sleeping or they need help." Def. Ex. 4 (Picarello Dep. Tr.) at 134:23–135:6. Officer Picarello further agreed at his deposition that Shayne's position in cell 19 could indicate that someone was overdosing. Pl. Ex. 19 (Picarello Dep. Tr.) at 127:5–130:14.

Moreover, the evidence establishes that Shayne had displayed obvious signs of being dangerously intoxicated and was overdosing at this time, and therefore supports the inference that Officer Picarello knew that Shayne needed medical attention. *See, e.g.*, Pl. Ex. 3 (Cell 19 Video With Timestamps) at 5:39 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 114; Pl. Ex. 30 (SA2019-014 Report) at COB000065; Pl. Ex. 28 (Doolan Form 26) at 1; Pl. Ex. 23 (Lyman Rpt.) at 15.

**121.**     Stilphen appears to take his last breath at 5:39 AM or shortly thereafter.  See Exhibit 11, at 3:24:30.

**PLAINTIFF'S RESPONSE:**  Not disputed.

<u>Joseph Perry Incident</u>

**122.**     At around 3:00 AM on January 14, 2019, a prisoner named Joseph Perry was transported to the D-4 station for booking for an attempted rape.  See Exhibit 5, Doolan Dep., at 16:5-6, 17:5-6; Exhibit 19, Deposition Transcript of James Foley, at 36:11-14.  Perry had been involved in an incident that required a citywide "officer in trouble" call and was resistant and violent when he was placed under arrest.  See Exhibit 5, at 17:4-5; Exhibit 19, at 36:14-17.

**PLAINTIFF'S RESPONSE**: Not disputed.

**123.**      After the police wagon transporting Perry arrived at the D-4 sally port, Perry continued being uncooperative.  See Exhibit 5, at 17:5-6.  He refused to get out of the wagon.  See Exhibit 19, at 36:18-21.  Officers spent thirty minutes trying to coax him out.  See Exhibit 19, at 36:19-22.

**PLAINTIFF'S RESPONSE**: Not disputed.

**124.**      Perry then slammed his head three times on a steel handlebar in the wagon, causing a significant amount of bleeding.  See Exhibit 5, at 17:12-13; Exhibit 19, at 36:22-25.  Perry thrust himself into the back of the wagon to prevent officers from helping him.  See Exhibit 5, at 17:15-16.

**PLAINTIFF'S RESPONSE**: Not disputed.

**125.**      Officers were able to remove Perry from the wagon, but he continued to bash his head against the cement floor, causing further bleeding.  See Exhibit 5, at 17:16-20; Exhibit 19, at 36:25; 37:1-2.

**PLAINTIFF'S RESPONSE**: Not disputed.

**126.**      Boston EMS arrived at the D-4 station to transport Perry to a hospital.  See Exhibit 19, at 37:2-4.

**PLAINTIFF'S RESPONSE**: Not disputed.

**127.**      Officer Doolan was one of the officers in the Sally Port who interacted with Perry. See Exhibit 5, at 167:10-11.  Following that incident, Officer Doolan was covered with blood.  See Exhibit 5, at 167:13. Officer Doolan had to take a shower and put on a new uniform before returning to his duties on the shift.  See Exhibit 5, at 167:13-20.

**PLAINTIFF'S RESPONSE**:  Not disputed.

128.    Officer Almeida was also in the sally port during the Perry incident, though he did not personally see Perry ram his head into the handlebar.  See Exhibit 1, at 137:6-25; 138:1-25; 139:1-25; 140:1-14.

**PLAINTIFF'S RESPONSE**:  Not disputed.

129.    After Perry was taken to the hospital, the duty supervisor set up a crime scene around the wagon.  See Exhibit 19, at 37:10-11.  The Homicide, Internal Affairs, and Crime Scene Response units of the Boston Police were all called to the D-4 station to conduct an investigation. See Exhibit 5, at 168:12-14; Exhibit 19, at 37:11-12, 21-24.

**PLAINTIFF'S RESPONSE**:  Not disputed.

130.    Officer Doolan described the atmosphere in the D-4 station following Perry's death as a "disaster." See Exhibit 5, at 168:5-6.  Officer Almeida described the early morning of July 14, 2019, as "one of the busiest nights [he] had at the booking desk." See Exhibit 1, at 200:14-25; 201:1-8.  He said there was "not a second where somebody isn't saying something to you, from you -- community, the person beside you." See Exhibit 1, at 142:11-14.

**PLAINTIFF'S RESPONSE**:  Not disputed that Officer Doolan and Almeida testified in those words, with two clarifications. First, Shayne was booked prior to Perry's arrest and the atmosphere at that point did not appear rushed, and even allowed for a new officer to be given an opportunity to take fingerprints for the first time. *See* Pl. Ex. 14 (Freire Dep. Tr.) at 84:18–85:6,

110:22–25. Second, there is no indication and no cited evidence that the incident with Perry impacted cell checks.

**131.**     Because of the level of activity at the D-4 station following the Perry incident, a number of prisoners who arrived that morning were unable to be booked in a timely manner.  See Exhibit 5, Doolan Dep., at 168:12-14.

**PLAINTIFF'S RESPONSE:**  Not disputed that Officer Doolan testified that because of the Perry incident, some prisoners' booking was delayed. *See* Def. Ex. 5 (Doolan's Dep. Tr.) at 168:1–4.

Stilphen is Discovered Unresponsive

**132.**     Shortly before 5:51 AM, Officer Doolan was assisting the Trauma 24 (crime scene cleanup) in the sally port area.  See Exhibit 5, at 185:2-4.

**PLAINTIFF'S RESPONSE:**  Not disputed.

**133.**     Because the booking officers were involved in booking a prisoner who could not be booked earlier, Officer Doolan was asked to conduct a 15-minute check of the cell block. See Exhibit 5, at 185:13-18.

**PLAINTIFF'S RESPONSE:**  Not disputed.

**134.**     Surveillance video shows Officer Doolan conducting a cell block check beginning at 5:51 AM.  See Exhibit 11, at 3:36:24. When he passed by Stilphen's cell, Officer Doolan saw Stilphen "sitting in a position that appeared uncomfortable." See Exhibit 5, at 169:15-21.  Doolan testified that he got a "sixth sense bulb that something might not be right." See Exhibit 5, at 169:21-24.

**PLAINTIFF'S RESPONSE:**  Not disputed.

135.     Officer Doolan called out to Stilphen, but got no response. See Exhibit 5, at 170:1-2.

**PLAINTIFF'S RESPONSE**:  Not disputed.

136.     Officer Doolan continued walking down the cell block to check on the other prisoners in their cells.  See Exhibit 5, at 170:3-6.

**PLAINTIFF'S RESPONSE**:  Not disputed.

137.     After hitting the buzzer at the end of the hallway, Officer Doolan walked back down the cell block.  See Exhibit 5, at 170:10-12; Exhibit 11, at 3:36:36. When he passed Stilphen's cell on his way out of the cell block, Officer Doolan kicked the cell door and yelled his name.  See Exhibit 5, at 170:10-12; Exhibit 11, at 3:36:39. Stilphen did not respond.  See Exhibit 5, at 171:2-5; Exhibit 11, at 3:36:42.

**PLAINTIFF'S RESPONSE**:  Not disputed.

138.     Officer Doolan did not think that Stilphen was dead at the time that he kicked the cell door.  See Exhibit 5, at 203:8-10.  In Officer Doolan's experience, certain individuals with opioid addiction have a different baseline than people who are not addicted to opioids.  See Exhibit 5, at 203:14-17.  According to Officer Doolan, these individuals are able to lie in uncomfortable positions and then "just pop right up." See Exhibit 5, at 203:18-22.

**PLAINTIFF'S RESPONSE**:  Not disputed that Officer Doolan described the events in part in this manner. *See* Def. Ex. 5 (Doolan Depo. Tr.) at 203:8–10, 203:14–22. Disputed to the extent that it suggests that in Officer Doolan's experience or otherwise, individuals with opioid addiction are not in danger of overdose and respiratory depressions when lying in uncomfortable

positions. Pl. Ex. 22 (MacDonald Rpt.) at ¶ 108; Pl. Ex. 30 (COB 000062) at COB 000065; Pl. Ex. 19 (Picarello Dep. Tr.) at 130:12–14, 131:17–132:2.

139.     Based on his experience at the D-4 station, Officer Doolan had seen individuals in contorted positions before.  See Exhibit 5, at 203:24, 204:1-2.  In Officer Doolan's view, "the only thing wrong is the addiction that has caused them to just be in these positions." See Exhibit 5, at 204:4-6.

**PLAINTIFF'S RESPONSE**:  Not disputed that Officer Doolan testified in this manner. Disputed to the extent it suggests that in Officer Doolan's experience or otherwise, individuals with opioid use disorder who are in contorted positions are not in danger of overdose and respiratory depression. See Def. Ex. 5 (Doolan Depo. Tr.) at 203:24, 204:1–6; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 108; Pl. Ex. 30 (COB 000062) at COB 000065; Pl. Ex. 19 (Picarello Depo. Tr.) at 130:12–14, 131:17–132:2.

140.     Because Stilphen did not respond, Officer Doolan yelled for Officer Almeida to bring the key to Stilphen's cell.  See Exhibit 5, at 171:6-8.

**PLAINTIFF'S RESPONSE**:  Not disputed.

141.     Officer Almeida came to the cell block with the key.  See Exhibit 11, at 3:37:16. Officer Almeida unlocked the cell door, and Officers Almeida and Doolan entered the cell.  See Exhibit 11, at 3:37:19.

**PLAINTIFF'S RESPONSE**:  Not disputed.

142.     Officer Almeida touched Stilphen's shoulder but Stilphen still did not respond. See Exhibit 11, at 3:37:23. Officer Doolan saw that Stilphen's body was "limp and appeared drained of color." See Exhibit 11, at 3:37:27. Officer Doolan ran out of the cell to call for help and retrieve Narcan.  See Exhibit 11, at 3:37:28.

**PLAINTIFF'S RESPONSE:** Not disputed.

143.    Officer Almeida saw the small baggie of drugs on the cell bench.  See Exhibit 1, at 170:6-10; Exhibit 23, Photos of Small Baggie of Drugs.  Officer Almeida thought that it might contain fentanyl, which would be a danger to everyone in the cell.  See Exhibit 1, at 170:6-15.

**PLAINTIFF'S RESPONSE:** Not disputed that Officer Almeida described the events in this manner. Def. Ex. 1 (Almeida Dep. Tr.) at 170:6–11

144.    Officer Almeida pushed the baggie to the side and began to perform cardiopulmonary resuscitation ("CPR") on Stilphen.  See Exhibit 1, at 170:11-13.

**PLAINTIFF'S RESPONSE:** Not disputed.

145.    About a minute later, Officer Doolan reentered the cell with a Narcan kit.  See Exhibit 11, at 3:38:33. Officer Doolan was quickly followed by Officer Bertocchi, who relieved Officer Almeida in performing CPR.  See Exhibit 11, at 3:38:48. Other officers arrived at Stilphen's cell.  See Exhibit 11, at 3:39:00.

**PLAINTIFF'S RESPONSE:** Not disputed.

146.    Officer Almeida took Officer Marshall's radio and left the cell block to request EMS from a different location.  See Exhibit 11, Cell 19 Video, at 3:39:34; Exhibit 1, at 172:20-25, 173:1-12.  Based on his experience at the D-4 station, Officer Almeida knew that the radio sometimes did not work from inside the cell block.  See Exhibit 1, at 173:9-11, 25; 174:1-8. Officer Almeida wanted to ensure that the radio call went through because he was worried about Stilphen. See Exhibit 1, at 174:9-16.

**PLAINTIFF'S RESPONSE**:  Not disputed that Officer Almeida described the events in this manner. Def. Ex. 1 (Almeida Dep. Tr.) at 173:21–174:16.

147.      Officer Doolan struggled to administer the Narcan dose.  See Exhibit 11, at 3:39:24. He threw it on the floor and another officer ran to get more Narcan.  See Exhibit 11, at 3:39:31. Officers were able to administer three doses of Narcan before EMS arrived.  See Exhibit 5, at 192:24, 193:1-7.

**PLAINTIFF'S RESPONSE**:  Not disputed.

148.      Approximately five minutes after Officers Almeida and Doolan first entered Stilphen's cell, Boston EMS arrived at the scene.  See Exhibit 11, at 3:42:48. EMS took over the medical efforts.  See Exhibit 11, at 3:43:09.

**PLAINTIFF'S RESPONSE**:  Not disputed.

149.      Stilphen was transported to Tufts Medical Center.  See Exhibit 21, Supplemental Incident Report.  He died either en route to the hospital or shortly after arriving at the hospital. See Exhibit 21.

**PLAINTIFF'S RESPONSE**:  Not disputed that Shayne was transported from D-4 to Tufts Medical Center.  Disputed to the extent this statement is intended to suggest that Shayne did not lose his life in cell 19. The efforts to revive him induced Shayne to briefly regain a pulse, known as ROSC (*see id.*), but they did not save his life. *See* Pl. Ex. 22 (MacDonald Rpt.) at ¶ 134).

150.      The autopsy report lists Stilphen's cause of death as "acute fentanyl, despropionyl fentanyl (4-ANPP), heroin, cocaine, and benzodiazepine intoxication." See Exhibit 20, Report of Autopsy, at 1.  The report lists the manner of death as "accident (substance abuse)." See Exhibit 20, at 1.

**PLAINTIFF'S RESPONSE:**  Not disputed.

151.     The postmortem toxicology report indicates that Stilphen's heart blood was positive on benzodiazepines screen, cocaine metabolite screen, fentanyl screen, and opiates screen.  See Exhibit 22, Postmortem Toxicology Report, at 1.  An entry for "Organic Bases and Neutrals" notes the following: "Gabapentin breakdown, methadone, 4-ANPP, fentanyl, nordiazepam, cocaine and metabolites, bupropion and metabolites, 7- aminoclonazepam, chlordiazepoxide and metabolite detected." See Exhibit 22, at 1.  Stilphen's vitreous humor was found to contain 6.3 ng/mL of morphine, 2.6 ng/mL of 6- acetylmorphine, and 23 ng/mL of fentanyl.  See Exhibit 22, at 1.  Stilphen's femoral blood was found to contain 1.4 ng/mL of clonazepam, 30 ng/mL of 7-aminoclonazepam, 86 ng/mL of nordiazepam, 4.7 ng/mL of oxazepam, 545 ng/mL of Benzoylecgonine, 10 ng/mL of "Morphine-Free", and 24 ng/ML of fentanyl.  See Exhibit 22, at 1-2.

**PLAINTIFF'S RESPONSE:**  Not disputed.

152.     A Certificate of Drug Analysis indicates that the powdery substance discovered in Cell 19 "was found to contain Heroin, Fentanyl, and Valeryl Fentanyl, a synthetic opioid, all Class A controlled substances.  Analysis also indicated the presence of Tramadol, a Class E controlled substance, and Caffeine." See Exhibit 24, Certificate of Drug Analysis.  The weight of the tested powder was .15 grams.  See Exhibit 24.

**PLAINTIFF'S RESPONSE:**  Not disputed.

153.     A day or two after Stilphen's death, Officer Doolan was walking through the employee parking lot at the D-4 station when he came across Plaintiff and another family member. See Exhibit 5, at 227:19-24; 228:1-15.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that it was the night after Shayne's death. Pl. Ex. 10 (Cox Dep. Tr.) at 136:5–11.

154.     After he learned who she was, Officer Doolan had a brief conversation with Plaintiff . See Exhibit 5, at 228:20-24; 229:1-12.  Officer Doolan told Plaintiff that he was the one who found Stilphen, and that the officers tried everything they could to keep him alive.  See Exhibit 5, at 229:3-6, 17-19.  He said that he knew Stilphen from Nashua Street, and that he was not a bad kid.  See Exhibit 5, at 229:12-14.

**PLAINTIFF'S RESPONSE:**  Not disputed.

155.     Officer Doolan also told Plaintiff that there were things he could not say about Stilphen's death because there was an ongoing investigation.  See Exhibit 5, at 229:6-8, 15-17.  He concluded by saying that someone would reach out to Plaintiff to let her know what was going on. See Exhibit 5, at 229:20-24.

**PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Officer Doolan also told Lynnel Cox that Shayne had communicated to Officer Doolan that Shayne had ingested opioids about 30 minutes before he was arrested and that he had recently left a detoxification treatment center and need to go back to the detoxification treatment center. Pl. Ex. 10 (Cox Dep. Tr.) 133:3–19, 143:8–144:13.

<u>Dr. MacDonald's Testimony</u>

156.     During expert discovery, the Plaintiff produced an expert report written by Dr. Ross MacDonald.  See Exhibit 27, Expert Report of Ross MacDonald, M.D. Dr. MacDonald was also deposed by defense counsel.  See Exhibit 28, Deposition of Ross MacDonald.

**PLAINTIFF'S RESPONSE**:  Not disputed.

157.     Dr. MacDonald describes himself as an "expert in the treatment of substance use disorder, including the treatment of substance use disorder in correctional settings." See Exhibit 27, at ¶ 8.  From 2017 to 2022, Dr. MacDonald worked as the Chief Medical Officer and Senior Assistant Vice President for the Division of Correctional Health Services at New York City Health + Hospitals, the division of the public hospital system responsible for healthcare, including substance use treatment, for those incarcerated in the New York City jail system.  See Exhibit 27, at ¶ 10.

**PLAINTIFF'S RESPONSE**:  Not disputed.

158.     Dr. MacDonald does not perform any volunteer work with people who have opioid use disorder on the street.  See Exhibit 28, at 68:11-15.  In his current position as Chief Medical Officer at a public hospital in New York, Dr. MacDonald has gone out with a street outreach team to provide care to homeless individuals in the community one time.  See Exhibit 28, at 70:14-22.

**PLAINTIFF'S RESPONSE**:  Not disputed, with the clarification that Dr. MacDonald has "treated hundreds of patients with substance use disorders" and the programs he has managed have "treated many thousands." Pl. Ex. 22 (MacDonald Rpt.) at ¶ 11.

159.     Dr. MacDonald acknowledged that the decision whether to send an arrestee who is suspected to be intoxicated on drugs concerns "thresholds." See Exhibit 28, at 55:2-24; 56:1.  According to Dr. McDonald, "[i]t's not all intoxicated people, but certain concerning levels of intoxication would prompt [hospitalization]." See Exhibit 28, at 56:1-3.

**PLAINTIFF'S RESPONSE**:  Not disputed.

160.     Based on his review of the surveillance video and other materials, Dr. MacDonald asserted that it was very likely that Stilphen consumed drugs before he was arrested on July 14,

2019, though he acknowledged that he had no direct evidence of what Stilphen was doing prior to his arrest. See Exhibit 28, at 71:14-15; 72:3-4.

> **PLAINTIFF'S RESPONSE:**  Not disputed.

161.     Dr. MacDonald opined that up to the point when Stilphen was placed in Cell 19, he did not believe that Stilphen was experiencing an overdose, or that he required Narcan to reverse an overdose.  See Exhibit 28, at 74:10-24, 75:1-22.

> **PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Dr. MacDonald testified that Shayne was at risk of an overdose while he was in booking and should not have been left alone without being monitored. Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 106, 116.

162.     Dr. MacDonald opined that Stilphen "had a serious medical need" during booking. See Exhibit 28, at 73:20-24.  According to Dr. MacDonald, there were multiple ways the medical need could have been handled: the first way would be giving Stilphen medical attention, while the second way would be a "different or more robust monitoring of his status" following booking. See Exhibit 28, at 73:24; 74:1-9, 83:4-13.

> **PLAINTIFF'S RESPONSE:**  Not disputed.

163.     Dr. MacDonald claimed that Stilphen's bent-forward position in the group holding cell was an "unnatural position." See Exhibit 28, at 88:23-24; 89:1-14.  This characterization was based on Dr. MacDonald's belief that the position was "not a usual sleeping position" and "not something that would typically be comfortable." See Exhibit 28, at 96:1-8.

> **PLAINTIFF'S RESPONSE:**  Not disputed, with the clarification that Dr. MacDonald testified not based on "belief" but expert medical opinion.

164.     Dr. MacDonald further opined that the position is "not a good position from a respiratory standpoint." See Exhibit 28, at 96:9-10.  He explained that "[e]specially in someone

who is intoxicated, it would tend towards compressing the thoracic cavity, and could further impair breathing or respiratory perforations." See Exhibit 28, at 96:7-14.

**PLAINTIFF'S RESPONSE**:  Not disputed.

165.     Dr. MacDonald acknowledged that "it's not unusual to find people who are intoxicated in unusual positions." See Exhibit 28, at 97:5-15.

**PLAINTIFF'S RESPONSE**:  Not disputed, with the clarification that Dr. MacDonald's report and testimony makes clear that these positions are often dangerous. Pl. Ex. 22 (MacDonald Rpt.) at ¶ 69; *id.* at 71; *id.* at 76.

166.     Dr. MacDonald testified that the half life of heroin is on the order of a few hours, and the halflife of fentanyl is a matter of minutes.  See Exhibit 28, at 57:16-24; 58:1-8; 59:4-17.

**PLAINTIFF'S RESPONSE**:  Not disputed that Dr. MacDonald testified that the half life of heroin is "more like a few hours" and that of fentanyl is "probably in the matter of minutes rather than hours," with the clarification that Dr. MacDonald also explained that "fentanyl is kind of a complex drug in the sense that it also builds up in the body, in the fat source of the body.  So with chronic use, you usually get a phenomena of sort of delayed release, which makes its effects last somewhat longer than its very short half life would suggest." Def. Ex. 28 (MacDonald Dep. Tr.) at 58:2–8.  Dr. MacDonald also testified that fentanyl's half life is "very short but it's complicated by the [pharmacodynamics] . . . which refers to how it's absorbed and processed in the body." *Id.* at 59:8–10.

167.     Dr. MacDonald thought that the emergency response once officers discovered Stilphen unresponsive was appropriate.  See Exhibit 28, at 95:6-8.

**PLAINTIFF'S RESPONSE**:  Not disputed.

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

### Shayne's Opioid Use Disorder

1.         Until his death on July 14, 2019, Shayne Stilphen had lived with opioid use disorder (OUD) for many years. Pl. Ex. 10 (Cox Dep. Tr.) at 63:8–15; Pl. Ex. 17 (MacDonald Rpt.) at ¶¶ 83–85; Pl. Ex. 12 (Fitzgerald Dep. Tr.) at 93:4–6. Shayne was diagnosed with opioid use disorder by a physician. Pl. Ex. 10 (Cox Dep. Tr.) at 63:8–15.

2.         Opioid use causes "depressive effects across the entire central nervous system," which means that opioids alter an individual's state of alertness and decrease the natural drive to breathe. Pl. Ex. 22 (MacDonald Rpt.) at ¶ 61.

3.         If a person takes a high enough dose of opioids, it can lead to an overdose, in which "a toxic amount of a drug, or combination of drugs, overwhelms the body" and interferes with the part of the brain that regulates unconscious breathing. Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 64–66. Respiratory depression, in turn, may lead to death. *Id.* ¶ 70.

4.         A person who ingests an unsafe level of opioids does not necessarily stop breathing right away: the dangerous effects of opioids on the human body can increase over a period of many hours. *Id.* at ¶ 67; Pl. Ex. 17 (MacDonald Dep. Tr.) at 89:4–14.

5.         If a person who ingested too many opioids becomes completely unresponsive, timely administration of the lifesaving drug naloxone, which is commonly known as Narcan, can reverse an overdose and restore adequate breathing. Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 15, 67, 77, 97; Pl. Ex. 17 (MacDonald Dep. Tr.) at 87:13–21; Pl. Ex. 12 (Fitzgerald Dep. Tr.) at 111:19–23, 113:7–114:9.

6.      Signs that an individual has ingested a life-threatening amount of opioids include drowsiness and unusual posturing. Pl. Ex. 17 (MacDonald Dep. Tr.) at 88:10–22; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 104.

7.      An individual's ability to respond to stimulus and converse does not indicate that they are not at risk of overdose. Pl. Ex. 22 (MacDonald Rpt.) at ¶ 108; Pl. Ex. 12 (Fitzgerald Dep. Tr.) at 106:25–107:6.

## Opioid Use in the Mass and Cass Area

8.      Over the past decade, opioid use has increased dramatically throughout much of the United States, including in Massachusetts. *See* Pl. Ex. 25 (Commonwealth of Massachusetts Executive Department Press Release (STILPHEN_0004363)) at STILPHEN_0004363.

9.      On March 27, 2014, then-Governor of Massachusetts Deval Patrick declared a public health emergency in Massachusetts in response to the growing opioid addiction epidemic. Pl. Ex. 22 (MacDonald Rpt.) at ¶ 43; Pl. Ex. 25 (Commonwealth of Massachusetts Executive Department Press Release (STILPHEN_0004363)) at STILPHEN_0004363.

10.     The intersection of Massachusetts Avenue and Melnea Cass Boulevard, known as "Mass and Cass," has been the epicenter of the Commonwealth's opioid crisis since at least 2016 and falls within District 4. Pl. Ex. 5 (Bertocchi Dep. Tr.) at 70:7–12, 70:22–71:4; Pl. Ex. 14 (Freire Dep. Tr.) at 140:17–21.

11.     Police forces in Boston are aware of the significant opioid crisis and overdose epidemic. *See generally* Pl. Ex. 26 (2015 Boston Police Nasal Narcan Training); Pl. Ex. 27 (2019 Boston Police Nasal Narcan Training); Pl. Ex. 25 (Commonwealth of Massachusetts Executive Department Press Release (STILPHEN_0004363)). The Individual Defendants were aware of the

opioid crisis. Pl. Ex. 4 (Almeida Dep. Tr) at 41:23-43:3; Pl. Ex. 5 (Bertocchi Dep. Tr.) at 184:17-22; Pl. Ex. 14 (Freire Dep. Tr.) at 34:9-36:2; Pl. Ex. 19 (Picarello Dep. Tr.) at 21:11-22:16.

12.      Officers assigned to D-4 regularly encounter people with OUD and who are experiencing opioid over-intoxication and overdose. Pl. Ex. 20 (Sweeney Dep. Tr.) at 88:21–89:1; Pl. Ex. 4 (Almeida Dep. Tr.) at 218:15–219:3; Pl. Ex. 19 (Picarello Dep. Tr.) at 80:3–13, 82:15–17, 87:16–17; Pl. Ex. 14 (Freire Dep. Tr.) at 35:24–36:5; Pl. Ex. 5 (Bertocchi Dep. Tr.) at 186:2–7; Pl. Ex. 7 (Butcher Dep. Tr.) at 56:1–7

13.      Prior to Shayne's death, Officers Almeida and Bertocchi were trained that overdose deaths outnumbered motor vehicle deaths in Massachusetts, with 12 Massachusetts residents fatally overdosing every week by 2008. Pl. Ex. 26 (2015 Boston Police Nasal Narcan) at 8; Pl. Ex. 34 (Almeida Training History); Pl. Ex. 16 (Higgins Dep. Tr.) at 159:3–160:6, 167:20–168:1; Pl. Ex. 35 (Bertocchi Training History).

14.      Prior to Shayne's death, Officers Freire and Picarello were trained about the rising number of Boston EMS transports to the hospital for a suspected heroin overdose—2,601 in 2015 alone—and were taught that Mass & Cass represented the number one hot spot for such transports. Pl. Ex. 27 (2019 Boston Police Nasal Narcan Training) at 6–7; Pl. Ex. 36 (Freire Training History); Pl. Ex. 16 (Higgins Dep. Tr.) at 164:22–166:9; Pl. Ex. 37 (Picarello Training History).

15.      Prior to Shayne's death, Officers Freire and Picarello were trained that "40% of all transports were males between the age of 20 and 39." Pl. Ex. 27 (2019 Boston Police Nasal Narcan Training) at 9.

16.      BPD training described people who were "really high" on opioids as looking "sleepy" and "nodding" but being "arousable," Ex. 26 (2015 Boston Police Nasal Narcan Training)

at 22, 30; Ex. 27 (2019 Boston Police Nasal Narcan Training) at 19, 27, and noted that drugs "could continue to increase in a person's system without consuming more because their body is metabolizing that opioid." Pl. Ex. 16 (Higgins Dep. Tr.) at 128:10–16. The training also described people who were overdosing on opioids as exhibiting a "heavy nod," being "not arousable" and with "slow or stopped" breathing. Ex. 26 (2015 Boston Police Nasal Narcan Training) at 22, 30; Ex. 27 (2019 Boston Police Nasal Narcan Training) at 19, 27.

17.     BPD training alerted its officers to the dangers of opioids, including that they "repress the urge to breath" and can lead to deadly overdose. Pl. Ex. 26 (2015 Boston Police Nasal Narcan Training) at 16, 19; Pl. Ex. 27 (2019 Boston Police Nasal Narcan Training) at 13, 16.

18.     BPD trained its officers that someone who is "really high" should be "stimulate[d] and observe[d]," Pl. Ex. 26 (2015 Boston Police Nasal Narcan Training) at 30; Pl. Ex. 27 (2019 Boston Police Nasal Narcan Training) at 27, because someone who is "really high . . . could go into that overdose realm." Pl. Ex. 16 (Higgins Dep. Tr.) at 81:18–24.

19.     BPD trained its officers that "even if a person is really high and not overdosed, they should not be left alone because they may slip into an overdose." Pl. Ex. 16 (Higgins Dep. Tr.) at 124:6-21.

20.     Officer Almeida testified that a lot of people were "under the influence of something" in the D4 area. Pl. Ex. 4 (Almeida Dep. Tr.) at 230:13–23; *see also id.* at 218:21–23. He further testified that "especially in this district" he had seen people in positions similar to Shayne's position in Cell 19. *Id.* at 217:20–218:6; *see also id.* at 216:6–13.

21.     Officer Bertocchi testified that it was "common to see people that could be unsteady on their feet in that area of Mass & Cass" because there was "a drug epidemic going on in that area." Pl. Ex. 5 (Bertocchi Dep. Tr.) at 184:17–22.

22.     Officer Picarello stated that people in the Mass & Cass area "tend to have a drug problem," and that Shayne's positions in the holding cell and Cell 19 was how "people with a drug addiction commonly sit." Pl. Ex. 19 (Picarello Dep. Tr.) at 82:14–15, 86:1–8, 127:21–128:2, 129:17–20.

23.     Officer Freire testified that "every day, morning and night" she would see people overdose on the sidewalk or in middle of the street. Pl. Ex. 14 (Freire Dep. Tr.) at 35:7–10.

24.     Officer Freire described the level of opioid use around District 4 in July of 2019 as "[o]verwhelming." Pl. Ex. 14 (Freire Dep Tr.) at 35:24–36:5. Officer Freire also testified that D-4 would "get a lot of calls of people overdosing." *Id.*

25.     Officer Freire testified that it was "very common" to see people in Mass & Cass slumped over in Shayne's position in Cell 19. Pl. Ex. 14 (Freire Dep Tr.) at 125:24–126:11; *see also id.* at 124:22–125:1, 127:10–16.

26.     Officers Almeida, Bertocchi, Freire, Marshall and Picarello believed that Shayne's behavior was not unusual, abnormal, or out of the ordinary for the population they encountered in District 4. Pl. Ex. 31 (Connolly Dec. 2021 Report (COB02289)) at COB02291–2295; *see also id.* at COB002305; Pl. Ex. 19 (Picarello Dep. Tr.) at 130:12–14, 131:17–132:2.

27.     Officers Almeida and Bertocchi had each been involved in overdose calls. *See* Pl. Ex. 4 (Almeida Dep. Tr.) at 60:13–21; Pl. Ex. 5 (Bertocchi Dep. Tr.) at 58:25–59:21.

28.     Officer Bertocchi agreed that it is common for individuals who are arrested in D-4 within the vicinity of Mass Ave and Harrison Ave. to be under the influence of drugs. Pl. Ex. 5 (Bertocchi Dep. Tr.) at 186:2–7.

**Shayne's Death at D-4**

29.         Shayne was arrested at "Mass Ave/ Harrison Ave, Roxbury," in the Mass and

Cass neighborhood, on the suspicion of "Breaking & Entering a Motor Vehicle." Def. Ex. 13

(Shayne Arrest Booking Form) at COB000001.

30.         Officer Bertocchi believed Shayne had "tendencies" and "characteristics" of a

drug user. Pl. Ex. 5 (Bertocchi Dep. Tr.) at 185:19–186:20.

31.         Officer Bertocchi testified that "[Shayne] went on saying that he was [breaking

into the car] [be]cause he was just trying to get his money to . . . buy drugs." Def. Ex. 2 (Bertocchi

Dep. Tr.) at 104:4–6.

32.         Officer Picarello acknowledged that Shayne "had prior drug addiction charges"

per his criminal history, such as "[p]ossession of a class A [drug]." Pl. Ex. 19 (Picarello Dep. Tr.)

at 133:8–9, 19.

33.         Officer Picarello agreed that Shayne's "demeanor during the booking process"

indicated to him that Shayne "was addicted to opioids." Pl. Ex. 19 (Picarello Dep. Tr.) at 132:18–

133:3.

34.         Officer Doolan knew that Shayne struggled with an opioid addiction. Pl. Ex. 11

(Doolan Dep. Tr.) at 154:1–7.

35.         Shayne Stilphen spent twenty-seven minutes in the holding cell before booking.

Pl. Ex. 1 (Holding Cell Video With Timestamps) at 1:31–1:58 AM.

36.         While Shayne Stilphen was in the holding cell, Shayne was unsteady on his feet

and swayed from side to side while talking to Officer Bertocchi. Pl. Ex. 1 (Holding Cell Video

With Timestamps) at 1:33–1:34 AM.

37.     Officer Bertocchi observed Shayne in the holding cell slumped forward over his legs, head hanging below his knees. *See* Def. Ex. 2 (Bertocchi Dep. Tr.) at 127:2–5.

38.     At 1:53 AM Shayne was slumped forward over his legs, head hanging below his knees in the group holding cell. Pl. Ex. 1 (Holding Cell Video With Timestamps) at 1:53 AM.

39.     Officer Bertocchi entered the group holding cell and handed Shayne a milk carton at approximately 1:54 AM. Pl. Ex. 1 (Holding Cell Video With Timestamps) at 1:54 AM.

40.     Although Shayne straightened up to take the milk carton from Officer Bertocchi, he slumped over again very soon after. Pl. Ex. 1 (Holding Cell Video With Timestamps) at 1:54 AM -1:55 AM.

41.     Shayne's slumped over position where he was folded over his legs was something Officer Bertocchi never saw before. Pl. Ex. 5 (Bertocchi Dep. Tr.) at 188:16–19.

42.     Around 1:58 AM, Shayne was brought into the booking area. Pl. Ex. 2 (Booking Video With Timestamps) at 1:58 AM. During booking, Shayne showed obvious signs that the opioids in his body had reached a dangerous level: his body contorted into unnatural postures, he had difficulty standing without assistance, and he repeatedly appeared to nod off during fingerprinting. *See, e.g., id.* at 1:58 AM–2:21 AM; Pl. Ex. 22 (MacDonald Rpt.) at ¶ 105; Pl. Ex. 24 (Fitzgerald Rpt.) at 4. Officers Almeida, Bertocchi, and Freire booked Shayne. *See, e.g.*, Pl. Ex. 2 (Booking Video With Timestamps) at 1:58 AM -2:21 AM. Officer Picarello was also present for at least periods of Shayne's booking. Def. SUMF ¶ 7.

43.     During booking, Officers Bertocchi and Freire helped Shayne stand at least seven times. *See* Pl. Ex. 2 (Booking Video With Timestamps) at 2:09–2:14 AM.

44.     Officer Bertocchi repeatedly put his hand on Shayne's back to try to steady him. *See* Pl. Ex. 2 (Booking Video With Timestamps) at 2:09–2:10 AM.

45.     Officer Bertocchi held Shayne's arm to keep him upright and tapped Shayne to try to keep him awake. *See* Pl. Ex. 2 (Booking Video With Timestamps) at 2:09–2:10 AM.

46.     Officers Bertocchi and Freire once again placed their arms on Shayne's back to help him stand. *See* Pl. Ex. 2 (Booking Video With Timestamps) at 2:14 AM.

47.     Shayne was unable to complete the fingerprinting process on his own: to obtain Shayne's fingerprints, Officer Bertocchi physically moved Shayne's hand, while Officer Freire placed her hand on Shayne's back to help him remain standing. *See* Pl. Ex. 2 (Booking Video With Timestamps) at 2:11 AM.

48.     Officer Almeida took Shayne's booking photos. Def. SUMF ¶ 50. Shayne struggled to stand upright during his booking photos. *See* Pl. Ex. 2 (Booking Video With Timestamps) at 2:16–2:19 AM.

49.     While Officer Almeida took his booking photos, Shayne leaned against the wall and began to slump down numerous times. *See* Pl. Ex. 2 (Booking Video With Timestamps) at 2:16–2:19 AM. Shayne's level of intoxication is evident in the booking photos themselves. *See* Def. Ex. 13 (Shayne's Arrest Booking Form) at COB00001.

50.     Officers Almeida, Bertocchi, and Freire watched while Shayne struggled to stand upright. *See* Def. SUMF ¶ 50; Pl. Ex. 2 (Booking Video With Timestamps) at 2:16–2:19 AM; Def. Ex. 3 (Freire Dep. Tr.) at 118:1–7.

51.     Dr. MacDonald is a medical doctor who currently serves as the Chief Medical Officer of NYC Health + Hospitals/Woodhull Medical and Mental Health Center. Dr. MacDonald previously oversaw the opioid treatment program at the Rikers Island jail in New York City from 2013 through 2022 and has treated hundreds of patients with substance use disorders over the course of his career. Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 8–11.

52.     During booking, "Shayne clearly was unable to stand on his feet without support, was swaying back and forth, and was showing tell-tale signs of head-tilt." Pl. Ex. 22 (MacDonald Rpt.) at ¶ 106.  These are all signs that the body's systems that maintain alertness and wakefulness are disrupted and that overdose could occur imminently.  *Id.*

53.     Officers Almeida, Bertocchi, Freire, or Picarello did not request a medical evaluation, transport Shayne to the hospital for medical treatment, or provide medical care to Shayne. *See generally* Pl. Ex. 2 (Booking Video With Timestamps); Def. Ex. 2 (Bertocchi Dep. Tr.) at 162:16–22; Pl. Ex. 4 (Almeida Dep. Tr.) at 169:5-8, 271:5-12; Def. Ex. 19 (Picarello Dep. Tr.) at 105:9–17, 134:15–135:6, 136:22–137:4.

54.     Upon review of video surveillance of Shayne's time in booking, numerous BPD police officers agreed that Shayne appeared intoxicated during booking. Pl. Ex. 21 (Taxter Dep. Tr.) at 210:5-9, 214:9-215:6, 251:6-15; Pl. Ex. 20 (Sweeney Dep. Tr.) at 173:19-25; Pl. Ex. 9 (Connolly Dep. Tr.) at 169:23-170:8; Pl. Ex. 13 (Foley Dep. Tr.) at 141:22-142:5; Pl. Ex. 15 (Gaughan Dep. Tr.) at 140:19-142:4, 143:14-17, 145:20-21; Pl. Ex. 43 (Zarnoch Dep. Tr.) at 39:22-25, 40:2-6, 40:14-18. Ms. Fitzgerald agreed that Shayne showed signs of intoxication, Pl. Ex. 24 (Fitzgerald Rpt.) at 4, and both Dr. MacDonald and Ms. Fitzgerald agreed that Shayne was at risk of overdose at that time. Pl. Ex. 22 (MacDonald Rpt.) ¶¶ 106–08; Pl. Ex. 12 (Fitzgerald Dep. Tr.) at 106:25–107:6.

55.     When faced with the video surveillance of Shayne's time in booking at deposition, the Officers Almeida, Freire, and Bertocchi maintained that they still did not believe Shayne was showing signs of intoxication. *See, e.g.*, Pl. Ex. 4 (Almeida Dep. Tr.) at 261:24-25, 262:21-263:1, 263:20-24, 264:9-10, 267:5-7, 269:16-21, 270:24-271:22, 272:13-273:6; Pl. Ex. 5

(Bertocchi Dep. Tr.) at 161:21-163:3; Pl. Ex. 14 (Freire Dep. Tr.) at 98:18-99:23, 101:17-24, 103:20-23, 104:17-105:1, 108:24-109:8, 114:20-25, 120:18-121:15.

56.     Officers Bertocchi, Freire, and Almeida escorted Shayne to cell 19. Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:21 AM–2:23 AM.

57.     Almost immediately after Shayne was locked in cell 19, and while Officers Bertocchi, Freire, and Almeida remained directly outside the door, Shayne slumped over his legs with his arms bent awkwardly behind him in an unnatural position. *See* Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:21–2:22 AM.

58.     At approximately 2:34 AM, Shayne appeared to have begun to ingest drugs from a bag and continued to do so periodically for the next two hours. *See* Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:34 AM–4:34 AM.

59.     Shayne's intoxication showed no signs of improving over the course of the evening, and instead appeared to get worse. *See generally* Pl. Ex. 3 (Cell 19 Video With Timestamps).

60.     The video footage over the course of these hours shows Shayne repeatedly contorted into unnatural positions, slumped over his legs. *See, e.g.*, Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:47 AM, 3:00 AM, 3:32 AM, 4:02 AM.

61.     Officer Almeida testified that during cell checks, he "tr[ies] to look into the cells" but does not know if officers are required to do so. Pl. Ex. 4 (Almeida Dep. Tr.) at 122:20–18.

62.     Officer Almeida walked by cell 19 approximately 11 times between the hours of 2:21 AM and 5:51 AM. *See* Pl. Ex. 3 (Cell 19 Video With Timestamps) at 2:54, 3:05, 3:17, 3:32, 4:02, 4:28, 4:55, 5:05, 5:10, 5:20, and 5:35 a.m.

63. Officer Picarello walked by cell 19 at 4:43 a.m. *See* Pl. Ex. 3 (Cell 19 Video With Timestamps) at 4:43 AM.

64. At approximately 4:48 a.m., Shayne slumped forward, his limp torso awkwardly folding over his crossed legs. Pl. Ex. 3 (Cell 19 Video With Timestamps) at 4:48 AM.

65. Shayne remained in this contorted position for over an hour as officers repeatedly walked by and did nothing. Pl. Ex. 3 (Cell 19 Video With Timestamps) at 4:48 AM-5:53 AM.

66. Officer Almeida walked by Shayne's cell at 4:55 AM, 5:05 AM, 5:10 AM, and 5:35 AM. *See* Pl. Ex. 3 (Cell 19 Video With Timestamps) at 4:55 AM, 5:05 AM, 5:10 AM, and 5:35 AM. Officer Almeida did nothing to assist Shayne at these times. *Id.*

67. Officer Picarello dropped food off at Shayne's cell at approximately 5:39 AM. *See* Pl. Ex. 3 (Cell 19 Video With Timestamps) at 5:39 AM. Officer Picarello did nothing to assist Shayne at that time. *Id.*

68. Shayne died while in BPD custody. Pl. Ex. 30 (Taxter 2019 Report (COB000062)) at COB000064.

69. At 5:51 a.m., Officer Sean Doolan walked by Shayne for the first time that night. Pl. Ex. 3 (Cell 19 Video With Timestamps) at 5:51 AM.

70. Officer Doolan stated in his Form 26 that he observed Shayne "in Cell 19, resting in a position that looked as if it would be of extreme discomfort for most individuals." Pl. Ex. 28 (Doolan Form 26) at 1.

71. Officer Doolan testified that "Shayne was sitting in a position that appeared uncomfortable. And I kind of just was like, you know, that -- that looks off. Like, you know, you

get the sixth sense bulb that says something might not be right. It looked off, and I remember calling out to him, getting no response." Def. Ex. 5 (Doolan Dep. Tr.) at 169:20–170:2.

72.     Officer Doolan completed checking all of the cells to confirm that the other detainees were alright and returned to Shayne's cell approximately fifteen seconds later "to address what was going on with Shayne." *Id.* at 170:6–9; *See* Pl. Ex. 3 (Cell 19 Video With Timestamps) at 5:51 AM. Officer Doolan understood that Shayne's position required immediate intervention to confirm whether Shayne was alright. Pl. Ex. 11 (Doolan Dep. Tr.) at 176:8–16.

73.     Upon finding Shayne "unresponsive," Officer Doolan summoned Officer Almeida who "immediately called for EMS to the station" and "[Officer Doolan] and Officer Bertocchi began life saving attempts." Pl. Ex. 28 (Doolan Form 26) at COB000025.

74.     In reviewing video footage of Shayne in cell 19 during their depositions, other BPD officers agreed that Shayne's position required immediate intervention to confirm whether Shayne was alright. Pl. Ex. 6 (Bliss Dep. Tr.) at 131:14–18; Pl. Ex. 15 (Gaughan Dep. Tr.) at 152:18–21.

75.     Officer Picarello agreed that Shayne's position in cell 19 could indicate that someone was overdosing on opioids. Pl. Ex. 19 (Picarello Dep. Tr.) at 131:17–132:2.

76.     Shayne's position while in cell 19 "should have raised concerns that he was experiencing a medical emergency or was at risk of a medical emergency." Pl. Ex. 22 (MacDonald Rpt.) at ¶ 115; *see also id.* at ¶¶ 104–15.

77.     Ms. Fitzgerald testified that if someone in her care was in that position, she "would have spoke[n] to them" to "see if they were all right . . ." and attempted to rouse them with questions such as "'Are you okay? Do I have to Narcan you?'  Pl. Ex. 12 (Fitzgerald Dep. Tr.) at 116:11–20.

78.        Dr. Michael Lyman has a Ph.D. from the University of Missouri-Columbia and over 40 years of experience as a law enforcement agent, criminal investigator, police trainer and educator. Pl. Ex. 23 (Lyman Rpt.) at p. 2. Before retiring from teaching in May 2019, Dr. Lyman spent 30 years as a professor and researcher, focusing his studies on police procedure, criminal investigation, drug enforcement, and related areas. *Id.* Prior to his academic career, Dr. Lyman worked as a criminal investigator for eleven years. *Id.*

79.        "Shayne . . . at the minimum, should have been provided close monitoring throughout the time he remained in his cell." Pl. Ex. 23 (Lyman Rpt.) at 16.

80.        "Even an officer untrained in identifying symptoms of opiate impairment, would have concluded that Shayne Stilphen was in need of immediate medical attention or close monitoring during the booking process . . ." *Id.* at 16.

81.        Shayne's "profound signs of intoxication [before being placed in cell 19] demonstrated that he was at risk for progressive intoxication in subsequent hours." Pl. Ex. 17 (MacDonald Dep. Tr.) at 75:23–76:1.

82.        The intoxication that Shayne was displaying when booked could have progressed to overdose for a range of reasons, only one of which is the ingestion of additional drugs. *Id.* at 84:19–85:3.

83.        The folded-over "lotus" position in which Shayne could be seen beginning at 4:48 AM on July 14, 2019 is one that can "dramatically reduce[] the amount of oxygen each breath takes in, which can more quickly deprive the body of an adequate oxygen supply." Pl. Ex. 22 (MacDonald Rpt.) at ¶ 69.

**Shayne's Death Was Preventable**

84.     Shayne life could have been saved if Narcan had been administered in time, but the delay of administering Narcan until 5:52 AM resulted in his death. Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 127–30.

85.     There is a reasonable likelihood that administration of Narcan up until 5:10 A.M., and possibly as late as 5:39 A.M., would have reversed the effect of the overdose and prevented Shayne's death, Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 127–30.

86.     If "prompt basic first aid to Shayne" had been provided when "possible overdose was detected, Shayne would almost certainly be alive today." Pl. Ex. 22 (MacDonald Rpt.) at ¶ 123.

87.      "[H]ad officers that passed by Shayne's cell simply checked to see if Shayne was even breathing at all, attempted to rouse him, and/or attempted to manually reposition him, it is likely that Shayne would not have died." Pl. Ex. 22 (MacDonald Rpt.) at ¶¶ 123–25.

**Internal Affairs Investigation Into Shayne's Death**

88.     Sergeant Detective Lucas Taxter was assigned to internal affairs from 2017 to 2021. Pl. Ex. 21 (Taxter Dep. Tr.) at 46:8–14.

89.     Sergeant Detective Taxter was assigned to the IAD investigation of Shayne's death and concluded in his initial report from watching the group holding cell and booking video footage in the first instance that "[i]t was apparent that [Shayne] was likely under the influence of drugs when he arrived at D4 at the time of his booking and after being placed in cell 19." Pl. Ex. 30 (Taxter 2019 Report (COB000062)) at COB000065; Pl. Ex. 21 (Taxter Dep. Tr.) at 165:13–15.

90.     Sergeant Detective Taxter testified that his basis for this statement was his "opinion after observing [Shayne] appear to nod off in the holding cell and his inability to stand

still in an upright position for the entire booking process." Pl. Ex. 21 (Taxter Dep. Tr.) at 164:17–24.

91.      Sergeant Detective Taxter stated that, "[a]lthough uninjured and cooperative, video evidence showed that [Shayne] was unable to stand up straight at times during the booking procedure. Pl. Ex. 30 (Taxter 2019 Report (COB000062)) at COB000065. The internal investigations unit report also stated that "[a]t one point, [Officer] Bertocchi had to physically assist [Shayne] keep his balance and stand up straight." *Id.*

92.      Sergeant Detective Taxter also concluded in his initial report that "medical attention should have been provided to [Shayne] before he was placed in a cell 19, or at the very latest, immediately after he ingested the drugs and remained in that unusual and seemingly uncomfortable position." Pl. Ex. 30 (Taxter 2019 Report (COB000062)) at COB000065.

93.      Sergeant Detective Taxter testified that he thought "medical attention should have been provided to [Shayne] before he was placed in a cell 19, or at the very latest, immediately after he ingested the drugs and remained in that unusual and seemingly uncomfortable position" because "that's what [he] thought should have happened based on what [he] observed in the video." Pl. Ex. 21 (Taxter Dep. Tr.) at 165:1–15. As a result, Sergeant Detective Taxter initially concluded that BPD officers had violated Rule 318, Section 3. Pl. Ex. 30 (Taxter 2019 Report) at _COB000066.

94.      Lt. Detective Connolly, who was also assigned to the IAD investigation into Shayne's death, similarly reached an initial conclusion that officers had violated Rule 318 Section 3. Pl. Ex. 32 (Connolly Dec. 2020 Report (COB005441)) at COB005446.

95.      Sergeant Detective Taxter and Lt. Detective Connolly changed their conclusions to determine that officers had not violated Rule 318 Section 3 only after they focused

on the frequency with which the officers in D-4 saw people exhibiting the signs and symptoms of drugs use, and therefore determined this was not "unusual" in District 4. Pl. Ex. 9 (Connolly Dep. Tr.) at 163:23–164:17; 94:14–21, 165:17, 174:6–8, Pl. Ex. 21 (Taxter Dep. Tr.) at 173:17–174:12; Pl. Ex. 29 (Taxter 2020 Report (COB002289)) at COB002304-05; Pl. Ex. 32 (Connolly Dec. 2021 Report (COB000032)) at COB000038-39.

96.     Sergeant Taxter testified that he changed his report and his thoughts about potential violations of Rule 318 Section 3 because "I didn't take into account the subjectivity of the situation, especially where the officers who worked in that district at this time saw this, what I thought was unusual behavior, they saw it a lot more than I did, just one time, and it wasn't as alarming to them as it appeared to be to me when I viewed the video." Pl. Ex. 21 (Taxter Dep. Tr.) at 173:17–174:12.

97.     Detective Connolly testified that he changed his report and his thoughts about potential violations of Rule 318 Section 3 because "I put the D4 officers, what they normally see [] and looked at it through that lens, in my head, looking at the video." Pl. Ex. 9 (Connolly Dep. Tr.) at 163:23–164:17; *see also id.* at 94:14–21; 165:17–21; 174:6–8.

## Death of Cristhian Geigel at D-4 in May 2019

98.     Cristhian Geigel was arrested in in late May 2019 and brought to D-4. Pl. Ex. 40 (Geigel Homicide Unit Investigation Report (COB002826)) at COB002827.

99.     Cristhian Geigel was discovered dead in his cell at D-4 on May 28, 2019. Pl. Ex. 40 (Geigel Homicide Unit Investigation Report (COB002826)) at COB002827; Pl. Ex. 42 (Celluci Dep. Tr.) at 10:4-7.

100.     Cristhian Geigel's cause of death was acute intoxication due to the combined effects of fentanyl, oxycodone, methamphetamine and heroin. Pl. Ex. 41 (Geigel Report of Autopsy (COB002923)) at COB002923; Pl. Ex. 42 (Celluci Dep. Tr.) at 115:4–5.

101.     Cristhian Geigel took his last breath around 6:40 PM on May 27, 2019. Pl. Ex. 42 (Celluci Dep. Tr.) at 95:8–18; 126:19–22; Pl. Ex. 39 (Cellucci Geigel IAD Rpt. (COB005489)) at COB005501.

102.     Cristhian Geigel laid face down on his cell bench until 8:39 AM on May 28, 2019, when officers attempted to wake him for court. Pl. Ex. 42 (Celluci Dep. Tr.) at 99:4–23; 149:1-4; Pl. Ex. 39 (Cellucci Geigel IAD Rpt. (COB005489)) at COB005489.

103.     Officers walked by Cristhian's cell more than fifty times after he had died and did nothing. Pl. Ex. 20 (Sweeney Dep. Tr.) at 132:19–133:5.

104.     Officer Almeida was on duty in the early morning of May 28, 2019. Pl. Ex. 4 (Almeida Dep. Tr.) at 294:25–295:8.

105.     Officer Almeida walked by Mr. Geigel's cell numerous times between the hours of 12:30 AM and 4:00 AM on May 28, 2019 and did nothing. Pl. Ex. 4 (Almeida Dep. Tr.) at 294:25–295:8.

106.     Officer Bertocchi was informed of the incident involving Mr. Geigel at a roll call prior to Shayne Stilphen's death. Pl. Ex. 5 (Bertocchi Dep. Tr.) at 83:13–14.

## **BPD Rule 318**

107.     Rule 318, Section 3 states that "any unusual appearance or behavior displayed by a prisoner shall receive immediate attention." Def. Ex. 26 (Rule 318) at COB02386.

108.     The BPD definition of the term "unusual" is subjective and geographically dependent. Pl. Ex. 21 (Taxter Dep. Tr.) at 160:12–21; Pl. Ex. 20 (Sweeney Dep. Tr.) at 66:9–13; Pl. Ex. 8 (Chrispin Dep. Tr.) at 208:22–23; Pl. Ex. 9 (Connolly Dep. Tr.) at 152:22.

109.     "The wording in Section 3 which states 'unusual appearance or behavior displayed by a prisoner . . .' lacks clarity and does nothing to tell officers what to look for in prisoners who might be experiencing a medical emergency or be impaired by opiates. This is because what seems 'unusual' for one officer may not be considered 'unusual' for another." Pl. Ex. 23 (Lyman Rpt.) at 19.

110.     Sergeant Detective Taxter testified that "something that would seem unusual to an officer looking in a cellblock in West Roxbury might be usual in the South End." Pl. Ex. 21 (Taxter Dep. Tr.) at 161:16–25, 162:1–5.

### Copeland Incident

111.     In April 2019, Mr. Copeland was arrested and brought to District 4. Pl. Ex. 38 (Fitzgerald Copeland IAD Rpt. (COB002677)) at COB002678; Pl. Ex. 18 (Marshall Dep. Tr.) at 82:23–83:12.

112.     Although he was experiencing a stroke, the officers, including Officer Almeida, assumed that his symptoms were due to alcohol intoxication. Pl. Ex. 38 (Fitzgerald Copeland IAD Rpt. (COB002677)) at COB002677, COB002682, COB002686–87, COB002689; Pl. Ex. 4 (Almeida Dep. Tr.) at 320:7–14; Pl. Ex. 20 (Sweeney Day 1 Dep. Tr.) at 111:6–13, 112:20–25; Pl. Ex. 18 (Marshall Dep. Tr.) at 96:1–4, 94:24–95:2.

113.     Even though Mr. Copeland had slurred speech, was incapable of walking on his own, and fell while going to the bathroom, Pl. Ex. 12 (Fitzgerald Copeland IAD Rpt. (COB002677)) at COB002679–80; Pl. Ex. 18 (Marshall Dep. Tr.) at 87:10–21, 317:9–22, Officer Almeida testified that he did not consider whether Mr. Copeland needed medical attention because "his actions were consistent with somebody intoxicated." Pl. Ex. 4 (Almeida Dep. Tr.) at 320:7–14. This conclusion was reiterated throughout the D-4 station, including by Officer Sweeney.

Pl. Ex. 20 (Sweeney Dep. Tr.) at 111:6–13, 112:20–25; Pl. Ex. 18 (Marshall Dep. Tr.) at 96:1–4;

Pl. Ex. 38 (Fitzgerald Copeland IAD Rpt. (COB002677)) at COB002682, 002686–87, 002689.

March 15, 2024                         Respectfully submitted,

                                       */s/ Robert Frederickson III*
                                       Robert Frederickson III (BBO #670111)
                                       GOODWIN PROCTER LLP
                                       100 Northern Avenue
                                       Boston, Massachusetts 02210
                                       Tel.: (617) 570-1000
                                       rfrederickson@goodwinlaw.com

                                       Jessie J. Rossman (BBO # 670685)
                                       Adriana Lafaille (BBO #680210)
                                       Isabel Burlingame (BBO #710027)
                                       American Civil Liberties Union
                                       Foundation of Massachusetts, Inc.
                                       One Center Plaza, Suite 850
                                       Boston, MA 02108
                                       Tel.: (617) 482-3170
                                       jrossman@aclum.org
                                       alafaille@aclum.org
                                       iburlingame@aclum.org

                                       Alexandra D. Valenti* (*Pro hac vice*)
                                       Christine Potkay* (*Pro hac vice*)
                                       Gabriella Montes* (*Pro hac vice*)
                                       GOODWIN PROCTER LLP
                                       The New York Times Building
                                       620 Eighth Avenue
                                       New York, NY 10018
                                       Tel.: (212) 459-7351
                                       avalenti@goodwinlaw.com
                                       cpotkay@goodwinlaw.com
                                       gmontes@goodwinlaw.com

                                       Matthew Ginther* (*Pro hac vice*)
                                       GOODWIN PROCTER LLP
                                       1900 N Street, NW
                                       Washington, DC 20036
                                       Tel.: (202) 346-4000
                                       mginther@goodwinlaw.com

                                       *Attorneys for Plaintiff Lynnel Cox, as administrator*
                                       *of the estate of Shayne R. Stilphen*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 15, 2024, I served the foregoing document on all parties by filing it via the Court's CM/ECF system and that a copy will be sent via the CM/ECF system electronically to all counsel of record.

<u>*/s/ Robert Frederickson III*</u>
Robert Frederickson III (BBO #670111)

76