# EXHIBIT 5

Page 1

VOLUME: I
PAGES: 1-203
EXHIBITS: 148-155

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 1:22-CV-11009

_____

LYNNEL COX, as Administrator of the )
Estate of Shayne R. Stilphen, )
        Plaintiff, )
       vs. )
BOSTON POLICE DEPARTMENT, ISMAEL ALMEIDA,)
PAULMICHAEL BERTOCCHI, CATIA FREIRE, )
DAVID MARSHALL, and JOHN/JANE DOE NO. 1, )
        Defendants. )
_____)

VIDEOTAPED DEPOSITION OF
PAULMICHAEL BERTOCCHI, called as a witness by and
on behalf of the Plaintiff, pursuant to the
applicable provisions of the Federal Rules of Civil
Procedure, before P. Jodi Ohnemus, RPR, RMR, CRR,
CA-CSR #13192, NH-LSR #91, MA-CSR #123193, and
Notary Public, within and for the Commonwealth of
Massachusetts, at Goodwin Procter, LLP, 100
Northern Avenue, Boston, Massachusetts, on
Wednesday, September 13, 2023, commencing at 10:08
a.m.

Page 58

1  Q. -- do I understand that correctly?
2  A. Yes, Municipal Police Training
3  committee -- Council.
4  Q. And does this reflect some of the outside
5  trainings that you referenced in your testimony
6  earlier that are not necessarily reflected on the
7  BPD training record that we've marked as Exhibit
8  151?
9  A. Some of them, yes.
10 Q. Are there additional outside trainings
11 that you've received that are not reflected on
12 either Exhibit 151 or 152?
13 A. Yes.
14 Q. And when did you receive those trainings?
15 A. I don't recall the specific time frame.
16 Q. Do you recall from -- whether they were
17 after you graduated from the academy?
18 A. Yeah. It was afterwards, yes.
19 Q. Do you recall whether they would have been
20 prior to July of 2019?
21 A. It would have been afterwards.
22 Q. Are you familiar with the opioid epidemic
23 in this country?
24 A. I am.
25 Q. And what is your understanding of that

Page 59

1 epidemic?
2  A. I believe it was in around 2017 that it
3 was declared a nationwide drug epidemic in this
4 country.
5  Q. Have you had any personal experience with
6 the opioid epidemic outside of your work as a
7 police officer?
8  A. Yes.
9  Q. Has anyone in your family been personally
10 affected by the opioid epidemic?
11 A. Yes.
12 Q. Have any of your friends been personally
13 affected by the opioid epidemic?
14 A. Yes.
15 Q. Have you ever administered Narcan to a
16 person experiencing an overdose?
17 A. Yes.
18 Q. How many times?
19 A. Numerous.
20 Q. Can you approximate?
21 A. Not more than ten.
22 Q. When do you recall administering Narcan to
23 a person experiencing an overdose?
24 A. It's hard to recall every specific
25 instance.

Page 60

1  Q. Can you recall any specific instance?
2  A. There's several. I can give you an
3 example if you'd like.
4  Q. Please do.
5  A. There was an individual overdosing in an
6 alleyway. His friends flagged us down, and we
7 assisted him, provided several doses of Narcan,
8 CPR. He came to, and he was transported to the
9 hospital by Boston EMS.
10 Q. Were you working as a BPD officer at that
11 time?
12 A. I was.
13 Q. And you were on duty at the time that you
14 provided this individual Narcan?
15 A. I was.
16 Q. Can you recall any other specific instance
17 of administering Narcan to a person experiencing an
18 overdose?
19 A. I don't remember the specifics, no.
20 Q. Based on your experience, are you able to
21 recognize whether or not someone is under the
22 influence of opioids?
23 A. Yes.
24 Q. And what signs do you look for?
25 A. As I previously testified, an individual

Page 61

1 who may be under the influence of an opioid is
2 pinpoint pupils, lethargic manner towards them.
3 Some individuals also may be more animated than
4 others when they're under the influence of opioids.
5  Q. In your experience, would someone under
6 the influence of opioids sometimes be able to
7 converse?
8  A. Under the influence most times, yes, they
9 can converse.
10 Q. Do you ever use the phrase "speaking
11 coherently"?
12     MR. WHITESELL: Objection.
13 A. Yes, I think that's a common term to use.
14 Q. And what does "speaking coherently" mean
15 to you?
16 A. They're talking in a manner that's --
17 you're able to understand.
18 Q. In your experience, would someone under
19 the influence of opioids sometimes be able to speak
20 coherently?
21 A. It's possible, yes.
22 Q. Are you familiar with the term "nod off"?
23 A. Yes.
24 Q. And how are you familiar with that term?
25 A. It's a term that's used in regards to

16 (Pages 58 - 61)

Page 70

1 stated he did not need medical attention multiple
2 times, but due to the size of the scrape and cuts
3 on his arms, I contact medical for him -- from my
4 training and experience, I knew the cut did need
5 medical assistance.
6    Q.  Okay.  Thank you.
7        Are you aware of a nationwide increase in
8 opioid use during the time that you have worked at
9 BPD?
10   A.  Yes.  As I previously testified, I believe
11 the -- to be considered a nationwide drug epidemic
12 put in effect in 2017.
13   Q.  And based on your personal experience, do
14 you think it's fair to say that the D-4 area has
15 been particularly hard hit by this increase in
16 opioid use?
17   A.  I think the entire city of Boston has.
18   Q.  And how would you describe the level of
19 opioid use around the D-4 area in 2019?
20   A.  There's a heavy amount of drug use in the
21 area of District 4 and District 6.
22   Q.  Are you aware of an area referred to as
23 the Mass. and Cass area of Boston?
24   A.  Yeah, I am.
25   Q.  And what is your understanding of that

Page 71

1 area?
2    A.  That's considered to be possibly one of
3 the epi -- epicenters of drug use, drug sales in
4 the city.
5    Q.  Are you aware of that area sometimes
6 referred to as "methadone mile"?
7    A.  Yes.
8    Q.  And what is your understanding of why that
9 area is known as methadone mile?
10   A.  It's a slang term used in regards to
11 describing the area due to the many facilities in
12 that area that are used to help treat those
13 addicted to drugs, methadone.
14   Q.  Were you ever provided any formal
15 instruction from BPD about the Mass. and Cass area?
16   A.  In regards to...
17   Q.  Just generally.
18   A.  I would have -- provided information in
19 regards to that area, what goes on in that area,
20 personal protection in that area, in regards to
21 needles, assisting those in the area, providing
22 them with services.
23   Q.  Does the opioid crisis affect your day to
24 day at -- as a police officer at BPD?
25   A.  Yes.  I think it affects everybody within

Page 72

1 the department and the city.
2    Q.  In what ways does the opioid crisis affect
3 your day to day as a police officer at BPD?
4    A.  Assisting those that need it is -- again,
5 it's -- it's broad to say every day is the same in
6 regards to this.
7    Q.  What -- what happens when an individual in
8 BPD custody reports feeling ill?
9    A.  Can you specify what you mean by "ill" or
10 define "ill"?
11   Q.  What happens when an individual in BPD
12 custody reports to someone at BPD that they are not
13 feeling well?
14   A.  Again, every individual brought into BPD
15 custody is booked and treated in the same manner
16 throughout the booking process.  They're asked --
17 every booking process they are asked:  Do you need
18 medical assistance?  If that individual does
19 request medical assistance, medical assistance is
20 given to them.
21   Q.  Based on your experience at BPD, what are
22 the various ways in which BPD communicates with
23 police officers?
24       For instance, via email?
25   A.  You've got email.  You've got regular

Page 73

1 mail.  You've got announcements at roll call.
2 You've got the radio.
3    Q.  Does D-4 specifically have any policies in
4 addition to BPD policies?
5    A.  Each district station can have specific
6 policies that -- within the district itself that
7 the captain would like officers to abide by, but
8 the general rule that every police officer working
9 for the Boston Police Department follow the rules,
10 policies, and procedures of the department.
11   Q.  And how are these district-specific
12 policies communicated to officers?
13   A.  This could be done at roll call.  The
14 captain could give -- post a notice on the bulletin
15 board.
16   Q.  What is a roll call?
17   A.  Prior to the start of every shift, the
18 duty supervisor provides the information of the
19 day, gives updates of the previous shifts, and
20 assigns officers working that shift to their
21 assignments.
22   Q.  Does every officer on shift attend the
23 roll call?
24   A.  Yes.
25   Q.  And how long are roll calls, typically?

Page 82

1  A. No.
2  Q. You've never heard that name before?
3  A. No idea who that is.
4  Q. So I'm going to -- strike that.
5     Have you ever received any communication
6  from BPD or from your superiors regarding an
7  individual named Albert Copeland?
8     MR. WHITESELL: Objection.
9  A. Again, as I previously testified, I have
10 no idea who that is.
11 Q. Are you familiar with an individual named
12 Cristhian Geigel?
13 A. I'm aware of the name, yes.
14 Q. And how are you aware of the name?
15 A. It was in your complaint.
16 Q. Prior to receiving the complaint, were you
17 familiar with an individual named Cristhian Geigel?
18 A. The name arose in your complaint. And
19 upon reading that, it refreshed my memory as
20 regards to the incident involving Mr. Geigel.
21 Q. Do you recall whether you were -- strike
22 that.
23    Do you understand that Mr. Geigel was
24 found dead at D-4?
25 A. I was.

Page 83

1  Q. Do you recall whether you were working at
2  D-4 the morning that Mr. Geigel was found dead in
3  his cell?
4  A. I was assigned to District 4 at that time
5  but was not working during the time that he was
6  found deceased.
7  Q. Did you interact at all with Mr. Geigel
8  while he was at District 4 in May 2019?
9  A. No.
10 Q. Did you ever receive any communication
11 from BPD or from your superiors regarding
12 Mr. Geigel's death at D-4?
13 A. At a roll call we were advised of the
14 passing of Mr. Geigel. And the duty supervisor at
15 the time, who I do not recall who it was, stated --
16 coming from the captain -- that better searches
17 need to be done by officers in the holding cell and
18 the booking area.
19 Q. Do you recall the duty supervisor at the
20 roll call where you were advised of the passing of
21 Mr. Geigel saying anything else?
22 A. No.
23 Q. Do you recall receiving any other
24 communication from BPD regarding Mr. Geigel other
25 than the roll call that you've just testified to?

Page 84

1  A. No.
2  Q. Do you recall when that roll call was?
3  A. Sometime following after his passing.
4  There was several -- over the course of several
5  shifts that it was reiterated to officers the
6  booking policy and procedure, and the captain
7  wanted to have the duty supervisors reiterate the
8  searching of prisoners prior to placing them in the
9  cells.
10 Q. Are you aware of any formal change to cell
11 check procedures that occurred following
12 Mr. Geigel's death at D-4?
13 A. Can you specify what you mean by "cell
14 checks"?
15 Q. What do you understand a cell check to be?
16 A. I'm aware of the policies and procedures
17 that states that a cell check is done by the
18 booking officer every 15 minutes.
19 Q. Now, to your understanding, are -- were
20 the policies and procedures that you just
21 referenced concerning cell checks that were in
22 place at the time of Mr. Geigel's death the same
23 procedures in place at the time of Shayne
24 Stilphen's death in July 2019?
25 A. Yes. The policies and procedures of the

Page 85

1  department don't change.
2  Q. Did you ever discuss Mr. Geigel's death
3  with any of your fellow police officers?
4  A. I was made aware of his passing by my
5  partner at the time.
6  Q. Who was your partner at the time?
7  A. Officer Butcher.
8  Q. And what did he tell you regarding
9  Mr. Geigel?
10 A. He just advised me that an individual
11 passed away in the holding cell during the day --
12 or one of the cells during the day tour that day.
13 Q. Was that a conversation you had in person
14 with Mr. Butcher or via text or email?
15 A. I know it wasn't by email. I believe he
16 told me in the parking lot before the beginning of
17 our shift that evening for the overnight.
18 Q. Do you recall anything else regarding your
19 discussion with Officer Butcher relating to
20 Mr. Geigel?
21 A. No.
22 Q. Other than your conversation with Officer
23 Butcher, do you recall discussing Mr. Geigel's
24 death with any other individual at BPD?
25 A. No. It was just brought about during the

Page 102

1  no.
2  Q.  Do you recall interacting with Shayne
3  while he was in the holding cell?
4  A.  I do.
5  Q.  What do you recall about interacting with
6  Shayne while he was in the holding cell?
7  A.  We had several conversations.  We
8  conduct -- I had finished conducting the inventory
9  booking procedure with him.
10  Q.  Do you remember anything about Shayne's
11  appearance in the -- in the holding cell?
12  A.  No.
13  Q.  Do you remember anything specifically
14  about Shayne's behavior?
15  A.  We were conversing, talking normally.
16  Specifically we were laughing 'cause we had the
17  same sneakers on, just different colors.
18  Q.  Other than the sneakers, do you recall
19  discussing anything with Shayne while he was in the
20  holding cell?
21  A.  I advised him of just how the booking
22  process would work.  I told him it was going to be
23  a few minutes 'cause there was someone else being
24  booked at the time from another district.
25  Q.  Anything else you can remember discussing

Page 103

1  with Shayne while he was in the holding cell?
2  A.  We were just conversing back-and-forth.
3  He was just telling me that -- about -- I told him
4  what his charges were going to be for breaking into
5  the car.  He stated that he was on the street.  He
6  was just looking for something inside the vehicle.
7  We talked back-and-forth, and he asked why we were
8  the ones that stopped him because we were wearing
9  plain clothes.  We were different than other
10  officers in uniform.
11     We were just talking about people that we
12  may have known in the area, and he advised me that
13  he was sick of being on the street and that he was
14  willing to be a criminal informant.
15     Just back-and-forth conversations
16  between -- two were just talking.
17  Q.  Anything else specifically you can
18  remember?
19  A.  We talked about the sneakers; basketball,
20  obviously, 'cause we were both wearing Jordans; he
21  was talking about him being an informant.  He was
22  saying that he was on his own out there 'cause his
23  family disowned him.
24  Q.  What do you recall Shayne saying about
25  that?

Page 104

1  A.  Was just -- he was getting upset just
2  that -- 'cause I told him his charges, about him
3  breaking into the car.  I told him that the witness
4  did see him.  He went on saying that he was doing
5  it 'cause he was just trying to get his money to --
6  to buy drugs 'cause he had an issue, but we
7  obviously had stopped him prior.
8     And then he went on that he was on his own
9  on the street, saying that he doesn't talk to his
10  family; that they disowned him and that they don't
11  want anything to do with him.
12  Q.  Anything else you can recall Shayne saying
13  to you?
14  A.  Nah, we were just kind of joking
15  back-and-forth about a few individuals that were
16  displaced on the street, if he knew them.
17  Q.  Did you share the content of the
18  discussions you had with Shayne with any other
19  officer at BPD that night?
20  A.  I think I may have told Officer Freire
21  that he was joking with me about us wearing the
22  same sneakers.
23  Q.  Do you remember telling Officer Freire
24  anything else with respect to the discussions you
25  had with Shayne in the holding cell?

Page 105

1  A.  No.  If anything, 'cause she was new -- I
2  think she only had, like, one or two weeks on the
3  job -- I was just telling her how -- just when
4  booking a -- an individual or a prisoner, that
5  it's -- some officers do, some don't -- just to
6  make normal conversation with them and just
7  converse back-and-forth, 'cause obviously it's a
8  bad circumstance for everybody.
9     It's -- whether it's their first arrest or
10  an individual's been arrested before, just
11  conversing with someone normally, just normal
12  conversation is how I personally do it.  It just --
13  they're a person just like I am.  Just talking
14  back-and-forth.  Just man-to-man type of thing.
15  Q.  Other than telling Officer Freire that you
16  had been joking with Shayne about wearing the same
17  sneakers, do you recall discussing the content of
18  your discussions with Shayne with any other officer
19  that night?
20  A.  I don't recall, no.
21  Q.  Is there anything else that you recall
22  about the time that Shayne is in -- was in the
23  holding cell at D-4 that you haven't already
24  testified about?
25  A.  No, he was in there just for some time

Page 110

1  I can state how Officer Almeida asks these
2 questions to -- this question merits -- he's asking
3 this question because of this, or he's asking this
4 question because of that.  It's important to
5 document tattoos or addresses or phone numbers.
6 It's a training, essentially.
7   Q.  Do you mean that you were essentially
8 training Officer Freire with respect to the booking
9 process?
10   A.  I think -- I wasn't her training officer,
11 but showing her how it's done.
12   Q.  Do you recall having discussions with any
13 officer other than Officer Freire during Shayne's
14 booking process?
15   A.  If anything, it would have been Officer
16 Almeida telling him -- with clothing -- or helping
17 him with the charges or officer ID numbers.
18   Q.  At any point during Shayne's booking
19 process did you consider the possibility that
20 Shayne may be under the influence of drugs?
21   A.  No.
22   Q.  Is there anything you can recollect about
23 Shayne's booking process that you haven't already
24 testified about?
25   A.  Can you rephrase the question?

Page 111

1   Q.  Sure.
2       We've -- we've been talking through
3 Shayne's booking process, and I just wanted to give
4 you the opportunity if there was anything that you
5 remember that you haven't already testified about?
6   A.  He was conversing with us normally.  He
7 was able to answer all the questions that Officer
8 Almeida had to complete the intricate booking
9 process.  Specifically one of the lines of where --
10 ask if any medical notations are needed, which is
11 on every booking sheet.  Mr. Stilphen stated no.
12   Q.  You recall personally hearing Officer
13 Almeida ask if any medical notations are needed and
14 Mr. Stilphen stating no?
15   A.  No, but the booking process is done the
16 same -- every way for every prisoner in every
17 district throughout the city of Boston; and that
18 question is mandatory to be completed.  And if it's
19 not completed, the -- where it's submitted to will
20 kick it back and state that it has to be done.  And
21 if he had answered yes, medical assistance would
22 have been required or contacted.
23   Q.  So I understand that's the policy, but you
24 did not personally hear Officer Almeida ask
25 Mr. Stilphen that --

Page 112

1   A.  No --
2   Q.  -- during the booking process?
3   A.  -- but it is a required form to fill out
4 on the sheet and it's unable to be submitted if
5 it's not.
6       (Counsel confer.)
7   Q.  Could you hear what Officer Almeida was
8 saying to Mr. Stilphen during the booking process?
9   A.  Yes.
10   Q.  And what do you recall Officer Almeida
11 saying to Mr. Stilphen during the booking process?
12   A.  He was just asking the routine booking
13 questions to fill out the sheet in the automated
14 system.
15   Q.  Do you recall specifically hearing Officer
16 Almeida ask if Mr. Stilphen was in need of medical
17 attention?
18   A.  Again, as I just testified, I stated I
19 don't remember specifically hearing that, but if
20 that answer -- if that was left empty on the
21 booking form and submitted, it would have been
22 kicked back and been unable to be submitted.
23       To clarify for the record, on the
24 automated booking system, there's -- every -- every
25 file, every piece has to be filled out.  And once

Page 113

1 it's submitted, it goes to headquarters to our ID
2 unit.  But if something isn't filled out properly
3 or not filled out or left blank on that, it's
4 kicked back and needs to be filled out
5 appropriately or else it's unable to be submitted
6 and the prisoner can't be properly booked and
7 verified.
8       Therefore, every form and every file needs
9 to be filled out on that sheet.
10   Q.  I know I asked this earlier, but just one
11 last opportunity:  Anything else that you remember
12 about the booking process with Shayne that night
13 that you haven't already testified about?
14   A.  No, just that he was able to correctly and
15 cooperatively conduct the booking process with no
16 issue.
17       MS. POTKAY:  Okay.  I think now is a good
18 breaking point for lunch, if that works.
19       MR. WHITESELL:  Fine with me.  We could
20 break.
21       VIDEO OPERATOR:  Time is 1:30 p.m.  We're
22 off the record.
23       (Whereupon the deposition recessed at
24       1:30 p.m.)
25

Page 126
1  A.  I did not.
2      MS. POTKAY:  I'm just going to play the
3  video starting at 3 minutes and 42 seconds.
4      (Video playing.)
5  Q.  Do you recall what you were discussing
6  with Shayne at this time?
7  A.  I do not know.
8      MS. POTKAY:  Pause the video at 4 minutes.
9      I'm going to fast forward in the video
10 footage to the 23-minute mark.
11     MR. WHITESELL:  I know you said this --
12 what exhibit is this again?  I don't mean you need
13 to look it up.  You can tell me later.
14     (Court Reporter comment.)
15     MR. WHITESELL:  That's not a big deal.  I
16 just wanted to note it.
17     (Video playing.)
18     MS. POTKAY:  Paused the video at 23
19 minutes and 32 seconds.
20 Q.  Am I correct that it's you entering the
21 holding cell again at approximately 23 minutes and
22 30 seconds?
23 A.  It is.
24 Q.  And you appear to have something in your
25 hand?

Page 127
1  A.  It's a carton of milk.
2  Q.  Did you observe Shayne in a position
3  folded over his waist as you entered the cell at
4  that time?
5  A.  I did.
6  Q.  Were you concerned at all to see Shayne in
7  that position?
8  A.  Not due to him popping right up.
9  Q.  So you were not concerned to see Shayne in
10 that position because he popped right up?
11 A.  Yes, he popped right up, and he was
12 coherent and took the carton of milk.
13 Q.  Are you aware that Officer Doolin later
14 found Shayne in a similar position folded over his
15 legs?
16 A.  He was observed sitting like that several
17 times throughout the course of the process prior to
18 being booked.  Due to his consistency of sitting
19 like that, it was comfortable for him.  If it was
20 some sort of unpeculiar or uncomfortable position,
21 his body would have been like that the entire
22 time -- several times as he got up to speak with
23 us.
24 Q.  Are you aware that Officer Doolin
25 described that position as one that would be of

Page 128
1  extreme discomfort for most individuals?
2  A.  I am.
3  Q.  And do you agree with Officer Doolin's
4  assessment?
5  A.  For some individuals that may be an
6  uncomfortable position.
7  Q.  Would you agree that for most individuals
8  that would be an uncomfortable position?
9  A.  For some people it may be.
10 Q.  So would you agree with Officer Doolin's
11 assessment that for most individuals it would be of
12 extreme discomfort?
13 A.  Again, as I testified several times now, I
14 believe it -- for some people that may be
15 uncomfortable.
16 Q.  Have you ever seen people in that position
17 before?
18 A.  That specific position?
19 Q.  Yes.
20 A.  I think everybody has a different way they
21 sit.
22 Q.  I'm not sure that answered my question.
23     Have you ever seen people in that specific
24 position before?
25 A.  I've seen people in similar positions.

Page 129
1  Q.  And what do you mean by "similar
2  positions"?
3  A.  Somewhat of an un- -- of a contorted body
4  like that, sitting in an awkward manner.
5  Q.  Have you ever thought that people in that
6  position or similar positions were in need of
7  medical attention?
8  A.  If a person is sitting in an awkward
9  manner like that, is nonresponsive and incoherent
10 and not able to get right up, it would draw
11 concerns.  But as you just saw in the video and
12 depicted right here, he was able to get right up
13 and was coherent.
14 Q.  After finding Shayne in this position in
15 the holding cell, did you talk to anyone else at
16 BPD about Shayne being in this position at that
17 time?
18 A.  No, due to him being responsive, coherent,
19 and getting right up as I entered.
20     MS. POTKAY:  So I'd like to turn to
21 another video.  This will be the booking desk video
22 footage of Shayne Stilphen's booking on July 14th,
23 2019, that was produced with Bates COB000108, and I
24 believe this was previously marked as Exhibit 31.
25     (Exhibit 31, previously marked.)

Page 158

1  and 10 seconds.
2      Q.  Did it appear to you that Shayne was
3  having any difficulty standing while having his
4  booking photos taken?
5      A.  At this point in the process they were
6  taking -- ah -- photographs of his tattoos.
7      Q.  And how does that relate to my question as
8  to whether it appeared to you that Shayne was
9  having any difficulty standing?
10     A.  I don't recall if his positioning at that
11 point was to assist Officer Almeida in taking
12 photographs of the tattoos to appropriately fit the
13 booking requirements.
14         MS. POTKAY:  I'm going to play the video
15 starting at 20 minutes and 11 seconds.
16         (Video playing.)
17         MS. POTKAY:  Pause the video at 21 minutes
18 and 14 seconds.
19     Q.  Did it appear to you that Shayne was
20 having any difficulty standing here?
21     A.  He is bouncing up and down while he was
22 trying to put his shirt on.
23     Q.  Shayne was not having booking photos taken
24 at this point in time; right?
25     A.  Correct.  He would be finished if he was

Page 159

1  putting his clothing back on.
2      Q.  Did it appear to you that Shayne is again
3  sliding down the wall here?
4      A.  As I previously testified, it appears he
5  was bouncing up and down as he was putting his
6  shirt on.
7      Q.  What do you mean by "bouncing up and
8  down"?
9      A.  He's flipping his undershirt inside out,
10 bending at the knees and popping back up.
11         MS. POTKAY:  I'm going to play the video
12 starting at 21 minutes and 14 seconds.
13         (Video playing.)
14         MS. POTKAY:  I'm going to pause the video
15 again at 21 minutes, 20 seconds.
16     Q.  Does it appear to you that Shayne's,
17 again, sliding down the wall here?
18     A.  Again, he's bending at his knees trying to
19 put his shirt on.
20     Q.  Why did you think he was doing that?
21         MR. WHITESELL:  Objection.
22     A.  Could you restate the question?
23     Q.  Why did you think he was doing that?
24     A.  He's putting his shirt on.
25     Q.  Is it typical, in your experience, for

Page 160

1  people to bend at their knees when trying to put a
2  shirt on?
3      A.  Everyone could put their shirt on a
4  different way.
5          MS. POTKAY:  I'm going to start the video
6  at 21 minutes and 20 seconds.
7          (Court Reporter comment.)
8          (Video playing.)
9          MS. POTKAY:  Pause the video again at 21,
10 minutes 27 seconds.
11     Q.  I've asked you the same question:  Does it
12 appear to you again that Shayne is having
13 difficulty standing here?
14     A.  No.
15         MS. POTKAY:  Play the video at 21 minutes,
16 27 seconds.
17         (Video playing.)
18         MS. POTKAY:  I'm going to pause the video.
19     Q.  It looks like you're signing something; is
20 that right?
21     A.  Correct.
22     Q.  And what would you have been signing?
23     A.  Following the completion of the booking
24 process, once it's submitted, two forms come out:
25 The arrest booking form and, then, a Miranda form,

Page 161

1  as well as a property form down the bottom.  And it
2  requires officer's signature for the Miranda
3  portion of it.
4      Q.  And did you sign the Miranda portion?
5      A.  I believe I did.  I don't recall
6  specifically.
7      Q.  Did you have any concerns regarding
8  Shayne's well-being during the booking process?
9      A.  Can you please rephrase the question?
10     Q.  What don't you understand about the
11 question?
12     A.  If you could please rephrase it or restate
13 it.
14     Q.  Did you have any concerns regarding
15 Shayne's need of medical attention during the
16 booking process?
17         MR. WHITESELL:  Objection to form.
18     A.  If Mr. Stilphen was in need of medical --
19 immediate medical attention, Boston EMS would have
20 been called.
21     Q.  Did you have any concerns regarding
22 Shayne's need of medical attention during the
23 booking process?
24         MR. WHITESELL:  Objection.
25     A.  As I previously testified, if Mr. Stilphen

|  |  |
|---|---|
| Page 162<br>1  asked or was in need of immediate medical<br>2  attention, EMS would have been contacted to arrive<br>3  at the station.<br>4     Q.  You didn't call Boston EMS for<br>5  Mr. Stilphen; is that correct?<br>6     A.  As I previously testified, if he asked or<br>7  was in need of medical assistance, EMS would have<br>8  been contacted.<br>9     Q.  So I understand that testimony, but that's<br>10 not directly responsive.<br>11        You did not call Boston EMS for<br>12 Mr. Stilphen; right?<br>13    A.  At what point in the incident?<br>14    Q.  At any time that Mr. Stilphen was --<br>15 strike that.<br>16        During the booking process for<br>17 Mr. Stilphen, you did not call Boston EMS; correct?<br>18    A.  Because he was in no need of EMS<br>19 treatment.<br>20    Q.  So that's a no, that you did not call<br>21 Boston EMS; correct?<br>22    A.  No, because of the mannerism he displayed<br>23 and we were able to see on scene -- or at the<br>24 booking desk.<br>25    Q.  Did you have any suspicion that Shayne may | Page 164<br>1     Q.  And, again, Officer Bertocchi, please let<br>2  me know if you'd like to rereview any of the video<br>3  footage as we go through it.<br>4        COURT REPORTER:  Exhibit 153?  Want to<br>5  mark this?<br>6        MS. POTKAY:  I'm sorry.  Oh, yes, I need<br>7  to mark this.  Sorry.  Thank you.  Let's mark this<br>8  as Exhibit 153.  And, again, for the record, that's<br>9  with Bates No. STILPHEN_0001484.<br>10       (Exhibit 153, video, STILPHEN_0001484.)<br>11       MS. POTKAY:  So I'm playing the video at<br>12 the start.<br>13       (Video playing.)<br>14    Q.  Do you recognize this video footage?<br>15    A.  I do.<br>16    Q.  And what is it?<br>17    A.  Mr. Stilphen being placed in the cell<br>18 following the completion of the booking process.<br>19    Q.  And is that you -- yourself and Officer<br>20 Freire placing Shayne in the cell?<br>21    A.  Yes.<br>22    Q.  And this is cell 19?<br>23    A.  Yes.<br>24       (Video playing.)<br>25       MS. POTKAY:  I'm going to pause the video |
| Page 163<br>1  be intoxicated under -- or under the influence of<br>2  drugs during the booking process?<br>3     A.  No.<br>4        MS. POTKAY:  I think now's a good time to<br>5  take a break.<br>6        MR. WHITESELL:  Okay.<br>7        VIDEO OPERATOR:  The time is 3:49 p.m.<br>8  We're off the record.<br>9        (Recess was taken.)<br>10       VIDEO OPERATOR:  The time is 4:18 p.m.<br>11 We're on the record.<br>12    Q.  Welcome back, Officer Bertocchi.<br>13       MS. POTKAY:  I'd like to pull up some<br>14 video footage.  This was produced with Bates No.<br>15 STILPHEN_0001484.  This is video footage of cell 19<br>16 at D-4 that is time stamped and starts at<br>17 approximately 2:21 a.m.<br>18       And so that the record is clear, although<br>19 the time stamp for time of day can be seen in the<br>20 upper left-hand corner of the video footage, I'm<br>21 going to primarily refer to the time on the video<br>22 by the time internal to the video and not the<br>23 actual time of day.<br>24       And if I'm referring to the specific time<br>25 of day, I'll specify that. | Page 165<br>1  at 1:30.<br>2     Q.  That's you and Officer Freire standing<br>3  outside the cell; right?<br>4     A.  Correct.<br>5     Q.  Did you notice Shayne slowly folding<br>6  forward over his legs in this way after you and<br>7  Officer Freire escorted him to the cell?<br>8     A.  I don't recall.  I was securing the latch<br>9  to the door -- to the cell block door.<br>10    Q.  Does it concern you now seeing Shayne<br>11 folding over his legs like this on the video<br>12 footage?<br>13    A.  He was sitting like that several times<br>14 previously in the holding cell.<br>15    Q.  So I'll just ask the question again:  Does<br>16 it concern you now seeing Shayne folding over his<br>17 legs like this on the video footage?<br>18    A.  No, because his mannerisms were consistent<br>19 with that during the previous booking process.<br>20       MS. POTKAY:  I'm going to skip ahead in<br>21 the video, playing it from approximately 10 minutes<br>22 and 56 seconds.  You can see the time stamp is<br>23 approximately 2:32 a.m.<br>24       (Video playing.)<br>25    Q.  Do you see that Shayne is still folded |

Page 182

1  "Assisting me this morning
2  is Sergeant Detective John Fitzgerald.
3  Sir, please introduce yourself for the
4  record."
5  SERGEANT DETECTIVE FITZGERALD:
6  "Good morning. Sergeant Detective
7  John G. Fitzgerald. My name last name is
8  spelled F-i-t-z-g-e-r-a-l-d. I'm also
9  assigned to internal affairs division."
10  SERGEANT DETECTIVE TAXTER: "Thank you.
11  Also in the room is Police Officer
12  Bertocchi.
13  Sir, please introduce yourself
14  and spell your last name for the record."
15  OFFICER BERTOCCHI: "Police Officer
16  Paulmichael Bertocchi, B-e-r-t-o-c-c-h-i."
17  SERGEANT DETECTIVE TAXTER: "Thank you.
18  Are you aware that --"
19  (End of audio playing.)
20  MS. POTKAY: And so, for the record, I
21  have paused the audio recording at 48 seconds.
22  Q.  Do you recognize this as the audio
23  according of your IA interview in connection with
24  the death of Shayne Stilphen that took place on
25  February 13th, 2020?

Page 183

1  A.  I do.
2  MS. POTKAY: I just want to play the audio
3  starting at 7 minutes and 17 seconds.
4  (Audio playing.)
5  SERGEANT DETECTIVE TAXTER: "...those
6  times?"
7  ANSWER: "He did not."
8  QUESTION: "Lastly, regarding Stilphen's
9  clothing that was brought back from the
10  hospital after he passed away, do you
11  have any information about what happened
12  to that clothing?"
13  ANSWER: "I do not."
14  SERGEANT DETECTIVE TAXTER: "All right.
15     "Sergeant Fitzgerald?"
16  SERGEANT FITZGERALD: QUESTION: "Going
17  back to the booking when he was unsteady.
18  Is that uncommon or common for people
19  that are arrested in that district,
20  especially at that time of night?"
21  ANSWER: "Especially involved in the
22  anticrime car doing a lot of drug work,
23  that is common, but -- that is a common
24  thing --"
25  QUESTION: "Yeah."

Page 184

1  ANSWER: -- "most people are coherent just
2  like him.
3  QUESTION: "Okay. So the unsteadiness
4  is -- is not unusual --"
5  ANSWER: "No."
6  QUESTION: -- "for those people you were
7  --"
8  MS. POTKAY: I paused the audio at 7
9  minutes and 58 seconds.
10  Q.  Why is that unsteadiness that you
11  testified about in your IA interview common in the
12  line of drug work?
13  A.  They were asking about the area
14  specifically of Mass. and Cass. I think it --
15  Sergeant Fitzgerald asked if it's common to see
16  people that could be unsteady on their feet.
17  Q.  And why, to your knowledge, is it common
18  to see people that could be unsteady on their feet
19  in that area of Mass. and Cass?
20  A.  That area in -- specifically is, as we've
21  previously testified and brought about, that -- a
22  drug -- drug epidemic going on in that area.
23  Q.  Did you think that Shayne may be on drugs
24  on July 14th, 2019, based on him displaying that
25  unsteadiness that you stated was common for

Page 185

1  individuals brought into custody at D-4?
2  A.  Although he appeared to be lethargic and
3  unsteady at some times, he was coherent,
4  responsive, and able to complete the booking
5  process and communicate with us without issue;
6  therefore, it did not arise any issues or concerns.
7  Q.  So did you think that Shayne may -- may
8  have been on drugs on July 14th, 2019?
9  MR. WHITESELL: Objection.
10  A.  He may have taken some at some point
11  during that day, but his characteristics and
12  mannerisms and dealing with him did not raise any
13  concerns or need for medical assistance.
14  MS. POTKAY: I'm going to play the audio
15  of the IA interview starting at 9 minutes and 37
16  seconds.
17  (Audio playing. )
18  SERGEANT DETECTIVE TAXTER: QUESTION:
19  "Did it appear, based upon your
20  interactions with Mr. Stilphen, the crime
21  he was arrested for, the area he was
22  arrested in, that he may be a drug user?"
23  ANSWER: "It was a call for a B&E to a
24  motor vehicle, which, you know, related to
25  a drug crime at that time; but, yes, it

Page 186

1  did have those tendencies it appeared."
2  QUESTION: "Okay. And that's common
3  for individuals who are arrested
4  within that district and within
5  that -- within that -- the vicinity
6  of Mass. Ave. and Harrison?"
7  ANSWER: "Correct."
8  MS. POTKAY: And I've paused the audio
9  interview at 10 minutes and 10 seconds.
10  Q. You used the word "tendencies" in the
11  testimony that we just heard.
12     Do you recall that?
13  A. Yes.
14  Q. And what did you mean by "tendencies"?
15  A. Tendencies are characteristics.
16  Q. And what tendencies did Shayne display on
17  July 14th, 2019?
18  A. Some lethargicness, skinny build.
19  Q. Any others that you can recall?
20  A. Not that I can recall, no.
21  Q. And when did you observe those tendencies?
22  A. It was there -- the arrest happened about
23  2:00 o'clock in the morning. He could have had
24  lethargic tendencies from being up all day. He was
25  very disheveled.

Page 187

1  Q. Anything else you recall observing about
2  Shayne?
3  A. Not that I can recall, no.
4  MS. POTKAY: So I'm going to play the IA
5  interview starting at 10 minutes and 10 seconds.
6  SERGEANT DETECTIVE TAXTER: "I have no
7  other questions. Thank you."
8  SERGEANT FITZGERALD: QUESTION: "Officer
9  Bertocchi, when he was in the holding cell
10  -- and I believe you brought him a milk
11  carton also --"
12  ANSWER: "Correct."
13  QUESTION: -- "at that time, the
14  video showed that he was leaning forward
15  when you walked in and then he -- he sat
16  up when you -- he immediately sat up,
17  actually, when you walked in. Have you
18  ever seen anyone else, in your experience,
19  leaning forward like that in the cell?"
20  ANSWER: "Yes."
21  QUESTION: "Okay. So it wasn't that
22  unusual?"
23  ANSWER: "No."
24  QUESTION: "Do you have any more --"
25  MS. POTKAY: And I paused the audio at 10

Page 188

1  minutes and 45 seconds.
2  Q. You testified that you had previously seen
3  individuals in your experience leaning forward like
4  that in a cell; right?
5  A. Yes.
6  Q. In what other context had you seen an
7  individual folded forward over their legs like that
8  in a cell?
9  A. In a cell?
10  Q. Yes.
11  A. Or -- I don't recall specifics, but I have
12  seen individuals -- whether it's a cell or on the
13  street -- in somewhat awkward positions like that,
14  sitting, but they have arose and got up and popped
15  right up just like Shayne did.
16  Q. You don't recall any specific instances of
17  seeing an individual folded over their legs like
18  that in a cell?
19  A. I can't recall specifically, no.
20  Q. But in each of those instances you
21  recalled that the individual arose and -- and got
22  up and popped right up, just like Shayne did?
23  A. Yes, of a -- although an individual could
24  be sitting in a position like that, that, to a
25  normal person, may seen awkward, an individual

Page 189

1  sitting like that or in another abnormal position
2  to some, if they get right up and able to
3  communicate and function normally, then there's no
4  need to contact EMS.
5  Q. In those prior instances, to your
6  knowledge, were those individuals under the
7  influence of anything?
8  A. Not that I recall.
9  Q. Did you have any reason to be concerned
10  for those prior individuals' well-being?
11  A. As I previously testified, I don't recall,
12  but if an individual appears to be in distress and
13  is in need of medical attention, the medical
14  attention will be sought for them.
15  Q. Circling back quickly, you testified
16  earlier that at the start or perhaps at the
17  completion of your IA interview Sergeant Taxter
18  said he was aware that you had not submitted a form
19  26; is that correct?
20  A. Nah, it was either before or after that I
21  spoke with him in regards to that.
22  Q. Did Sergeant Detective Taxter say anything
23  else with regard to your form 26 relating to Shayne
24  Stilphen during that discussion?
25  A. I don't recall his specific statement, but

48 (Pages 186 - 189)