# EXHIBIT 11

Page 1

```
 1                  UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MASSACHUSETTS

 3                  CIVIL ACTION NO. 1:22-CV-11009

 4

 5

 6      *********************************

 7      LYNNEL COX, as administrator of the

        Estate of Shayne R. Stilphen,

 8

                         Plaintiff

 9

        vs.

10

11      BOSTON POLICE DEPARTMENT,

        ISMAEL ALMEIDA, PAUL MICHAEL BERTOCCHI,

12      CATIA FREIRE, DAVID MARSHALL, and

        JOHN/JANE DOE NO. 1,

13

                         Defendants

14

        *********************************

15

16

17                  VIDEOTAPED DEPOSITION OF:

18                         SEAN DOOLAN

19                       GOODWIN PROCTER

20                    100 Northern Avenue

21                    Boston, Massachusetts

22           August 24, 2023        10:11 a.m.

23

24           Darlene M. Coppola, RPR, RMR, CRR
```

Page 154

1    Shayne received comfort meds or he
2  received -- he got medications on rounds, I do
3  remember.
4    Q.  And so from that, your understanding
5  was that he likely was someone that was
6  struggling with opioids?
7    A.  Yes.
8    Q.  About when in your time at Nashua
9  Street was this?  I think you said you
10  were --
11    A.  I was there from April 2016 until the
12  end of August 2017.
13    Q.  So it was sometime in that time
14  frame?
15    A.  It was sometime in that time frame,
16  yes.
17    Q.  About how long, if you recall, were
18  you and Shayne in the same unit?
19    A.  I can guarantee that it was at least
20  three months.  And then possibly, like here
21  and there, as I was covering for another unit
22  during a lunch break or something from time to
23  time.
24    Q.  Do you -- did you have any

Page 155

1  interactions with Shayne before July 14, 2019
2  in your capacity as a D-4 police officer?
3    A.  No.
4    Q.  And you're aware that Shayne died on
5  July 14, 2019, yes?
6    A.  Yes.
7    Q.  How did -- were you on duty on
8  July 14, 2019?
9    A.  Yes.
10    Q.  When did that tour of duty start?
11    A.  I was working overnights at that time,
12  so it would be 11:45 p.m. until 7:30 a.m.
13    Q.  So your shift began at 11:45 p.m., on
14  July 13, 2019?
15    A.  Yes.
16    Q.  Were you -- so were you on duty at BPD
17  at the time of Shayne's arrest?
18    A.  Yes.
19    Q.  And that arrest was on July 13, 2019,
20  right, or during that shift?
21    A.  I've been off overnights for so long,
22  so I don't know how the day works with the
23  shift swap anymore.  So, like, I was working
24  the night Shayne was arrested.

Page 156

1    Q.  Do you recall why BPD was called to
2  the scene where Shayne was arrested?
3    A.  Yes.
4    Q.  And what's your memory of that?
5    A.  Someone had called 911 and reported
6  that someone had broken into a vehicle on
7  Mass. Ave., and when I responded to that
8  scene, I went to where the vehicle was and the
9  911 caller was.
10    Q.  And when you arrived at the scene,
11  were other officers already there?
12    A.  Yes.
13    Q.  And I think you said earlier that
14  night you were working the service car.  So it
15  was just you?
16    A.  I was riding by myself, yes.
17    Q.  And what do you -- when you arrived at
18  the scene, what was happening?
19    A.  I observed a car with a broken window
20  and several items scattered throughout the
21  car, a couple of items on the sidewalk.  And
22  then there was somebody who was on the foyer,
23  I think it was like the 600 block of
24  Mass. Ave.

Page 157

1    We had talked.  We had conversed.  I
2  got the report from them.  I got the report
3  from the 911 caller.  And that information, I
4  relayed that there was a confirmed break, and
5  whatever provided description was given to me,
6  I sent to the officers that were still out.
7    Q.  So you said there were several items
8  scattered.  What type of items?
9    A.  I couldn't tell you.
10    Q.  Anything indicating drug use or
11  anything of that nature?
12    A.  I mean, I didn't process the car.  We
13  don't process it.  So we were just -- when
14  something like that happens, you have a victim
15  kind of give a quick look-through of the
16  vehicle, and say, hey, if there's anything
17  missing in the car.  They're going to know
18  more about their inventory than we are.
19    I'm pretty sure that the victim said
20  that it didn't look like anything significant
21  was taken from the car.  But I don't recall
22  specifically.
23    Q.  So you interacted with the victim, the
24  person whose car it was?

40 (Pages 154 - 157)

Page 166

1    like, you know me, I'm not a bad dude.
2         And I just remember saying to him,
3    like, just something silly, you just got
4    caught up in, it all works itself out, like,
5    it always does, they always end up back out at
6    some point.  And so it was brief.  It was --
7    it was a brief conversation.
8         Q.  Other than talking with him briefly in
9    the holding cell -- well, I guess, when was
10   the next time you saw Shayne?
11        A.  When I found him later on that night.
12        Q.  Did you observe the booking process
13   for Shayne at all?
14        A.  No.
15        Q.  Were you at the D-4 station that whole
16   night, or did you leave the station at some
17   point?
18        A.  As mentioned previously at the
19   beginning of my deposition, we had the OT
20   call, which ultimately involved a homicide in
21   the wagon bay and it was a very -- it was a --
22   it was a terrible night.
23        Q.  How long after your initial
24   interaction with Shayne, about when did you

Page 167

1    leave the station after that point?
2         A.  I don't remember exact timeline.  I
3    think I wrote a lot of these Form 26s that
4    night.  So all the times will be on those
5    because I can't remember what they were right
6    now.
7         Q.  Sure.  After addressing the incident
8    with Mr. Perry, did you -- you came back to
9    the D-4 station at that point?
10        A.  I was involved directly with the
11   incident in the wagon bay with Mr. Perry.
12        Q.  I see.
13        A.  I was covered in blood, and I was
14   instructed by Lieutenant Foley to change my
15   uniform and do whatever administrative
16   paperwork related to that.
17        I remember going up to the locker
18   room, putting the bloody uniform in a prisoner
19   property bag, taking a shower, putting a new
20   uniform on.  And I think at that point,
21   Lieutenant Foley was, like, at this point,
22   we're just playing defense for the rest of the
23   night, respond to calls from the station.  We
24   have a lot of paperwork that we have to do.

Page 168

1         I think that there were still
2    prisoners that needed to be booked that
3    couldn't be because of the incident that
4    happened with Perry.  So there was just an
5    overwhelming -- like it was a disaster in that
6    station, and there was -- there was still work
7    that needed to get done.
8         So I changed up my uniform.  I came
9    back downstairs.  I think I started writing
10   my -- one of my Form 26s.  I don't remember
11   exactly where I was or what I was doing, and
12   the buzzer went off.  I remember Homicide and
13   Internal Affairs are walking around the
14   station doing their investigation.  And I went
15   back to go and do my 15-minute check because I
16   was asked, like, can you do this?  I'm trying
17   to do this right now, can you help me out?
18        And I said, absolutely, I'll go do a
19   check.  So when I went to go do the check,
20   that's when I found Shayne.
21        Q.  And so between your initial
22   interaction with Shayne in the holding cell,
23   the Perry incident happens, you go upstairs,
24   change clothes, and then you do this cell

Page 169

1    check, you hadn't seen Shayne at any point in
2    between?
3         A.  No, I had not.
4         Q.  About how long was that timewise?
5         A.  I would say a few hours.
6         Q.  And so when you went to do -- was that
7    the first cell check that you had done that
8    night?
9         A.  I believe so.  I think that -- I think
10   that when the Perry thing was happening and
11   everything was kind of -- that was -- that was
12   my first check that night because I was told
13   right away to clean up because I was -- I was
14   covered in blood.
15        Q.  And when you saw Shayne at that point,
16   what did you observe?
17             MR. WHITESELL:  At what point?
18             MS. VALENTI:  When he did --
19   when he first did his cell check.
20        A.  Shayne was sitting in a position that
21   appeared uncomfortable.  And I kind of just
22   was like, you know, that -- that looks off.
23   Like, you know, you get the sixth sense bulb
24   that says something might not be right.  It

43 (Pages 166 - 169)

Page 170

1    looked off, and I remember calling out to him,
2    getting no response.
3          And I just said, all right, well, let
4    me go check the rest of these guys, make sure
5    everything else is good, and we're going to
6    come back and address this.  I confirmed
7    everybody else was good.  Scanned the buzzer.
8    I went back, and I again tried to address what
9    was going on with Shayne.
10         I think I kicked the door several
11   times.  I was -- I was getting no verbal
12   response from him.
13   BY MS. VALENTI:
14        Q.   Why did you decide to check everyone
15   else before attending to Shayne?
16        A.   Because I've got to make sure no one
17   else is in the same -- that -- I have to
18   ensure that everybody is good, and that
19   buzzer, when it's going off, is the most
20   annoying sound in the world.  So if that's
21   going off for 35 minutes 40 minutes, so I'm
22   going to go and I'm going to ensure that
23   everybody else is good, and then I'm going to
24   come back and address what I have in front of

Page 171

1    me.
2         Q.   When you came back, you said you were
3    kicking the door.  What happened at that
4    point?
5         A.   I didn't get any response from Shayne.
6    So at that point, I yelled to Izzy, I think it
7    was Izzy, Officer Almeida, to get the cell
8    key.  And then we opened the cell and we went
9    to work.
10        Q.   So you didn't have the cell key with
11   you when did you the cell check?
12        A.   No.
13        Q.   Is that a requirement?
14        A.   No.
15        Q.   So the person doing the cell check can
16   have a cell key with them?
17        A.   Their prerogative.
18        Q.   There's no requirement one way or the
19   other?
20        A.   No.
21        Q.   And so when Officer Almeida came with
22   the key, did you enter the cell?
23        A.   Yes.
24        Q.   And what did you do at that point?

Page 172

1         A.   I put my hand on Shayne's shoulder.  I
2    lifted him up, and we began performing
3    lifesaving measures at that point.
4         Q.   What were those lifesaving measures?
5         A.   We immediately administered Narcan.
6    While I was doing CPR, I don't remember who it
7    was, but they alerted that there was a plastic
8    bag that had been ripped open and was on the
9    floor in the cell and not to touch anything,
10   to try to minimize the scene as much as
11   possible.
12         I did several -- I did several rounds
13   of compressions on Shayne before EMS arrived
14   and were able to do their work on him.
15        Q.   And you said you administered Narcan,
16   right?
17        A.   Yes.
18        Q.   More than one dose?
19        A.   Yes.
20        Q.   And you mentioned earlier today that
21   there's different types of Narcan.  Do you
22   remember which type you were using at that
23   time?
24        A.   Whatever was provided by the

Page 173

1    department.
2         Q.   Once EMS arrived, did you have any
3    other physical interaction with Shayne?
4         A.   No.  They -- they arrived.  We
5    immediately removed him from the cell, put him
6    on a stretcher in the booking area.  They did
7    their work in there because part of the
8    training is you have to have space to do work.
9    They did a lot of work on him.
10         And then because the wagon bay is
11   closed off, it's a crime scene, there's crime
12   scene tape all over the place, they had to
13   escort him out through the guard room, where
14   we write our reports, to go out to the rear
15   parking lot.  So now, in essence, we have two
16   full crime scenes in the Area D, in the D-4
17   booking area.
18        Q.   While EMS was working, were you
19   nearby?  Were you able to observe what they
20   were doing?
21        A.   I was there the whole time until he
22   went out.
23        Q.   So you mentioned the position that
24   Shayne was in.  Did you have any understanding

44 (Pages 170 - 173)

Page 174

1    of how long he had been in that position?
2        A.  No.
3        Q.  Have you since learned how long he was
4    in that position?
5        A.  He had been in there for quite a bit,
6    is what I've been told.  I don't remember
7    exactly how long, but, you know, he had been
8    in that position for -- for some time.
9        Q.  Do you have any understanding as to
10   why -- well, strike that.
11           You took certain actions upon seeing
12   Shayne in that position.  Do you have any
13   understanding as to whether anyone prior to
14   you had attempted to take similar actions?
15           MR. WHITESELL:  Objection.
16       A.  I can only speak on behalf of myself.
17   BY MS. VALENTI:
18       Q.  Do you have any understanding as to
19   why no one attempted to help Shayne before
20   you?
21           MR. WHITESELL:  Objection.
22       A.  I can only speak on behalf of myself.
23   BY MS. VALENTI:
24       Q.  Have you ever talked to any of your

Page 175

1    fellow officers about the incident in this
2    regard?
3        A.  Can you clarify, like, when?
4        Q.  Yes.  Have you ever asked any of your
5    fellow officers why they did or did not take
6    certain actions that night?
7        A.  No, not -- not -- not a question like
8    that.
9        Q.  Have you ever asked them anything
10   about what happened to Shayne?
11       A.  We don't -- we never -- we never ask
12   each other questions about what we did or what
13   we didn't do.  It was one of those, oh, crap
14   moments that just -- we were all kind of
15   shocked.  That's something, you know...
16       Q.  And when you say that, are you talking
17   about sort of that night when you were all
18   still at the station or since then?
19       A.  I haven't talked about this until, you
20   know, obviously I was advised of the
21   deposition.  You know, I'm not trying to
22   downgrade a situation, but there's a lot of
23   traumatic incidents that happen in the line of
24   duty.  And sometimes you don't remember what

Page 176

1    happens until something like this gets brought
2    up, so...
3        Q.  Have you -- well, let me first ask,
4    when you saw Shayne in the position that he
5    was in, why did you respond in the way you
6    did?
7            MR. WHITESELL:  Objection.
8        A.  It just looked like an uncomfortable
9    position.  It just -- it just looked
10   uncomfortable.  You know, if I was putting
11   myself into that position, I would probably
12   not feel physically okay.  I certainly don't
13   have that flexibility.
14           So I just -- I just called out.  You
15   know, I -- I requested a verbal response from
16   Shayne and I didn't get it.
17   BY MS. VALENTI:
18       Q.  Has there ever been a -- another
19   situation in which you found a prisoner who
20   had died in their cell?
21       A.  Me personally, no.
22       Q.  This is the only time you've had an
23   experience like this?
24       A.  Oh, no.  Nashua Street, when I was a

Page 177

1    CO, several occasions.
2        Q.  But in your time as a BPD officer?
3        A.  In my time as BPD, yeah, if I -- if
4    I'm digging into the memory bank, this is the
5    most -- this is -- this is the -- this is the
6    most significant.  Like, I don't recall
7    anybody else dying in the cell.
8            Performing, you know, lifesaving
9    measures in the cell, a couple of times after
10   the incident, but no, this is the only...
11       Q.  So this was a significant issue, in
12   your view, or a significant event?
13       A.  Yes.
14       Q.  Do you think that it was wrong for
15   other officers not to have helped Shayne
16   sooner before you intervened?
17           MR. WHITESELL:  Objection.
18       A.  I think that's opinion related, and I
19   can't speak on behalf of other officers.
20   BY MS. VALENTI:
21       Q.  Do you have a personal opinion on it,
22   though?
23           MR. WHITESELL:  Objection.
24       A.  I think there's things that could be

45 (Pages 174 - 177)