# EXHIBIT 19

Page 1

```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS

   - - - - - - - - - - - - - - - - -x
                                     :
   LYNNEL COX, as administrator       :
   of the Estate of Shayne R.         :
   Stilphen,                          :
                Plaintiff,            :   Civil Action No.
                                      :   1:22-CV-11009
         vs.                          :
                                      :
   BOSTON POLICE DEPARTMENT,          :
   ISMAEL ALMEIDA, PAULMICHAEL        :
   BERTOCCHI, CATIA FREIRE,           :
   DAVID MARSHALL, and BRIAN          :
   PICARELLO,                         :
                Defendants.           :
   - - - - - - - - - - - - - - - - -x
```

         VIDEO-RECORDED DEPOSITION OF BRIAN J. PICARELLO, a witness called by the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure, before Alexander K. Loos, Registered Diplomate Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Goodwin Procter, LLP, 100 Northern Avenue, Boston, Massachusetts, on Tuesday, October 24, 2023, commencing at 9:36 a.m.

PRESENT:
     Goodwin Procter, LLP
         (By E. Wrenne Bartlett, Esq.; and Nicholas Franco, Esq.)
         E-mail:  Wbartlett@goodwinlaw.com
                  Nfranco@goodwinlaw.com
         620 Eighth Avenue
         New York, NY 10018
         917.229.7803
         for the Plaintiff.

(Continued on the following page)

Page 18

1  A. I took -- I used to take overtime there
2  when I was assigned to District D-14.
3  Q. So since you've started at B-2, you don't
4  take overtime shifts at District 4?
5  A. Correct.
6  Q. And why is that?
7  A. Just -- so how the districts are broken up,
8  I work in Area B. That's Area D.
9  Q. Okay.
10  A. So you tend to take overtime where you're
11  assigned, that area. Because if you don't take
12  overtime in Area B, and you take it in Area D
13  because you would rather work there, even though
14  you're assigned to Area B, someone might not get to
15  go home that night and get ordered to work in Area B
16  while you're working in Area D, just because you
17  like it better.
18      That's just a hypothetical. Just, I don't
19  know, that's just, like, an example I could give.
20  Q. Okay. So there's just not --
21  A. I just kind -- everyone just kind of stays
22  in their area.
23      Some people -- you can work anywhere you
24  want. There's no rule against it. But that's just

Page 19

1  why I don't personally do it.
2  Q. That makes sense.
3      And so when you were at D-14, how often
4  would you work overtime at D-4?
5  A. I don't recall how often I did it.
6  Q. Would it be more than ten times?
7  A. I -- I -- I wouldn't -- it was a while ago.
8  I couldn't put a number on it.
9  Q. So any -- any time that you did a shift at
10  D-4 would have been between June 2019 and
11  December 2019, correct?
12  A. Correct.
13  Q. And did your responsibilities at D-14
14  differ at all from your responsibilities when you
15  took an overtime shift at D-4?
16  A. Well, yeah -- well, it would depend on --
17  you're going to have to ask the question again,
18  because just the way how my brain works, when you're
19  talking about "work," like, it differs from how you
20  explain it.
21  Q. That's fair. Let me break it down.
22      So what were your responsibilities while
23  you were at D-14?
24  A. Well, when I was on FTO, field training

Page 20

1  officer, I was assigned a training officer, and I
2  was on the day shift. And then once I was -- I had
3  completed that, after my FTO was finished and I no
4  longer needed an officer with me, they -- they moved
5  me back to the midnight shift in Area D-14.
6  Q. And forgive me. FTO, what does that stand
7  for?
8  A. Field training officer.
9  Q. And then you had an overnight shift; is
10  that correct?
11  A. I -- so once I was off -- once I was able
12  to not have a field training officer, once my
13  first -- very first shifts out of the academy were
14  finished, they took me off of the day tour in D-14
15  where I was assigned and moved me to the midnight
16  shift in D-14.
17  Q. And when you did an overtime shift for D-4,
18  would that typically be the overtime -- the midnight
19  shift?
20  A. Well, it depended on what -- if --
21  during -- this incident, it was the midnight shift
22  because I was still on FTO.
23  Q. Okay.
24  A. But after FTO, my normal shift was

Page 21

1  midnight, so I wouldn't be working overtime
2  midnights --
3  Q. I see.
4  A. -- in another district.
5      So it would be either I got ordered to work
6  the day shift, be held over in the morning, or I
7  took a 4:00 to midnight -- 4:00 to 11:45 shift,
8  which is also known as the first half, voluntarily
9  or got ordered over there for that shift.
10  Q. Okay. Understood.
11      Okay. Officer Picarello, are you familiar
12  with the opioid epidemic in this country?
13  A. I am.
14  Q. Okay. And what's your understanding of the
15  epidemic?
16  A. That -- what is my understanding?
17      Could you phrase that differently?
18  Q. Sure.
19      Why -- why do you think there's an opioid
20  epidemic in this country?
21  A. Because big pharma overprescribes pain
22  medicine to a bunch of -- a bunch of people who
23  didn't know the effects of OxyContin, which led to
24  stronger opiates.

Page 22

1  Q. And do you think that has increased the
2  amount of people taking opioids?
3  A. Yes.
4  Q. And what are the results of more people
5  taking opioids?
6      Do you -- I'll leave it at that.
7  A. What are the results of?
8      I'm sorry. You're going to have to...
9  Q. Sure.
10     How does that impact your role as a police
11 officer if more people are taking opioids?
12 A. Well, people are addicted to op -- I'm
13 sorry, opioids -- I get tongue twisted.
14 Q. Understood.
15 A. If more people are taking drugs, they tend
16 to commit more acts of crime.
17 Q. And have you seen there be an increase of
18 crime of people who use opioids while you've been a
19 police officer?
20 A. I would say I was not a police officer
21 before the epidemic began, so I wouldn't know, be
22 able to tell you the difference.
23 Q. When would you say "the epidemic began" --
24 A. Like when I was a kid I would say, right.

Page 23

1  Q. So would that be early 2000s?
2  A. Early 2000s, yep.
3  Q. Okay. What about homelessness? Do you
4  think that has any impact on the use of -- people
5  using opioids impacts homelessness?
6  A. Do I think homelessness has an impact on --
7  Q. Vice versa.
8      Do you think people are more likely to be
9  homeless if they are using or addicted to opioids?
10 A. Yes.
11 Q. And have you seen an increase in
12 homelessness of people who are addicted to opioids?
13 A. I would say addicted to any number of
14 things could create homelessness.
15 Q. Have you had any personal experience with
16 the opioid epidemic outside of your work as a police
17 officer?
18 A. Yes.
19 Q. And could you, at a high level, explain
20 that experience?
21 A. At a high level?
22 Q. I don't need to know any, you know, details
23 of names or anything, but just what that experience
24 has been.

Page 24

1  A. Well, I've had multiple family members,
2  friends are who have been addicted to opioids.
3  Q. I'm sorry to hear that.
4      And have you ever administered Narcan to a
5  person experiencing an overdose?
6  A. At -- now? Or prior?
7  Q. Outside of your role as a police officer.
8  A. Outside?
9      No.
10 Q. Okay. But you have administered Narcan in
11 your role as a police officer?
12 A. Yes.
13 Q. How many times, if you could estimate?
14 A. I don't recall.
15 Q. More than ten?
16 A. I would say less than that.
17 Q. Okay. Have you ever received training on
18 the treatment of someone experiencing an opioid
19 overdose outside of your role as a police officer?
20 A. No.
21 Q. So Officer Picarello, can you tell me about
22 the training you are required to receive before you
23 became a BPD officer.
24 A. The training, like the academy?

Page 25

1  Q. Uh-huh.
2  A. Well, we go to a six-month academy. It has
3  various different parts of it, from physical
4  training, to firearms training, to constitutional
5  law, criminal law, scenario-based training, things
6  of that nature.
7  Q. And all officers receive the same training
8  at the academy?
9  A. Correct.
10 Q. There's no option to pick and choose what
11 you receive training on?
12 A. No.
13 Q. And during your training at the academy,
14 what were you required to do to complete your
15 training?
16     How many hours? Let's start with that.
17 A. I couldn't tell you.
18 Q. But there was a standardized number that
19 all officers had to receive in training before they
20 could successfully complete the academy?
21 A. I -- I believe so.
22 Q. Do you recall if you learned about BPD
23 rules and procedures at the academy?
24 A. I believe so.

7 (Pages 22 - 25)

Page 78

1  you get to kind of pick and choose -- not pick and
2  choose what you get to do, but more so your
3  assignments.  When I got more senior, I would never
4  book until this happened to my hand.
5      But now that I'm unfortunately stuck inside
6  booking because of my hand, I do say, yeah, I do --
7  because of this incident, and everything that
8  happened, I do -- I think I would say that I'm
9  almost too cautions, I would say.  Sometimes I wake
10 guys up and piss them off, and I feel bad.
11     But, like, at the end of the day, it's
12 either that or, you know, I'm going to end up here
13 again and someone -- not even only me.  Somebody,
14 like, could -- you know, they could be dead, and I
15 had no idea because it's 5:00 in the morning and I
16 thought he was sleeping.
17     Q.  Okay.  Understood.
18         And did anyone tell you to be more cautious
19 with your cell checks?
20     A.  No.  I took that upon myself.
21     Q.  You mentioned maybe learning about sternum
22 rub while you were in the military.
23         Do you think being in the military affects
24 any other parts of your monitoring of prisoners?

Page 79

1      A.  No, I don't think so.
2          I anticipate the buzzer going off
3  sometimes, I guess.
4          I don't know.
5      Q.  But nothing specific regarding medical care
6  or first responder or anything like that?
7      A.  No.
8          Most of the medical stuff I learned in the
9  military was, like, tourniquets and things of that
10 nature.
11     Q.  Officer Picarello, I know we talked about
12 the opioid epidemic before.
13         Would you say the districts that you've
14 worked in -- B-2, D-14 -- have been hit by the
15 increase in opioid use?
16     A.  Well, I would say everybody, everyone in
17 America has been hit by it.
18         I would say out of the three districts you
19 just named, D-4 and B-2 share Mass. and Cass.
20         D-14 is more of, like, a college town, like
21 Boston College, Boston University.  That's where
22 District 14 is.
23     Q.  Okay.
24     A.  So, I mean, I'm sure there's people with

Page 80

1  drug addiction over there, but it's not to the
2  extent of Mass. and Cass, I would say.
3      Q.  Yeah.
4          So what is the Mass. and Cass area?  Why --
5  why do you reference that when talking about
6  increase in opioid use?
7      A.  Because that's a known area of the city
8  where people with a drug -- drug problems congregate
9  and -- and live actually.
10     Q.  And do you -- do you know why that is?
11     A.  I -- I couldn't tell you.  I -- I believe
12 it's because there's methadone clinics nearby, but
13 I've never actually thought of that question.
14     Q.  And have you ever heard that area referred
15 to as "Methadone Mile" for that reason?
16     A.  Yes.
17     Q.  And so you say this -- that's mostly in
18 District 4 and B-2; is that right?
19     A.  It's on -- it borders -- the intersection
20 of Melnea Cass and Mass. Ave. is shared by three
21 different districts.  It's C-6, excuse me, District
22 C-6, D-4 and District B-2.  We all have one area of
23 the border of the street, I guess you would call it.
24     Q.  And knowing that you've been in B-2 of

Page 81

1  those districts the most, do you think there's been
2  an increase of arresting and booking people who are
3  intoxicated with opioids in B-2?
4      A.  Well, I tend to not arrest people down
5  there while I'm working at B-2.
6      Q.  Oh, why is that?
7      A.  Because I don't want them to -- because I
8  would rather summons them and, you know, use my
9  discretion than have them in Boston police custody
10 and have another incident like this, to be honest.
11     Q.  And that's -- has anyone told you to do
12 that?  Or that's based on your own --
13     A.  No, that's me using my own discretion as a
14 Boston police officer.
15     Q.  Okay.
16     A.  Now, if a boss comes over and somebody who
17 outranks, like -- I still have bosses like everybody
18 else.  If they tell me I have to do something, I
19 have to do something.
20         But I'm going to -- if I'm making the call
21 and I have the choice of whether or not to summons
22 someone for a crime who appears to have a drug
23 addiction or arrest them and bring them into the
24 station, I'm going to summons them.  That's just my

21 (Pages 78 - 81)

Page 82

1  own personal preference.
2      Q.  And you said for someone who appears to
3  have a drug addiction.
4          How do you know -- what signs would
5  indicate that someone has a drug addiction?
6      A.  I mean, most people with a drug problem --
7  specifically like fentanyl and heroin and opioids --
8  they -- you can hear it in their voice.  You can
9  tell by -- I mean, tell by the way they walk.
10  They're moving relatively slow, I would say.
11          I mean, there's a bunch of different
12  characteristics, I would say.
13          And hon -- and, honestly, if, like, you're
14  saying -- this all stemmed from your question about
15  people down in that area, and it's, like, if
16  someone's down in that area, they tend to have a
17  drug problem.
18          So that's what I was getting at, people
19  down there.
20      Q.  Understood.
21          So you mentioned that you can hear it in
22  their voice sometimes.
23          What do you mean by that?
24      A.  Like they almost -- like someone with a --

Page 83

1  an op -- drug addiction, opioid addiction, like even
2  when they're not high, they still sometimes sound
3  high, almost like a -- I don't know how else to
4  describe it.  Like they could -- they could not have
5  had any drugs at all that day, but they still have
6  that -- that slurred tone in their voice, I guess I
7  would call it.
8      Q.  And then you -- you noted moving slow when
9  they walked?
10      A.  Well, yeah.
11      Q.  Any -- anything else that would indicate
12  someone was addicted to opioids?
13      A.  Yeah.
14          They -- like especially if they live down
15  there, like sometimes you'll see them just standing
16  at the corner of a street and it looks like they're
17  sleeping standing up.  They -- they nod off, in and
18  out.
19      Q.  What do you mean by "nod off"?
20      A.  Like they had their -- they nod in and out.
21  I don't know how else...
22      Q.  Anything else you can think of that would
23  indicate someone was intoxicated with opioids?
24      A.  I'm not saying at the time they're

Page 84

1  intoxicated.  I'm saying that's, like, a trait they
2  have even when they're not high on heroin or
3  fentanyl or any other opioid.
4      Q.  I see.
5      A.  I'm saying it's, like -- I don't know
6  what -- I don't -- I'm not a doctor, so I don't
7  know.
8      Q.  You're saying those would be the signs that
9  someone has --
10      A.  Those are characteristics of someone with
11  an opioid -- like heroin or fentanyl addiction.
12      Q.  Okay.  Understood.
13          What about an overdose specifically, if
14  someone -- what would be the signs and symptoms of
15  someone?
16      A.  Well --
17      Q.  Overdosing on opioids.
18      A.  If someone overdosed, you know, they
19  would -- they're not -- they're no longer breathing,
20  so they would turn blue or purple.
21      Q.  Any signs before that that would indicate
22  someone was overdosing on opioids?
23      A.  I mean, like I said, it's tough because the
24  same signs that someone show on -- during an

Page 85

1  overdose are the same signs that I talked about when
2  they're not even high.  Like the nodding, someone
3  nodding in and out.
4          I guess another sign which would contribute
5  to their breathing would be like it sounds like
6  they're snoring when their head's tilted back.
7      Q.  And that would be --
8      A.  They're trying to breathe, but they're
9  making snoring noises.  It's because they're --
10  they're -- there's no air getting into their lungs,
11  so they're, like, suffocating, I guess.  They're
12  overdosing.
13          But that would be -- that would be a sign
14  of somebody overdosing, rather than them just having
15  a -- an opioid addiction and just being, like, tired
16  and nodding off.
17          Because a lot of them -- a lot of -- I've
18  been -- I've been working down Mass. Ave, Mass. and
19  Cass, and I've had a civilian who was fresh out of
20  traffic just going home to wherever she lives
21  probably in the suburbs, not from the area.  She
22  came up and banged on my window and said, "There's a
23  guy dead over there."
24          And I said, "Okay.  Where?"

Page 86

1     And I went, and I sternum rubbed him, and
2  he hopped right up.  And he was perfectly fine and
3  ran away from me.
4     Q.  Uh-huh.
5     A.  But he looked like he's overdosed on drugs,
6  but he's perfectly fine.  That's -- that is the norm
7  down there.  That is not uncommon.  That is the
8  norm.
9     Q.  That's a good example.
10       So -- so I hear you saying that it's
11 difficult to tell between someone who's addicted to
12 opioids versus someone who's having a -- who is
13 actively overdosing on opioids; is that right?
14    A.  I would say -- I would say there are --
15 someone could at 2:00 in the morning, something like
16 that -- yeah, 2:00 in the morning, when they're
17 trying to sleep, yeah.  It would be -- it's
18 extremely hard to tell the difference.
19    Q.  And have you received any training or
20 otherwise on how to recognize that distinction?
21    A.  Not that -- just the training that you've
22 seen.
23    Q.  And has your personal experience influenced
24 how you recognize those signs at all, based on what

Page 87

1  you've seen in Mass. and Cass?
2     A.  Yeah.
3        Like I said, like -- like, I just gave an
4  example of how I was down there -- this was at
5  work -- and someone came up.  And she was -- she was
6  terrified because she thought somebody was dead.
7  And, at the end of the day, he was perfectly fine.
8  He didn't even -- he -- obviously, he wanted to get
9  up immediately away from me.  Like, he didn't want
10 any medical attention.
11       There's been times where I've seen people
12 get Narcaned and they were -- sorry.  They were just
13 drunk.  There's a guy down there that's not addicted
14 to heroin.  He actually just has a really bad
15 alcohol problem, and he passes out in the street.
16 But because everybody down there is part of the
17 heroin epidemic, they -- people -- officers or
18 firefighters or EMTs -- who go to the call will
19 immediately Narcan him, and he wakes up and freaks
20 out and just -- and he's just passed out drunk.  And
21 he's been down there for years.
22    Q.  Understood.
23       So there's --
24    A.  So it's hard -- it's very hard to tell the

Page 88

1  difference between, like I said, somebody -- like
2  that guy, for example, or the man that I woke up and
3  he ran away.  And that's definitely -- that's --
4  that's the norm.  Because as soon as you wake
5  somebody up, they -- they see the cops, and they --
6  whether they have a warrant, or they don't want to
7  go to the hospital -- you know, like I've got to
8  call you an ambulance -- they run away.  They don't
9  want to go to the hospital.  They want to -- they
10 want to keep, you know, whatever they're doing.
11    Q.  So I hear you saying that when an officer
12 or an EMS or firefighters come to that area, there's
13 an assumption that the person they're assisting is
14 using opioids.
15       Is that right?
16       MR. WHITESELL:  Objection.
17       THE WITNESS:  I wouldn't say there's
18 assumption, but it's more than likely that the
19 person -- it also depends on the call, because
20 people live down there.
21    BY MS. BARTLETT:
22    Q.  Sure.
23    A.  People, like I said, like the lady, the
24 lady who tapped on my window trying to be a good

Page 89

1  Samaritan, just going home from work or whatever, or
2  coming to work, or she's just commuting, there's --
3  there's people that don't have drug problems that
4  are obviously down there.
5        But I would say most of the 911 volume
6  comes from drug -- drug activity or drug-related 911
7  calls.
8     Q.  And that's why they immediately Narcan
9  somebody when they respond to those calls?
10    A.  Yeah.  If you see someone in the middle of
11 Mass. and Cass on the street, like I say, it
12 wouldn't be uncommon to immediately Narcan them.
13       And then that guy, just like I said, he's
14 been down there for a while, and he's just -- he
15 just has an alcohol problem.
16    Q.  If you're unsure --
17    A.  I mean, that's what he tells me every time
18 he gets Narcaned.
19    Q.  Okay.
20    A.  Because he -- he just flips out, throws it.
21       And, I mean, I kind of believe him.  I
22 don't know.  So...
23    Q.  If you're unsure if someone is showing
24 signs of opioid addiction versus having an opioid

Page 102

1  Q. Okay.
2  A. But I did hear about the incident, about a
3  male that they thought was drunk that was actually
4  having a heart attack or something like that.
5  Q. And then what about Christhian Geigel? Do
6  you recall hearing that name?
7  A. I -- I'm aware of who that is, yep.
8  Q. And what's your understanding of the
9  incident with Christhian Geigel?
10 A. I believe he also overdosed in the cells at
11 D-4 prior to Shayne.
12 Q. And this was May 20th, 2019, so this is
13 still before you would have started as an officer,
14 correct?
15 A. Yeah.
16    So I had never heard of this until after
17 Shayne's thing.
18 Q. Okay.
19 A. So I had -- I had -- but, again, I wasn't
20 stationed at D-4, so it wouldn't have been something
21 I was at roll call to hear about.
22 Q. Right.
23    But it was never raised at the academy or
24 anything like that?

Page 103

1  A. Not that I recall, no.
2  Q. Do you know if there was any -- any changes
3  to cell check procedures after Mr. Geigel's death?
4  A. I'm not aware of -- I don't recall. I
5  don't know.
6  Q. What about any changes to training after
7  Mr. Geigel's death?
8  A. I don't know.
9  Q. And any changes to calling -- when to call
10 for medical attention for someone after Mr. Geigel's
11 death?
12 A. I don't know.
13 Q. And did you ever discuss Mr. Geigel's death
14 with any officers?
15 A. No. I didn't -- like I said, I didn't know
16 about it until...
17 Q. Do you know who would have raised it after
18 Shayne's death?
19 A. I've heard -- I've heard of it because of
20 this.
21 Q. Just because of this lawsuit?
22 A. Yeah.
23 Q. Okay. So you -- you had not heard of the
24 incident otherwise except --

Page 104

1  A. Well, I heard that -- I didn't know his
2  name. I didn't know how it happened. I just heard
3  that someone died in the cell. I didn't know any
4  logistics of it until I got -- until this.
5  Q. Okay. Understood.
6     Okay. And you've said this already about
7  B-2.
8     So there's been no in-custody overdose
9  deaths during your time at B-2; is that right?
10 A. Not that I can recall, no.
11 Q. Okay. And then what about -- I know this
12 was a short period -- but your time at D-14, any
13 overdose deaths?
14 A. Not that I can recall, no.
15 Q. Okay. Okay. So we'll talk about Shayne
16 now.
17    So prior to July 14th, 2019, the day of
18 Shayne's death, had you -- did you know anything
19 about Shayne? Had you met him?
20 A. No.
21 Q. Did -- do you know -- did you know that he
22 had opioid use disorder prior to July 14th?
23 A. Did I know?
24    I didn't know.

Page 105

1  Q. Okay. All right.
2     And so I assume no one told you or
3  otherwise mentioned that this guy has opioid use
4  disorder?
5  A. No.
6  Q. Did you know if anyone at District 4 knew
7  Shayne prior to July 14th?
8  A. No.
9  Q. How did you first find out about Shayne's
10 death?
11 A. I believe it was Officer Doolan that
12 alerted us that he was in trouble in the cell.
13 Q. And EMS was called, correct?
14 A. Yes.
15 Q. And EMS transported Shayne to the hospital,
16 right?
17 A. Yes.
18 Q. And do you know -- and Shayne -- do you
19 know when -- what happened after he was transported
20 to the hospital?
21 A. I believe he died at the hospital.
22 Q. And do you know who told you that?
23 A. I -- I think it was just told to everyone
24 at the station.

27 (Pages 102 - 105)

```
                                                   Page 106
 1   Q.  Okay.
 2   A.  I don't -- I don't believe -- no one
 3  personally came up to me and said, "Hey."  Like I
 4  just think it was -- it was told.  They called in
 5  homicide and stuff.
 6   Q.  Do you think everyone was told maybe during
 7  a roll call or something similar like that?
 8   A.  No.  I -- this was -- no.  I knew about
 9  this before I went home from work.
10   Q.  Okay.
11   A.  So...
12   Q.  Because -- I assume because you weren't --
13   A.  Yeah.  No.  Like -- so before -- like,
14  before I left the station, I had known that he had
15  passed away.
16   Q.  Okay.  And I imagine, because you were not
17  stationed at D-4 at the time, you didn't hear any
18  other updates regarding Shayne after July 14th; is
19  that right?
20   A.  Yeah.  I didn't know -- I saw -- I saw his
21  mother on the news.  That was about it.  I didn't
22  know about any other updates since then.
23   Q.  And so you were working the midnight shift
24  at D-4 that night, correct?
```

```
                                                   Page 107
 1   A.  The night of this, yes.
 2   Q.  Okay.  So that would have started at
 3  11:45 p.m. on July 13th?
 4   A.  Correct.
 5   Q.  Okay.  And were you involved at all in
 6  Shayne's arrest?
 7   A.  I would say no.  But, I mean, it depends on
 8  what you consider "involved."
 9   Q.  Were you at the scene of his arrest?
10   A.  I was there, yes.
11       Like on the streets?
12   Q.  Yes.
13   A.  No.
14       Like I said, I was assigned to booking FTO.
15   Q.  Okay.  Do you know who was involved with
16  his arrest?  Who at D-4?
17   A.  Who arrested him?
18   Q.  Uh-huh.
19   A.  Is that what you're asking?
20       Officer Bertocchi and Freire.
21   Q.  And did you speak to Officer Bertocchi or
22  Freire after they arrested him, but prior to him
23  being placed in Cell 19?
24   A.  I don't think we spoke of the arrest.
```

```
                                                   Page 108
 1  I probably -- I don't know -- I couldn't
 2  tell you what was said in passing.
 3   Q.  So they didn't say anything about Shayne in
 4  your conversations?
 5   A.  I don't -- not that I can recall.
 6   Q.  And so you said you were FTO booking
 7  officer; is that right?
 8   A.  Yes.
 9   Q.  So did you book Shayne?
10   A.  I -- I didn't book him, but I probably was
11  watching how the booking process was done.
12       I remember -- I remember seeing him, but I
13  don't remember anything other than -- I remember
14  standing with him at one point during the booking
15  process.  I remember seeing him, and I remember he
16  got arrested for breaking into a car.  And then I
17  don't recall much after that.
18       But I didn't -- I didn't, like, do his
19  fingerprints.  I didn't take his mug shots.  I
20  didn't fill out -- the booking sheet that you showed
21  us earlier, I didn't fill that out.
22   Q.  Did you -- but you did -- you were probably
23  watching while he was being booked?
24   A.  I was probably trying to learn how to do
```

```
                                                   Page 109
 1  it, because, like I said, this was the very first
 2  time I ever did booking, or assigned that job.
 3   Q.  Did you recall anything about Shayne's
 4  demeanor while he was being booked?
 5   A.  No.
 6   Q.  Do you remember if he was having trouble
 7  standing or anything like that?
 8   A.  Not that I recall, but I -- yeah.  Not that
 9  I recall.
10   Q.  And I assume none of the officers who were
11  involved with his booking mentioned Shayne's
12  demeanor during the booking process?
13   A.  Not that I can recall.
14   Q.  So they didn't say anything to you, like,
15  "This is" -- "He's having trouble standing, but this
16  is usual for the booking process," or anything like
17  that?
18       MR. WHITESELL:  Objection.
19       THE WITNESS:  I don't recall my training
20  officer being, like, anything was normal or un --
21  abnormal about the whole situation.
22       BY MS. BARTLETT:
23   Q.  And your training officer was Officer
24  Almeida; is that right?
```

|  |  |
|---|---|
| Page 126<br>1  behind him kind of -- now that I know what he's<br>2  doing, it's easier to say what he was doing I guess.<br>3      Q.  Sure.<br>4      A.  But I don't think I would have thought --<br>5  and those cells are dark.  I don't think I would<br>6  have noticed him moving his hand behind his back.<br>7          Now, if -- now, if, like -- B-2 also, like<br>8  I keep the lights on when -- when I'm booking so I<br>9  can see in the cell more clearly.  So if I saw<br>10 someone fidgeting like that and hiding their hand<br>11 behind their back with the lights on, I would be,<br>12 like, "What are you doing?"<br>13         But I don't recall seeing him do anything<br>14 like that, so...<br>15     Q.  Do you know that Sergeant Detective Taxter<br>16 thought that this person walking by was Officer<br>17 Marshall.<br>18         Have you heard that?<br>19     A.  I saw his name listed on the paperwork I<br>20 got.<br>21     Q.  Okay.  But you have no reason --<br>22     A.  That is me.<br>23     Q.  And you have no understanding of why<br>24 Sergeant Detective Taxter thought it was Officer | Page 128<br>1      For somebody with an opioid, heroin or a<br>2  fentanyl addiction, I would say this is normal.<br>3      Q.  So if you saw someone in that position,<br>4  would you assume that they had used opioids?<br>5          MR. WHITESELL:  Objection.<br>6          THE WITNESS:  If I saw somebody in this<br>7  position, would I assume they had used -- they use<br>8  or used?<br>9  BY MS. BARTLETT:<br>10     Q.  If you -- would this positioning indicate<br>11 to you that someone had used opioids?<br>12         MR. WHITESELL:  Objection.<br>13         THE WITNESS:  That they had -- so a user,<br>14 like they have an addiction?  Or they had just taken<br>15 opioids?<br>16 BY MS. BARTLETT:<br>17     Q.  Let's go with had an addiction.<br>18         Would this position indicate to you --<br>19     A.  This position would indicate that somebody<br>20 had an addiction to, like, fentanyl or heroin.<br>21     Q.  Okay.  And would it also indicate that the<br>22 person had used -- recently used opioids?<br>23     A.  Not recently.  I mean it could.<br>24         But, again, like I said, that person could |
| Page 127<br>1  Marshall?<br>2      A.  I -- I don't know.<br>3          MS. BARTLETT:  Okay.  So I'm going to skip<br>4  ahead.<br>5          Okay.  So I've skipped ahead to 5:20 a.m.<br>6          (Video played and stopped.)<br>7          MS. BARTLETT:  And I'm going to pause for a<br>8  moment.<br>9      Q.  So Officer Picarello, you see that Shayne<br>10 is now sitting with his torso kind of between his<br>11 legs with his arms somewhat sticking out behind him.<br>12         Do you see that?<br>13     A.  Yes.<br>14     Q.  And his head is pretty much drooped almost<br>15 below the bench.<br>16         Do you see that?<br>17     A.  Yes, I see how he's sitting.<br>18     Q.  As we discussed unusual behaviors or<br>19 appearances before, would this be considered<br>20 "unusual" to you?<br>21     A.  I would -- for a normal -- for -- for<br>22 someone without a drug addiction, for someone<br>23 without a drug addiction, I would say this is<br>24 abnormal. | Page 129<br>1  just have a drug addiction, and that's how -- that's<br>2  how people that are commonly -- people with a drug<br>3  addiction commonly sit.<br>4      Q.  Okay.  And what about -- would this<br>5  position indicate to you that someone may be<br>6  overdosing from opioids?<br>7      A.  I would say that -- I would say that's not<br>8  an abnormal position for somebody with an opioid<br>9  addiction.<br>10     Q.  Okay.  So it would not indicate to you that<br>11 someone was overdosing on opioids?<br>12     A.  I would -- I would say, for a normal<br>13 person, that that position would be -- not -- a<br>14 person without a drug addiction, that would be a<br>15 part of the -- what do the rules say, "abnormal<br>16 behavior"?<br>17         I would say for somebody without a drug<br>18 addiction, that would be abnormal behavior.<br>19 Somebody with a drug addiction, that would not be<br>20 abnormal behavior.<br>21     Q.  Okay.  So not knowing anything about the<br>22 person in custody, seeing someone in this position<br>23 would not signal to you that this person may be<br>24 overdosing on opioids? |

|  | Page 130 |
|---|---|
| 1 | MR. WHITESELL: Objection. |
| 2 | THE WITNESS: What was the question again? |
| 3 | I'm sorry. |
| 4 | BY MS. BARTLETT: |
| 5 | Q. So without knowing someone's background on |
| 6 | if they were addicted to opioids or otherwise, |
| 7 | someone in this position would not indicate to you |
| 8 | that they may be overdosing on opioids? |
| 9 | A. Without knowing someone's background? |
| 10 | Q. Correct. |
| 11 | A. Would I know if they were overdosing? |
| 12 | Q. Would this suggest to you that they may be |
| 13 | overdosing on opioids? |
| 14 | A. It could. |
| 15 | MS. BARTLETT: Okay. Okay. |
| 16 | So I'm going to let it play. If, again, |
| 17 | you'll look at the door. |
| 18 | (Video played and stopped.) |
| 19 | BY MS. BARTLETT: |
| 20 | Q. Okay. And you see an officer walk by? |
| 21 | A. Yep. |
| 22 | Q. And is that you? |
| 23 | A. Yes. |
| 24 | MS. BARTLETT: Okay. And I'll keep |

|  | Page 131 |
|---|---|
| 1 | playing. |
| 2 | (Video played and stopped.) |
| 3 | BY MS. BARTLETT: |
| 4 | Q. And you see two more people walk by; is |
| 5 | that right? |
| 6 | A. Yep. |
| 7 | Q. Who are those? |
| 8 | A. That was a prisoner -- I have no idea what |
| 9 | his name is -- and Officer Almeida. |
| 10 | Q. Okay. And what were you doing? |
| 11 | A. I believe we were escorting a prisoner back |
| 12 | to his cell, or to a cell. |
| 13 | Q. So were you conducting a cell check also at |
| 14 | that point or that was just an escort? |
| 15 | A. I think I looked into the cell, or -- but I |
| 16 | don't think we were conducting a cell check. |
| 17 | Q. Okay. And if you had looked into the cell, |
| 18 | do you think you would have raised this positioning |
| 19 | to Officer Almeida? |
| 20 | A. No. Again, because, I like I said, this |
| 21 | isn't an abnormal position for someone with a drug |
| 22 | addiction. |
| 23 | Q. And how would you know if Shayne had a drug |
| 24 | addiction? |

|  | Page 132 |
|---|---|
| 1 | A. Because I saw him when he came in at |
| 2 | booking. |
| 3 | Q. Okay. So at booking, Shayne was showing |
| 4 | signs of having a drug addiction? |
| 5 | A. No. I said I saw him at booking, that he |
| 6 | has a drug addiction, not that he was on drugs. |
| 7 | Q. Oh. So what at booking told you that |
| 8 | Shayne had -- |
| 9 | A. I told you before the characteristics. |
| 10 | Like, their slurred -- like, that slurred tone in |
| 11 | their voice, and, like, not -- people that nod in |
| 12 | and out. |
| 13 | Q. And so Shayne was exhibiting those signs at |
| 14 | booking? |
| 15 | A. I would say yeah. |
| 16 | But, like I said, that's not uncommon for |
| 17 | people with a drug over -- drug addiction. |
| 18 | Q. Just to be clear, so when you were watching |
| 19 | Shayne's booking, he was showing signs of being |
| 20 | addicted to opioids? |
| 21 | A. Yes. |
| 22 | Q. And those signs were? If you could repeat. |
| 23 | A. Like I said, he sounds how people that -- |
| 24 | at Mass. and Cass sound like. They have that |

|  | Page 133 |
|---|---|
| 1 | slurred tone in their voice. And that he would nod |
| 2 | in and out. And then once you got his attention, he |
| 3 | would snap right out of it. |
| 4 | Q. Okay. Okay. |
| 5 | So at booking you believed you established |
| 6 | the belief that Shayne was addicted to opioids; is |
| 7 | that right? |
| 8 | A. Well, also his criminal history. He had |
| 9 | prior drug addiction charges, I believe. |
| 10 | Q. What criminal charge would it be for to |
| 11 | indicate to you -- |
| 12 | A. I don't recall. But when you book someone, |
| 13 | you print out their entire criminal history. |
| 14 | Q. Uh-huh. |
| 15 | A. So -- |
| 16 | Q. Okay. I'm just trying to think what |
| 17 | criminal charge would indicate to you that someone |
| 18 | had an opioid addiction. |
| 19 | A. Possession of class A would indicate that. |
| 20 | Q. Okay. So you saw Shayne's criminal |
| 21 | history, in connection with his demeanor during the |
| 22 | booking process, indicated to you that he was |
| 23 | addicted to opioids? |
| 24 | A. Yeah. |

34 (Pages 130 - 133)

Page 134

1  Q.  Okay.  And did Officer Almeida say anything
2  to you about this demeanor?
3  A.  I don't recall our discussions, like I
4  said.
5  Q.  Do you recall, as someone being addicted to
6  opioids, any concern with proceeding with the
7  booking?
8  A.  No.  Because, like I said, like, if someone
9  has a drug addiction, that's not a reason to --
10 again, I was brand new.  But even now, someone with
11 a drug addiction isn't -- that's not a reason to,
12 like, just send them to the hospital.  A drug
13 addiction doesn't get -- send you to -- get you
14 medical attention, per se.
15 Q.  Okay.  So Shayne's signs at booking, you
16 did not think either at the time or now, based on
17 your experience, required medical attention?
18 A.  At booking, no.
19 Q.  Okay.  Do you think his positioning in the
20 cell now required medical attention?
21 A.  Well, now I know why we're here.
22 Q.  Sure.
23     Without that knowledge, would you -- just
24 seeing his positioning, would you think that he

Page 135

1  would have needed medical attention?
2  A.  At 5:00 in the morning?  Maybe.  No,
3  probably -- maybe.  I don't know.
4     It's -- like I said, it's tough to tell at
5  5:00 in the morning with someone with a drug history
6  if they're sleeping or they need help.
7  Q.  Now, with the experience that you had with
8  Shayne at B-2, if you saw someone in this position
9  at 5:00 in the morning, would you attempt to rouse
10 them, tap on the door as you explained before?
11 A.  Yeah.  Yeah.
12     MS. BARTLETT:  Okay.  Okay.
13     Okay.  So I'll skip ahead.
14     So I've skipped ahead to 5:38 a.m., and I'm
15 letting the video play.
16     (Video played.)
17     BY MS. BARTLETT:
18 Q.  And you see there's an officer here, seems
19 to be putting down a bag and dropping off food?
20 A.  Yeah.
21 Q.  Do you know who that is?
22 A.  That's me.
23 Q.  And you were dropping off breakfast for the
24 detainees; is that right?

Page 136

1  A.  Yes.
2     MS. BARTLETT:  Did this -- I'll pause the
3  video here.
4     (Video stopped.)
5     BY MS. BARTLETT:
6  Q.  Do you know if this also constituted a cell
7  check?
8  A.  I would say yes.
9  Q.  Okay.
10 A.  I'm not sure if I -- if the buzzer needed
11 to be hit or what time, but I would say that this
12 constitutes a cell check.
13 Q.  And as you're placing the food in the slot
14 in his door, I assume you're looking into the cell
15 to see?
16 A.  I looked into the other one, placed the
17 food in.  And then I looked into his and placed the
18 food.
19 Q.  Okay.  So you are conducting the looking
20 into the cell as you understand is required?
21 A.  Right.
22 Q.  Okay.  And again, at this point, without
23 the understanding that you have now, and based on
24 your experience at that time of July 2019, you did

Page 137

1  not think Shayne needed medical attention, correct?
2     MR. WHITESELL:  Objection.
3     You can answer.
4     THE WITNESS:  No, I didn't.
5     BY MS. BARTLETT:
6  Q.  And again, I know I already asked this, but
7  just to confirm, Sergeant Detective Taxter also
8  thought this was Officer Marshall.
9     Do you have any reason --
10 A.  I have no idea why he would think that.
11     MS. BARTLETT:  Okay.  Now I'll put the
12 video down.
13 Q.  Did you have any involvement with Shayne
14 after this point?
15 A.  After I handed the food?
16 Q.  Uh-huh.
17 A.  Not -- no.  I think I would -- he was
18 shortly found afterwards.
19     And I, being so new, just kind of stayed --
20 tried to stay out of the way and let people with
21 more experience, you know, try to help.
22     MS. BARTLETT:  Understood.
23     So I'm going to mark as exhibit, I think
24 we're at 205.  Is that right?