# EXHIBIT 21

Page 1

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3

4                                 Civil Action No.

                                  1:22-CV-11009

5

6      **********************************

       LYNNEL COX, as Administrator of

7      the Estate of Shayne R.

       Stilphen,

8

                     Plaintiff,

9            v.

10     BOSTON POLICE DEPARTMENT,

       ISMAEL ALMEIDA, PAUL MICHAEL

11     BERTOCCHI, CATIA FREIRE, DAVID

       MARSHALL, AND JOHN/JANE DOE

12     NO. 1,

13               Defendants.

       **********************************

14

15

16          Videotaped Deposition of LUCAS E.

17   TAXTER, held at Goodwin Procter, 100 Northern

18   Avenue, Boston, Massachusetts, commencing at

19   10:10 a.m., on the 29th of August, 2023, before

20   Maureen O'Connor Pollard, Registered Diplomate

21   Reporter, Realtime Systems Administrator,

22   Certified Shorthand Reporter, Notary Public.

23                     - - -

24

Page 46

1 other organizations, like neighborhood
2 associations, business associations in the Back
3 Bay neighborhood, meetings hosted by the Boston
4 Red Sox for the Fenway residents, and more or
5 less a liaison between the community and the
6 department.
7     Q.   Okay.
8     A.   And my next assignment was internal
9 affairs.
10     Q.   And that would have been in 2017?
11     A.   2017, correct.
12     Q.   How long were you at internal
13 affairs for?
14     A.   Until 2021.  And in 2021, I was
15 reassigned to the anticorruption division, which
16 is where I currently work.
17         My rank after being transferred to
18 IA changed to sergeant detective after six
19 months of working there.  I was never a
20 detective before, so I got promoted to sergeant
21 before I made -- went from patrolman to
22 sergeant.  I was never a detective in between.
23 So I got my detective rating after I got
24 promoted.

Page 47

1         Sorry if that's a little confusing.
2     Q.   No, it's helpful.
3         One follow-up question I have to
4 make sure I'm understanding correctly.  So it's
5 possible for someone to go from patrolman to
6 detective without sitting for the sergeant's
7 exam, is that correct?
8     A.   Correct.  It's a separate exam.  If
9 you can imagine, the two big bureaus in the
10 department are Bureau of Field Services, which
11 is the uniformed officers, and Bureau of
12 Investigative Services, the detectives.
13         And each bureau has similar ranks
14 where patrol police officer and detective are
15 the same rank but the detective has a rating,
16 and then sergeant, sergeant detective,
17 lieutenant, lieutenant detective, captain,
18 captain detective.
19     Q.   Understood.  That's very helpful.
20 Thank you.
21     A.   Took me a while to figure it out.
22     Q.   So it sounds like you were a police
23 officer for several years before becoming
24 sergeant.

Page 48

1     A.   I think 11 years, yes.
2     Q.   During those 11 years, did you have
3 experience booking individuals into police
4 stations?
5     A.   Some.
6     Q.   And during those 11 years, did you
7 have experience conducting cell checks of
8 individuals who were being held in BPD custody?
9     A.   Yes.
10     Q.   In 2001 when you took the sergeant
11 exam, what -- what's involved in the sergeant's
12 exam?
13     A.   First you're provided with a
14 reading list, a list of books that are the
15 source of information where the questions will
16 come from.  The exam is administered by the
17 State, Civil Service Commission, and it's
18 offered -- well, it's offered every two years.
19 Boston doesn't always sign up every two years,
20 sometimes it's longer.
21         But at any rate, the books are --
22 cover topics of management, managing people,
23 personnel, law, criminal law, constitutional
24 law, juvenile law, motor vehicle law.  It's been

Page 49

1 a while since I studied, but that's basically
2 it, a generalization of what you're tested on.
3     Q.   Okay.
4     A.   Oh, and rules and regs.
5     Q.   I was going to ask.
6     A.   Yes.  That's a big one.
7     Q.   Do you recall what you were tested
8 on with respect to rules and regulations for
9 your sergeant exam?
10     A.   No, ma'am.
11     Q.   Did you receive any study materials
12 from the BPD in preparation for the sergeant
13 exam?
14     A.   Yes.  So we were provided with a
15 list of books which we had to purchase on our
16 own; however, the department provided us with
17 specific rules that might be on the test, and we
18 were able to access the rules on the department
19 intranet.  And I think they're available to the
20 public now on the internet.  So we could either
21 read it from your computer or print them out to
22 study.
23     Q.   Do you recall what specific rules
24 the BPD highlighted in preparation for your

13 (Pages 46 - 49)

Page 158

1  "Attachments 14 and 15"?
2      A.   Yes.
3      Q.   And then on the first page of the
4  document I just handed you, Exhibit 87, it says
5  "Attachment 14"?
6      A.   Correct.
7      Q.   Fair to understand, then, that
8  this -- that Exhibit 87 was one of the
9  attachments to your SA report?
10     A.   Yes.
11     Q.   Okay.  So if you look on that first
12  page of 000065, it looks like several of the
13  rules that are being discussed stem from
14  Rule 318, is that right?
15     A.   Yes, different sections.
16     Q.   And Exhibit 87 that we're looking
17  at is Rule 318, is that right?
18     A.   Yes.
19     Q.   To the best of your knowledge, was
20  this the rule that was in place at the time that
21  Shayne was held in custody?
22     A.   Yes.
23     Q.   If you turn to the second page of
24  Exhibit 87, so 005647, do you see towards the

Page 159

1  top of the page where it says "Section 3,
2  Sickness or Injury"?
3      A.   Yes.
4      Q.   Is this the same rule that is
5  referenced in the top half of page 000065, when
6  you say, "Rule 318, Section 3, Prisoner Sickness
7  or Injury"?
8      A.   Correct.
9      Q.   And do you see where portions of
10  Section 3 have been highlighted?
11     A.   Yes.
12     Q.   Do you know who highlighted it?
13     A.   I think I did.
14     Q.   Do you know why you highlighted it?
15     A.   Because it was pertinent or related
16  to this investigation, specific directives that
17  officers are to adhere to.
18     Q.   At the end of Section 3, do you see
19  where it says, "Any unusual appearance or
20  behavior displayed by a prisoner shall receive
21  immediate attention"?
22     A.   Yes.
23     Q.   What did you understand that
24  requirement to mean?

Page 160

1      A.   Just what it says.  If an officer
2  observes any behavior or appearance from a
3  prisoner, it needs to be looked into
4  immediately.
5      Q.   For the purposes of this rule, was
6  it your understanding that "unusual" was on an
7  objective or subjective basis?
8          MR. MAAS:  Objection.
9          But you can answer.
10         THE WITNESS:  That is subjective.
11  BY MS. ROSSMAN:
12     Q.   So was it your understanding that
13  based on this rule, "unusual" should be
14  determined from the subjective perspective of
15  the officer who was with the prisoner?
16     A.   Yes.  That would be one case, yeah.
17  It may also have to do with where in the city
18  the arrest was made or what the arrest was made
19  for.
20         But, yes, subjective on the part of
21  the officer in this case.
22     Q.   And did you receive any training
23  from BPD about what the meaning of this rule
24  was?

Page 161

1      A.   I don't recall that, no.  Not that
2  sentence anyway.
3      Q.   Do you know what the basis of your
4  understanding that any unusual appearance for
5  the purposes of this rule should be determined
6  on a subjective basis?
7      A.   Do I know what the basis would be?
8      Q.   Yeah, what was the basis of your
9  understanding that this had a subjective
10  meaning?
11     A.   I mean, unusual is an adjective
12  that could mean two different things to two
13  different people.  Like I said, depending on
14  where in the city we're talking.
15         For example, District 4 versus
16  District 5 in West Roxbury, something that would
17  seem unusual to an officer looking in a
18  cellblock in West Roxbury might be usual in the
19  South End.
20     Q.   And why would that be, in your
21  opinion?
22     A.   Well, where there's the
23  centralization of public services in the South
24  End for the benefit of drug addicts or people

41 (Pages 158 - 161)

Page 162
1 addicted to narcotics, for example, a lot of the
2 people that go through that cellblock and
3 booking procedure are addicts, and it's not
4 unusual to see certain behaviors that they may
5 not see in other parts of the city.  I'm not
6 judging.  I'm just saying having worked there, I
7 can say that that's true.
8     Q.   If you look at the -- we go back,
9 I'm sorry, to your SA report, so look again at
10 page 000065.
11     A.   Okay.
12     Q.   And do you see how in this
13 paragraph you describe that Shayne was unable to
14 stand up straight at times during the booking
15 procedure?
16     A.   Are we still in Section 3?
17     Q.   Yes.  It's the second paragraph in
18 Section 3.
19     A.   Yes, I see that.
20     Q.   Did you personally observe on the
21 video that Shayne was unable to stand up
22 straight at times during the booking procedure?
23     A.   That's what I thought I saw, yes.
24     Q.   Okay.  And then the next sentence

Page 163
1 in that paragraph talks about Bertocchi having
2 to physically assist Shayne to keep his balance?
3     A.   Yes.
4     Q.   And stand up straight?
5     A.   Yes.
6     Q.   And again, was that based on your
7 review of the video?
8     A.   Yes.  I believe Bertocchi had to
9 put his hand on Stilphen's back to hold him
10 steady at one point, at least one point.
11     Q.   And in the next sentence do you see
12 how you talk about Shayne nodding off at least
13 three times?
14     A.   Yes.
15     Q.   And was that, again, based on your
16 review of the video?
17     A.   Yes, that's what it appeared to be
18 to me.
19     Q.   Were those observations that you
20 had of the video significant in terms of your
21 analysis of whether there was a potential rule
22 violation of Section 3?
23     A.   Well, there was the potential for a
24 rule violation partially based on that, yes.

Page 164
1     Q.   And why was that?
2     A.   Because nodding off might be an
3 indicator that someone is under the influence of
4 a drug and could have possibly overdosed,
5 according to our training.
6     Q.   If you look at the next paragraph,
7 the one that begins, "All video evidence would
8 have been visible," do you see that?
9     A.   Yes, ma'am.
10     Q.   Where you say -- the second
11 sentence says, "It was apparent that Stilphen
12 was likely under the influence of drugs when he
13 arrived at District 4 at the time of his booking
14 and after being placed in cell 19."
15         Do you see that?
16     A.   Yes.
17     Q.   What was the basis for your
18 statement that it was apparent that Stilphen was
19 likely under the influence of drugs during those
20 times?
21     A.   That was my opinion after observing
22 him appear to nod off in the holding cell and
23 his inability to stand still in an upright
24 position for the entire booking process.

Page 165
1     Q.   And then the final sentence of that
2 paragraph, you had stated, "For these reasons,
3 medical attention should have been provided to
4 Stilphen before he was placed in cell 19 or, at
5 the very latest, immediately after he ingested
6 the drugs and remained in that unusual and
7 seemingly uncomfortable position."
8         Is that right?
9     A.   That's what I wrote.
10     Q.   And what was the basis for that
11 statement?
12     A.   It's easy to Monday morning
13 quarterback, but that's what I thought should
14 have happened based on what I observed in the
15 video.
16     Q.   Can I have you go back to Rule 318?
17 So this is that Exhibit 87 you were just looking
18 at.
19     A.   Okay.
20     Q.   And if you could flip, please, to
21 page 005653.
22         MR. MAAS:  Which page?  Sorry.
23         MS. ROSSMAN:  005653.
24         THE WITNESS:  Rule 318.  Prisoner

42 (Pages 162 - 165)

Page 170

1  been -- that this rule had been adhered to?
2      A.   Because the officers visited the
3  cells every 15 minutes, and disabled the alarm.
4      Q.   The next sentence after that starts
5  with "However" and says, "However, a review of
6  the video evidence showed that although Almeida
7  and Marshall conducted rounds of the cellblock
8  and disabled the prisoner inspection alarm, they
9  did not take any measures to check on Stilphen
10  and ensure that he was not in any distress, even
11  though he was seated in a very unusual position
12  for 1 hour and 4 minutes."
13        Did I read that correctly?
14      A.   Yes.
15      Q.   What were you trying to say with
16  this sentence that I just read?
17      A.   Basically what I wrote.  The
18  officers checked on Stilphen every 15 minutes.
19  I thought that based on the way he was seated,
20  they may -- they should have probably tried to
21  arouse him, because to me, I thought it was
22  unusual, an unusual way to sit.
23      Q.   Given that that's what you thought,
24  did you, at the time that you wrote this report,

Page 171

1  think that the rule may have not been adhered
2  to?
3      A.    I guess I thought it was possible.
4  I thought maybe the rule was a little ambiguous,
5  you know, where it -- okay, you visit the cell,
6  you shut off the alarm, and then that's kind of
7  it, you know, a little open-ended.
8      Q.   Did you have an opinion about what
9  measures the officers should have taken?
10        MR. MAAS:  Objection.
11        You can answer.
12        THE WITNESS:  At the very least
13    maybe kicked the door, see if you can get
14    him to sit up like he did the other three or
15    four times that he was in that position.
16  BY MS. ROSSMAN:
17      Q.   Anything else?
18      A.    Go into the cell, shake his
19  shoulder, ask him if he's okay, see if there's
20  any -- I mean, they didn't have any reason to
21  believe that he had taken drugs at that time,
22  not that I know of, but had they gone in, they
23  may have seen it, seen drugs.
24        I'd have to review the video again

Page 172

1  to see exactly what time he produced the drugs
2  based on these prisoner checks, but it's a
3  possibility they may have found the drugs before
4  he overdosed.
5      Q.   And you had said earlier in this
6  report that during booking Shayne was exhibiting
7  signs that made it apparent that he had taken
8  drugs?
9      A.   It was a possibility.
10        MR. MAAS:  Objection.
11        You can answer.
12        THE WITNESS:  I believe that was a
13    possibility, yes.
14  BY MS. ROSSMAN:
15      Q.   If you turn to page 000066.
16      A.   Okay.
17      Q.   Midway through the page where it
18  says "Conclusion"?
19      A.   Yes.
20      Q.   In that first paragraph, am I
21  correct that you were writing that you believed
22  there was at the time you wrote this a
23  preponderance of evidence that there was a
24  violation of Rule 318, Section 3?

Page 173

1      A.   I believe that there was a -- that
2  it was a possibility, and I didn't do a very
3  good job at expressing that when I wrote it.  I
4  think I was -- I think I jumped the gun here,
5  and like I mentioned before, I attribute that to
6  inexperience, and this was the first prisoner
7  death that I investigated.
8        My intent here was to ensure that
9  this was going to continue to be investigated
10  either by myself or by another investigator.
11      Q.   So standing here today, do you
12  agree that there was a preponderance of evidence
13  that there was a violation of Rule 318, Section
14  3?
15        MR. MAAS:  Objection.
16        But you can answer.
17        THE WITNESS:  No.  Because I didn't
18    take into account the subjectivity of the
19    situation, especially where the officers who
20    worked in that district at this time saw
21    this, what I thought was unusual behavior,
22    they saw it a lot more than I did, just one
23    time, and it wasn't as alarming to them as
24    it appeared to be to me when I viewed the

44 (Pages 170 - 173)

Page 174

1   video.
2           So I didn't take that into account
3   when I wrote that sentence.
4   BY MS. ROSSMAN:
5       Q.   And standing here today, is it your
6   understanding that that subjectivity is
7   important in terms of determining whether or not
8   there's been a violation of Rule 318, Section 3?
9       A.   Yeah.  I mean, it's -- the way the
10  rule is written is it's subjective, so of course
11  it has to be -- subjectivity has to be taken
12  into account.
13      Q.   The second paragraph in your
14  conclusion, do you see where you wrote that
15  there was -- that your investigation is also
16  proven by a preponderance of the evidence that
17  there was a violation of Rule 318, Section 13?
18      A.   I see that.
19      Q.   And at the time that you wrote
20  this, what was the basis for your conclusion?
21      A.   Based on the fact that although the
22  officers adhered to the rule by disabling the
23  alarm and looking into the cells during their
24  rounds, they did not take any further steps to

Page 175

1   check on Stilphen, who was seated in that
2   fold-over position, folded-over position.
3           Yeah, like I said before, I hate
4   thinking back now because it seems that it could
5   have been prevented fairly easily, but to an
6   officer who works in this district and sees it
7   all the time, it wasn't as alarming to them.
8       Q.   Standing here today, do you still
9   believe that there is a preponderance of the
10  evidence that a violation of Rule 318, Section 3
11  occurred?
12          MR. MAAS:  Objection.
13          Go ahead.
14          THE WITNESS:  No.  I answer that
15      that way because I give -- I didn't take
16      into account these officers' perspective
17      when I wrote this, and now that I've had
18      more time to digest it, think about it, and
19      read subsequent reports to my reports, my
20      mind is changed.
21  BY MS. ROSSMAN:
22      Q.   When you say "subsequent" -- excuse
23  me.
24          When you say "subsequent reports,"

Page 176

1   do you mean subsequent IAD reports from BPD?
2       A.   Yes, from Lieutenant Connolly.
3       Q.   And is it your understanding that
4   that subjectivity that you just mentioned is
5   important in terms of determining whether or not
6   there has been a rules violation for Rule 318,
7   Section 13?
8       A.   In this case, yes.  I mean, if the
9   rule said if someone is seated with his legs
10  crossed, folded over at the waist for an hour,
11  you have to go into the cell, then that's a
12  violation, but that's not how the rule is
13  written.
14      Q.   If you turn to page 000067, which
15  is the next page.  I know you've already
16  identified your signature at the top of this
17  page, is that right?
18      A.   Yes.
19      Q.   Who are the other two individuals
20  who signed this report?
21      A.   Lieutenant Michael Connolly and
22  Deputy Superintendent Courtney Matthews.
23      Q.   Based on your experience at the
24  IAD, do you know what it signifies that they

Page 177

1   signed this report?
2       A.   To me, that means they approve it.
3       Q.   And do you have an understanding of
4   what their approval means with respect to the
5   contents of the report?
6       A.   In this case, that it be
7   investigated further and assigned an IAD number.
8           MS. ROSSMAN:  If we can set up the
9       video, let's take a break and we can look at
10      the video, if that works.
11          THE WITNESS:  Sure.
12          THE VIDEOGRAPHER:  The time is now
13      2:29, and we're off the record.
14          (Whereupon, a recess was taken.)
15          THE VIDEOGRAPHER:  The time is now
16      2:40, and we are on the record.
17  BY MS. ROSSMAN:
18      Q.   Sergeant Detective, I know we just
19  took a break.  Is there anything you want to
20  change or add to your testimony?
21      A.   No.  But just to clarify, on my SA
22  report, 2019-014, with regard to the
23  highlighting and circling and other markings,
24  that could have been me, I just don't remember

45 (Pages 174 - 177)

Page 210

1  that you were discussing?
2      A.   I believe it wasn't as concrete in
3  this case where the officers did what the rule
4  says that they're supposed to do.  But at the
5  same time, the video showed that Shayne Stilphen
6  may have been under the influence of drugs
7  before he came into the station, definitely
8  while he was in the station after he took the
9  drugs.
10         So I guess my answer is, it wasn't
11 as cut and dry as the other three sections were,
12 in my mind.  And again, it wasn't my
13 responsibility at the time to do the final
14 findings, but I just wanted to make sure all the
15 information as I saw it was there for the
16 lieutenant so that he could make the appropriate
17 decisions.
18     Q.   Could you similarly take a look, if
19 you turn to page 02306, and look at the section
20 Rule 102, Section 4, and let me know if there's
21 anywhere in there where you say that this rule
22 was adhered to or whether the officers behaved
23 in accordance with this rule?
24     A.   Sure.

Page 211

1      Q.   Thank you.
2         (Witness reviewing document.)
3      A.   I did not write that, no.
4      Q.   So similarly to what we were just
5  speaking about with respect to Section 13, did
6  it signify something that you did not include
7  that language in Section 4, where you did
8  include it with respect to your discussion with
9  respect to the other sections?
10     A.   I guess it was -- it was just left
11 open-ended, and I wasn't satisfied.  I do
12 believe that that rule was actually amended in
13 the final-final report from Connolly.  I think
14 it was changed to something more specific for
15 duty supervisor, it was stricken, but that's
16 what I was using at the time.
17        Neglect of Duties, in my
18 experience, is a rule that we can -- that we use
19 as a catch-all when we can't find a more
20 specific rule to use.
21     Q.   Okay.  If you turn back to page --
22 if I could have you look at again your SA and
23 the IAD at the same time, so if you could look
24 at 000065 and 02304.

Page 212

1      A.   The second report, what am I
2  looking at?
3      Q.   02304.
4      A.   Okay.
5      Q.   So the third paragraph under
6  Section 3 on page 000065, we already identified
7  you had said, "It was apparent that Stilphen was
8  likely under the influence of drugs when he
9  arrived at District 4 at the time of his booking
10 and after being placed in Cell 19."
11        Do you see that?
12     A.   Yes.
13     Q.   And if we turn back to 02304 under
14 Section 3, in the paragraph at the bottom of the
15 page, do you see that you say, "Almeida
16 testified that Stilphen did not appear to be
17 under the influence of drugs at the time of his
18 booking."
19        And then the final sentence in that
20 paragraph says, "Bertocchi and Freire reported
21 that Stilphen appeared to be a drug user but did
22 not appear to be under the influence of drugs at
23 the time of booking."
24     A.   Yes.

Page 213

1      Q.   Why did you not reference your
2  earlier comment that it was apparent to you
3  based on your review of the video that he was
4  under the influence of drugs in this paragraph
5  on page 02304?
6      A.   I know I referenced it in my video
7  summary.  I don't know why I omitted it here.
8  It was not intentional.
9         Yeah, so the top of page 305 I
10 write about what I saw in the video, "unable to
11 stand still during the booking procedure."
12     Q.   Is there anyplace in that paragraph
13 that you're referencing --
14     A.   "Nodded off."  Sorry.
15     Q.   No, go ahead.
16     A.   No, I was just reading.
17     Q.   Is there anyplace in that paragraph
18 that you're reading at the top of page 02305
19 where you include your conclusion that it was
20 apparent that Stilphen was likely under the
21 influence of drugs which you had included on
22 page 000065?
23     A.   No, no.
24     Q.   Do you recall why you omitted that?

54 (Pages 210 - 213)

Page 214

1      A.   The SA report was done early on in
2  the investigation prior to speaking with any of
3  the officers, and the -- by the time I got to
4  write this report there -- I keep -- I know I
5  wrote "testimony," but it's not -- I don't think
6  that's the proper word.  But what they said
7  during their interviews weighed more on what I
8  initially saw during the SA investigation.
9      Q.   As you describe in that paragraph
10  on the top of page 02305, your review even
11  during the IA investigation still led you to
12  believe that Shayne was nodding off while he was
13  being held in custody, is that correct?
14      A.   Yes.
15      Q.   And you also still believed as part
16  of your video review for the IA investigation,
17  as you state in the second paragraph on this
18  page, that he was seated in an unusual position
19  for an extended period of time?
20      A.   Yes, that was my opinion.
21      Q.   Did you still believe at the time
22  that you wrote the IA investigation that it was
23  apparent that Shayne was under the influence of
24  drugs while he was --

Page 215

1         MR. MAAS:  Objection.
2  BY MS. ROSSMAN:
3      Q.   -- being held in custody?
4         MR. MAAS:  Objection.
5         Go ahead.
6         THE WITNESS:  Yes.
7  BY MS. ROSSMAN:
8      Q.   If you can look at the bottom,
9  we're on page 02305.  I want to direct your
10  attention to Section 13, that final paragraph.
11      A.   Okay.
12      Q.   And if you look at the Section 13
13  in your SA report, that's 000065.
14      A.   Okay.
15      Q.   Your final sentence in your review
16  of Section 13 in your SA report states,
17  "However, review of the video evidence showed
18  that although Almeida and Marshall conducted
19  rounds of the cellblock and disabled the
20  prisoner inspection alarm, they did not take any
21  measures to check on Stilphen and ensure that he
22  was not in any distress even though he was
23  seated in a very unusual position for one hour
24  and four minutes."

Page 216

1         Do you see that?
2      A.   Yes.
3      Q.   That sentence is not included in
4  your review of Section 13 in your IAD report, is
5  that correct?
6      A.   Yes.
7      Q.   Why did you remove that sentence
8  from your IAD investigation?
9      A.   I believe because I referenced it
10  under Section 3.
11      Q.   Did you believe it was no longer
12  relevant to your analysis of Section 13 during
13  your IAD report?
14      A.   Section 13 I believe was very
15  specific in an officer's responsibility, and
16  again, for the same reasons why I thought the
17  officers -- I'm sorry, for the -- so for that
18  reason, I took that part out and put it -- and
19  applied it to Section 3, Sickness or Injury.
20      Q.   You can put those to the side.
21         And if we can go back to Exhibit
22  85, which is that IAPro document.
23      A.   For the IAD case?
24      Q.   Yes.  Thank you for that

Page 217

1  clarification.
2         So, yeah, Exhibit 85.  And we were
3  on page 005162.
4      A.   All right.
5      Q.   All right.  The bottom of the page,
6  do you see the entry that's dated May 26th --
7  excuse me, "May 22nd, 2020, review"?
8      A.   Yes.
9      Q.   If you go on to the next page, it
10  says "Case review"?
11      A.   Yes.
12      Q.   Do you know whose review that May
13  22nd, 2020 is -- entry is referring to?
14      A.   Mike Connolly.
15      Q.   Okay.  Do you recall whether you
16  discussed Lieutenant Detective Connolly's review
17  of your report?
18      A.   No, I don't.
19      Q.   The next entry, which is
20  November 10th, 2020, "Supervisor report.  Read
21  and case file review."
22      A.   Yes.
23      Q.   Do you see that?
24         Similar question, do you know whose

55 (Pages 214 - 217)

Page 250

1     Fair to say that during the more --
2 almost minute and a half of this video that
3 Shayne was continuing to bend at the knees?
4     A.   Yes.
5     Q.   And that the officer that you had
6 identified as Officer Bertocchi repeatedly was
7 putting his hand on Shayne's back?
8     A.   Yes.  I think I saw him do that
9 three, maybe four times.
10     Q.   And did you see Officer Bertocchi
11 also holding Shayne's arm at one point during
12 this video?
13     A.   Yes.
14     Q.   I'm going to move forward to minute
15 18.  17:59, I'm going to press "play."
16         (Video clip played.)
17     Q.   Stopped it at 20:59.
18         I know we talked about this
19 previously, but now that you've been able to
20 refresh your recollection with this video, do
21 you see that Shayne during his booking videos
22 was both leaning against and at times sliding
23 down the wall?
24     A.   Yes.

Page 251

1     Q.   Based on your review of this video,
2 did it appear to you that Shayne was under the
3 influence of drugs?
4         MR. MAAS:  Objection.
5         Go ahead.
6         THE WITNESS:  He may have been, or
7     he may have been acting like that because he
8     wasn't high.  But, yes, he may have been
9     under the influence of drugs.  That would be
10     my first assumption.
11 BY MS. ROSSMAN:
12     Q.   What would be your first
13 assumption?
14     A.   That he was under the influence of
15 drugs, yes.
16     Q.   I can take this down.
17         Sergeant Detective, I know we had
18 talked about the fact that you had conducted
19 several interviews with individuals as a part of
20 your investigation into Shayne Stilphen's death,
21 correct?
22     A.   Yes.
23     Q.   So I want to listen to a couple of
24 them with you, not all of them.

Page 252

1     A.   Okay.
2     Q.   I'm going to pull up first what was
3 produced to us as COB 001738 and introduce this
4 as Exhibit 96.
5         (Whereupon, Exhibit Taxter 96 was
6     marked for identification.)
7 BY MS. ROSSMAN:
8     Q.   Okay.  I'm going to play the first
9 few seconds of this for you.  Is that all right?
10     A.   Sure.
11     Q.   Great.
12         MR. MAAS:  Are you going to
13     identify who it's with?
14         MS. ROSSMAN:  Yeah.  I'm sorry.
15         So this was produced to us as the
16     interview with Officer Marshall.
17         I'm going to hit "play."
18         (Video of interview between
19     Sergeant Detective Lucas Taxter and Police
20     Officer David Marshall played as follows:
21         "S.D. TAXTER:  It's about 7:20 a.m.
22     My name is Sergeant Detective Lucas Taxter,
23     T-A-X-T-E-R.  I'm assigned as an internal
24     affairs investigator.  This is a recorded

Page 253

1     interview with Police Officer David Marshall
2     concerning IAD 2019-0519.
3         "This interview is being conducted
4     within the offices of the internal affairs
5     division of Boston Police headquarters.")
6 BY MS. ROSSMAN:
7     Q.   Do you recognize that, Sergeant
8 Detective Taxter?
9     A.   I do.  That's me.
10     Q.   And do you recall what this
11 recording was of?
12     A.   An interview with Officer Marshall.
13     Q.   And was that interview with respect
14 to the investigation into Shayne Stilphen's
15 death?
16     A.   Yes.
17     Q.   This interview took place on
18 February 13th, 2020, which I believe is about
19 seven months after Shayne Stilphen's death, is
20 that correct?
21     A.   Yes.
22     Q.   Do you know why the interview was
23 conducted seven months later?
24     A.   I don't know if there's a reason,

64 (Pages 250 - 253)