# EXHIBIT 42

Page 1

```
 1                                      Volume I
                                        Pages 1 to 173
 2                                      Exhibits 130 to 143
 3               UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
 4
     - - - - - - - - - - - - - - - - -x
 5                                      :
     LYNNEL COX, as administrator       :
 6   of the Estate of Shayne R.         :
     Stilphen,                          :
 7               Plaintiff,             :  Civil Action No.
                                        :  1:22-CV-11009
 8         vs.                          :
                                        :
 9   BOSTON POLICE DEPARTMENT,          :
     ISMAEL ALMEIDA, PAULMICHAEL        :
10   BERTOCCHI, CATIA FREIRE,           :
     DAVID MARSHALL, and JOHN/JANE      :
11   DOE NO. 1,                         :
                 Defendants.            :
12   - - - - - - - - - - - - - - - - -x
13            VIDEO-RECORDED DEPOSITION OF CHARLES
     CELLUCCI, a witness called by the Plaintiff, taken
14   pursuant to the Federal Rules of Civil Procedure,
     before Alexander K. Loos, Registered Diplomate
15   Reporter and Notary Public in and for the
     Commonwealth of Massachusetts, at the Offices of
16   Goodwin Procter, LLP, 100 Northern Avenue, Boston,
     Massachusetts, on Thursday, September 7, 2023,
17   commencing at 12:27 p.m.
18
19
20
21
22
23
24
```

Page 10

1  Q.  If I say "Christhian," will you understand
2  that I am speaking about Christhian Geigel?
3  A.  I will.
4  Q.  And do you understand that he was arrested,
5  held in BPD custody, died on Monday May 27th, 2019,
6  and was discovered on Tuesday, May 28th, 2019?
7  A.  Yeah.  I understand that.
8  Q.  Okay.  Do you have a preferred term to
9  refer to individuals who are held in BPD custody?
10  A.  Prisoner.
11  Q.  Okay.  And are you familiar with the term
12  "IA Pro"?
13  A.  I am.
14  Q.  What is it?
15  A.  It's the reporting software system that we
16  use in internal affairs to do our cases.  We would
17  drop all the reports that we had, do our reports and
18  put them in there, put all our interviews and all
19  our pictures into that software system.  And it
20  would be managed by the clerk up at internal
21  affairs, and that's the system we use to do internal
22  affairs reports.
23  Q.  Okay.  Is it fair to say that IA Pro would
24  typically contain all of the final reports that are

Page 11

1  associated with an IAD investigation?
2  A.  They do.
3  Q.  In your experience, have there been any
4  instances where a report that was associated with an
5  IAD investigation was not uploaded into IA Pro?
6  A.  If I was assigned a report that was done by
7  some -- like the anti-corruption division --
8  Q.  Uh-huh.
9  A.  -- it wasn't yet in IA Pro, and I had to do
10  a report based on their investigation and put it
11  into IA Pro, and then it would transfer over.
12  Q.  Okay.  Outside of situations in which you
13  were assigned a report from the anti-corruption
14  division, were there any other instances where a
15  report that was associated with an IAD investigation
16  would not be uploaded onto IA Pro?
17  A.  I don't recall.
18  Q.  Okay.  Is it also fair to say you had
19  mentioned that I think interviews and photographs
20  would be uploaded onto IA Pro; is that right?
21  A.  Yes.
22  Q.  So would it be fair to say that IA Pro
23  contains all the documents that are related to an
24  IAD investigation?

Page 12

1  A.  They do.
2  Q.  In your experience, have there been any
3  instances in which a document that was associated
4  with an IAD investigation was not uploaded onto IA
5  Pro?
6  A.  I can't speak for other people's
7  investigations, but for my investigations,
8  everything that came in was entered into IA Pro.
9  Q.  Okay.  Now, my understanding is that
10  internal affairs investigations get a number
11  assigned to them; is that right?
12  A.  Correct.
13  Q.  And in some instances an internal affairs
14  investigation will get a number with an "IAD" in
15  front of it; and in other instances internal affairs
16  investigation could get a number with an "SA" in
17  front of it.
18      Is that correct?
19  A.  Right.
20  Q.  Are you familiar with the SA numbers?
21  A.  I am.
22  Q.  What does "SA" stand for?
23  A.  I don't recall what it stands for, but
24  it's -- it's a complaint that is not a violation --

Page 13

1  well, it can be not a violation of the rules and
2  it's still investigated by an internal affairs
3  investigator.  I forget what it's called, though.
4  I've been out of there for three or four years now.
5  Q.  Okay.  Do you recall who made the
6  determination of what kind of number would be
7  assigned to an IAD investigation?
8  A.  The deputy would assign the case and give
9  it to the clerk, and the clerk would give it to the
10  lieutenant whose group was catching that week.
11  So...
12  Q.  So you mentioned a couple of different
13  folks there.
14      Do you recall which of those individuals
15  would actually assign the number that became
16  attached to the investigation?
17  A.  The clerk.
18  Q.  The clerk?  Okay.
19      And when you said "deputy" earlier, were
20  you referring to the deputy of the IAD?
21  A.  Yes.
22  Q.  Would it be fair to assume that when we're
23  talking today, unless you otherwise designate, that
24  when you say "deputy" you're referring to the deputy

Page 94
1  A. Yep.
2  Q. Okay. Do you see where, under Number 5, it
3  says:
4       "Mr. Geigel then bends down over the
5       front of the toilet/sink and appears to be
6       snorting an unknown substance for the next
7       few minutes"?
8  A. Yep.
9  Q. What was your understanding of what was
10 occurring at this period in time?
11 A. He was ingesting illegal narcotics that he
12 removed from his undergarments.
13 Q. Okay. This video that you were able to be
14 reviewing, that's also visible in real-time at the
15 booking desk in D-4. --
16 A. Correct.
17 Q. -- is that correct?
18 A. Correct.
19 Q. Did you ask any of the officers who were on
20 duty at the time that this incident that's
21 referenced in Number 5 occurs, whether they observed
22 Christhian ingesting substances on the monitor?
23 A. I didn't interview anybody. I just read
24 their 26s, and nobody reported witnessing him ingest

Page 95
1  whatever he ingested that day.
2  Q. Did any of the Form 26s reference whether
3  they had been watching the video monitor?
4  A. I don't recall.
5  Q. If you could turn to Page 005501.
6     Do you see in the middle of the page,
7  Number 8:
8       "At 6:40 Mr. Geigel appears to take
9       his last breath"?
10 A. Yep.
11 Q. How did you determine that at 6:40
12 Mr. Geigel appeared to take his last breath?
13 A. Because I watched the video, and he had
14 some kind of a seizure. You can see him seizing on
15 the bench with his -- laying face down with his
16 hoody over his head, and you can see his chest going
17 up and down. And then you can see him just stop
18 breathing on the video.
19 Q. The seizure isn't referenced in your
20 report; is that right?
21 A. Correct.
22 Q. Why is that?
23 A. Because it's in the video that's attached,
24 so they could have looked at the video.

Page 96
1     And then I informed the lieutenant that
2  there was video and to watch the video.
3     I mean, I attached the video, so it's all
4  there.
5  Q. The seizure that you were able to see on
6  the video that you were watching, that also, again,
7  would have been available in real-time on the video
8  monitor in the booking office; is that right?
9  A. Yeah. That's the same.
10    They should be looking at the same videos.
11 I'm not sure which ones they had up at the time.
12 Q. Uh-huh.
13 A. But they should have had all the cells that
14 they had prisoners in up at the booking desk.
15 Q. And did you ask any of the officers who
16 were on duty at the time of Christhian's seizure
17 whether they saw him have a seizure?
18 A. I did not.
19 Q. Why not?
20 A. Because I didn't know he had a seizure at
21 the time. I didn't find out he had a seizure until
22 weeks later when I watched the video.
23 Q. As a part of your investigation, are you
24 able to follow up with the officers who work --

Page 97
1  A. I mean he was dead for --
2  Q. -- in D-4?
3  A. -- eight hours before someone found him.
4  So I couldn't ask them if he had a seizure eight
5  hours ago. They wouldn't have been on shift or --
6  Q. You were aware via the logs that were a
7  part of --
8  A. Right.
9  Q. -- your investigation who was on duty at
10 the time that Christhian had a seizure; is that
11 right?
12 A. Correct.
13 Q. Did you do any follow-up with those
14 officers once you determined that Christhian had a
15 seizure --
16 A. No.
17 Q. -- to see whether they had viewed that
18 seizure on the video?
19 A. I didn't ask them, no.
20 Q. Why not?
21 A. Because it wasn't part of my investigation.
22 I wasn't -- I wasn't trying to determine the cause
23 of death or what happened -- I was just trying to
24 see if the rules were followed. And that seizure

Page 98

1 appeared to happen in between the 15-minute
2 intervals. But I didn't ask them if they were
3 watching the monitors at the time or -- I just
4 didn't.
5    Q. So that entry that we were just looking at,
6 at Number 8, says that you determined that at
7 approximately 6:40 p.m., Mr. Geigel took his last
8 breath; is that right?
9    A. It appears he did, yes.
10    Q. Uh-huh.
11       And then you mentioned, the next entry at
12 Number 9, that there's an officer who's walking by
13 between 6:44 and 6:58; is that right?
14    A. Yeah. Yep.
15    Q. Did you determine whether that officer
16 looked into --
17    A. She appears to be looking in.
18    Q. I'm sorry. Say that again.
19    A. She appears to be looking in at the time.
20    Q. Based on what you're looking at right now?
21    A. Yeah.
22    Q. Do you recall whether you made a
23 determination about that at the time you were
24 writing this report?

Page 99

1    A. I don't.
2    Q. If you look at Number 10, do you see that
3 your next entry says:
4       "At 8:39 on May 28th, 2019, Officer
5       Butcher enters Cell 16 and attempts to wake
6       Mr. Geigel for court"?
7    A. Yeah. Yep.
8    Q. So is it fair to say that there's
9 approximately 13 hours between when you had
10 identified that Mr. Geigel appeared to take his last
11 breath and this next entry at Number 10?
12    A. Yeah.
13    Q. What did you observe on the video during
14 the 13 hours between those two entries?
15    A. I observed the officers walking by the
16 cell, hitting the buzzer. Some of them looking in;
17 some of them not. Some of them I don't know if they
18 were watching the monitors out in the -- at the
19 booking desk, but the whole time Mr. Geigel appears
20 to be sleeping with his hood over his head. So you
21 really can't see him other than -- you can see him
22 but you can't see, like, his face or his -- so he
23 just appears to be a good prisoner that's sleeping.
24    Q. Fair to say that Mr. Geigel didn't move

Page 100

1 after he died?
2    A. Fair to say.
3    Q. So during those 13 hours, Mr. Geigel did
4 not move, correct?
5    A. Correct.
6    Q. And based on the number of cell checks that
7 occurred, that's approximately 50 cell checks that
8 occurred over those 13 hours; is that correct?
9    A. Yep.
10    Q. And no police officer entered Mr. Geigel's
11 cell at that point in time; is that correct?
12    A. Correct.
13    Q. Okay. You didn't feel like that was a
14 relevant point to put into your report?
15       MR. MAAS: Objection.
16       You can answer.
17       THE WITNESS: No. I didn't feel like it
18 was relevant.
19 BY MS. ROSSMAN:
20    Q. Why?
21    A. Because he was a good prisoner. You don't
22 want to disturb a good prisoner and agitate them.
23 They were already dealing with a prisoner across
24 from him, a few times they were having problems with

Page 101

1 the prisoner who was not a model prisoner.
2    Q. If you turn to Page 005503.
3       Do you understand under "recommendation,"
4 you say:
5       "After a careful review and due
6       consideration of all the facts and
7       evidence..."
8    A. Yeah.
9    Q. If you turn to Page 005505 --
10    A. Yep.
11    Q. -- which is the page that lists the
12 attachments --
13    A. Yep.
14    Q. -- is this all the facts and evidence that
15 you're referencing in that sentence that I just
16 read?
17    A. Yep.
18    Q. Was there anything else that you considered
19 as a part of your investigation outside of these
20 attachments?
21    A. No.
22    Q. Okay. If you go back to your
23 recommendation, the second part of that sentence
24 reads:

Page 114

1  Q. Why not?
2  A. Because he didn't know that Mr. Geigel had
3  passed. He was only required, as the duty
4  supervisor, to check him once during the tour. And
5  he did not report any rule violations, so I didn't
6  check with him to see if he violated any rules.
7  Q. Was it relevant to your investigation to
8  talk with the duty supervisor who was on duty at the
9  time that Christhian died?
10 A. That would be more on the homicide
11 investigation --
12 Q. Why is that?
13 A. -- than mine.
14    Because I was just looking for rule
15 violations and documenting whether the prisoner was
16 checked in accordance with the rules. I wasn't
17 trying to determine the cause of death and manner of
18 death.
19 Q. Do you know whether the homicide unit had
20 any conversations with Lieutenant Detective Gaughan?
21 A. I believe in the report it says they
22 have -- no, I don't believe Gaughan's name is
23 mentioned in the report. I think it's just Hill.
24 Hill's name is mentioned in the report.

Page 115

1  Q. Is that surprising to you?
2  A. No.
3  Q. Why not?
4  A. I just think that Mr. Geigel's death is
5  just a -- just an overdose, and it was no -- there
6  was no crime committed. There was no -- it's just
7  something that was tough to avoid. I mean, the
8  search policies of the police department doesn't
9  allow us to look into underclothing for B&E arrests,
10 so it was just something that happened. It was
11 something probably wasn't preventable unless they
12 saw him ingesting it and got him right into an
13 ambulance and out of there. But they -- during the
14 15-minute window when he ingested it, it appears
15 that he passed away, and nobody noticed him.
16 Q. Do you think the 13 hours that he was not
17 discovered was preventable?
18    MR. MAAS: Objection.
19    You can answer.
20    THE WITNESS: I think someone could have
21 kicked the door and saw that he wasn't moving and
22 went in there earlier. But it wouldn't have changed
23 the fact that he had passed. They just would have
24 found him at a different time.

Page 116

1  BY MS. ROSSMAN:
2  Q. If you can turn to Page 005522.
3     Am I correct that this is the Form 26 from
4  Lieutenant Timothy Horan?
5  A. It is.
6  Q. Do you see at the top where it says:
7        "Prisoner on May 29th, 2018"?
8  A. Yeah.
9  Q. Based on our earlier conversation, do you
10 think that's incorrect and that it should say
11 "deceased prisoner on May 28th, 2019"?
12 A. It should.
13 Q. And is that similar in the first sentence
14 of his report where it says:
15        "... on May 29th, 2019, I was
16    notified..."
17 A. Yeah.
18 Q. That should read May 28th; is that correct?
19 A. Correct.
20 Q. And then sorry to do this with respect to
21 another sort of date, but the second full paragraph
22 where it says:
23        "On Monday night, May 28th, 2019" --
24 A. Yep.

Page 117

1  Q. -- should that read on Monday night, May
2  27th, 2019?
3  A. It should.
4  Q. So it appears -- am I correct that
5  Lieutenant Horan was on duty Monday night from
6  10:45 p.m. until sometime on Tuesday morning?
7  A. Correct.
8  Q. So Christhian was dead the entire time that
9  Lieutenant Horan was on duty; is that correct?
10 A. It appears.
11 Q. If you look at the third full paragraph,
12 where it says:
13        "PO Matthew McCabe was assigned as the
14    booking officer for the last half tour of
15    duty, and he was assisted in the cell
16    checks by Police Officer Ismael Almeida,
17    who was assigned as the clerk."
18    Do you see that?
19 A. Yeah.
20 Q. So is it your understanding, based on this
21 Form 26, that Ismael Almeida conducted cell checks
22 during this period of time on Monday night into
23 Tuesday morning?
24 A. Correct.

Page 126

1  A.  I did not.
2  Q.  Why not?
3  A.  Because I didn't know if -- because I
4  didn't -- she didn't report seeing any, so -- and I
5  watched her on video walking by and hitting the
6  buzzer.  So I didn't ask her if she observed him
7  ingesting anything he wasn't supposed to be.
8  Q.  Did you think that was relevant to your
9  investigation?
10     MR. MAAS:  Objection.
11     But you can answer.
12     THE WITNESS:  It wasn't relative to whether
13  she checked him.  It was relative to him passing
14  away.  But if she saw him, she obviously would have
15  notified the duty supervisor and called for EMS.
16  But she never saw him, so she never reported seeing
17  him ingesting drugs, so it was never followed up on.
18  BY MS. ROSSMAN:
19  Q.  Your report also indicated that Christhian
20  took his last breath around 6:40 p.m., correct?
21  A.  That's what I believe from watching the
22  video, yes.
23  Q.  Uh-huh.
24     And that was also during the period that

Page 127

1  Lisa Wright was conducting inspections, correct?
2  A.  Correct.
3  Q.  Did you conduct any interviews with her
4  about that?
5  A.  No.
6  Q.  And why not?
7  A.  Again, same response.  She didn't report
8  seeing him ingest any drugs.  She saw him just
9  sleeping there.  She just reported she walked by and
10  checked the cells and hit the buzzer, so she didn't
11  report seeing anything, or watching anything on the
12  video.
13  Q.  Okay.  If you turn to Page 005526.
14     And this appears to be Officer Monahan's
15  Form 26; is that right?
16  A.  Yep.
17  Q.  The last paragraph on this page, midway
18  through the paragraph, it states:
19     "Sometime between 3:45 a.m. and
20     4:00 a.m." --
21     Excuse me.  I should have said towards the
22  top of the page, do you see that Officer Monahan was
23  assigned to the last half shift --
24  A.  Uh-huh.

Page 128

1  Q.  -- which began on Sunday, May 26, 2019, and
2  ended on Monday May 27th, 2019?
3  A.  Yeah.
4  Q.  Okay.  So now if you go to that third
5  paragraph, in the middle, it says:
6     "Sometime between 3:45 a.m. and
7     4:00 a.m. Officer Sean Doolan, who was
8     assigned to the front desk for that shift,
9     took my place as the booking officer to
10     allow me time to complete my Form 26."
11     Do you see that?
12  A.  Yeah.
13  Q.  Okay.  If you turn to Page 005543, is this
14  another page from the prisoner inspection log that
15  we were talking about earlier?
16  A.  It is.
17  Q.  And does this -- at the top, do you see
18  that it says May 27th, 2019?
19  A.  Yep.
20  Q.  Is it your understanding, looking at these
21  times, that this is beginning the very early morning
22  of May 27th, 2019?
23  A.  It is.
24  Q.  And so would this be that last half shift

Page 129

1  that Officer Monahan was talking about?
2  A.  Yes, it is.
3  Q.  All right.
4     And about midway through the first time
5  column beginning at 3:45 p.m. through 7:15 a.m., do
6  you see how the inspector is listed as "SD"?
7  A.  Yeah.
8  Q.  Who is that?
9  A.  Sean Doolan.
10  Q.  Okay.  So does that correspond with the
11  Form 26 that Officer Monahan had submitted?
12  A.  It is.
13  Q.  If you turn back to Officer Monahan's Form
14  26 on 005526 --
15  A.  Yep.
16  Q.  -- do you see how the last sentence in that
17  last paragraph says:
18     "Officer Doolan will also be
19     submitting a Form 26 documenting his time
20     at the booking desk."
21  A.  Yep.
22  Q.  Okay.  If you look at Page 005505, these
23  are the attachments that were included as a part of
24  your investigation, correct?

33 (Pages 126 - 129)

Page 146

1  Form 26s; is that correct?
2      A.  Correct.  Or watched it on video, or
3  reported they watched it on video.  They were
4  unaware.
5      Q.  Based on your experiences with the IAD --
6      A.  Or they never reported they were aware --
7  were aware that he had ingested drugs.
8      Q.  Uh-huh.
9          Based on your experiences with the IAD, did
10 you think it was relevant to directly ask them
11 whether they had observed Christhian consuming
12 drugs?
13         MR. MAAS:  Objection.
14         Go ahead.
15         THE WITNESS:  Not really.
16         Like, I mean, it took a while to find it
17 just watching it on video.  So for them to be aware
18 of it, it would have been, like, a split second.
19 They would have had to have been paying attention to
20 them, and it's impossible when you have 16 cells
21 filled with prisoners.  I didn't think it was
22 necessary to ask them.
23         MS. ROSSMAN:  Okay.  I'm going to show you
24 what will be marked for identification as

Page 147

1  Exhibit 139 --
2          (Video marked as Cellucci
3          Exhibit 139 for identification.)
4          MS. ROSSMAN:  -- what was produced to us as
5  COB001803.
6      Q.  Are you able to see that on the screen?
7      A.  I am.
8      Q.  Is it fair to say that this is part of the
9  video of Christhian's time in custody at D-4?
10     A.  It is.
11     Q.  Okay.  I'm going to move forward to the
12 time stamp -- and this is actually a time stamp of
13 the time of day -- to 6:19.
14     A.  Yep.
15         MS. ROSSMAN:  All right.
16         I'm going to press play.
17         (Video played.)
18         MS. ROSSMAN:  I've stopped it at time stamp
19 6:21:05.
20     Q.  Can you describe what just you saw?
21     A.  It appeared that Mr. Geigel was
22 manipulating something in front of the sink/toilet
23 stall, apparently opened up whatever he was
24 manipulating, put it on the sink, and then he

Page 148

1  ingested it with -- it appears he ingested whatever
2  he put on the sink with his nose.
3      Q.  And was this period in the video what you
4  were referring to in your report when you talked
5  about Christhian appearing to ingest drugs?
6      A.  It is.
7      Q.  And it appears as though that was a period
8  of about two minutes on the video; is that right?
9      A.  That's right.
10     Q.  And you didn't ask Officer Lisa Wright
11 whether she observed these two minutes, correct?
12     A.  Correct.
13     Q.  You didn't ask Lieutenant Gaugin whether he
14 observed these 2:00 minutes; is that correct?
15     A.  Correct.
16         MS. ROSSMAN:  I'm going to move forward to
17 time stamp 6:36:20.
18         All right.
19         We're going to start at 6:36:16.
20         THE WITNESS:  And I found this.  It took
21 forever.
22         BY MS. ROSSMAN:
23     Q.  Here we go, 6:36:19 -- 17.
24         I have stopped it at 6:36:34.

Page 149

1          Can you describe what you saw during that
2  time period in the video?
3      A.  It appears to me that Mr. Geigel has a
4  seizure on the bench, laying face down.
5      Q.  And you didn't ask Officer Wright if she
6  observed this, correct?
7      A.  Correct.
8      Q.  You didn't ask Lieutenant Gaughan if he
9  observed this, correct?
10     A.  Correct.
11         MS. ROSSMAN:  I'm going to continue
12 playing, so starting at 6:36:24.
13         (Video played.)
14         MS. ROSSMAN:  And I have stopped at
15 6:36:46.
16     Q.  Would it be accurate to say that -- well,
17 describe what you just saw in those last ten seconds
18 that we played.
19     A.  It appears that he's seizing a little more,
20 his right arm is moving a little bit.
21     Q.  Okay.  And you didn't ask Police Officer
22 Wright whether she observed that second seizure,
23 correct?
24     A.  Correct.