# **EXHIBIT 43**

Page 1

```
 1                                    VOLUME: I
                                      PAGES:  1 to 93
 2                                    EXHIBITS: 20 to 23
 3
                 UNITED STATES DISTRICT COURT
 4                 DISTRICT OF MASSACHUSETTS
 5        Civil Action No. 1:22-CV-11009
 6      LYNNEL COX, as                      )
        Administrator of the Estate         )
 7      of Shayne R. Stilphen,              )
                   Plaintiff,               )
 8                                          )
        vs.                                 )
 9                                          )
        BOSTON POLICE DEPARTMENT,           )
10      ISMAEL ALMEIDA, PAUL                )
        MICHAEL BERTOCCHI, CATIA            )
11      FREIRE, DAVID MARSHALL and          )
        JOHN/JANE DOE NO. 1,                )
12                 Defendants.              )
13
14            VIDEOTAPED DEPOSITION OF KEVIN
15       ZARNOCH, called as a witness on behalf of
16       the Plaintiff, pursuant to the applicable
17       provisions of the Federal Rules of Civil
18       Procedure, before Jeanette N. Maracas,
19       Registered Professional Reporter and Notary
20       Public in and for the Commonwealth of
21       Massachusetts, at the Offices of Goodwin
22       Procter, LLP, 100 Northern Avenue, Boston,
23       Massachusetts, on Thursday, June 22, 2023,
24       commencing at 2:09 p.m.
25
```

Page 38

1  Q. And just to clarify, I meant Shayne and
2     Officer Freire.
3  A. Understood.
4  Q. Okay. And at that time -- and you answered
5     this question before in the context of
6     arrest, but at that time when he was in the
7     vehicle, did Shayne seem sober to you?
8  A. He seemed the same as he was on-scene. I
9     don't know that he -- he seemed sober to me
10    on the ride back, yeah.
11 Q. As best as you can tell at that time, Shayne
12    had not ingested any drugs and was showing
13    no signs of intoxication?
14 A. Nothing that I recall.
15 Q. Did Shayne need any assistance getting into
16    or out of the vehicle?
17 A. I know for sure he didn't need any assistance
18    getting out of the vehicle. We always help,
19    generally we help most prisoners into the
20    vehicle just to make sure they don't bang
21    their head, but it's also a little difficult
22    getting in with handcuffs on.
23 Q. When you say you know for sure, is that
24    because you went back and watched the video
25    at some point or is that just based on your

Page 39

1     independent recollection?
2  A. I watched the video.
3  Q. And your statement here today about your
4     characterization of it, is that based on
5     your having watched the video or on your
6     independent recollection?
7        MR. WHITESELL: Objection.
8  A. Based on the video.
9  Q. Thank you. So now that we have gotten to
10    the stage where you talked about his
11    transport and getting out of the vehicle,
12    I'd like to now next turn to his placement
13    in the holding cell. Can you first tell
14    me what you recall about your interactions
15    with Shayne in the holding cell?
16       MR. WHITESELL: Objection.
17 A. Mostly small-talk. We usually, when we have
18    prisoners in, if they're conversing with us,
19    we converse with them.
20 Q. Focusing again on that conversation, any
21    indication that he was not sober?
22 A. I think as time went on when he was sitting
23    there, I certainly noticed that he was maybe
24    exhibiting signs that he had possibly taken
25    something.

Page 40

1  Q. What were the signs?
2  A. Looked tired, head nodding a little bit.
3     It was late at night as well, but, you know,
4     I would say that would be the signs you'd
5     see, that his head was drooping down at
6     times.
7  Q. You said "took something." Can you give me
8     any more detail what that something you
9     understood him -- strike that. Horrible
10    question.
11       What did you mean by "took
12    something"? Could you give me some more
13    detail on that?
14 A. I couldn't assume what it was, but obviously
15    based on the area and the time of night,
16    where it was, I would generally -- there's a
17    pretty bad opioid problem down there, so I
18    would presume it was an opioid.
19 Q. That would be your best guess?
20 A. That would be my best guess.
21 Q. You listed head nodding, seeming tired.
22    Anything else?
23 A. Nothing that I'm aware of.
24 Q. Did he seem unsteady on his feet?
25 A. At this time he was sitting down in the

Page 41

1     holding cell, so I didn't notice.
2  Q. When he was walking into or out of the
3     holding cell?
4  A. When he walked in, he walked in, I mean,
5     I would say he walked in normal, what I would
6     say was normal for somebody in handcuffs.
7  Q. Is it fair to say that as the night was
8     progressing, things were getting worse?
9        MR. WHITESELL: Objection.
10 A. I'm not aware beyond the time I left him.
11    I don't know.
12 Q. I would like to pull out an image from the
13    holding cell as an exhibit. This will be
14    Exhibit 20, not the statement before.
15       (Exhibit 20 marked for
16    identification.)
17 Q. Take a minute.
18 A. Sure.
19 Q. Just for context so that you know when I
20    captured this still, you and Officer Almeida
21    had been in there previously and had left
22    and these two individuals walked in and had
23    a conversation with Shayne.
24 A. Sure.
25 Q. Do you know who these are?

11 (Pages 38 - 41)