UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 22-11009-RGS

LYNNEL COX, as administrator of the
Estate of Shayne R. Stilphen

v.

CITY OF BOSTON, ISMAEL ALMEIDA,
PAULMICHAEL BERTOCCHI, CATIA FREIRE,
and BRIAN PICARELLO

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

May 14, 2024

STEARNS, D.J.

Early in the morning of July 14, 2019, Shayne Stilphen died of an opioid overdose while in the custody of the Boston Police Department (BPD). Stilphen's mother, plaintiff Lynell Cox, acting as administrator of his Estate, sued the City of Boston (the City) and Officers Ismael Almeida, Paulmichael Bertocchi, Catia Freire, and Brian Picarello (the Individual Defendants). She alleges that defendants collectively violated Stilphen's due process right to adequate medical care while in pretrial custody in violation of 42 U.S.C. § 1983 (Count I); the City violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 (Count II); and the Individual Defendants caused

Stilphen's wrongful death in violation of Mass. Gen. Laws ch. 229, § 2. Defendants in due course moved for summary judgment. The court convened a hearing on the motions on May 2, 2024. The court will deny summary judgment for the reasons explained below.

## BACKGROUND

**The Opioid Epidemic and Stilphen's Opioid Use Disorder**

The following facts are undisputed unless otherwise noted.[1] Opioids are highly addictive drugs that implicate a significant risk of overdose. The opioid epidemic has touched communities nationwide; since 2013, deaths caused by synthetic opioids have increased precipitously from year to year.[2] Then-Governor of Massachusetts Deval Patrick declared opioid addiction a public health emergency in the Commonwealth in 2014. Decl. of Robert Frederickson III (Frederickson Decl.), Ex. 25 (Dkt. # 97-25). By 2021, 220

---

[1] In addition to the parties' briefing, the court takes judicial notice of medical and statistical information published on the website of the Centers for Disease Control and Prevention (CDC). Because the accuracy of this information (as opposed to editorial judgments and conclusions) "cannot reasonably be questioned," the court may take judicial notice of these facts. Fed. R. Evid. 201(b)(2); *see also Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of factual information on CDC's website).

[2] *Opioids: Understanding the Epidemic*, CDC (last updated Aug. 8, 2023), https://www.cdc.gov/opioids/basics/epidemic.html [hereinafter *Opioids: Understanding the Epidemic*].

Americans were dying each day from opioid overdoses.[3] Over time, an area near the intersection of Massachusetts Avenue and Melnea Cass Boulevard, popularly known as "Mass and Cass," became the epicenter of the epidemic in Boston. The District 4 police station in the South End neighborhood of Boston (the D-4 Station) – where the Individual Defendants worked on July 14, 2019 – covers the Mass and Cass area.

All BPD officers receive training in identifying opioid overdoses and are taught to administer the antidotal drug naloxone (commonly called Narcan). Pl.'s Statement of Additional Facts (PSAF) (Dkt. # 96) ¶ 11. Each Individual Defendant testified that they were familiar with opioid addiction. *Id.* Officers Almeida and Bertocchi had responded to several overdose emergencies, and Officer Freire testified that she saw people overdose "every day, morning and night." *Id.* ¶¶ 23, 27.

When an individual overdoses on opioids, the drugs "interfere[] with the part of the brain that regulates unconscious breathing," causing respiratory depression (hypoventilation). *Id.* ¶ 3, quoting Frederickson Decl., Ex. 22 (MacDonald Report) (Dkt. # 97-22) ¶ 64. Respiratory depression can lead to death. *Id.* However, if timely administered, Narcan can reverse the effects of a user's overdose. *Id.* ¶ 5.

---

[3] *Opioids: Understanding the Epidemic.*

Before his death, Stilphen suffered from opioid use disorder (OUD). *Id.* ¶ 1. He began using opioids at age 16, twelve years before his death. *See* MacDonald Report ¶ 88. Although Stilphen completed at least ten detoxification programs, he repeatedly suffered relapses. *Id.* On July 10, 2019, Stilphen reported that he was using opioids multiple times per day and had overdosed more than twenty times. *Id.*

**Apprehension and Booking**

On July 14, 2019, Officers Almeida and Picarello were serving as booking officers at the D-4 Station. Defs.' Statement of Undisputed Material Facts (DSMF) (Dkt. # 88) ¶¶ 2-7. Officers Bertocchi and Freire were assigned to patrol duties. *Id.* At 1:00 am, an officer responding to a report of an individual breaking into a motor vehicle near Mass and Cass stopped Stilphen. *Id.* ¶¶ 12-13. Officers Bertocchi and Freire, along with several other BPD officers, arrived at the scene shortly after, arrested Stilphen, and brought him to the D-4 Station. *Id.* ¶¶ 14, 20-21.

On arriving at the station, Stilphen was brought to a holding cell. *Id.* ¶¶ 21-22. Stilphen spoke briefly with Officer Almeida, who searched Stilphen's pockets twice. *Id.* ¶¶ 23, 25. Officer Almeida left the holding cell, and Officer Bertocchi entered, had a further conversation with Stilphen, and removed his handcuffs. *Id.* ¶ 26. Officer Sean Doolan, who knew Stilphen

4

from the Nashua Street Jail (where Stilphen had previously served time as an inmate), also entered the cell and spoke to Stilphen. *Id.* ¶¶ 8, 30-31. Once alone in the cell, a video monitor showed Stilphen bent forward at the waist while in a seated position. *Id.* ¶ 35. A few minutes later, Officer Bertocchi entered the cell, and Stilphen "popped right up." *Id.*

The parties agree that Stilphen did not tell Officers Almeida or Bertocchi that he had taken drugs that day, but there is a dispute as to whether Stilphen confided in Officer Doolan. *Compare id.* ¶ 33, *with* Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (PSMF) (Dkt. # 96) ¶ 33. The Individual Defendants testified that they believed Stilphen was acting normally at this point. *See* DSMF ¶¶ 27, 32.

Stilphen was then taken from the cell and walked to the booking area. *Id.* ¶ 36. A non-defendant officer searched Stilphen's shoes, while Officer Freire fingerprinted Stilphen. During the fingerprinting, Stilphen bent at the knees and was leaning and swaying. *See id.* ¶¶ 45, 47-48; PSMF ¶¶ 45, 47-48. At multiple points, Officers Bertocchi and Freire assisted Stilphen in staying balanced. *See, e.g.*, Frederickson Decl., Ex. 2 (Booking Footage) (Dkt. # 97-2) at 11:15, 14:55. At the conclusion of the fingerprinting, Officer Almeida took Stilphen's booking photos. During photographing, Stilphen complied with Officer Almeida's instructions, but he repeatedly "doz[ed] off"

5

and slumped before reviving himself. DSMF ¶¶ 51-53; *see also* Booking Footage at 18:35-18:50, 18:55-19:05.

Officer Almeida then completed an intake form. The intake form states that Stilphen was "Alert," as opposed to, for example, "Under the Influence of Drugs." *See* DSMF, Ex. 17. Officer Almeida characterized Stilphen's booking as an "average District 4 booking." DSMF, Ex. 1 at 204:16-205:12. In his words, the "average District 4 booking" on a Saturday night included people who "had a little bit too much to drink," or who had engaged in recreational drug use. *Id.* at 205:5-10, 232:1-7. Officer Almeida, however, testified that he did not believe that Stilphen was intoxicated or under the influence of drugs when he was booked. *Id.* at 271:19-272:12.

**Time in Individual Cell**

After the booking, Officers Almeida, Bertocchi, and Freire took Stilphen to an individual cell. DSMF ¶ 70. Immediately after the officers shut the door to the cell, Stilphen began slowly slipping into a contorted, bent-over sitting position. Frederickson Decl., Ex. 3 (Cell Footage) (Dkt. # 97-3) at 0:42-1:20. Moments later, the officers reopened the door, and Stilphen sat up. *Id.* at 1:30. But when the officers shut the door again, Stilphen slipped back into the same sitting position. *Id.* at 1:42-2:00. This was the last time Officer Freire had any contact with Stilphen. DSMF ¶ 73.

Stilphen remained in a bent-over position for ten minutes, until Officer Bertocchi knocked on the cell door and offered him milk and a sandwich. Cell Footage at 11:40. Stilphen accepted the milk and sandwich, sat down again, and manipulated an object in his hand. *Id.* at 12:40-13:15. The parties agree that, at this point, Stilphen began ingesting drugs that had been overlooked by the officers during the searches of his person at the arrest and booking. DSMF ¶ 81; PSMF ¶ 81.

This pattern continued for the next several hours. Stilphen generally sat in a contorted, bent-over position, although at times he sat up leaning against the wall, and he continued to ingest drugs. Various BPD officers, including Officers Almeida and Picarello, walked past Stilphen's cell every fifteen minutes, but Stilphen seldom stirred from his slumped-over position. Officers only occasionally stopped and peered into his cell.[4]

At 5:39 a.m., Officer Picarello delivered food to Stilphen's cell. Cell Footage at 3:18:01. Stilphen did not move. At 5:51 a.m., Officer Doolan passed by Stilphen's cell and, noticing that his sitting position "appeared uncomfortable," called out to Stilphen. DSMF ¶¶ 132-135. Stilphen did not respond, leading Officer Doolan to call for Officer Almeida, who unlocked

---

[4] Officer Almeida testified that he may have looked "peripherally" into Stilphen's cell, but he was certain that he "didn't turn [his] head to look inside" the cell. MacDonald Report at 22.

7

Stilphen's cell door. *Id.* ¶¶ 135, 141. Officer Almeida touched Stilphen and found him nonresponsive. *Id.* ¶ 142. Officer Doolan left the cell to retrieve a Narcan dose while Officer Almeida promptly began CPR. *Id.* ¶¶ 142, 144. Approximately one minute later, Officer Doolan returned with the Narcan, and Officer Bertocchi took over for Officer Almeida, continuing to perform CPR. *Id.* ¶ 145. EMS personnel arrived soon after and rushed Stilphen to Tufts Medical Center. *Id.* ¶¶ 148-149.

Stilphen died en route to or shortly after arriving at Tufts. *Id.* An autopsy determined that the cause of his death was "acute fentanyl, despropionyl fentanyl (4-ANPP), heroin, cocaine, and benzodiazepine intoxication." *Id.*, Ex. 20 (Dkt. # 88-20) at 1 (emphasis omitted).

**Internal Affairs Investigation**

Lieutenant Detective Michael Connolly and Sergeant Detective Lucas Taxter were subsequently assigned to investigate Stilphen's death. Detective Taxter initially determined that, "after observing [Stilphen] appear to nod off in the holding cell and his inability to stand still in an upright position for the entire booking process," the officers should have known that Stilphen "was likely under the influence of drugs when he arrived at D4 at the time of his booking and after being placed in cell 19." Frederickson Decl., Ex. 21 (Taxter Dep.) (Dkt. # 97-21) at 164:12-24; *see also* Frederickson Decl., Ex. 30 (Taxter

8

Report) (Dkt. # 97-30) at 5.  He further concluded that the officers should have asked for EMS assistance "before [Stilphen] was placed in cell 19, or at the very latest, immediately after he ingested drugs," and that the Individual Defendants' failure to do so violated BPD Rule 318 § 3.[5]  Taxter Report at 4-5.  Detective Connolly reached the same preliminary conclusion.  Frederickson Decl., Ex. 32.  However, after "tak[ing] into account the subjectivity of the situation" and considering what behavior would be "unusual" to "officers who worked in [D-4]," both Detectives revised their opinions and concluded that the Individual Defendants did not violate Rule 318.  Taxter Dep. at 173:17-174:3; *see also* Frederickson Decl., Ex. 9 (Dkt. # 97-9) at 163:23-164:21.

## DISCUSSION

Summary judgment is warranted where the movant demonstrates that the record, "construed in the light most flattering to the nonmovant, 'presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law.'"  *Lawless v. Steward Health Care Sys.*, 894 F.3d 9, 20-21 (1st Cir. 2018), quoting *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017).  A factual dispute is "genuine" if there is

---

[5] Rule 318 § 3 states that "[a]ny unusual appearance or behavior displayed by a prisoner shall receive immediate attention."

9

"'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing version of the truth at trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990), quoting *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975).

Where summary judgment "is sought on an issue involving state of mind, 'great circumspection is required.'" *Gual Morales v. Hernandez Vega*, 579 F.2d 677, 680-681 (1st Cir. 1978), quoting *Hahn*, 523 F.2d at 468. But alleging a claim that implicates a party's state of mind does not automatically preclude summary judgment; "[t]here must be some indication that [the plaintiff] can produce the requisite quantum of evidence to enable [her] to reach the jury with [her] claim." *White v. Hearst Corp.*, 669 F.2d 14, 17 (1st Cir. 1982), quoting *Hahn*, 523 F.2d at 468.

**Count I: Fourteenth Amendment Failure to Provide Medical Care**

The parties dispute whether the court should apply a deliberate indifference or objective reasonableness standard in analyzing Count I. In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court held that an objective test applies to Fourteenth Amendment excessive force claims brought by pretrial detainees. *Id.* at 396-397. In the wake of *Kingsley*, the federal circuits are split on whether the objective test also applies to claims

of failure to provide adequate medical care brought by pretrial detainees.[6] The First Circuit has not directly joined the issue but, post-*Kingsley*, has iterated that due process protections for pretrial detainees "extend at least as far as the protection that the Eighth Amendment gives to a convicted prisoner." *See Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 74 (1st Cir. 2016), quoting *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990). Because Cox could prevail under either standard, this court need not attempt to resolve the issue.

The (more rigorous) two-prong deliberate indifference test asks first whether Stilphen had a serious medical need, and second whether the Individual Defendants exhibited deliberate indifference to that need. *See Abernathy v. Anderson*, 984 F.3d 1, 6 (1st Cir. 2020). A serious medical need is "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the

---

[6] Five Circuits have adopted an objective test. *See, e.g., Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *Short v. Hartman*, 87 F.4th 593, 609-612 (4th Cir. 2023); *Brawner v. Scott Cnty.*, 14 F.4th 585, 596-597 (6th Cir. 2021); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352-353 (7th Cir. 2018); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-1125 (9th Cir. 2018). Four Circuits have continued to apply a deliberate indifference standard. *See Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018); *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020); *Dang ex rel. Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017).

necessity for a doctor's attention." *Gaudreault*, 923 F.2d at 208. "[A] significant risk of future harm may suffice" to support the existence of a serious medical need. *See Perry v. Roy*, 782 F.3d 73, 79 (1st Cir. 2015). An officer is deliberately indifferent if they "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). While mere negligence or an inadvertent failure to act does not constitute deliberate indifference, a "'wanton disregard' to a prisoner's needs . . . akin to criminal recklessness" is.[7] *Kosilek v. Spencer*, 774 F.3d 63, 83 (1st Cir. 2014) (en banc), quoting *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011). A trier of fact may find that an officer knew of a risk "based on the fact that the risk was obvious." *Miranda-Rivera*, 813 F.3d at 74.

The Individual Defendants contend that Stilphen did not have a serious medical need prior to overdosing in the cell. *See* Individual Defs.' Mot. at 8, 14. First Circuit law points in the opposite direction. *See, e.g.*, *Miranda-Rivera*, 813 F.3d at 75 (triable question whether detainee had an

---

[7] The Individual Defendants contend that Cox must prove that they "intended wantonly to inflict pain." Officers Almeida, Bertocchi, Freire and Picarello's Mem. of Law in Support of their Mot. for Summ. J. (Individual Defs.' Mot.) (Dkt. # 85) at 7. This misstates the standard by conflating the due process owed to a pretrial detainee with the Eighth Amendment standard applied when a convicted inmate alleges the use of excessive force in a prison setting. If Cox shows deliberate indifference to Stilphen's medical needs, she need prove "no further mens rea of the officer—whether intent or motivation." *Miranda-Rivera*, 813 F.3d at 74.

obviously serious medical need existed where symptoms could suggest he was "dangerously drunk or high"); *Perry*, 782 F.3d at 80 ("The fact that the condition worsened over time says nothing of the condition at the times [the detainee] was evaluated; a reasonable jury could have found that this shows that the medical need was serious all along.").

With respect to the second prong, the Individual Defendants claim that they did not believe that Stilphen was at risk of overdosing until he became nonresponsive. Individual Defs.' Mot. at 9. This, too, raises triable factual questions. Determining whether the Individual Defendants acted with deliberate indifference requires an assessment of their states of mind and credibility. However, there is "no room for credibility determinations" at the summary judgment stage. *See Greenburg v. Puerto Rico Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). And even if the jury were to conclude that the Individual Defendants knew or should have known that Stilphen had a serious medical need, they could reasonably determine that the Individual Defendants did not act with deliberate indifference because they routinely and competently performed the required cell checks. Because

these issues cannot be resolved as a matter of law, the court will deny summary judgment on Count I.[8]

**Count II:  Title II of the ADA**

To succeed on her Title II claim, Cox must show

> (1) that [Stilphen] is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of [his] disability.

*Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000).  The medical care of pretrial detainees is a service, program, or activity covered by the ADA.  *See Kiman v. New Hampshire Dep't of Corrs.*, 451 F.3d 274, 284 (1st Cir. 2006).  However, mere failure to treat Stilphen does not give rise to an ADA claim; Cox must instead show that the officers failed to treat

---

[8] The Individual Defendants also argue, in a footnote, that they are entitled to qualified immunity.  Because "the law on denial of medical care has long been clear in the First Circuit," and because the argument is woefully underdeveloped, the court will not consider it in deciding summary judgment.  *See Miranda-Rivera*, 813 F.3d at 75.

Count I is also asserted against the City.  The City argues only that summary judgment is warranted because Cox has failed to establish a constitutional deprivation by the Individual Defendants.  *See* Mem. of Law in Support of City of Boston's Mot. for Summ. J. (Dkt. # 87) at 3.  As the court will deny summary judgment on the underlying constitutional violations, the City's dependent motion is necessarily also denied as to Count I.

14

Stilphen because of an unwillingness to take with sufficient seriousness the needs of persons suffering OUD.[9]  *See id.*

Cox argues that the officers' actions were informed by a stereotype of individuals with OUD rather than on an individualized inquiry into Stilphen's condition.  This is a triable theory of a Title II violation.  *See Buchanan v. Maine*, 469 F.3d 158, 176 (1st Cir. 2006).  And she points to testimony from Officers Almeida, Freire, and Picarello that they did not believe Stilphen required any special medical treatment because it was common for them to see individuals with drug addictions sitting in positions like those in which Stilphen was sitting.  *Id.* at 35.  While by no means an open-and-shut case, a reasonable jury could conclude that the officers, based on a discriminatory stereotype of persons with OUD, chose not to pursue prompt medical intervention despite Stilphen's demeanor.[10]  Thus the court will deny summary judgment on Count II.

---

[9] The City's threshold argument that Stilphen is not a "qualified individual" under Title II because he was using illegal drugs fails as a matter of law.  Drug addiction is a disability covered by Title II, *see* 28 C.F.R. § 35.108(b)(2), and Title II's implementing regulations prohibit a public entity from denying health services "to an individual on the basis of that individual's current illegal use of drugs, if the individual is otherwise entitled to such services" *id.* § 35.131(a)(1).

[10] The parties also debate whether the doctrine of respondeat superior applies to Title II, which is an open question in the First Circuit.  The court for present purposes finds that the officers' actions are "properly attributable

**Count III:  Wrongful Death**

Cox lastly pursues a wrongful death claim against the Individual Defendants under the Massachusetts Wrongful Death Statute (WDS), Mass. Gen. Laws ch. 229, § 2, based on a theory of intentional conduct.[11]  The WDS proscribes, *inter alia*, any negligence or "willful, wanton, or reckless act" that "causes the death of a person."  Mass. Gen. Laws ch. 229, § 2.  The WDS had historically been interpreted in Massachusetts, as in other jurisdictions, as a statutory mechanism permitting a decedent's personal representative to obtain relief otherwise unavailable at common law.[12]  *See Mutsuyam v.*

---

to the [City]," as they were at all times acting in their official capacities as municipal employees.  *Cox v. Mass. Dep't of Corr.*, 2018 WL 1586019, at *8 (D. Mass. Mar. 31, 2018).

[11] Although the WDS generally speaks of varieties of negligent conduct, Cox is barred from bringing a negligence action against the Individual Defendants because of her failure to make a presentment to the City as required by section 4 of the Massachusetts Tort Claims Act (MTCA), Mass. Gen. Laws ch. 229, § 4.  The choice may have been a strategic one.  The MTCA "imposes liability on a public employer for a public employee's negligent act[s] performed within the scope of his employment and relieves the public employee from liability."  *Schenker v. Binns*, 18 Mass. App. Ct. 404, 404 (1984); *see also Howard v. Town of Burlington*, 399 Mass. 585, 589-590 (1987).  The MTCA is held to cover conduct that is reckless, wanton, or willful as well as acts and omissions that are negligent in the usual sense.  *See Molinaro v. Town of Northbridge*, 419 Mass. 278, 279 (1995); *Forbush v. City of Lynn*, 35 Mass. App. Ct. 696, 701 (1994).

[12] At common law, there was no recovery for wrongful death.  *See Baker v. Bolton*, 170 Eng. Rep. 1033 (1808) ("In a civil court, the death of a human being could not be complained of as an injury.") (Ellenborough, L.J.).  The

16

*Birnbaum*, 452 Mass. 1, 22-23 (2008).  In *Gaudette v. Webb*, 362 Mass. 60 (1972), however, the Supreme Judicial Court (SJC) revised its view in light of the Supreme Court's decision in *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970), holding that, given the modern evolution of the law, "the right to recovery for wrongful death is [now understood to be] of common law origin."  *Gaudette*, 362 Mass. at 71.  Under the rule established in *Gaudette*, when interpreting the application of the WDS, a court is to "look first to the statute and then, if the language does not resolve the question, to the common law for guidance."  *See GGNSC Admin. Servs., LLC v. Schrader*, 484 Mass. 181, 186-187 (2020).

In its language, the WDS punishes conduct that is negligent, willful, wanton, *or* reckless.  It does not, however, specify acts or omissions that are intentional in nature.  As a result of this potential ambiguity, the issue before the court is whether Massachusetts would recognize, under guidance of the common law, a civil action under the WDS for damages for wrongful death based on intentional conduct.  The court thinks the answer is yes.  As a

---

bar to recovery imposed by the rule was imported into Massachusetts and other common-law jurisdictions in the United States. *See, e.g.*, *Hyatt v. Adams*, 16 Mich. 180, 188-189 (1867).  As in England, the adoption of wrongful death statutes was intended to correct what was thought an unjust anomaly in the law. *See generally* T.A. Smedley, *Wrongful Death—Bases of the Common Law Rules*, 13 Vand. L. Rev. 605 (1960).

specific matter, Justice Lowy in *GGNSC*, albeit in dictum, pointed out that the WDS permitted a derivative action by the representative of a decedent seeking compensation recoverable in "such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted." *Id.* at 187-188, quoting Mass. Gen. Laws ch. 229, § 2. Buttressing this statement is the recognition that the common law recognized more than a handful of torts based on intentional conduct. The intentional infliction of emotional distress, false imprisonment, and defamation come to mind. The common law also recognized a number of civil actions based on conduct that could also be prosecuted as crimes – for example, assault, battery, false imprisonment, and trespass.[13]  In sum, the court concludes that the SJC would recognize a cause of action under the WDS based on intentional (wanton and willful) conduct.

Cox's allegations in Count III most closely resemble the crime of involuntary manslaughter. Involuntary manslaughter is

> an unlawful homicide, unintentionally caused (1) in the commission of an unlawful act, *malum in se*, not amounting to a felony nor likely to endanger life . . . or (2) by an act which

---

[13] Dual civil and criminal actions did not figure in the early common law because of the medieval doctrine of merger under which a corresponding civil wrong was subsumed in the "higher nature" of the parent felony, the common-law penalties for which made pursuit of a civil action futile. *See, e.g.*, *Higgins v. Butcher*, 90 Eng. Rep. 61 (1607).

> constitutes such a disregard or probable harmful consequences to another as to constitute wanton or reckless conduct.

*Commonwealth v. Campbell*, 352 Mass. 387, 397 (1967) (internal citation omitted). "[E]ach type of involuntary manslaughter requires a showing that the defendant knew, or should have known, that his conduct created a high degree of likelihood that substantial harm would result to another." *Commonwealth v. Sneed*, 413 Mass. 387, 393 (1992); *see also Commonwealth v. Sheppard*, 404 Mass. 774, 776 (1989) (treating such acts or omissions in a criminal context as the legal equivalent of intentional conduct).[14]

As is clear from the foregoing analysis, Count III presents a close question. There is, however, a genuine dispute of fact in the record as to the Individual Defendants' states of mind. At various points throughout the early morning of July 14, the Individual Defendants saw Stilphen exhibiting behaviors that a reasonably trained police officer should have recognized as indicative of an overdose and yet consciously ignored the high likelihood that without their intervention, substantial harm to Stilphen would occur. Although the jury might well accept the Individual Defendants' testimony

---

[14] The court intends to frame its instructions to the jury on Count III using the language governing involuntary manslaughter without, of course, mention of the crime itself.

that they did not believe this to have been the case, the determination of the Individual Defendants' intent is a question "better suited for the jury." *Petitti v. New Eng. Tel. & Tel. Co.*, 909 F.2d 28, 34 (1st Cir. 1990).

Nor can the court conclude as a matter of law that the Individual Defendants did not "cause" Stilphen's death. The Individual Defendants posit that Stilphen "caused his own death when he surreptitiously ingested the drugs that killed him." Individual Defs.' Mot. at 20. But there is a genuine factual (and medical) dispute whether Stilphen died as a result of ingesting the drugs he had available in his cell (drugs that the Individual Defendants failed to detect and remove from his person during the arrest and booking procedures), or whether he died as a result of progressive intoxication from drugs previously ingested.[15] Accordingly, the court will deny summary judgment on Count III.

## ORDER

For the foregoing reasons, defendants' motions for summary judgment are <u>DENIED</u>. The Clerk will set a date for a trial before a jury.

SO ORDERED.

/s/ Richard G. Stearns_____
UNITED STATES DISTRICT JUDGE

---

[15] Dr. MacDonald testified that, upon Stilphen's arrival at the D-4 Station, he was "at risk for progressive intoxication in subsequent hours." MacDonald Dep. 75:23-76:1.