# EXHIBIT 1

1

```
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
 3          CIVIL ACTION  NO. 1:22-CV-11009-RGS
 4    LYNNEL COX, As Administrator of  )
      the Estate of Shayne R.          )
 5    Stilphen,                        )
                         Plaintiff,    )
 6                                     )
               vs.                     )
 7                                     )
      BOSTON POLICE DEPARTMENT,        )
 8    ISMAEL ALMEIDA, PAUL MICHAEL     )
      BERTOCCHI, CATIA FREIRE, AND     )
 9    JOHN/JANE DOES NOS. 1-2,         )
                         Defendants.   )
10    _____
11          DEPOSITION OF LYNNEL COX, called as a
12    witness by and on behalf of the Defendants,
13    pursuant to the applicable provisions of the
14    Massachusetts Rules of Civil Procedure, before
15    Melissa R. McKenzie, Certified Shorthand
16    Reporter, No. 1445F97, and Notary Public within
17    and for the Commonwealth of Massachusetts, at the
18    offices of Boston City Hall, 1 City Hall Square,
19    Boston, Massachusetts, on Wednesday, August 30,
20    2023, commencing at 10:30 a.m.
21
22          ELLEN M. FRITCH & ASSOCIATES
                363 SILVER STREET
23             SOUTH BOSTON, MA 02127
                 emfritch@aol.com
24                (617) 269-5448
```

2

## APPEARANCES:

EDWARD WHITESELL
SENIOR ASSISTANT CORPORATION COUNSEL
RANDALL MAAS
ASSISTANT CORPORATION COUNSEL
CITY OF BOSTON LAW DEPARTMENT
1 City Hall Square, Room 615
Boston, MA  02201
(617) 635-4045
Edward.Whitesell@boston.gov
Randall.Maas@boston.gov
For the Defendants

ALEXANDRA D. VALENTI, ESQUIRE
GOODWIN PROCTER, LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
(212) 459-7351
avalenti@goodwinlaw.com
For the Plaintiff

JESSIE ROSSMAN, ESQUIRE
ACLU OF MASSACHUSETTS
One Center Plaza, Suite 850
Boston, MA  02108
(617) 482-3170
jrossman@aclum.org

Also Present:  Alexandra Arnold
               Lauren Rey

3

I N D E X

TESTIMONY OF:                    PAGE

Lynnel Cox

(By Mr. Whitesell)               5

(By Ms. Valenti)                 196

4

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 104 | E-mail | 21 |
| 105 | Text messages | 37 |
| 106 | Text messages | 49 |
| 107 | Letter | 52 |
| 108 | Text messages | 53 |
| 109 | Text messages | 56 |
| 110 | Text messages | 60 |
| 111 | Complaint | 70 |
| 112 | Herald-Tribune Article | 80 |
| 113 | Letter | 82 |
| 114 | Text messages | 88 |
| 115 | Boston Police Incident Report | 90 |
| 116 | Text messages | 99 |
| 117 | Text messages | 100 |
| 118 | Boston Police report | 108 |
| 119 | Text messages | 111 |
| 120 | BSAS Intake | 116 |
| 121 | Text messages | 124 |
| 122 | E-mails | 146 |
| 123 | Boston Police report | 158 |
| 124 | E-mails | 168 |
| 125 | E-mails | 172 |
| 126 | E-mails | 173 |
| 127 | Letter | 176 |
| 128 | Winthrop Town Hall agenda | 177 |
| 129 | E-mails | 184 |
| 130 | E-mails | 194 |

EXHIBITS RETAINED BY ATTORNEY WHITESELL

177

| | | |
|---|---|---|
| 1 | | that? |
| 2 | A. | I thought it was through Charlene. |
| 3 | Q. | Charlene being Charlene Luma? |
| 4 | A. | Yes. |
| 5 | Q. | Your recollection is she reached out to you to |
| 6 | | let you know? |
| 7 | A. | Yes. |
| 8 | Q. | Do you think she may have given you a heads up |
| 9 | | that a decision was coming? |
| 10 | A. | Yeah, I do believe something along those lines. |
| 11 | Q. | What was your reaction to finding out they |
| 12 | | weren't going to charge anyone with a crime? |
| 13 | A. | I'm sure I was sad, but I -- yeah, I was sad. |
| 14 | | Even this letter -- |
| 15 | Q. | Do you recall attending a meeting in Winthrop |
| 16 | | which Rachael Rollins was present around this |
| 17 | | time? |
| 18 | A. | Yes. |
| 19 | Q. | You smiled.  Do you recall -- do you have a |
| 20 | | recollection of what happened? |
| 21 | A. | I do. |
| 22 | | (Exhibit No. 128, agenda, |
| 23 | | marked for identification.) |
| 24 | Q. | You had a chance to look at this? |

178

| | | |
|---|---|---|
| 1 | A. | I did. |
| 2 | Q. | Have you ever seen this particular document? |
| 3 | A. | No. |
| 4 | Q. | Do you see on Page 2 -- first, at the bottom of |
| 5 | | each page see where it says, Stilphen 355 and |
| 6 | | Stilphen 356? |
| 7 | A. | Yes. |
| 8 | Q. | You understand that these were documents that |
| 9 | | were produced by you through counsel? |
| 10 | A. | (Nods head.) |
| 11 | Q. | On the last line of Page 2 of the document it |
| 12 | | says, Lynnel Cox has made -- I think it's |
| 13 | | supposed to be it known she will be present.  Do |
| 14 | | you see that? |
| 15 | A. | Yes. |
| 16 | Q. | Do you recall making it known to the D.A.'S |
| 17 | | office that you intended to attend this meeting? |
| 18 | A. | Yes. |
| 19 | Q. | And what was your purpose in attending the |
| 20 | | meeting? |
| 21 | A. | My purpose in attending the meeting was to get |
| 22 | | answers to the promises that the D.A. had made |
| 23 | | me, and other folks in her office, but they |
| 24 | | stopped communicating with me.  And the only way |

179

| | | |
|---|---|---|
| 1 | | I could get it was to put her out in the public |
| 2 | | because I wanted her constituents to know that if |
| 3 | | this could happen to me, even though I was not |
| 4 | | her constituent, that it could happen to them |
| 5 | | too, and that this is how she was responding, or |
| 6 | | lack of responding.  I was holding her feet to |
| 7 | | the fire. |
| 8 | Q. | And this is approximately a week before the date |
| 9 | | on the letter saying that no charges would be |
| 10 | | filed. |
| 11 | | Do you know whether or not you spoke |
| 12 | | with Charlene Luma about the decision not to |
| 13 | | bring charges before you attended this meeting? |
| 14 | A. | No. |
| 15 | Q. | No, you didn't speak with her before this |
| 16 | | meeting? |
| 17 | A. | I didn't know at the time we went to the meeting |
| 18 | | that they weren't going to bring charges against |
| 19 | | anybody. |
| 20 | Q. | So you found out from Charlene Luma at some time |
| 21 | | after this meeting? |
| 22 | A. | I would assume so. |
| 23 | Q. | Did you engage the district attorney during this |
| 24 | | meeting at any point? |

180

| | | |
|---|---|---|
| 1 | A. | Yes, I did. |
| 2 | Q. | When was that? |
| 3 | A. | The question answer section.  Public mic. |
| 4 | Q. | So the last part of the meeting you engaged her? |
| 5 | A. | M-hum. |
| 6 | Q. | When you say public mic, was there a procedure or |
| 7 | | process for being able to speak and ask |
| 8 | | questions? |
| 9 | A. | Yes. |
| 10 | Q. | And what was that process? |
| 11 | A. | You would stand at the mic, you would address the |
| 12 | | D.A.  She then had a chance to speak with you. |
| 13 | Q. | And about how long did this session last? |
| 14 | | A little bit. |
| 15 | Q. | Did everyone that wanted to speak get a chance to |
| 16 | | ask questions? |
| 17 | A. | I believe so, yes. |
| 18 | Q. | Did you get a chance to ask questions of the |
| 19 | | district attorney? |
| 20 | A. | I did. |
| 21 | Q. | Do you recall what questions you asked her? |
| 22 | A. | I do. |
| 23 | Q. | What did you ask her? |
| 24 | A. | I remember I read a portion of her memorandum |

181

1    that she wrote to Suffolk County constituents
2    promising to -- promising things to the
3    community, to the population.  And I asked her
4    what things she has done since she had been in
5    office to fulfill that promise.
6 Q. And what did she respond?
7 A. There was none.
8 Q. She just didn't answer you at all?
9 A. She gave me a blanket answer, and said, I think
10   I've tried to help you.  And I continued to go
11   on.  I had it pretty written out what I was going
12   to address with her.
13 Q. Was there anything else specific that you
14   addressed with her?
15 A. I addressed -- yeah, I mean, I did a little
16   research, done a little research, about the
17   things that she was addressing in Suffolk County
18   and that none of those things fell into this
19   promise that she had made.  I asked her what the
20   response was to the investigation.
21 Q. Did she answer that?
22 A. Yeah, I think she told me that it wasn't, like,
23   for public forum.  I'm pretty sure I asked her
24   some specific questions and let the folks know

182

1    that they had lost my son's clothing, and that
2    there was staff there that signed for things
3    without even looking in the bag, and that these
4    are the D.A.'s and A.D.A.'s that are solving
5    crimes and don't even read an inventory sheet
6    without signing for it.
7 Q. Was this the first time you had an opportunity to
8    speak directly to the district attorney?
9 A. No.
10 Q. You talked to her earlier?
11 A. M-hum.
12 Q. Specifically?
13 A. M-hum.
14 Q. Was that in a less public forum?
15 A. Yes, it was in her office.
16 Q. Were there other people there?
17 A. Yes.
18 Q. Did you have occasion after this community
19   meeting to go meet with District Attorney Rollins
20   again?
21 A. No.
22 Q. Do you recall District Attorney Rollins ever
23   telling you personally that there was no crime
24   committed?

183

1 A. I believe we were on camera after the meeting
2    with Mary Saladna and she told me, I've done
3    everything for you.  I set you up with a meeting
4    with Maura Healy.  How could you come here.
5           She was pointing her finger in my
6    face.  I asked her to please get out of my space.
7    It was not a nice -- she was very aggressive.
8 Q. And this was all at this meeting on
9    September 26th --
10 A. Yes.
11 Q. -- or after it?
12 A. Yes.
13 Q. And that was on video?
14 A. Yes.
15 Q. So you hadn't been told in advance of this
16   meeting, but certainly during this meeting you
17   were told, that the D.A. was not going to charge
18   anyone with a crime?
19 A. I think she did hint.  I can't say for certain,
20   but I remember being really upset that day, and
21   she clearly was too.
22 Q. At some point did you ask Rollins to change the
23   assistant district attorneys involved in the
24   investigation?

184

1 A. I may have.  She actually -- she promised me that
2    she was going to look over it herself when I had
3    that problem with the clothing.  She looked me in
4    my eye and promised me and told me a story about
5    her sister and how her sister was addicted and
6    how she was raising her kid.  She went on and on
7    this story, and she was a perfect politician and
8    promised me that she was going to look over the
9    case.  And it's not going to leave my office
10   until that happens, and I'm going to get back to
11   you after I look at this, and she never did.
12 Q. So she was lying to you too?
13 A. Maybe she forgot.  I can't say she lied.  Those
14   are your words not mine.
15           MS. VALENTI:  Can we take five
16   minutes?
17           MR. WHITESELL:  Sure.
18           (Short recess.)
19           MR. WHITESELL:  Back on.
20           (Exhibit No. 129, e-mail,
21   marked for identification.)
22 A. Okay.
23 Q. All right.  So do you recognize these e-mails?
24 A. I do.