# EXHIBIT 3

Page 1

1

2

3                   UNITED STATES DISTRICT COURT

                    DISTRICT OF MASSACHUSETTS

4                  CIVIL ACTION NO. 1:22-CV-11009

5       ─────────────────────────────────────────

6    LYNNEL COX, as Administrator of the      )

7    Estate of Shayne R. Stilphen,            )

8                    Plaintiff,               )

9                    vs.                      )

10   BOSTON POLICE DEPARTMENT, ISMAEL ALMEIDA,)

11   PAULMICHAEL BERTOCCHI, CATIA FREIRE,     )

12   DAVID MARSHALL, and JOHN/JANE DOE NO. 1, )

13                    Defendants.             )

14      ─────────────────────────────────────────)

15                       VIDEOTAPED DEPOSITION OF JAMES F.

16   LYDON, called as a witness by and on behalf of the

17   Plaintiff, pursuant to the applicable provisions of

18   the Federal Rules of Civil Procedure, before P.

19   Jodi Ohnemus, RPR, RMR, CRR, CA-CSR #13192, NH-LSR

20   #91, MA-CSR #123193, and Notary Public, within and

21   for the Commonwealth of Massachusetts, at Goodwin

22   Procter, LLP, 100 Northern Avenue, Boston,

23   Massachusetts, on Wednesday, October 11, 2023,

24   commencing at 10:08 a.m.

25

1            VIDEO OPERATOR:  Good afternoon.  We are

2      now on the record.  This is the videographer

3      speaking, Gayle Ashton, with Veritext Legal

4      Solutions.

5            Today's date is October 11th, 2023, and

6      the time is 1:34 p.m.  We are here at Goodwin

7      Procter LLP, 100 Northern Avenue, Boston,

8      Massachusetts, to take the video deposition of

9      James Lydon in the matter of Lynnel Cox versus

10     Boston Police Department, et al.

11           Would counsel please introduce themselves

12     for the record.

13           MR. GINTHER:  Matthew Ginther for the

14     plaintiff.  Sorry.  Matthew Ginther of Goodwin

15     Procter for the plaintiff.  Here with me are my

16     colleagues, Jessie Rossman and Isabel --

17           MS. BURLINGAME:  Burlingame.

18           MR. GINTHER:  -- Burlingame.

19           MR. MAAS:  And Randall Maas from the City

20     of Boston law department for the defendants.

21           VIDEO OPERATOR:  Would the court reporter,

22     Jodi Ohnemus, please swear in the witness.

23           JAMES F. LYDON, having

24               satisfactorily been identified by

25               the production of a driver's license,

1           and being first duly sworn by the Notary

2           Public, was examined and testified as

3           follows to interrogatories

4      BY MR. GINTHER:

5           Q.   Good afternoon.

6           A.   Good afternoon.

7           Q.   Can you please state and spell your first

8      name for the record.

9           A.   Certainly.  My first name is James.  It is

10      spelled J-a-m-e-s.

11           Q.   And your last name?

12           A.   My last name is Lydon.  It is spelled

13      L-y-d-o-n.

14           Q.   And are you represented by counsel here

15      today?

16           A.   I am.

17           Q.   And that's Mr. Maas?

18           A.   Yes, it is.

19           Q.   Have you been deposed before?

20           A.   I have.

21           Q.   I'm sorry to hear that.

22                How long ago was that?

23           A.   I'm sorry to say I don't remember.

24           Q.   The -- the previous deponent, his previous

25      deposition was 1993.

Page 18

1      A.    Yes.

2      Q.    Category 15.  (As read):

3            "Training histories of Ismael Almeida,

4      Paulmichael Bertocchi, Catia Friere, David

5      Marshall, and Brian Picarello regarding booking

6      procedures."

7      A.    I do not have access to their training

8      histories.  I do remember at least two of the names

9      as former recruits, and if they were on since

10     2000- -- since 2006 on, then I -- there's a really

11     good chance that I trained them.  I've trained

12     pretty much everybody except for the current class.

13     There were several weeks in which I was unable to

14     train because I had been transferred out of the

15     academy.

16           Prior to that I had my hands in the

17     booking training of everybody from probably the end

18     of 2006 up until today, with that -- with those

19     exceptions that I just mentioned -- to the specific

20     names -- but I do recognize a couple of the names

21     on there.

22     Q.    Okay.  Thank you, Mr. -- Officer Lydon.

23           And what did you do to prepare for this

24     deposition today?

25     A.    I prepared with my counsel.  We had

```
                                                Page 20
 1          Q.   Okay.  And I did not mean to interrupt
 2     you.  You were describing to me how you went about
 3     preparing for today's deposition.
 4          A.   Yes.  So I did have that booking class
 5     last week.  My counsel showed up to that class to
 6     view the class, to get an idea of what it is that I
 7     actually do.  And that is pretty much how I
 8     prepared for this deposition today.
 9          Q.   Outside of the rule -- and I believe you
10     were mentioning Rule 318 -- did you review any
11     documents to prepare for today's deposition?
12          A.   Outside of Rule 318?
13          Q.   Uh-huh.
14          A.   Outside of Rule 318, I did not review any
15     documents to prepare for this deposition, with the
16     exception -- I'm sorry -- this email that you --
17     Exhibit 195.
18          Q.   Understood.
19               I understand you've been at BPA for some
20     time.
21          A.   BPD?
22          Q.   I'm sorry.  The Boston Police Academy
23     specifically.
24          A.   Academy, yes.
25          Q.   And what -- for the purposes of better
```

1      understanding where you are coming from today, what

2      has been your role at the Boston Police Academy?

3           A.   My main role at the Boston Police Academy

4      since I was accepted in their ranks in 2006 is the

5      role of the report-writing instructor.  That's my

6      main role.  I've also taken on other roles, one of

7      which was teaching computer classes to squads of

8      recruits during the breakout periods and that would

9      involve me teaching booking.

10          Q.   And so do I understand correctly that

11     there is one booking class for each set of cadets?

12          A.   For recruits, yes, there is one booking

13     class for each set of recruits.  We do also teach

14     cadets, and I'm not making that -- that correction

15     at all.  I just sometimes need to separate them.

16     'Cause cadets don't get booking classes at all.

17     'Cause they're not allowed to have contact with

18     prisoners.

19               Recruits are going to be police officers.

20     So they will have contact with prisoners, and they

21     must get the booking class.  But, yes, one booking

22     class per every recruit that goes through the

23     academy.

24          Q.   And for the purposes of the record and my

25     education, can you differentiate a cadet versus a

Page 22

1      recruit.

2          A.    Yes.  A cadet is basically a civilian

3      employee -- a uniformed civilian employee who will

4      then work in an administrative or support position

5      upon their graduation from the academy.

6               A recruit is a -- they're a police recruit

7      that is -- becomes a sworn member of the

8      department.  They will become a police officer.

9               Cadets at some point can apply to be

10     police officers, and we do have many cadets that

11     become police officers.

12              A recruit, when they become a police

13     officer, will have all the -- the rights and

14     responsibilities that a police officer would have.

15     A cadet would, again, be administrative and

16     support.  They do have different uniforms.  They

17     have different lengths of their training.  I want

18     to say -- and I'm not 100 percent positive about

19     this -- but a cadet training is about four weeks,

20     maybe five, depending on the additional classes or

21     any hiccoughs in the system in regard to scheduling

22     their emergency vehicle operation course location.

23              Recruit classes are generally about seven

24     months.

25          Q.    And so thank you for that because that

                                                  Page 23

1      makes an important correction to my previous

2      question.

3               So is it accurate to say that you teach

4      one booking class per group of recruits?

5           A.   Yes.

6           Q.   And so approximately one class twice a

7      year?

8           A.   Depending on the -- the schedule.  Some

9      years we do get two recruit classes in a year.

10     Some years we only get one.  This particular year

11     we've had one recruit class in, although we did

12     have a recruit class that graduated at the

13     beginning of the year.  But the training for

14     booking would be -- they got trained for booking

15     last year in -- in 2022.  The current class,

16     recruit class 63-23, was trained recently for

17     booking.

18               If -- in the case of multiple classes a

19     year, it has just happened to fall on the -- on the

20     calendar that maybe a class would be booked --

21     would be taught how to book at the beginning of the

22     calendar year and then maybe a class would be

23     taught how to book at the end of the calendar year,

24     but it's not something that is written in stone, so

25     to speak.

```
                                          Page 24
 1          Q.   Do you teach every booking class?
 2          A.   Yes, with the exceptions of the ones
 3     that -- this past month, since the -- it was the
 4     middle of August toward about the middle of
 5     September I was transferred due to the
 6     Commissioner's 20-tour initiative in which he pulls
 7     officers from specialized units and sends them back
 8     out to the districts to work radio calls and to
 9     work as patrol units.
10               During that time I was unable to book -- I
11     was unable to teach recruits on how to book
12     prisoners.
13          Q.   So you were back on the street for a
14     little bit?
15          A.   Yes.
16          Q.   How was that?
17          A.   It was fun.
18               (Court Reporter comment.)
19          Q.   While we're on the topic of the booking
20     class, do I understand correctly that all practices
21     and procedures for booking and intake are taught in
22     that class?
23          A.   Yes.
24          Q.   Outside of that class are booking and
25     intake somehow subject to training -- strike that.
```

1      booking -- that being fingerprinting, data entry

2      photograph taking -- as opposed to other aspects of

3      booking?

4          A.   Yes.

5          Q.   Would I be correct in saying that the --

6      that booking class did not touch on cell visits and

7      monitoring?

8          A.   I don't remember if -- if we talked about

9      that.  That is a big point that we talk about with

10     recruits, but I don't remember if we mentioned cell

11     visits and monitoring for that.

12         Q.   What about collection, preservation, and

13     return of detainee property?

14         A.   I believe we touched on that because part

15     of the -- cell visits and monitoring are not

16     recorded in the RICI program.

17         Q.   For the record, can you just say what the

18     RICI program is?

19         A.   Yes, the RICI program is the computer

20     program that we use at the Boston Police Department

21     to book prisoners, collect their -- their data into

22     a record; and this record is then shared with,

23     again, the ID unit and the FBI.

24             RICI stands for the Repository of

25     Integrated Criminalistic Imaging, and we've been

Page 37

```
 1         using that since 1993 -- I've been using it since
 2         1995 when I first got on the job.
 3                 The RICI program doesn't have a spot for
 4         prisoner checks.  The RICI program does have a spot
 5         for property.  When I teach the class and when I
 6         did the refresher, I used the RICI program as a
 7         guide to teach the students or to refresh the
 8         students.  That is why I think that I covered on
 9         the prisoner property for that refresher class, but
10         for that refresher class I cannot remember covering
11         the checks because it wasn't in the RICI program.
12             Q.   And is the RICI program still a program
13         used today?
14             A.   Yes.
15             Q.   And when you said that some other programs
16         do include a data entry field for checks -- first
17         of all, did I represent that correctly?
18             A.   With all due respect, no.
19             Q.   So if you can correct me, that would be
20         great.
21             A.   But there are other -- yes.  I'm sorry.
22                 There are other methods of collecting that
23         information, and I've recently become aware of
24         another method of that.
25                 So the main method of that information
```

1    and I wouldn't have addressed it with the -- with

2    the sworn officers in their booking refresher

3    class.

4         Q.   If we look a little bit further down,

5    paragraph 4, section 3, which provides (as read):

6         "When a prisoner is unconscious, the duty

7    supervisor shall be notified, every effort shall be

8    made to restore consciousness, and medical

9    assistance shall be summoned."

10        For the purposes of that paragraph of

11   section 3 of Rule 318, first, what does it mean to

12   be unconscious?

13        A.   That is a really good question that I am

14   struggling to come up with an answer with.  It's

15   such a -- a natural thing that I can't really

16   describe it.

17        It is when you are not -- no longer

18   conscious; when you're not responsive.  You have

19   no -- and I would say responsive physically and

20   verbally.  If someone was in a state in which they

21   were unable to respond to stimulus, that would be

22   unconscious; however, still alive.

23        Q.   And how, if at all, are officers trained

24   on discerning whether a prisoner is unconscious or

25   not?

Page 61

1        A.    I don't know if there's any -- any
2     particular training that would let officers know
3     how they were conscious or not.  I train them to
4     look for signs of breathing definitely, although an
5     unconscious person can breathe; and I would -- I
6     have mentioned in training that if somebody is
7     unconscious, we're definitely going to get help.
8     That's part of the training that I give to the
9     recruits in this, and I -- I would have to say that
10    I would probably have mentioned it to -- to the
11    officers in the refresher course too, 'cause I do
12    make a point of telling the recruits that they're
13    not just going to go in; they're going to --
14    they're going to call for help first and then go in
15    and render aid because -- and -- and specifically I
16    do this because they could be giving CPR by
17    themselves in there and nobody may know what's
18    going on; and they could be yelling and screaming
19    and maybe not be heard.
20            So I specifically tell the recruits, you
21    will -- if you find a prisoner -- and I use the
22    term "unconscious" -- that is unconscious, I say,
23    Go get help.  Just open the door and start
24    screaming for help, and then go back in and then
25    open the cell door and render aid.

Page 62

```
 1          Q.   And, again, for the record, everything
 2     that you just provided, has -- has that been the
 3     case since 2016?
 4          A.   I do not know.  I -- I believe it has, but
 5     I do not know the dates.
 6          Q.   Do you know what -- the term
 7     "semiconscious"?
 8          A.   I've heard of the term "semiconscious."
 9          Q.   Is there -- in the course of your training
10     of recruits or sworn officers, do you provide them
11     any training as to what to do if they observe
12     somebody in a semiconscious state?
13          A.   No.  I've never used that word or -- or
14     taught anybody about that.
15          Q.   And if we turn to the fifth paragraph of
16     section 3, which provides (as read):
17               "Any unusual appearance or behavior
18     displayed by prisoner shall receive immediate
19     attention."
20               What do you understand "unusual appearance
21     or behavior" to mean?
22          A.   A behavior or appearance that is not the
23     usual.  I would -- I have -- I'm sorry.
24               I have used the example of -- of not
25     breathing in that instance.  I've told recruits
```

Page 63

```
 1        they will -- they will look in to see if the
 2        prisoner is breathing, and that is not usual.
 3           Q.   Anything else?
 4           A.   I have not used any other terms or any
 5        other conditions for that.
 6           Q.   And, again, I'm sorry if this is
 7        repetitive, but does your answer, to the best of
 8        your present recollection, cover the entire period
 9        since 2016 in terms of the training you've
10        provided?
11           A.   For recruits?
12           Q.   Yes.
13           A.   Again, I -- I believe that it has, but I
14        don't -- I don't base it on dates.  So I -- I
15        believe it is -- stayed the same.
16           Q.   You have no reason to believe it has
17        changed?
18           A.   I have no reason to believe it has
19        changed, yes.  Yeah, that is an excellent way to
20        put it.
21                MR. GINTHER:  We've been going about an
22        hour and a half.  Let's take a quick break.  I'm
23        cognizant of the time.  Randall, when -- let's go
24        off the record.
25                VIDEO OPERATOR:  The time is 2:52.  We are
```

Page 64

1      going off the record.

2                (Recess was taken.)

3                VIDEO OPERATOR:  We are back on the

4      record.  The time is 3:08.

5         Q.   All right.  So let's turn to section 13 of

6      Rule 318, which provides, in pertinent part, that

7      (as read):

8                "The duty supervisor shall visit or cause

9      to be visited all persons in their custody at least

10     once every 15 minutes and shall ensure that each

11     visit is recorded in the prison inspection record."

12               Officer Lydon, am I correct that this

13     section of the rule falls under the training that

14     you provide to recruits and to sworn officers in

15     the context of that one class we discussed?

16        A.   Yes.

17        Q.   And what does this rule provide for?

18        A.    It provides for an inspection for the

19     prisoners so that we can assure their safety.

20     15-minute time period in which they're out of our

21     sight -- every 15 minutes we're able to -- to look

22     at them and make sure that they're okay.

23               The rule itself also provides for the fact

24     that this particular visit -- or these visits every

25     15 minutes are -- are logged in in the -- that

Page 65

1    record; and as I earlier said, that it is now

2    logged in with your ID.

3            And the rule also provides for the fact

4    that the duty supervisor is the one that is letting

5    everybody know that this is what's happening,

6    although this is taught in class.  So every recruit

7    that becomes a police officer should know that this

8    needs to get done.

9       Q.   Has -- are you aware of this rule having

10   changed since 2016?

11      A.   In total, no.  But I do know that the --

12   the new station at District 7 uses the ID system;

13   and I don't know if other stations use that.  I

14   know that in 2006 when I was at District 4 it was a

15   button that you would push.  I also know that the

16   logs have changed.  They've updated the way that

17   the logs look and how they're printed up, but I

18   don't know any specifics about that.

19      Q.   So outside of the logging of the 15-minute

20   inspections, are you aware of this -- any changes

21   to this rule since 2016?

22      A.   I don't know any dates, but I know there

23   was -- and you said outside of logging -- at one

24   point, as I mentioned earlier in my testimony, that

25   there used to be two buttons:  There was a button

1     at the end of the hallway where all the prisoners

2     were, and there was a button at the booking

3     officer's desk.

4           That button was put there so the booking

5     officer could shut the alarm off, finish whatever

6     task they're doing -- maybe they're dealing with

7     the bail commissioner or they're signing for the

8     food for the prisoners or whatever they're doing,

9     whatever tasks they're completing -- and then go in

10    and hit the button.  That was the plan.

11          I don't officially know why that was

12    changed, but I do know that something happened in

13    one of the districts -- I don't know exactly what

14    district or what exactly it was or who it was --

15    but because of that, those buttons at the booking

16    officer's desk were removed.

17          So the only button you could hit was the

18    button at the end of the corridor, forcing every

19    booking officer to walk through the prisoner cell

20    block to get to that button to shut the alarm off.

21          But I don't know the times.  I don't know

22    the date -- the dates of the change.  That could

23    have changed before 2016.  It could have changed

24    afterwards.  I don't know.

25          Q.   So outside of the mechanisms for logging

1          the inspections or the procedures for documenting

2          the inspections, whether it be the button at the

3          booking desk or the scanner at the end of the hall,

4          are you aware of any changes to the rule?

5               A.    No.

6               Q.    And outside of those two buckets of

7          things, have you changed how you have trained

8          individuals on this rule since 2016?

9               A.    Outside of those two, then, no.

10               Q.    The rule says that the duty supervisor (as

11          read):

12                    "...shall visit or cause to be visited all

13          persons in their custody," among other things.

14                    What does the rule mean by "shall visit or

15          cause to be visited" in the context of these

16          prisoner inspections?

17               A.    That whoever is doing the visiting, be it

18          the duty supervisor or the person that they are

19          directing to do that, which would be the booking

20          officer, would look at the prisoners to gauge their

21          current well-being.

22               Q.    And am I correct in saying that that is --

23          strike that.

24                    In the course of the training that you

25          provided to recruits or to sworn officers in the

Page 68

```
 1          context of that class that we discussed, how do you

 2          train individuals on meeting the "shall visit or

 3          cause to be visited" part of the rule?

 4              A.    In regard to the recruits and those --

 5          again, those three classes -- or maybe a little bit

 6          more -- I describe what needed to be done.

 7                   For recruits I actually pantomime it out

 8          for them.  I will walk down the aisle between

 9          their -- their desks in the computer lab and

10          pantomime me actually hitting a button down at the

11          end.  And then I'll pantomime them walking back and

12          just -- just to -- just to show them.  Again, that

13          movement, I think, is important so that they can

14          see a dynamic class happening.

15                   I also talk about that they will visually

16          inspect these prisoners as they are going by them;

17          and I mention that there's no need to actually wake

18          them up if they're asleep.  This is a big thing

19          with them when I talk about this.  I say, you don't

20          want to wake up a sleeping prisoner who just got to

21          sleep.  It's kind of inhuman to keep waking

22          somebody up who's under your care like that.  But

23          to inspect them as if you were inspecting your

24          child at night before bed.

25                   And at this point I'll have them all --
```

```
 1        anybody who has kids, I'll say, "Whoever has kids,
 2        raise your hand."
 3               And if they have children, they raise
 4        their hand, and then I again pantomime what I used
 5        to do with my daughter, and I would show them that.
 6               And I say, "Does anybody ever remember
 7        doing this?"
 8               And I show them a pantomime of me looking
 9        at my daughter when she was little and pausing and
10        inspecting her visually to see if she was
11        breathing.
12               And then I'll give a relaxed -- I mean, a
13        very relaxed sigh.  Good.  She's breathing.  Now I
14        can move on.  That's what I say for the prisoners.
15        I say, you don't have to wake them up.  You just
16        look and see if they're breathing.  And if they're
17        breathing, let them sleep.  Don't disturb them.
18               I do say if they're not breathing, you
19        definitely want to check on them by banging on the
20        glass or the Plexiglas, whatever it is -- I'm not
21        really sure what the -- I think it's some sort of
22        Plexiglas that is on the cell doors.  Banging on
23        the door.  Banging on the Plexiglass to try to get
24        some sort of reaction out of them to see if they
25        are, in fact, sleeping and maybe you just are
```

```
 1        unable to see their chest rising and falling.
 2             Q.    So let's break that up.
 3             A.    Okay.
 4             Q.    And, again, just for the purposes of the
 5        record, do I understand you correctly to be saying
 6        that in your training of recruits you instruct
 7        recruits to, at a minimum, look -- first look into
 8        the cell?
 9             A.    Yes.
10             Q.    And then, after they have looked into the
11        cell, what else do you instruct them to do?
12             A.    To inspect for breathing.  'Cause there's
13        one thing looking in the cell to acknowledge the
14        fact that there's a person in there.  So I
15        definitely say look in the cell, but then, to
16        extend that, I say, You must look to see if the
17        person's breathing.  You can't just go, There's
18        somebody in there.
19                   You have to make sure that they're
20        actually still breathing.  Some prisoners will be
21        awake, and they'll look at you and then that's
22        fine.  You don't have to inspect to see if they're
23        breathing 'cause they might not sleep at night or
24        it's during the day and they're just sitting there.
25                   So if you can see them, then -- and they
```

Page 71

1    look at you, then you're okay; you know that
2    they're all right.
3              But it's the ones at night especially --
4    and it doesn't have to be at night, but it's the
5    ones who are sleeping that is the concern.  So I'll
6    say, Look to see that there's somebody in there,
7    that everything's okay.  Then inspect to see if
8    they're breathing by seeing the rise and fall of
9    the chest or stomach, however way it is, and
10   then -- and then -- do you want me to continue to
11   break it down?
12        Q.    Please.
13        A.    And then, if there's nothing, you can't
14   see movement, then you need to assure yourself that
15   this person is -- is okay.  So you would bang on
16   the door or the Plexiglas, however way it -- it is,
17   to try to get a response out of them.  They might
18   startle awake and then you know that they are
19   alive.  They're okay.  And if you have to keep
20   banging until they actually wake up, then that's
21   what you've gotta do.
22              And then, once you're satisfied that the
23   person is okay and that they were just sleeping and
24   then maybe you just couldn't see movement, then you
25   can move on with your checks.

Page 72

1          Q.   Now, in answering the question before, you

2     brought up that you relayed to officers how this is

3     what you did with your daughter.

4          A.   Yes.

5          Q.   So my question for you is everything that

6     you just described to me, is that your

7     understanding of what's required of this rule, or

8     is it James Lydon's best practices?

9          A.   I think it's a little bit of both, to be

10     honest with you.  I mean, I think the rule

11     requires -- I mean, it clearly says, all right, (as

12     read):

13               "To visit their persons in custody every

14     15 minutes to ensure --"

15               I'll stop right there 'cause that's just

16     the -- the logging of that.

17               And from the very beginning of me booking

18     prisoners back -- way back when in 1995 -- or

19     whenever I first started booking prisoners as a

20     police officer -- it was expressed to me that you

21     need to make sure they're okay.

22               So I think the rule -- the rule requires

23     that visit to be a visit that I ensure that the

24     person is there and okay and is breathing; and I

25     think it's also my best practices.

1        A.    I give them that instruction, and I tell

2     them they will immediately report it to the duty

3     supervisor.   I then expand on that and tell them

4     what's probably going to happen at that point.

5        Q.    Do you provide any training or instruction

6     to recruits regarding how to handle cases where

7     somebody appears ill but does not report feeling

8     ill?

9        A.    So the prisoner feels ill --

10        Q.    Appears --

11        A.    Appears ill --

12        Q.    -- but does not --

13        A.    -- but doesn't report that they're ill?

14        Q.    That's right.

15        A.    I have never given specific instructions

16     on that, but I have told recruits that they are to

17     gauge the prisoners -- there's a dropdown menu in

18     one of the panels of the RICI system, and it

19     basically asks for their -- their state of

20     consciousness; and I explain the four choices that

21     are on this -- in this section, and those four

22     choices are:   alert; dazed; under the influence of

23     liquor, which is represented by UIL; and under the

24     influence of drugs, which is represented by UID.

25     And I explain that they need to make an assetation

Page 89

1      [verbatim] of the prisoner's state.  They have to
2      look at them, and they have to determine which to
3      pick from those.
4              I also say that there are times in which
5      they're going to have to make a determination about
6      the prisoner based on what condition they believe
7      the prisoners to be in.  Specifically, you
8      shouldn't be booking a prisoner that is, for
9      example, drunk, because they could fall over and
10     hit their heads.
11             And someone who's drunk might not
12     necessarily say that they're drunk, but they might
13     appear to be so.  So I give them instruction along
14     those lines.
15         Q.   So just to make sure I understand.
16             Every person who is booked, the booking
17     officer is required to make an assessment in the
18     RICI system that classifies individuals as either
19     being alert, dazed, under the influence of liquor,
20     or under the influence of drugs?
21         A.   Yes.
22         Q.   To the best of your understanding, that
23     remains to be the case today?
24         A.   Yes.
25         Q.   And that was true in 2019 as well?

```
 1          A.   I can definitely say yes for that, yes.

 2          Q.   How are -- how are officers trained on

 3     that -- strike that.

 4               If somebody is assessed as being anything

 5     other than alert, does the booking continue?

 6          A.   Yes, if safe to do so.

 7          Q.   Is there any written guidance that you are

 8     aware of relating to this assessment?

 9          A.   I believe it's in the book, the textbook

10     that we have provided.

11          Q.   And do you train officers on how to make

12     this assessment?

13          A.   I train officers to make the assessment,

14     and I tell them that it's going to be their best

15     estimate as to what they feel the condition of the

16     prisoner is.  I tell them they must be truthful.

17     And I tell them that -- at one point I had a -- an

18     assistant district attorney from the Suffolk County

19     District Attorney's Office come in and speak to the

20     recruits in my report-writing class.  I do this

21     every year.  I have somebody from the district

22     attorney's office come in and talk to them.

23               This one particular year we had a district

24     attorney come in who explained that there is a

25     popular defense in which the defense attorney will
```

1      claim that their client was so drunk that they were

2      not in control of their actions and therefore they

3      had no intent.  And a lot of crimes -- part of the

4      elements of the crimes would be based on intent of

5      the prisoner.

6              So this assistant district attorney said

7      you really need to note their state of

8      consciousness, and it was -- I took this as part of

9      the booking.  I immediately focused on that and

10     used that story as part of the training for the

11     recruits; and I mention that all the time to them.

12             So that's how we talk about it.  I say,

13     make your best -- your best guess.  I say, if --

14     it's got to be truthful.  If the person's drunk and

15     at a later time the defense attorney claims that

16     they're too drunk to have made a conscious action

17     and they have no intent, it is what it is.  It's

18     business.  We can't lie.

19             But if they're alert and this defense

20     attorney is saying that, then you may be called to

21     testify in court for the fact that you chose alert

22     for this particular prisoner when the defense is

23     saying that this particular prisoner wasn't alert;

24     they were drunk.

25         Q.   And outside of teaching recruits that they

1      need to make an honest assessment, do I

2      understand -- understand correctly that you do not

3      provide any training as to how to make that

4      assessment?

5          A.   I do not provide training as to how to

6      make the assessment, other than I explain to

7      them -- I do explain about the smell of alcohol,

8      but I also explain that there are many drugs that

9      somebody could take that they won't smell.  So I

10     say just make your best assessment and be honest.

11     So I guess that's pretty much that.

12         Q.   Aside from that assessment, do you provide

13     any training to recruits as to how to handle

14     individuals who are showing signs of intoxication?

15         A.   Yes.

16         Q.   Can you expand on that?

17         A.   Yes.

18              As part of that -- again, that section of

19     the booking record of RICI, I always talk about the

20     fact that it -- if you're booking someone, you need

21     to -- you need to make sure that it's safe to do

22     so.  You cannot book a prisoner who is unable to

23     stand on their own.  It just doesn't work.  You

24     can't physically do it.  You can't safely do it.

25     And even the video -- the images that are taken for

1       booking class.  I see his original booking class,

2       which is on the third page.  "Status date:

3       9/28/2006."  But I don't see any reference to the

4       refresher class on here at all.

5               Let me just look on this even though this

6       is -- it's all 2002, 2001.

7               (Witness reviews document.)  Yeah, I don't

8       see anything on here about the refresher class --

9       unless I'm missing it.

10          Q.   And for our benefit, do you know how the

11      refresher class -- or the course name of the

12      refresher class?

13          A.   No.  I don't know what it would -- would

14      have been officially called.  If it was left up to

15      me, I'd just say, put booking refresher or booking

16      refresher class.

17          Q.   That would be too easy, though; right?

18              Do you have personal knowledge of

19      providing Officer Friere training on booking

20      procedures?

21          A.   I believe her graduation date was in -- is

22      this mine or is this...

23          Q.   It is ours.  Right here.

24          A.   I believe her graduation was in 2019?  Am

25      I correct in that?

1          Q.    Let me pull that up. (Reviews document.)

2                So that's correct.  June 2019.

3          A.    If that's the case, then she was part of

4     that -- that -- she was part of a class that I

5     taught on that.  So I taught her booking.  I don't

6     remember her in class, but I remember I was

7     teaching booking at that time at that class; and

8     there was no interruptions in service like there

9     was for this particular recruit class currently.

10         Q.    And for the purposes of the record, the --

11    you instructed that class for the 2019 recruits in

12    the manner at which you testified generally earlier

13    today?

14         A.    Yes.

15         Q.    Do you recall providing the instruction

16    and training related to booking to Officer

17    Bertocchi?

18         A.    Again, I remember the name, but I don't

19    remember him in class.

20         Q.    Officer Bertocchi would have graduated

21    from the academy in April 2018.

22         A.    2018?

23         Q.    That's correct.

24         A.    So he would have -- would have been in

25    57-17.

Page 119

1      Q.    That's correct too.

2      A.    So I would have been his -- his instructor

3    for booking.

4      Q.    And same questions for -- you would have

5    instructed that class in the same way that you

6    testified having to instruct that class, generally,

7    earlier today?

8      A.    Yes.

9      Q.    (Reviews notes.)  I'm just going to take a

10   best guess.

11         Approximately how many officers have you

12   trained since you joined the academy?

13     A.    Wow.  That's an approximation.  So if you

14   just give me a moment, I can go through that.  I

15   may have to count on my fingers.  Is that -- might

16   be embarrassing, but I'm going to do that.

17     Q.    It's okay.  Ballpark.  Hundreds?

18   Thousands?

19     A.    Oh, it's -- it's well over hundreds.

20         My first recruit class was -- and, again,

21   I don't normally count 44-06 as my first class

22   because I was just starting off.  I was just

23   helping out where I could.  45-06 was my first

24   recruit class.

25         So now they're at 63-23.  If my math is