```
 1                UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS

 3

 4    _____

 5    Lynnel Cox, as administrator of
      the estate of Shayne R. Stilphen,
 6
                         Plaintiff,        Civil Action
 7                                         No. 22-CV-11009-RGS
      v.
 8                                         August 13, 2024
      City of Boston, et al,                9:00  a.m.
 9
                         Defendants.
10    _____

11

12

13

14          BEFORE THE HONORABLE RICHARD G. STEARNS

15                UNITED STATES DISTRICT COURT

16             JOHN J. MOAKLEY U.S. COURTHOUSE

17                     1 COURTHOUSE WAY

18                     BOSTON, MA  02210

19

20

21

22
                       JAMIE K. HALPIN, RPR, RMR
23                       Official Court Reporter
                     John J. Moakley U.S. Courthouse
24                     1 Courthouse Way, Room 5205
                             Boston, MA  02210
25                        jkhhalpin@gmail.com
```

1  Q.    Through the time that he was placed in his individual cell
2  at D-4, you didn't believe that Stilphen was experiencing an
3  overdose, did you?
4  A.    No.  He was showing signs of intoxication.
5  Q.    And you just told us now that you didn't think he was
6  showing signs of an overdose until 4:48 a.m., correct?
7  A.    Yes.
8  Q.    All right.  And a few minutes after he's placed in the
9  cell when Officer Bertocchi returned to the cell with a
10 sandwich and two milk cartons, I think you mentioned -- you
11 didn't think at that point he was experiencing an overdose, did
12 you?
13 A.    No.  He was still showing signs of intoxication but was
14 maintaining his responsiveness.
15 Q.    Intoxicated individuals don't need to go to the hospital,
16 correct?
17 A.    My assertion here is that intoxicated individuals require
18 appropriate monitoring.  That could be through referral to
19 medical services, but it could also be done on-site.
20 Q.    We'll get to the progressive intoxication in a minute.  He
21 clearly wasn't in the coma that you were describing earlier
22 during your direct examination, correct?
23 A.    Correct.
24 Q.    And he certainly didn't need Narcan when Officer Bertocchi
25 went into his cell with -- or -- he didn't go into the cell,

1  Yes.
2  Q.  So you now know that it's unlikely that Shayne had been
3  taking fentanyl for a long period of time, correct?
4  A.  Yes.
5  Q.  All right.  At your, deposition, though, you presumed that
6  had he had taken -- in doing your report, you presumed he had
7  been taking it since it entered the northeast market, correct?
8  A.  I didn't appreciate the proximity of his treatment stay to
9  his incarceration at that time.  But I think what's important
10 is that these are all factors that make oversedation
11 unpredictable, and that was the point that I was making.
12 Q.  So let's get to the point:  Your opinion is that Shayne
13 was suffering from progressive intoxication that could lead to
14 an overdose when he was in this booking area, correct?
15 A.  I wouldn't frame it that way.  I think I clearly stated,
16 but I'll just state again, that there are many reasons why a
17 person who is demonstrating opioid intoxication in the setting
18 where Shayne was, in the booking process, could have
19 progression of that intoxication.
20     Those reasons include the complexities of half-life, the
21 other drugs that we talked about, and the possibility of
22 consuming more drugs.  Those are all reasons to closely monitor
23 a person in that setting.
24 Q.  And the obvious one here is the last one, consuming more
25 drugs, correct?

```
 1   A.   I think that one looms large in this case, yes.
 2   Q.   You would say that it would play heavily in an analysis of
 3   what caused Shayne's death, correct?
 4   A.   Yes.
 5   Q.   You've been hired to be retained as an expert 19 times,
 6   correct?
 7   A.   I don't know the exact number, but that sounds close, yes.
 8   Q.   At your deposition, we reviewed your CV, correct?
 9   A.   Yes.
10   Q.   Nineteen?  Twenty?
11   A.   I am not disputing that number, no.
12   Q.   In some of these cases, you testified or were asked to
13   testify about treatment of opioid use disorder in correction
14   centers, correct?
15   A.   Yes.
16   Q.   These are lawsuits seeking to get jail systems to use the
17   methadone or other types of treatment drugs as a treatment for
18   prisoners with opioid use disorder, correct?
19   A.   Yes.
20   Q.   And you've been an expert in cases involving access to the
21   medication, but you've never been asked to opine regarding an
22   in-custody opioid death, have you?
23   A.   No.
24   Q.   This is the first case you've ever testified on that,
25   right?
```