```
 1                  UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3


 4     _____

 5     Lynnel Cox, as administrator of
       the estate of Shayne R. Stilphen,
 6
                         Plaintiff,          Civil Action
 7                                           No. 22-CV-11009-RGS
       V.
 8                                           August 14, 2024
       City of Boston, et al,                 9:00  a.m.
 9
                         Defendants.
10     _____

11

12

13


14          BEFORE THE HONORABLE RICHARD G. STEARNS

15              UNITED STATES DISTRICT COURT

16            JOHN J. MOAKLEY U.S. COURTHOUSE

17                   1 COURTHOUSE WAY

18                    BOSTON, MA  02210

19

20

21

22
                      JAMIE K. HALPIN, RPR, RMR
23                     Official Court Reporter
                    John J. Moakley U.S. Courthouse
24                   1 Courthouse Way, Room 5205
                           Boston, MA  02210
25                      jkhhalpin@gmail.com
```

Case 1:22-cv-11009-RGS   Document 198-3   Filed 09/30/24   Page 2 of 9

43

1    A.    Yes.
2    Q.    Your first assignment after graduating from the academy
3    was at D-4?
4    A.    Yes.
5    Q.    You worked as a booking officer at D-4?
6    A.    You mean when I started or when the incident happened?
7    Q.    Did you ever work as a booking officer at D-4?
8    A.    The first time was that day when the incident happened.
9    Q.    You agree that booking is a pretty long process?
10   A.    Yes.
11   Q.    And once booking is completed, individuals are brought to
12   a cell?
13   A.    Correct.
14   Q.    Once individuals are placed in the cell, your job as the
15   booking officer is to check on the prisoner every 15 minutes?
16   A.    Yes.
17   Q.    And you were trained by the Boston Police Department that,
18   as a booking officer, you should walk down the cellblock every
19   15 minutes?
20   A.    Yes.
21   Q.    And you should make sure that the prisoners are okay in
22   their cell?
23   A.    Yes.
24   Q.    And there is an alarm that will go off every 15 minutes to
25   alert an officer that they have to go and do a cell check,

1  Q.   Are you familiar with the term sally port?
2  A.   I am now, yes.
3  Q.   Do you understand that the outside door has to be closed
4  in order for the inside door to open?
5  A.   Yes.
6  Q.   And that's a security measure?
7  A.   Yes.
8  Q.   That's similar to the security measure for locking up the
9  guns before taking the prisoner out of the car?
10 A.   Yes.
11      MR. WHITESELL:  Your Honor, I'm going to show a video
12 next and I have to get it set up.  Is this a good time to stop?
13      THE COURT:  I think it's a good time for the break
14 while you get that set up.
15      All right, jurors, let's take the morning recess.
16 We'll come back in about 25 minutes.
17      **(JURY EXITS AT 10:47 A.M.)**
18      THE COURT:  All right, Counsel.  Just a quick ruling
19 on the Geigel matter.  I had a chance to read this morning from
20 the plaintiffs.  I think my ruling is a little bit closer to
21 the defendants' understanding, but probably somewhere in
22 between the parties.  But this is what I'll allow:
23      As to Officer Almeida, I will allow his involvement in
24 the Geigel incident in the matter of questioning and that he
25 knew of Geigel's death.

1       With respect to the exhibits, no, unless they're offered
2  for purposes of impeachment.  They give no independent value,
3  again, unless they're offered for impeachment purposes.
4       With respect to Officer Bertocchi, again, I'll allow
5  questioning about his knowledge of Geigel's death and how he
6  came by that knowledge.  As to what extent information was
7  disseminated by officers is hearsay, and that will be excluded.
8       Same with Officer Doolan:  Certainly, you can ask about
9  his knowledge of Geigel's death, but -- I can see where it
10 would be relevant to both sides in a way.  But, again, anything
11 he has to say about information disseminated through the
12 station is hearsay.  He's not a defendant, and there is no
13 other basis for admission.
14           MS. VALENTI:  Your Honor, may I ask for clarification?
15           THE COURT:  Yes.
16           MS. VALENTI:  The testimony we were seeking to proffer
17 was not what was disseminated but just the fact that
18 information about the incident was disseminated.
19           THE COURT:  Disseminated to whom, how.  No.  You can't
20 speak for the entire department.  You can't speak for the
21 knowledge of anyone that he didn't speak to directly about the
22 incident so let's --
23           MS. VALENTI:  To the extent the officers were present
24 at what's called a roll call, where other officers are present,
25 I just want to, again, just to the extent of how the

```
 1   Q.   And would those parts include the parts and the
 2   District D-4 area?
 3   A.   Yes.
 4   Q.   And in the course of your professional career, you've had
 5   various training regarding opioid addiction and intoxication,
 6   right?
 7   A.   I have.
 8   Q.   And you also have experience with those issues in the
 9   course of your career, right?
10   A.   Yes.
11   Q.   And you mentioned this already, but you said that you
12   attended a training at the MBTA Transit Police Academy, right?
13   A.   Yes.  It was a full-time police academy.
14   Q.   And was that in relation to your work at Northeastern at
15   the time, or around that time?
16   A.   Correct, yes.
17   Q.   And that course was certified by the Municipal Police
18   Training Council, correct?
19   A.   It was.
20   Q.   That's also called the MPTC for short?
21   A.   Yes.
22   Q.   And the MPTC is a state-level organization, right?
23   A.   That's the council that certifies the police academies
24   throughout the state.
25   Q.   And the training that you attended there included certain
```

1  health training, correct?
2  A.   Yes, they had basic first responder training.
3  Q.   That was a several day-long course?
4  A.   Correct.
5  Q.   And that included training on CPR?
6  A.   Yes.
7  Q.   It included training on Narcan?
8  A.   I believe it did, yes.
9  Q.   It covered how to administer Narcan, right?
10 A.   I believe it would have, yes.
11 Q.   And you were taught that those that need Narcan are
12 unresponsive?
13 A.   Those that are unresponsive, not responding to any verbal
14 or physical stimulus, they may be showing choking or gurgling
15 on some type of substance, whether it's saliva or an outside
16 substance.
17 Q.   And that was information providing on the training?
18 A.   My trainings over the course of my career.
19 Q.   You also learned that Narcan should be administered to
20 someone who has very shallowed breathing?
21 A.   Correct.
22 Q.   Now, in your day-to-day work as a police officer at BPD,
23 the opioid epidemic affects you and everyone else in the
24 department, right?
25 A.   Yes.

1   Q.   And you're familiar with the Mass and Cass area of Boston?
2   A.   Yes.
3   Q.   You're also aware that area is sometimes referred to as
4   the methadone mile?
5   A.   Yes.  It's commonly referred to as that.
6   Q.   And so you understand that this area could be considered
7   an epicenter of drug use and drug sales in Boston, correct?
8   A.   Yes.
9   Q.   And there is a drug epidemic going on in that area, right?
10  A.   Correct.
11  Q.   And this area includes many facilities that are used to
12  help treat those addicted to drugs?
13  A.   Yes.  There is numerous different facilities and shelters
14  within that area.
15  Q.   And as of 2019 there was a heavy amount of dug use in the
16  area around D-4, would you agree with that?
17  A.   Yes.
18  Q.   Now, as part of your training at BPD, you were provided
19  information in regards to that area of Boston, correct?
20  A.   Can you repeat the question?
21  Q.   Sure, as part of your training at BPD you were provided
22  information in regards to that area of Boston, correct?
23  A.   Yes.  It was numerous different training bulletins,
24  advisories -- not only public health advisories, but the
25  department issued various different, whether, like I previously

1  said, training bulletins, just be on the lookout for certain
2  things, et cetera.
3  Q.    Generally speaking, those materials included information
4  about how to protect yourselves when you're in that area,
5  right?
6  A.    Correct.
7  Q.    And it also provided you information about how to assist
8  those that are in that area as well?
9  A.    Correct.
10 Q.    And when you were at the Boston Police academy, you
11 received medical training regarding drug use, right?
12 A.    We did.
13 Q.    And similar to your training that you mentioned earlier,
14 the MBTA training, the medical training at the Boston Police
15 academy, included both CPR and Narcan training, correct?
16 A.    It did.
17 Q.    And you also received training regarding opioid use at the
18 academy?
19 A.    Yes.
20 Q.    This training covered a wide range of topics particular to
21 opioid use, right?
22 A.    Yes.  I believe there were several different topics
23 covered in that specific part of the training.
24 Q.    That included various classifications of drugs, right?
25 A.    Correct.

1  Q.  That included what drugs classify as an opioid?
2  A.  Yes.
3  Q.  And that included that when an opioid is ingested by
4  someone what it does to that individual, correct?
5  A.  Correct.
6  Q.  And in the course of that training at the academy, you
7  learned that certain opioids can have different reactions for
8  different people, right?
9  A.  Yes.
10 Q.  But you were also taught that there were certain common
11 signs of opioid use; is that right?
12 A.  Correct.
13 Q.  And that includes pinpoint -- excuse me.  Pinpoint pupils?
14 A.  Yes.  That's one of them.
15 Q.  Another sign might be a person having a lethargic manner?
16 A.  Yes.
17 Q.  And, based on your experience, someone under the influence
18 of opioids may be able to converse as well, right?
19 A.  That's correct.
20 Q.  And it's even possible that someone under the influence
21 can speak coherently, right?
22 A.  Yes.
23 Q.  And when we say "speak coherently," meaning talk in a
24 manner that someone may be able to understand, right?
25 A.  Yes.