```
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF MASSACHUSETTS



     _____

     Lynnel Cox, as administrator of
     the estate of Shayne R. Stilphen,

                      Plaintiff,        Civil Action
                                        No. 22-CV-11009-RGS
     V.
                                        August 15, 2024
     City of Boston, et al,              9:00  a.m.

                      Defendants.
     _____




              BEFORE THE HONORABLE RICHARD G. STEARNS

                   UNITED STATES DISTRICT COURT

                  JOHN J. MOAKLEY U.S. COURTHOUSE

                         1 COURTHOUSE WAY

                         BOSTON, MA  02210
```

JAMIE K. HALPIN, RPR, RMR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA  02210
jkhhalpin@gmail.com

1  named Mr. Perry?
2  A.   Yes.
3  Q.   Were you involved in that arrest in any way?
4  A.   Not specifically involved but I was in the area.
5  Q.   Did you respond to the scene?
6  A.   We did.
7  Q.   That was a call that originated at C-6, correct?
8  A.   It was.
9  Q.   Did that call escalate?
10 A.   Very much so, yes.
11 Q.   Explain to me what happened.
12 A.   Boston Police operations --
13        MS. VALENTI:  Objection, your Honor.
14        THE COURT:  Overruled.
15 A.   Operations has the ability to go citywide with a broadcast
16 for a report which is an officer in trouble.  They said that
17 several officers were in trouble fighting with someone at
18 Victoria's Diner which is in District 6 and that officer in
19 trouble means everyone in the city is going.  So we headed in
20 that direction and we saw several officers had already
21 handcuffed an individual who was later identified as Mr. Perry.
22 They were violently struggling with him, and they were able to
23 get him in District 6 wagon.
24 Q.   So when you arrived, he was already in handcuffs?
25 A.   He was.

```
 1  Q.   You were there when they placed him in the wagon?
 2  A.   I was.
 3  Q.   And he was still resisting when you arrived?
 4  A.   Yes.  It took several officers to get him inside of the
 5  District 6 wagon.
 6  Q.   When you were on the scene and he was placed in the wagon,
 7  do you recall how many officers were there?
 8  A.   There was at least 40.  I remember seeing officers from
 9  District 2, District 4, District 6, District 11.
10  Q.   And they eventually got him in the wagon though, correct?
11  A.   They did.
12  Q.   And where was he transported?
13  A.   He was transported to District 4, which, from my previous
14  testimony, male prisoners from District 6 will go to
15  District 4.
16  Q.   So what did you and Officer Butcher do when he was placed
17  in the wagon?
18  A.   Operations again went out saying that they needed several
19  other officers to assist in that booking area, just due to the
20  violent and aggressive manner of Mr. Perry.
21  Q.   So when you got back to the station, where did you go?
22  A.   We stood behind in the booking area.
23  Q.   All right.  And at some point did you go to the wagon bay?
24  A.   We did.
25  Q.   And what did you see when you got to the wagon bay?
```

1   A.   Correct.
2   Q.   You were in the Marines for about four years?
3   A.   Yes.
4   Q.   And after leaving the marines, have you had a few other
5   jobs?
6   A.   Correct.
7   Q.   You started training to become a police officer at Boston
8   Police Academy around December of 2018?
9   A.   Correct.
10  Q.   And at the academy, you received training on how to
11  administer Narcan?
12  A.   Correct.
13  Q.   That Narcan training at the academy included recognizing
14  the signs or symptoms of opioid intoxication?
15  A.   Yes.
16  Q.   You also had training at the academy for booking, correct?
17  A.   Yes.
18  Q.   And during that training, you were trained on how to
19  conduct cell checks?
20  A.   Correct.
21  Q.   You were trained to look into the cell when conducting a
22  cell check.
23            MR. MAAS:  Objection, your Honor.
24            THE COURT:  Overruled.
25  A.   I believe so, yes.

```
 1   Q.   You understand based on your training when you do a cell
 2   check, you are trying to see if the prisoner is breathing?
 3   A.   I believe the cell check is look in to see there was
 4   nothing out of the ordinary, correct.
 5   Q.   So your testimony is you were not trained to look into the
 6   cell to see if the prisoner was breathing?
 7   A.   I believe that's part of the cell check, yes.
 8   Q.   Sorry.  Could you repeat that?
 9   A.   Yes, to see if they're breathing, yes.
10   Q.   And that's to make sure the prisoner is alive?
11   A.   Correct.
12   Q.   And then you graduated from the academy around June of
13   2019?
14   A.   Correct.
15   Q.   And once you graduated from the academy, you are assigned
16   to the D-14 precinct?
17   A.   Yes.
18   Q.   When you were first assigned at D-14, you were supervised
19   by a field training officer, right?
20   A.   Yeah.  Everybody has 30-days with an FTO, also known as
21   the field training officer.  So you can't be alone during the
22   first tours of duty.
23   Q.   And you said you have 30 days with that FTO officer,
24   right?
25   A.   30 tours of duty.  So our schedule is four on and two off.
```

```
 1    A.    Correct.
 2    Q.    And you learned later that same day, July 14, 2019, that
 3    Shayne had died?
 4    A.    Yes.
 5              MS. BARTLETT:  Your Honor, may I approach the witness?
 6              THE COURT:  You may.
 7    Q.    I just handed you a binder.  If you will go to that first
 8    tab of the binder and then flip over, you will see this is
 9    Joint Exhibit 10, and if you go to the next page, do you
10    recognize that document there?
11    A.    I do.
12    Q.    I'm going to pull it up on the screen as well.  So Officer
13    Picarello, this is a memorandum from you to Captain Steven
14    Sweeney dated July 14, 2019?
15    A.    Yes.
16    Q.    And did you write this memorandum?
17    A.    I did, I wrote this Form 26.
18    Q.    You just called it a Form 26.  So is this form also known
19    as a Form 26?
20    A.    Correct.
21    Q.    And for all major incidents, officers have to hand in a
22    Form 26?
23    A.    I would say whenever we're instructed by our bosses we
24    have to write a 26.
25    Q.    And it's standard practice to complete a Form 26 after a
```

```
 1   their waist such that you couldn't see their face, you wouldn't
 2   be able to tell whether their face was pale from that distance,
 3   correct?
 4   A.   No.
 5   Q.   You can't tap someone and try to wake them from a distance
 6   of eight to ten feet?
 7   A.   I can bang on the door, but physically touch them, no.
 8   Q.   But you could bang on the door?
 9   A.   Yes.
10   Q.   Officer Almeida, you're familiar with an incident
11   involving Mr. Cristhian Geigel, correct?
12   A.   Yes.
13   Q.   You understand that Mr. Geigel was found dead in his cell
14   at D-4 on May 28, 2019, correct?
15   A.   Yes.
16   Q.   And Mr. Geigel died of an overdose?
17   A.   I never seen any paper -- he passed away inside the cell.
18   I've never seen the paperwork.
19   Q.   You were on duty when Mr. Geigel was in his cell at D-4,
20   correct?
21   A.   Yes.
22   Q.   And your shift started that day would have been 11:45 p.m.
23   on May 27, 2019 and ended at 7:30 a.m. on May 28, correct?
24   A.   Yes.
25   Q.   You were the booking officer of that shift?
```

1   A.   My Form 26, an internal department form.
2   Q.   And it's something that you fill out or prepare when there
3   has been an incident of some kind?
4   A.   Yes.
5   Q.   And that is your signature at the bottom of the page?
6   A.   Yes, it is.
7   Q.   You wrote this Form 26 on July 14 sometime in the hours
8   following the incident with Shayne?
9   A.   Yes.
10  Q.   And your Form 26 is intended to be a summary of your
11  account of the incident?
12  A.   As far as this incident, yes.
13  Q.   Can we zoom in a bit to see the text?  Now, Officer
14  Almeida, you don't mention any of your interactions with Shayne
15  in the holding cell in this memo, right?
16  A.   I don't think so.
17  Q.   And you don't mention any of your interactions with Shayne
18  in the booking area, right?
19  A.   No.
20  Q.   You don't describe any of your cell checks, correct?
21  A.   No.
22  Q.   You felt that one paragraph was enough to explain what
23  happened that night?
24  A.   Yes.
25          MS. VALENTI:  No further questions.