```
 1                  UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3


 4     _____

 5     Lynnel Cox, as administrator of
       the estate of Shayne R. Stilphen,
 6
                       Plaintiff,      Civil Action
 7                                     No. 22-CV-11009-RGS
       V.
 8                                     August 16, 2024
       City of Boston, et al,           9:00  a.m.
 9
                       Defendants.
10     _____

11

12

13

14         BEFORE THE HONORABLE RICHARD G. STEARNS

15             UNITED STATES DISTRICT COURT

16           JOHN J. MOAKLEY U.S. COURTHOUSE

17                 1 COURTHOUSE WAY

18                  BOSTON, MA  02210

19

20

21

22
                    JAMIE K. HALPIN, RPR, RMR
23                    Official Court Reporter
                   John J. Moakley U.S. Courthouse
24                 1 Courthouse Way, Room 5205
                        Boston, MA  02210
25                     jkhhalpin@gmail.com
```

```
 1   Q.   Now, the time is 2:19:10 or so.  Do you see Shayne putting
 2   his shirt back on at this point or starting to?
 3   A.   Yes.
 4   Q.   So since he's putting his shirt back on, does that mean he
 5   completed the booking photos at this point?
 6   A.   Yes.
 7   Q.   Do you see his knees bending there?
 8   A.   Again, I can see him more -- I can't see the actual knees
 9   bending.  I'm going to assume his knees are bending.
10   Q.   And the time is now 2:20:12.  You see that Shayne has
11   finished putting his shirt on?
12   A.   Yes.
13   Q.   And when you were just saying that you couldn't see his
14   knees bending, you were referring to what you were able to see
15   that night?
16   A.   Yeah, so over the board.  Just common sense, I'm going to
17   assume the man is lowering the knees, have to bend for him to
18   lower, but I can't tell you I physically saw his knees bent.
19   Q.   Understood.  Now, you mentioned earlier that Mr. Geigel
20   had died before your shift that day?
21   A.   Yes.
22   Q.   And during your shift that followed, you walked by his
23   cell several times, correct?
24   A.   I did the cell checks from 11:45 to about 4.
25            MS. VALENTI:  No further questions.
```

1  A.    Yes, I do.
2  Q.    How long after Shayne's death did you write your Form 26?
3  A.    I think after Shayne was taken out of the station -- yeah,
4  so he didn't go out the wagon bay because the wagon bay was a
5  crime scene.  He went through the actual report writing room
6  and out the back door into the cruiser parking lot.  I was
7  still in the middle of what I had to do for Perry, and you're
8  not going to go home until something of this magnitude is
9  completed.  So I spent a lot of my morning at the station
10 completing both of my administrative reports.
11 Q.    So sometime in the hours following his death?
12 A.    Several hours following, yes.
13 Q.    And is the Form 26 report that you prepared, was that done
14 in the course of -- that was part of your work as a police
15 officer that day?
16 A.    Yes.
17 Q.    And you've already described the purpose of a Form 26.  Is
18 this the kind of report you make in the course of your regular
19 duties?
20 A.    It's not a regular occurrence.  Form 26s are -- they're
21 more -- they're essentially if you're trying to provide
22 specific and detailed information that you can't put into a
23 police report.
24 Q.    And they're relied upon by the other departments for that
25 purpose?  You said it was an interdepartmental memo.  Is it

```
 1  then relied upon by whoever is using it?
 2  A.   Yeah.  It will go up to the detectives and then like
 3  homicide will get the Form 26s and they'll obtained more
 4  information from them.  It's essentially details you can't
 5  provide in a publicly disseminated report.
 6  Q.   And when you write a Form 26, you do your best to make it
 7  as accurate as possible?
 8  A.   Yes.
 9  Q.   I'm handing you, Officer Doolan, what's been marked For
10  Identification as Plaintiff's Exhibit J, and do you recognize
11  this document, sir?
12  A.   Yes, I do.
13  Q.   What is it?
14  A.   This is my Form 26 in relation to the incident with
15  Shayne.
16  Q.   And turning to the second page, is that your signature?
17  A.   Yes, it is.
18  Q.   And so you drafted this document?
19  A.   Yes, I did.
20          MS. VALENTI:  Plaintiff moves to admit Plaintiff's
21  Exhibit J.
22          MR. WHITESELL:  No objection, your Honor.
23          THE COURT:  No objection?  You don't see any
24  evidentiary basis for an objection?
25          MR. WHITESELL:  Your Honor, I mean, I would object to
```

1   it if your Honor is inclined to keep it out of evidence.
2           THE COURT:  Well, if there is no objection, it's
3   simply a prior consistent statement.
4           MR. WHITESELL:  I take it back, your Honor.  I object
5   to the document.
6           THE COURT:  Police reports are hearsay.
7           MS. VALENTI:  I believe I established the foundation
8   for it being both a business record and public record, your
9   Honor.
10          THE COURT:  Just because you write it down doesn't
11  make it a business record.  It's not a usual occurring event.
12  Q.   Officer Doolan, I'll have you keep that with you in case
13  we need it to refresh your recollection on any points.  But let
14  me just ask you, would you agree that when you saw Shayne in
15  his cell the first -- when you came upon Shayne in his cell,
16  that he was in a position that you would describe as being one
17  of extreme discomfort?
18  A.   Yes.
19  Q.   And that night you mentioned there were other prisoners in
20  other cells in that cell block, correct?
21  A.   Correct.
22  Q.   Were other prisoners awake that night when you walked up
23  and down the hallway?
24  A.   I believe so, yes.
25  Q.   And did you think there might be a reason for that at the

1  A.  Not completely.  It was a combination of the
2  unresponsiveness along with what I had seen, but the fact that
3  I didn't get a response from Shayne is what made me need to go
4  into that cell.
5  Q.  So the position is what made you knock on the door and
6  call out to Shayne?
7  A.  Correct.
8  Q.  And it was only when you didn't get a response that you
9  were concerned that you needed to get the key?
10  A.  Correct.
11  Q.  If Shayne had responded in any way, gestured, said words,
12  when you knocked on the door, kicked the door, what would you
13  have done?
14  A.  I would have continued on.  If I got some type of
15  response, good enough for me.
16  Q.  So the fact that he was in that position didn't make you
17  believe that he needed medical attention?
18  A.  Correct.
19  Q.  I want to talk briefly about your time at the sheriff's
20  department.  I think you mentioned you attended a four-month
21  academy with the sheriff's department?
22  A.  Correct.
23  Q.  What kind of training did you do at the sheriff's academy
24  generally?
25  A.  Essentially the gist of the academy is understanding the

```
 1   Q.   And when you say prison ripped, what do you mean?
 2   A.   There probably wasn't more than 4 percent body fat on him.
 3   Q.   Did you think he was on something?
 4   A.   Yes.
 5   Q.   Was he combative?
 6   A.   Yes.
 7   Q.   How many officers were present at the scene?
 8   A.   At the conclusion of getting him into handcuffs and leg
 9   shackles, there had to be at least 75.
10   Q.   Were you one of the officers hands-on with Mr. Perry?
11   A.   Yes, I was.
12   Q.   How many other officers were hands-on with Mr. Perry?
13   A.   At least ten, fifteen of us, and that's not an
14   exaggeration.
15   Q.   And these officers were from multiple agencies?
16   A.   Yes?
17   Q.   When you arrived, was he in cuffs?
18   A.   When I arrived, he was not in cuffs.  He was on the
19   ground, and he was just doing the turtle but he was kicking,
20   and when we would try to get his arms, he would lash and he put
21   up a good fight before we were able to gain control of his
22   arms.  The arms are the main thing.
23   Q.   So once you got his arms under control and in cuffs, did
24   he still fight?
25   A.   Yes, he did.
```

1  Q.   At some point did you subdue him?
2  A.   He had to be put into leg shackles.  One of the wagons, I
3  think it would have been C-6, had shackles on them, and they
4  were able to get his leg shackled.
5  Q.   Leg shackles are not a normal piece of equipment in a
6  police car, correct?
7  A.   No.  They're typically at the booking area, but sometimes
8  some of the wagons will have them because they do transport
9  prisoners.  That's their main function during the daytime.
10 Q.   Who's arrest was he?
11 A.   It was C-6's arrest.
12 Q.   So as you said earlier, you went back to D-4 because he
13 was a male prisoner?
14 A.   Correct.
15 Q.   So what did you do after Mr. Perry was in the wagon?
16 A.   So I was one of the first ones back to District 4.  I
17 immediately -- excuse me.  I immediately notified Lieutenant
18 Foley.  I told him that there is something significant that's
19 going on.  We're going to need EMS and everybody back here.  I
20 remember the wagon pulling in.  I secured my firearm in the
21 locker in the booking.  The wagon pulled in, and at this point
22 in time, there was probably maybe 10, 15 of us that are in the
23 wagon bay awaiting for the door to open, different area
24 officers.  There was C-11, there was C-6, B-2, D-4, a plethora
25 of us were in there, and once the wagon stopped and everybody